USA vs. Olgin, et al. - Jury Trial - Volume 2 - April 7, 2015

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                    MIDLAND-ODESSA DIVISION

 3
   UNITED STATES OF AMERICA,          )
 4                                    )
         Plaintiff,                   )
 5                                    ) Case No. 7:14-CR-0227 RAJ
         vs.                          )
 6                                    ) Midland, Texas
   RAYMOND HERNANDEZ OLGIN, JR.;      )
 7  RUDOLFO ROMERO PAREDES;            ) April 7, 2015
   STACEY LOUISE CASTILLO; and        )
 8  ANTHONY RYAN GONZALES;             )
                                      )
 9       Defendants.                  )
   _____) 8:36 a.m.
10

11
                 TRANSCRIPT OF JURY TRIAL - VOLUME 2
12          BEFORE THE HONORABLE ROBERT A. JUNELL
                SENIOR UNITED STATES DISTRICT JUDGE
13

14
   APPEARANCES:
15

16  FOR THE GOVERNMENT:  WILLIAM FRANKLIN LEWIS, JR., AUSA
                         Office of the U.S. Attorney
17                       400 W. Illinois, Suite 1200
                         Midland, Texas  79701
18   - and -

19                       JOHN S. KLASSEN, AUSA
                         Office of the U.S. Attorney
20                       400 W. Illinois, Suite 1200
                         Midland, Texas  79701
21

22  FOR THE DEFENDANT, RAYMOND HERNANDEZ OLGIN, JR.:
                         E. JASON LEACH
23                       Law Office of E. Jason Leach, PLLC
                         The Grant Building
24                       307 N. Grant Avenue, Suite 300
                         Odessa, Texas  79761
25
```

USA vs. Olgin, et al. - Jury Trial - Volume 2 - April 7, 2015

1                     **APPEARANCES (CONTINUED)**

2


3

   **FOR THE DEFENDANT, RUDOLFO ROMERO PAREDES:**
4                          ROBERT V. GARCIA, JR.
                           Attorney at Law
5                          413 N. Texas Avenue
                           Odessa, Texas  79761

6


7

   **FOR THE DEFENDANT, STACEY LOUISE CASTILLO:**
8                          JOHN L. POOL
                           Law Office of John L. Pool
9                          117 N. W. Avenue A
                           Andrews, Texas  78714

10


11

   **FOR THE DEFENDANT, ANTHONY RYAN GONZALES:**
12                         ALLEN R. STRODER
                           Attorney at Law
13                         6010 Highway 191, Suite 230
                           Odessa, Texas  79762

14


15


16

   **COURT REPORTER:**      Ann M. Record, RMR, CRR, CMRS, CRI
17                          200 East Wall Street, Suite 117
                            Midland, Texas  79701
18                          (432) 685-0361

19


20

            Proceedings reported by machine shorthand reporter.
21          Transcript produced by Computer-Aided Transcription.

22


23


24


25

USA vs. Olgin, et al. - Jury Trial - Volume 2 - April 7, 2015

1                           I N D E X

2

3    **WITNESSES FOR THE GOVERNMENT:**                        **PAGE**

4    DIANA SEAGO
         Direct Examination By Mr. Lewis                 7
5        Voir Dire Examination By Mr. Leach             11
         Direct Examination Q.    (By Mr. Lewis)        13
6        Voir Dire Examination By Mr. Garcia            22
         Direct Examination By Mr. Lewis                22
7        Cross-Examination By Mr. Garcia                24

8    JOHNNY SAN MIGUEL
         Direct Examination By Mr. Klassen              27
9        Cross-Examination By Mr. Leach                106
         Cross-Examination By Mr. Garcia               109
10       Cross-Examination By Mr. Pool                 110
         Cross-Examination By Mr. Stroder              110
11       Redirect Examination By Mr. Klassen           114

12   JACQUELINE PINEDA
         Direct Examination By Mr. Lewis               117
13       Cross-Examination By Mr. Stroder              122

14   BABUBHAI PATEL
         Direct Examination By Mr. Lewis               124
15
     BRIAN HERNANDEZ
16       Direct Examination By Mr. Klassen             128
         Cross-Examination By Mr. Leach                186
17       Cross-Examination By Mr. Garcia               190
         Cross-Examination By Mr. Pool                 190
18       Cross-Examination By Mr. Stroder              193
         Redirect Examination By Mr. Klassen           195
19       Recross-Examination By Mr. Leach              196
         Recross-Examination By Mr. Stroder            197
20
     JAMES CHADWICK
21       Direct Examination By Mr. Lewis               199

22   LIZ HERNANDEZ
         Direct Examination By Mr. Lewis               223
23

24

25

USA vs. Olgin, et al. - Jury Trial - Volume 2 - April 7, 2015

1                        I N D E X  (CONTINUED)

2

3    EXHIBITS:                                              RCVD

4    GX  2    Photograph of 1101 Fitch, Apartment No.        208
              404
5    GX  3    Photograph of 1101 Fitch, Apartment No.        208
              404
6    GX  4    Photograph of 1101 Fitch, Apartment No.        208
              404
7    GX  5    Photograph of 1101 Fitch, Apartment No.        208
              404
8    GX  6    Photograph of 1101 Fitch, Apartment No.        208
              404
9    GX  7    Photograph of 1101 Fitch, Apartment No.        208
              404
10   GX  8    Photograph of 1101 Fitch, Apartment No.        208
              404
11   GX  9    Photograph of 1101 Fitch, Apartment No.        208
              404
12   GX 10    Photograph of 1101 Fitch, Apartment No.        208
              404
13   GX 11    Photograph of 1101 Fitch, Apartment No.        208
              404
14   GX 12    Photograph of 1101 Fitch, Apartment No.        208
              404
15   GX 13    Plastic Academy bag containing (1)             210
              "Winchester" box containing 25
16            Winchester 9mm bullets, and (1)
              "Winchester" box containing 50
17            Winchester 9mm bullets
     GX 14    A Tanita KD-200 portable scale                 210
18   GX 15    Photograph of Chevrolet Tahoe                  282
     GX 25    Nokia 520 Cellular Telephone                    13
19   GX 26    One (1) brown metal and yellow metal            13
              earring
20   GX 27    One (1) silver metal with brown band            13
              watch
21   GX 33    Parkway Inn Video Downstairs                   217
     GX 34    Parkway Inn Video Upstairs                     217
22   GX 35    Parkway Inn Video Multi-Camera                 217
     GX 104   Autopsy Photograph of Sean Lamb                 16
23   GX 105   Autopsy Photograph of Sean Lamb                 16
     GX 106   Autopsy Photograph of Sean Lamb                 16
24   GX 107   Autopsy Photograph of Sean Lamb                 16
     GX 108   Autopsy Photograph of Sean Lamb                 16
25   GX 109   Autopsy Photograph of Sean Lamb                 16

USA vs. Olgin, et al. - Jury Trial - Volume 2 - April 7, 2015

1                    **I N D E X (CONTINUED)**

2                                                        **PAGE**

3    GX 110   Autopsy Photograph of Sean Lamb             16
     GX 111   Autopsy Photograph of Sean Lamb             16
4    GX 112   Autopsy Photograph of Sean Lamb             16
     GX 113   Autopsy Photograph of Sean Lamb             16
5    GX 114   Bullet fragment collected from stomach      22
              of Victim, Sean Lamb
6    GX 115   Two (2) bullet fragments and slug           22
              collected from right abdomen of Victim,
7             Sean Lamb
     GX 116   Bullet fragment and slug collection from    22
8             right flank of Victim, Sean Lamb
     GX 117   Bullet fragment collected from right        22
9             back of Victim, Sean Lamb
     GX 118   Bullet collected from spine of Victim,      22
10            Sean Lamb, during autopsy
     GX 119   Autopsy Photograph of bullets removed       16
11            from Sean Lamb

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA vs. Olgin, et al. - Jury Trial - Volume 2 - April 7, 2015

1              **P R O C E E D I N G S**

2              (At 8:36 a.m., proceedings commenced)

3              (Defendants present)

4              (At 8:36 a.m., jury enters)

5              (Cry of the Court)

6              THE COURT:  Okay.  Thank you.  Please be seated.

7              It is 8:36, and we're back in the courtroom with the

8    jury.  The attorneys are present, and the defendants are

9    present.

10             Mr. Lewis, call your next witness, please.

11             MR. LEWIS:  Your Honor, the government would call

12   Diane Seago.

13             THE COURT:  Okay.  Ms. Seago, if you would turn

14   around here and let the clerk administer the oath to you.

15             (Witness sworn by the clerk)

16             THE COURT:  Ms. Seago, state your name for me,

17   please.

18             THE WITNESS:  Diana Seago.

19             THE COURT:  It's Seago; is that right?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  Spell that for me, please.

22             THE WITNESS:  S-E-A-G-O.

23             THE COURT:  Okay.  If we were in a coffee shop or

24   McDonald's or somewhere like that, you know, we would be

25   talking back and forth, and we would go "uh-huh" and "huh-uh."

Seago - Direct Examination

1   And my wife finishes my sentences for me sometimes.  I don't

2   know if that happens in your family or not.  But the court

3   reporter can't get all that down.  So let Mr. Lewis finish his

4   question and then you answer, and we'll give you plenty of time

5   to answer and all that.  He'll let you finish your answer

6   before he asks his next question, okay?

7              THE WITNESS:  Yes, sir.

8              THE COURT:  Thank you very much.

9              You may proceed, Mr. Lewis.

10             MR. LEWIS:  Thank you, Your Honor.

11                     **DIANA SEAGO,**

12         **GOVERNMENT'S WITNESS SWORN AT 8:39 A.M.**

13                  **DIRECT EXAMINATION**

14   BY MR. LEWIS:

15   Q.   Ms. Seago, how are you currently employed?

16   A.   I am employed at the Odessa Police Department.

17   Q.   What do you do at the Odessa Police Department?

18   A.   I am a detective in the robbery and homicide unit.

19   Q.   And how long have you been in the robbery and homicide

20   unit?

21   A.   Approximately two years.

22   Q.   How long have you been with the Odessa Police Department?

23   A.   Since 2009, so about six years.

24   Q.   And have you been with any other law enforcement agency

25   besides the Odessa Police Department?

Seago - Direct Examination

1  A.    No, sir.

2  Q.    How does somebody get into or attain the rank of detective

3  in the Odessa Police Department?

4  A.    There's a series of interviews and testing that we go

5  through in order to do that, and we also get training necessary

6  for investigation.

7  Q.    And robbery homicide, I guess, you investigate robberies

8  and homicides?

9  A.    Yes, sir.

10 Q.    Are there any other crimes that you investigate in that

11 division separate and apart from those?

12 A.    Yes, sir.

13 Q.    What would some of those investigations be?

14 A.    Aggravated assaults.  Sometimes just -- they end up being

15 thefts instead of robberies, things of that nature.

16 Q.    In the course of your duties as a detective in the robbery

17 homicide division, were you working on the day of May 13th,

18 2014?

19 A.    Yes, I was.

20 Q.    What, if anything, happened that afternoon?

21 A.    At approximately 4:25, 4:30, I received information from

22 my sergeant that there was a disturbance in the area of Dixie

23 and -- let me think.  If I may refer to the narrative that I --

24 Q.    Sure.

25 A.    -- have.  1614 North Dixie.

Seago - Direct Examination

1  Q.   Do you recall what that -- the nature of that disturbance
2  was?
3  A.   Yes.  Some individuals in an alley and there was a firearm
4  that had been displayed and a possible kidnapping that had
5  occurred.
6  Q.   Did you go to that location?
7  A.   Yes, I did.
8  Q.   Approximately what time did you go to that location?
9  A.   I arrived at about -- right at about the same time that I
10 was called.  I was in the area.  So about 4:30.
11 Q.   About 4:30?
12 A.   Yes, sir.
13 Q.   Okay.  And when you got there, what did you do?
14 A.   When I got there, I contacted the residents that had
15 initiated the 911 call notifying of the disturbance and the
16 kidnapping -- possible kidnapping, correction.  And I spoke to
17 a female there, Mrs. Hodges [sic], and her husband.
18 Q.   Mr. Hodges?
19 A.   Yes.
20 Q.   They were both there at the residence.
21 A.   Yes.
22 Q.   Okay.  Did you gain -- gather any information from them
23 about the disturbance?
24 A.   Yes.  They notified me that there were some individuals --
25            MR. GARCIA:  Your Honor, I am going to object out of

1  hearsay that these people may have told the witness.

2          THE COURT:  Mr. Lewis.

3          MR. LEWIS:  I am just asking for background

4  information as to why she was there and if she was at the right

5  place.

6          THE COURT:  Okay.  I am going to sustain the

7  objection.

8          MR. LEWIS:  Thank you, Your Honor.

9  Q.   (BY MR. LEWIS)  As part of your investigation besides

10  going there and meeting with the Hodges, did you obtain any

11  information -- did you obtain any physical items?

12  A.   Yes, I did.  They handed me a damaged black watch and a

13  large circular-type earring, kind of brown in color with some

14  yellow tones in it, and a broken black cell phone.  When I say

15  broken, I say the glass to the top of the cell phone was

16  broken.

17          MR. LEWIS:  May I approach the witness, Your Honor?

18          THE COURT:  You may.

19  Q.   (BY MR. LEWIS)  Detective Seago, I show you what's been

20  marked for identification purposes as Government's Exhibits 25,

21  26 and 27.  Do you see those?

22  A.   Yes, I do.

23  Q.   What are those items?

24  A.   These are the items that Mrs. Hodges handed to me at the

25  time that I made contact with her at her residence.

Seago - Voir Dire Examination

1  Q.   Where had those items come from?

2  A.   They had gathered them -- I was told that they had

3  gathered them --

4        MR. GARCIA:   Your Honor, I am going to object once

5  again to hearsay from this witness as to what this other person

6  told her.

7        THE COURT:   Overruled.

8        MR. STRODER:   I join in the objection.

9        THE COURT:   Overruled.

10  Q.   (BY MR. LEWIS)   You may answer.

11  A.   They gave me these items reporting to me that they had

12  gathered them from the alley after the disturbance.

13        MR. LEWIS:   The government would offer Government's

14  Exhibits 25, 26 and 27.

15        MR. LEACH:   May I ask the witness some questions?

16        THE COURT:   You may, Mr. Leach.

17                **VOIR DIRE EXAMINATION**

18  BY MR. LEACH:

19  Q.   Ma'am, you didn't recover those items from the alley?

20  A.   No, I did not.

21  Q.   So you don't know, based upon even what the Hodges told

22  you, whether they were there before the disturbance at all.

23  You don't know the result of the disturbance, I guess, is what

24  I'm saying.

25  A.   They were given to me by the Hodges.  I do not know their

1  original location prior to the Hodges handing them to me.

2  Q.    Okay.  Mr. Lewis asked you where you got them, and you

3  said from the Hodges.

4  A.    Correct.

5  Q.    And I am asking you:  Were they able to identify them as

6  not in the alley before the disturbance but in the alley after

7  the disturbance specifically?

8  A.    They reported to me that they recovered them from the

9  alley after the disturbance.

10 Q.    Did they report to you how long they had been in the

11 alley?

12 A.    They did not report to me how long they had been in the

13 alley.

14 Q.    Did they report to you that they were found in the alley

15 as a result of the disturbance?

16 A.    They reported to me that they found them in the alley, not

17 as a result of the disturbance.

18         MR. LEACH:  I'd object on the grounds of relevance,

19 Your Honor.

20         THE COURT:  Overruled.

21         MR. STRODER:  I join the objection, Your Honor.

22         THE COURT:  Overruled.

23         MR. POOL:  I would also join in the objection, then.

24         THE COURT:  Overruled.

25         MR. GARCIA:  And I'll also join in the objection,

Seago - Direct Examination Continued

1    Your Honor.

2             THE COURT:  Overruled.

3             Government's Exhibits 25, 26 and 27 are admitted.

4             MR. LEWIS:  Thank you, Your Honor.

5                    **DIRECT   EXAMINATION CONTINUED**

6    Q.   (BY MR. LEWIS)  Now, Detective Seago, after meeting with

7    the Hodges, on the -- on May 13th, what else did you

8    participate in or what other aspects of investigation did you

9    take with respects to the Sean Lamb murder investigation?

10   A.   After contacting the Hodges, I proceeded to go down the

11   alley, take photographs look at -- see if I could see anything,

12   any other type of evidence that may have been left in the alley

13   due to the disturbance.

14   Q.   What was the effective of that search conducted by you?

15   A.   I ended up photographing the alley, the area; and I

16   submitted those as evidence with our crime scene department,

17   Crime Scene Unit.

18   Q.   As another part of this investigation, do you know if

19   there was an autopsy performed on Sean Lamb?

20   A.   There was an autopsy performed.  I attended the autopsy on

21   the May 15th, 2014.

22   Q.   Did you go by yourself?

23   A.   I did not go by myself.  I went with the Crime Scene Unit

24   tech Melissa Cowan.

25   Q.   Where was the autopsy performed?

Seago - Direct Examination Continued

1  A.    It was performed in Tarrant County.

2  Q.    Now, going to or attending an autopsy, is that common as a

3  detective in robbery and homicide?

4  A.    It is something that we do, yes.

5  Q.    What's the purpose for attending the autopsy?

6  A.    To gather evidence and information at that particular

7  moment that can be used to assist us without having to wait for

8  the autopsy report to come in.  So we can give that information

9  to our detectives.

10 Q.    Do you know who performed that autopsy that day?

11 A.    Medical Examiner Greenberg.

12 Q.    Were you present while she conducted the autopsy?

13 A.    Yes, I was present.

14 Q.    Do you recall whether or not photographs were taken of

15 Sean during the autopsy?

16 A.    Yes, photographs were taken during the autopsy.

17         MR. LEWIS:  May I approach the witness again, Your

18 Honor?

19         THE COURT:  You may.

20         Y'all hear that squeaking noise?

21         MR. LEWIS:  Yes.

22         THE COURT:  Anybody have a guess of what it is?  I

23 have no idea.

24         (Discussion off the record)

25         THE COURT:  Okay.  You may proceed, Mr. Lewis.

Seago - Direct Examination Continued

1           MR. LEWIS:  Thank you, Your Honor.

2  Q.   (BY MR. LEWIS)  Detective Seago, have you had an

3  opportunity to review Government's Exhibits 104 through 113 as

4  well as 119, the photographs?

5  A.   Yes, I have.

6  Q.   Okay.  And specifically are you familiar with what's

7  contained in Government's Exhibits 104 through 113 and 119?

8  A.   Yes.

9  Q.   What are they?

10 A.   They are copies of the digital images that were taken at

11 the autopsy during the autopsy.

12 Q.   Do those photos appear to be accurate representations of

13 what's depicted in there?

14 A.   Yes, they are.

15 Q.   Are they pictures of the deceased, Sean Lamb, at the

16 autopsy?

17 A.   Yes, they are.

18 Q.   Okay.  And with respect to Government's Exhibit 119, if

19 you'll take a look at that.  Are you familiar with Government's

20 Exhibit 119?

21 A.   Yes, I am.

22 Q.   What is reflected in Government's Exhibit 119?

23 A.   It is a white tray with the bullet fragments that were

24 recovered from Sean Lamb's body.

25           MR. LEWIS:  At this time, Your Honor, the government

Seago - Direct Examination Continued

 1  would offer Government's Exhibits 104 through 113 and 119.

 2              MR. LEACH:  No --

 3              THE COURT:  Mr. Leach?

 4              MR. LEACH:  I'm sorry, Your Honor.  No objection to

 5  104 through 113 and no objection to 119.

 6              THE COURT:  Mr. Garcia?

 7              MR. GARCIA:  No objection, Your Honor.

 8              THE COURT:  Mr. Pool?

 9              MR. POOL:  Your Honor, I just have an objection to

10  Exhibit 109.  It is duplicative as 108.  And the same objection

11  to 111 and 112.  They both depict the same image.  It is not

12  necessary for the jury.

13              THE COURT:  Mr. Stroder?

14              MR. STRODER:  Yes, Your Honor.  I object on the basis

15  that they're cumulative to other pictures already in evidence.

16              THE COURT:  There's other pictures of the autopsy

17  already in?

18              MR. STRODER:  No, of the deceased.

19              THE COURT:  These are of the autopsy, you understand.

20              MR. STRODER:  I understand.

21              THE COURT:  Okay.  Your objection is overruled.

22  Mr. Pool's objection is overruled.

23              MR. LEWIS:  Thank you, Your Honor.

24              THE COURT:  Exhibits 104 through 113 and 119 are

25  admitted.

Seago - Direct Examination Continued

1          MR. LEWIS:  May I have permission to publish these to

2   the jury?

3          THE COURT:  You may.

4          MR. LEWIS:  Thank you.

5   Q.   (BY MR. LEWIS)  Detective Seago, is the image on the

6   screen there to your left?  Right there -- do you have the

7   image?

8   A.   No, sir.

9          THE COURT:  Just a second.  We'll let Monica --

10         Can you fix that for us?

11         THE CLERK:  It's not coming on.

12         THE COURT:  You can look at the big screen.

13         THE WITNESS:  Yes, sir.

14  Q.   (BY MR. LEWIS)  If you'll look up at the screen to your

15  left, Detective Seago, what is depicted in Government's

16  Exhibit 104?

17  A.   It is the torso of Sean Lamb with the bullet hole entries

18  that we observed during the autopsy.

19  Q.   And then Government's Exhibit 105, depicts what?

20  A.   That would have been another entry or exit wound of the

21  body of Sean Lamb.

22  Q.   And in what area?

23  A.   That would have been -- if I may, it would have been here

24  (Indicating) in this area of this part of his body.

25  Q.   You're describing -- or you're pointing for the jury an

Seago - Direct Examination Continued

1   area under the left armpit?

2   A.   Correct.

3   Q.   And then with regards to Government's Exhibit 106, what is

4   depicted in that photograph?

5   A.   It is going to be another bullet hole entry right here

6   (Indicating) under his right armpit.

7   Q.   Okay.

8   A.   And it would have been also like a gash here on his arm

9   here (Indicating).

10  Q.   And then with respect to the Government's Exhibit 107, can

11  you tell the jury what is being depicted or what's being shown

12  in that photograph?

13  A.   The exit wounds from some of the bullet hole entries that

14  they he had had on his body, on his backside.

15  Q.   Are those exit or entry wounds?

16  A.   I believe they were exit.

17  Q.   They were exit wounds?

18  A.   I don't recall very well, but I think they were exit.

19  Q.   Were you on the scene that day?

20  A.   I did not go to the scene of where his body was located.

21  Q.   Okay.  You have no firsthand knowledge of how Sean Lamb

22  was positioned or where he was at the time that he suffered

23  these wounds.

24  A.   I know that he -- based on digital images that I received

25  the same that the medical examiner had received prior to the

Seago - Direct Examination Continued

1   autopsy.

2   Q.   But what I'm saying is on the day which he suffered these

3   wounds, you don't know how he was positioned or any of that

4   information.

5   A.   Correct, I do not.  I was not there.

6   Q.   What is depicted in Government's 108?

7   A.   They are also wounds to his -- it would be the right

8   shoulder right here, if I may (Indicating), right here, on his

9   body right here (Indicating).

10  Q.   What you're pointing to, is that your right shoulder?

11  A.   Yes, sir.

12  Q.   Okay.  And then with respect to Government's 109, what is

13  that showing us in Government's Exhibit 109?

14  A.   That is going to be a close-up of the same -- of the prior

15  image but a much closer, more detailed imagine.

16  Q.   Is there anything of note that you can detect in this

17  photograph?

18  A.   No, sir, just the wounds from the bullets.

19  Q.   Okay.  And then Government's Exhibit 110 depicts what?

20  A.   It is an identifiable marking, a tattoo.

21  Q.   Is it on Sean's neck?

22  A.   It is on his neck.

23  Q.   Okay.  Government's Exhibits 111 and 112 -- we'll get to

24  112 and 113 as well.  But let's start with 111.  What are these

25  photographs of?

Seago - Direct Examination Continued

```
 1  A.    These are x-rays that are done prior to the autopsy being

 2  done, performed so that they can see where some of the

 3  fragments and bullets may be.

 4  Q.    Are you an x-ray technician?

 5  A.    I am not.

 6  Q.    Or a radiologist?

 7  A.    No, sir, I am not.

 8  Q.    Or a medical examiner?

 9  A.    No, sir, I am not.

10  Q.    Okay.  You could not testify as to what specifically is of

11  importance in this photograph, correct?

12  A.    Correct, I could not.

13  Q.    But it was something that you and the crime scene

14  technician Cowan captured so that somebody could talk about

15  that.

16  A.    It was given to the crime scene tech, yes, sir.

17  Q.    Okay.  As well as with Government's Exhibit 112; is that

18  correct?

19  A.    That is correct.

20  Q.    Okay.  And then also with Government's Exhibit 113, is

21  that another x-ray photograph that was received by y'all?

22  A.    Yes, it is.

23  Q.    Now, going to Government's Exhibit 119, tell us once again

24  what is depicted in Government's Exhibit 119.

25  A.    What is depicted is what I refer to as a white ice cube
```

Seago - Direct Examination Continued

1  tray with the bullet fragments that were recovered from the
2  body of Sean Lamb.  As they are recovered, the medical examiner
3  will place them in that tray.
4  Q.   What happens to them after they're placed in the tray?
5  A.   They are -- there's a chain of custody that goes -- that
6  becomes part of the autopsy, and they're given to someone
7  there.  And they will then give them back to us, but we have to
8  sign.
9  Q.   Okay.  In front of you, you should have what has been
10 marked for identification purposes as Government's 114, 115,
11 116, 117 and 118.  Do you see those?
12 A.   Yes, I do.
13 Q.   Are you familiar with those exhibits?
14 A.   Yes, I am.
15 Q.   What are those exhibits?
16 A.   They are the fragments that were recovered from his body
17 that I signed for them.
18 Q.   Are they the same fragments that are depicted in
19 Government's Exhibit 119?
20 A.   Yes.
21           MR. LEWIS:  Government would offer Government's
22 Exhibits 114, 115, 116, 117, 118.
23           MR. LEACH:  No objection to 114 through 118, Your
24 Honor.
25           THE COURT:  Okay.  Mr. Garcia?

Seago - Direct Examination Continued

```
 1            MR. GARCIA:  Your Honor, may I just ask a question
 2  just real quick?
 3            THE COURT:  You may.
 4                    VOIR DIRE EXAMINATION
 5  BY MR. GARCIA:
 6  Q.   Detective Seago, did you see the medical examiner actually
 7  take out these bullets and put them in the tray?
 8  A.   Yes.
 9  Q.   You did?  Okay.
10            MR. GARCIA:  I have no objection.
11            THE COURT:  Mr. Pool?
12            MR. POOL:  No objection, Your Honor.
13            THE COURT:  Mr. Stroder?
14            MR. STRODER:  No objection.
15            THE COURT:  Government's Exhibits 114, 115, 116, 117
16  and 118 are admitted.
17            MR. LEWIS:  Thank you, Your Honor.
18                 DIRECT  EXAMINATION CONTINUED
19  BY MR. LEWIS:
20  Q.   Government's Exhibit 114, where were those fragments
21  recovered from Sean Lamb?
22  A.   They would have been from his body and this one was from
23  the stomach during the autopsy.
24  Q.   With respect to Government's Exhibit 115, those fragments
25  were recovered from where?
```

Seago - Direct Examination Continued

```
 1  A.    From the right abdomen.

 2  Q.    And how many fragments are there?

 3  A.    This one is two.

 4  Q.    With respect to Government's Exhibit 116, what can you

 5  tell us -- where were those items recovered from Sean Lamb?

 6  A.    The right flank during the autopsy.

 7  Q.    What about Government's Exhibit 117?

 8  A.    From the right back during the autopsy.

 9  Q.    What about Government's Exhibit 118?

10  A.    This was the bullet collected from the spine during the

11  autopsy.

12            MR. LEWIS:  Pass the witness, Your Honor, subject to

13  redirect.

14            THE COURT:  Okay.

15            Do you want the lights turned on, Mr. Leach?

16            MR. LEACH:  I do not.

17            THE COURT:  Okay.

18            MR. LEACH:  Or I don't have any questions, Your

19  Honor, so I'll defer to Mr. Garcia.

20            THE COURT:  Okay.

21            Mr. Garcia.  Mr. Garcia, do you want the lights

22  turned on?

23            MR. GARCIA:  Please, Your Honor.

24            THE COURT:  Okay.

25            Turn the lights on.
```

1                          **CROSS-EXAMINATION**

2   BY MR. GARCIA:

3   Q.    Detective Seago, you said that your involvement in this

4   case took you to 1614 North Dixie; is that correct?

5   A.    Correct.

6   Q.    And then later on did it take you to Neta Place also,

7   30 Neta Place?

8   A.    I did not go to 30 Neta Place.

9   Q.    Okay.  And your involvement also involved going to the

10  autopsy; is that correct?

11  A.    Correct.

12  Q.    Did your involvement also -- or your investigation also

13  involve speaking with Wendy Nading?

14  A.    Yes, I did.

15  Q.    And with Anthony Coates?

16  A.    Correct.

17  Q.    And you prepared a report in connection with this case; is

18  that correct?

19  A.    Yes.

20  Q.    And do you have that in front of you?

21  A.    I did bring a copy of the report.

22  Q.    Okay.  Is it a three-page document?

23  A.    It -- yes, one of the documents is in three pages.

24  Q.    Okay.  And the report that I'm referring to is dated, I

25  think, June the 10th of 2014.

Seago - Cross-Examination

```
 1  A.    Yes.
 2  Q.    Is that the same one?  Okay.
 3           Now, in your report, you make a report about the
 4  interview you had with Ms. Wendy Nading; is that correct?
 5  A.    Correct.
 6  Q.    And you also make a reference to the interview you had
 7  with Anthony Coates; is that correct?
 8  A.    Correct.
 9  Q.    In either one of those reports that you prepared, you
10  don't mention anything about an AK-47 being seen by these two
11  people; is that correct?
12  A.    Did not reference to that particular type of firearm, no.
13  Q.    Okay.
14           MR. GARCIA:  Thank you very much.
15           THE COURT:  Mr. Pool?
16           MR. POOL:  No questions, Your Honor.
17           THE COURT:  Mr. Stroder?
18           MR. STRODER:  No further questions.
19           THE COURT:  Mr. Lewis, anything else?
20           MR. LEWIS:  Nothing further, Your Honor.
21           THE COURT:  May this witness be excused?
22           MR. LEWIS:  Yes, Your Honor.
23           THE COURT:  Mr. Leach?
24           MR. LEACH:  No objection.
25           THE COURT:  Mr. Garcia?
```

```
 1              MR. GARCIA:  No objection, Your Honor.

 2              THE COURT:  Mr. Pool?

 3              MR. POOL:  No objection, Your Honor.

 4              THE COURT:  Mr. Stroder?

 5              MR. STRODER:  None.

 6              THE COURT:  Detective, we appreciate you being here.

 7  You're excused.  I'd ask you not to discuss the case or your

 8  testimony with anyone except the attorneys until the jury

 9  begins its deliberations, all right?

10              THE WITNESS:  Yes, sir.

11              THE COURT:  Thank you.

12              Call your next witness, please.

13              MR. KLASSEN:  Your Honor, the government calls Johnny

14  San Miguel.  And this witness has not been sworn in yet.

15              THE COURT:  Come up here, please, sir.  Stop right

16  there.

17              (Witness sworn by the clerk)

18              THE CLERK:  Have a seat.

19              THE COURT:  Would you state your name for me, please.

20              THE WITNESS:  Johnny San Miguel.

21              THE COURT:  Mr. San Miguel, it is important that you

22  kind of keep -- you've got a good voice so we can hear it.

23  Sometimes witnesses get real soft.

24              THE WITNESS:  Okay.

25              THE COURT:  The other thing is we can't use "uh-huhs"
```

San Miguel - Direct Examination

 1  and "huh-uhs."  So if it's yes or no, whatever the answer would

 2  be.

 3          THE WITNESS:  Yes, sir.

 4          THE COURT:  Then let the lawyers finish their

 5  question before you answer, and they'll let you finish your

 6  answer before they ask their next question, okay?

 7          THE WITNESS:  Yes.

 8          THE COURT:  Thank you.

 9          Go ahead, Mr. Klassen.

10          MR. KLASSEN:  Thank you very much, Your Honor.

11                    **JOHNNY SAN MIGUEL,**

12          **GOVERNMENT'S WITNESS SWORN AT 9:05 a.m.**

13                    **DIRECT EXAMINATION**

14  BY MR. KLASSEN:

15  Q.   Mr. San Miguel, your last name is spelled how so the court

16  reporter can get it down.

17  A.   It is spelled in two words.

18  Q.   Go ahead and spell it out for her.

19  A.   It's S-A-N M-I-G-U-E-L.

20  Q.   And is Johnny your given name or is that a nickname?

21  A.   It is a given name.

22  Q.   Okay.  Mr. San Miguel, how old are you?

23  A.   I am 26.

24  Q.   What city do you live in?

25  A.   Odessa, Texas.

San Miguel - Direct Examination

```
 1  Q.    Have you lived in Odessa most or all of your life?
 2  A.    Yes, part of my life already.  I was born and raised in
 3  Odessa and moved to Albuquerque whenever I was about 10 years
 4  old.
 5  Q.    And then at some point moved back to Odessa.
 6  A.    Yes, sir.
 7  Q.    About when was that?
 8  A.    I want to say probably about maybe when I was 15 years
 9  old.
10  Q.    All right.  What are you doing for a living right at the
11  present time?
12  A.    I am in part-time college for cosmetology, and I am also
13  working at a barbershop.  It is called FadeCity.
14  Q.    FadeCity?
15  A.    Yes, sir.
16  Q.    And are you, in fact, studying to be a barber at OC right
17  now?
18  A.    Yes, sir.
19  Q.    All right.  Mr. San Miguel, I have some questions for you
20  concerning a person that perhaps at one time that you knew.
21  Did you know a young man by the name of Sean Lamb?
22  A.    Yes, sir.
23  Q.    And tell us a little bit about how you knew Sean, came to
24  know him and the nature of your relationship, please.
25  A.    Me, I knew Sean.  We all lived in the same apartment
```

San Miguel - Direct Examination

1 complex at Arbor Oaks and also we also all grew -- like was

2 hanging around at Arbor Terrace apartments.  It's right down

3 the street from it.  So I kind of like knewn [sic] him from the

4 other apartment complex.  And then when I really got to know

5 him was whenever my cousin, Steven Saenz, introduced me.

6 Q.   What was your cousin's name again?

7 A.   Steven.

8 Q.   Steven.  And his last name was what?

9 A.   Saenz.

10 Q.   All right.  You started to say that Steven introduced you.

11 A.   Yes.

12 Q.   And that's when you got to know Sean better.

13 A.   Yes, sir.

14 Q.   That was approximately -- you know, maybe how many years

15 ago was that?

16 A.   I want to say maybe about five years ago.

17 Q.   Okay.  So you would have been in your early 20s?

18 A.   Yes.

19 Q.   And he was probably what, late teens maybe?

20 A.   Yes, sir.

21 Q.   Okay.  Did you consider yourself close personal friends

22 with Sean or more like acquaintances?

23 A.   Acquaintances.

24 Q.   All right.  Mr. San Miguel, if you could direct your

25 attention to the first couple weeks perhaps of May of last year

San Miguel - Direct Examination

1  in 2014.  Did you reestablish contact with Sean during that

2  period of time?

3  A.   Yes.  He was currently locked up kind of about that time

4  and he had gotten out.  And I remember him showing up to our

5  apartment, knocking on there looking for me and my brother.

6  Q.   Okay.  Stop there.  Let's see if we can place that in time

7  just a little bit.  You remember when Sean died, correct,

8  roughly?

9  A.   Yes.

10  Q.   All right.  How many weeks would you say -- when he came

11  to the apartment looking for you, how many weeks or days prior

12  to that would it have been, in your estimation?

13  A.   I would guess, say, maybe three weeks.

14  Q.   Okay.  And you say that he had been released from jail,

15  correct?

16  A.   Yes, sir.

17  Q.   And he came to an apartment that you were at, correct?

18  A.   Yes, sir.

19  Q.   And what apartment were you staying at during this period

20  of time?

21  A.   I would say -- I think it was 404.

22  Q.   404 what?

23  A.   It was at the Arbor Terrace apartments.

24  Q.   The Arbor Terrace apartments?

25  A.   Yes.

San Miguel - Direct Examination

1   Q.   Was this an apartment that was -- that you had the lease
2   on or were you staying with some people?
3   A.   I was staying with some people.
4   Q.   Who were you staying with about that period of time?
5   A.   Liz Hernandez and Brian Hernandez and her kids that she
6   had.
7   Q.   Okay.  Let's talk about that.  Was this a large apartment
8   or a small apartment?
9   A.   It was small.
10  Q.   Okay.  How many bedrooms would you say?
11  A.   It was three bedrooms.
12  Q.   Okay.  And Liz Hernandez -- a woman named Liz Hernandez
13  lived there?
14  A.   Yes.
15  Q.   And a man named Brian Hernandez.
16  A.   Yes, sir.
17  Q.   Did you know what the relationship between Liz and Brian
18  was?
19  A.   When I moved there, yes, I did.
20  Q.   What was it?
21  A.   It was mother and son.
22  Q.   All right.  Brian was Liz's son.
23  A.   Yes.
24  Q.   And you said there were some other children there as well?
25  A.   Yes, two boys and a little girl.

San Miguel - Direct Examination

```
1   Q.    All right.  Whose children were they?
2   A.    Liz.
3   Q.    Okay.  How old roughly were these other two boys and girl?
4   A.    The two boys, I think they were, I want to say, about 10
5   years old and the little girl maybe about 6, I want to say.
6   Q.    How did it come about that you ended up staying there with
7   Liz and Brian in late April, early May of 2014?
8   A.    During that time, me and my brother, we were doing pretty
9   bad.  We were living out on the streets.  And I remember me and
10  my brother were just walking.  We ended up at Sahara Hotel.  We
11  got there and a black Tahoe pulled up, and it was Liz
12  Hernandez.  At the time, you know, I didn't know about her, you
13  know.  I met her through my brother.  And he had told me, you
14  know --
15  Q.    Okay.  Don't say what somebody else said.  I am just
16  trying to --
17  A.    Okay.  We -- she got there.  She paid for a motel for I
18  think it was maybe about a week and a half, and I'm thinking
19  she was running low on funds.  So she had told us, "Why don't
20  you just come live with us."
21  Q.    All right.  She invited you to come live with her.
22  A.    Yes, sir.
23  Q.    All right.  You said you were staying with your brother
24  kind of at motels, correct?
25  A.    Yes, sir.
```

San Miguel - Direct Examination

1   Q.   And your brother's name is what?

2   A.   Frankie San Miguel.

3   Q.   So both -- when you said she invited you, was that just

4   inviting you or you and Frankie both?

5   A.   Me and Frankie both.

6   Q.   All right.  And did -- before she -- you sort of

7   encountered her at the motel, had you ever met her before?

8   A.   No, sir.

9   Q.   All right.  Did Frank -- did you have the impression that

10  Frankie knew her before in some kind of way?

11  A.   No, not until that moment at that time that we got the

12  motel room.

13  Q.   All right.

14  A.   That's when I really found out.

15  Q.   So she was a new acquaintance to both of you, as far as

16  you knew?

17  A.   Yes, as far as I knew.

18  Q.   All right.  Did you agree to move in with them?

19  A.   Yes, sir.

20  Q.   And this would have been approximately when?

21  A.   Maybe I want to say April 28th.

22  Q.   Late April.

23  A.   Yes.

24  Q.   When you moved into that apartment, where did you and

25  Frankie sleep?  I guess what I'm asking:  Did they have a

San Miguel - Direct Examination

1  bedroom for you or what?

2  A.    No.   I was sleeping in the living room on the couch.   I

3  was sleeping right there.   And my brother, I believe he was

4  sleeping in a bedroom.

5  Q.    Did he develop a relationship?

6  A.    Yes.

7  Q.    Okay.   With who?

8  A.    Liz.

9  Q.    All right.   And Brian was living there during this time as

10  well, correct?

11  A.    Yes, sir.

12  Q.    All right.   In this time period, Mr. San Miguel, were you

13  employed at sort of a wage paying job?

14  A.    No, sir.

15  Q.    Were you attending Odessa College or any other college

16  during this period of time a year ago?

17  A.    No, sir.

18  Q.    All right.   What were you doing to support yourself?

19  A.    To be the honest truth, selling dope.

20  Q.    What type of narcotics were you selling back then?

21  A.    Methamphetamines.

22  Q.    All right.   At some point in time after you moved in, did

23  Mr. Saenz, Steven, I think you described him as your cousin; is

24  that correct?

25  A.    Yes, sir.

San Miguel - Direct Examination

1  Q.   Did he come as well to live there?

2  A.   Yeah, I think I want to say about a few weeks later --

3  Q.   Okay.

4  A.   -- he moved in.  My brother had gotten locked up, and we

5  were -- nobody had a job at the time.  And so we were needing

6  really help trying to pay the bills and all that, and Steven

7  had came in to help us pay the bills, you know.  It was, so

8  far, from selling dope.  He was -- we were all doing the same

9  thing.

10 Q.   All right.  Now, Steven is your cousin, correct?

11 A.   Yes, sir.

12 Q.   And is he older than you, younger, or about the same age?

13 A.   He's younger than me.

14 Q.   Did you invite Steven to come stay with you or did Liz or

15 do you even know how --

16 A.   No.  At the time I was standing outside -- I can't

17 remember exact date that it was, but I remember one morning I

18 was standing outside the apartment.  And at the time me and

19 Steven had kind of a problem with each other.

20 Q.   Had a what, I'm sorry?

21 A.   A problem.

22 Q.   A problem, okay.

23 A.   Yes.  It was just, you know, fighting with each other and,

24 you know, it wasn't just -- we weren't getting along at the

25 time.  And I remember him driving by the apartment and he saw

San Miguel - Direct Examination

 1  me and he pulled in.  And he got down and I remember him

 2  telling me, "Look, I'm sorry.  You know, I just want us to --

 3  we're family.  You know, we shouldn't be fighting."

 4         MR. LEACH:  Your Honor, I'm going to object as

 5  hearsay and narrative testimony.

 6         THE COURT:  Sustained.

 7  Q.  (BY MR. KLASSEN)  All I'm getting at is just -- we don't

 8  need to know all the background.  Just at some point you had --

 9  got back together and started communicating and you invited him

10  to come stay, correct?

11  A.  Yes, yes.

12  Q.  All right.  And that was okay with Liz also.

13  A.  Yes, sir.

14  Q.  Okay.  That's all we need to know.

15  A.  Okay.

16  Q.  Mr. Saenz, does he have a distinctive tattoo on his face

17  of some kind?

18  A.  Yes, I believe a star.

19  Q.  What is it?

20  A.  A star.

21  Q.  A star.  Where is it on his face?

22  A.  It is somewhere around here, (Indicating).  I think it is

23  on the right side.

24  Q.  Okay.  You are kind of pointing to your left --

25  A.  Or left, yeah.

San Miguel - Direct Examination

```
 1  Q.    -- left eye?

 2  A.    Yeah.

 3  Q.    All right.  Mr. San Miguel, while you were staying at that

 4  apartment with Liz and Brian, was Liz, as far as you know, was

 5  she working at a job?

 6  A.    Well, I know at the beginning she was working at

 7  Mr. Gatti's.

 8  Q.    Mr. Gatti's the pizza place?

 9  A.    Yes.

10  Q.    Okay.

11  A.    And I don't know what happened.  If she quit, she got

12  fired, I really don't know.  I didn't ask too many questions

13  about that.  But whenever -- she wasn't going to work no more

14  so I kind of figured something happened.

15  Q.    Brian, was he an adult or was he still a teenager when you

16  were staying there?

17  A.    He was still a teenager.

18  Q.    Was he in school at all?

19  A.    No.

20  Q.    Was he working some?

21  A.    No.

22  Q.    Okay.  Now, at some point in time for those weeks that you

23  were staying there, did you meet a man by the name of Ruben

24  Hernandez?

25  A.    Yes.
```

San Miguel - Direct Examination

1  Q.   And first of all, who did you understand Ruben to be?

2  A.   They were brother and sister.

3  Q.   Who is "they"?

4  A.   Liz and Ruben.

5  Q.   All right.  So this would be Liz's brother.

6  A.   Yes.

7  Q.   Had you known him or met him at all before you started

8  staying at Liz's place?

9  A.   I've known Ruben for maybe three years before --

10 Q.   Okay.

11 A.   -- I met Liz.

12 Q.   And in what contact did you know him, friends, business

13 associates or what?

14 A.   I would say an associate.

15 Q.   How would you describe it?

16 A.   When we saw each other, we would just talk.  But, I mean,

17 it wasn't kept in contact with -- with each other.  You know,

18 when we saw each other, well, can I have your number, you get

19 my number.  It wasn't like that.  When we saw each other, we

20 saw each other.  That's it.  You know, had a little small

21 talk -- it was just small talk between us.

22 Q.   Did you have any -- this is the time period before you

23 moved in, did you have any narcotics dealings at all with

24 Ruben?

25 A.   No.

San Miguel - Direct Examination

1  Q.   All right.  When you had moved in, at some point in time

2  did Ruben come on the scene there at the apartment in a context

3  that did involve narcotics?

4  A.   No, not at the beginning.

5  Q.   Well, later on after you had been there a while.

6  A.   Yes, sir.

7  Q.   All right.  Tell us what you remember about that.

8  A.   Well, during the first time when Ruben started coming

9  around, you know, he was just -- it wasn't methamphetamines.

10 It was cocaine.

11 Q.   Okay.  Tell the jury about the cocaine aspect of it.

12 A.   He would just bring in little small eight balls, you know,

13 nothing too big.

14 Q.   What is an eight ball for those of us who may not be

15 familiar with that term?

16 A.   I don't know what -- I can't remember how much it weighs,

17 really, to tell you the truth.  But it is not -- it is maybe

18 about that round, maybe that big (Indicating).  It's not very

19 much.

20 Q.   Is it kind of a distribution amount of cocaine, though?

21 People often sell eight balls?

22 A.   Yeah, you can sell them in wholes or you could break them

23 down.

24 Q.   Okay.  So Ruben was involved with cocaine, correct?

25 A.   Yes, sir.

San Miguel - Direct Examination

1   Q.    Did you ever help Ruben sell any cocaine?

2   A.    No, sir.

3   Q.    All right.  That was something that he did.

4   A.    Yeah, that was something he did.

5   Q.    From your personal observation, okay, now, not what

6   somebody else told you, but from your personal observation, did

7   Liz Hernandez assist her brother in storing cocaine or selling

8   cocaine?

9   A.    No, he was doing it all on his own.

10  Q.    Okay.  But did he do it such that you were -- you saw him

11  doing it and you heard him talk about it?

12  A.    Yes.

13  Q.    All right.  What about Steven, your cousin, did he help

14  with the cocaine at all?

15  A.    No, sir.

16  Q.    As far as you know.

17  A.    As far as I know.

18  Q.    Okay.  During this period of time while you were at Liz's

19  place, were you still -- and I'll use the word "trafficking,"

20  for lack of a better one, but were you still selling

21  methamphetamine?

22  A.    Yes, sir.

23  Q.    All right.  Large amounts or relatively small amounts?

24  A.    Small amounts.

25  Q.    What would be a typical amount of methamphetamine that you

San Miguel - Direct Examination

1  would sell?

2  A.   We were just really selling like just 50s or 20s.

3  Q.   What is a 50 for those who may not know?

4  A.   It is just a little baggy with a very, very small amount.

5  It is not really much.

6  Q.   Does the 50 -- if you know, at least from your experience,

7  does the term "50" refer to a weight of methamphetamine or for

8  an amount that it is sold for?

9  A.   For the amount it is sold for.

10 Q.   Roughly $50.

11 A.   Yes, $50.

12 Q.   All right.  What about Mr. Saenz, was he involved with

13 that at all as well?

14 A.   Yes.

15 Q.   Were you and Mr. Saenz working together or kind of

16 separate?

17 A.   We were kind of working together.

18 Q.   Okay.

19 A.   We were working together.

20 Q.   Were you supplying him with meth to sell, was he supplying

21 you, or did you have a supplier that you shared?

22 A.   We had a supplier that we shared.

23 Q.   All right.  And initially did you obtain any of the meth

24 that you were selling from Ruben at all initially?

25 A.   Can you repeat the question again?

San Miguel - Direct Examination

1  Q.   I'm sorry.  It was a bad -- poorly worded question.  At

2  the beginning when you had first moved in, the meth -- the

3  small amounts, the 50s of meth that you were selling, did you

4  obtain any of those from Ruben?

5  A.   No.

6  Q.   All right.  Any of those from Liz Hernandez?

7  A.   No.

8  Q.   At the beginning stages when you were first living there,

9  as far as you knew, did Liz and Ruben deal in methamphetamine

10  at all?

11  A.   Ruben, no.  Liz, she was just smoking.

12  Q.   Smoking methamphetamine.

13  A.   Yes.

14  Q.   All right.  And so the jury knows, too, Mr. San Miguel,

15  during this time period that you were staying there, were you

16  using methamphetamine as well?

17  A.   Yes, sir.

18  Q.   All right.  How -- there are different ways to use

19  methamphetamine, correct?

20  A.   Yes, sir.

21  Q.   How -- what was your preferred way?

22  A.   Smoking it.

23  Q.   Did you ever use -- during this time period, ever use it

24  any other way except for smoking?

25  A.   No, sir.

San Miguel - Direct Examination

1   Q.   All right.  At some point in time did Sean Lamb come to

2   stay at this particular apartment as well?

3   A.   Yes, sir.

4   Q.   Tell us what you remember about how that came about and

5   approximately when that was.

6   A.   I want to say maybe at the beginning of May, I would say.

7   Like I said, he just showed up and we were just talking, you

8   know.  We were excited to see him.  That he was out of jail,

9   you know.  And so he stayed around.

10  Q.   Did you invite him -- I guess you started -- he just hung

11  out with you for a while?

12  A.   Yeah, he just showed up.

13  Q.   Okay.

14  A.   He just showed up and we started talking and catching up

15  on things.  And, you know, I was asking him how he's doing, you

16  know, what his next plan and all this.  And I was letting him

17  know about the thing that me and Steven were doing and all

18  that.

19  Q.   In terms of the drugs.

20  A.   Right.

21  Q.   Okay.

22  A.   And so he kind of -- you know, at the time he was needing

23  some money, you know, fresh out of jail, you know, didn't have

24  nothing, no money.  So we let him in on it, you know.  And he

25  stuck around.  And we never discussed about him living there

San Miguel - Direct Examination

 1  or, you know, anything like that.  He just -- from there, the

 2  day and time that he got there, he just stayed there.  And none

 3  of us had a problem with it.

 4  Q.   And that includes Liz.  She had no problem with it?

 5  A.   She had no problem with it.

 6  Q.   All right.  And did he also participate in some of these

 7  methamphetamine trafficking activities with you and Steven?

 8  A.   Yes, sir.

 9  Q.   All right.  Were you and Steven supplying him with meth to

10  sell?

11  A.   Yes.

12  Q.   Okay.  You may have said initially, and I apologize.  I'm

13  just trying to keep it straight in my head.  Your estimation of

14  when Sean moved in was approximately how many days or weeks

15  before he died?

16  A.   Maybe about -- from the time that he got there?

17  Q.   Yes.

18  A.   I want to say maybe about four and a half weeks.

19  Q.   Maybe a month.

20  A.   Maybe a month, yeah.

21  Q.   All right.  Let's go back and talk about Ruben again just

22  a little bit, and I'm asking from your awareness now.  At some

23  point in time did Ruben have or start dealing or possessing an

24  amount of methamphetamine?

25  A.   No, not until me and Steven had a discussion with him, you

San Miguel - Direct Examination

1   know.  We knew that selling cocaine was his thing, and it
2   always has been.
3   Q.    Selling cocaine was a what?
4   A.    It was his thing.
5   Q.    His thing.  Okay.  I'm sorry.
6   A.    It was his thing.  He never really touched with anything.
7   No marijuana, just cocaine.  And we started telling him, like,
8   "If you really want to make money more than what you're making,
9   start selling meth.  We promise you, you'll triple your money
10  more than what you're doing now."
11  Q.    It's more profitable.
12  A.    It's more profitable, yes.  And so at first he was kind of
13  iffy about it, but we still kept on talking to him about it and
14  he kept on telling us, "Well, are you sure you could" --
15           MR. LEACH:  Your Honor, I am going to object to the
16  narrative testimony.
17           THE COURT:  Sustained.
18  Q.    (BY MR. KLASSEN)  We'll just break it a little piece at a
19  time.  Basically it was a proposal that you and Steven were
20  make to Ruben, correct?
21  A.    Yes.
22  Q.    Initially, was he enthusiastic or reluctant, would you
23  say?
24  A.    He was holding back on it.
25  Q.    Okay.  But I take it the topic came up more than once.

San Miguel - Direct Examination

1  A.    More than once, yes, sir.

2  Q.    All right.  And then, again, I am just trying to place

3  things in time frame now.  When you first started having these

4  conversations with Ruben, had Sean moved in yet or was this

5  before Sean moved in, as best you can remember?

6  A.    The beginning when we started bringing it up to Ruben, he

7  wasn't there.  But whenever Sean got there, that's when

8  everybody started kicking in gear, and he was really going --

9  like, how would I say? -- feeling more at ease about it and

10  really wanting to do it now.

11  Q.    Okay.

12  A.    And so that's when.

13  Q.    All right.  Ruben Hernandez, was he living with his sister

14  during any of this period of time?

15  A.    No, sir.

16  Q.    Do you know where he did live?

17  A.    I know it was -- I want to say it was a couple of blocks

18  away from 8th Street.  I don't know if that --

19  Q.    If you don't know, you don't know.

20  A.    Okay.

21  Q.    You never had been to his place at least in the couple

22  years before that?

23  A.    No, sir.

24  Q.    Okay.  How often would Ruben be there?

25  A.    He would come, I would say, once a week.

San Miguel - Direct Examination

1  Q.   Okay.  Did he ever crash overnight or anything like that?

2  A.   No, sir.

3  Q.   All right.  As far as you understood during this time

4  period, did Ruben have a paying job?

5  A.   No, sir, not that I know of.

6  Q.   Okay.  One thing I need to ask you about before we --

7  about your background with Ruben, did you have some marijuana

8  dealings with Ruben previous to this in some form or fashion?

9  A.   When Ruben started coming around more, that's when we

10 first started dealing with marijuana kind of.  It was just like

11 a one-time thing, you know.  Like I said -- remember like I

12 told you, he was -- never been the type of person to mess with

13 marijuana or anything else until, you know, this one time.

14 Q.   This is after you had moved in.

15 A.   Yes.

16 Q.   All right.  And what did you do in conjunction with Ruben

17 or in relation to him with regard to marijuana, the one-time

18 thing?

19 A.   It was just -- we just got a call -- well, he got a call

20 on night and saying that we needed to pick up some marijuana,

21 you know, large amounts.  And so we took off.

22 Q.   "We" meaning you, Ruben and who?

23 A.   Just me and Ruben.

24 Q.   Just you and Ruben.  Where did you go?

25 A.   We went to Marfa.

San Miguel - Direct Examination

1  Q.    All right.  What did you get in Marfa?

2  A.    We got 76 pounds of marijuana.

3  Q.    Okay.  Brought it back to where?

4  A.    To the apartment.

5  Q.    All right.  What became of that marijuana, if you know?

6  A.    We just got rid of all of it in one bundle.

7  Q.    Do you know who it was sold to?

8  A.    No, sir.

9  Q.    All right.  Ruben handled that part?

10 A.    Yes, sir.

11 Q.    All right.  Did you get paid for your role in it?

12 A.    Yes.

13 Q.    How much did you get paid, if you remember, roughly?

14 A.    I think it was $2,000, I want to say.

15 Q.    All right.  Let's go back to talking about methamphetamine

16 and you're proposing this idea that maybe Ruben could make more

17 money dealing in meth.  At some point in time, did he agree or

18 show up with some methamphetamine?

19 A.    Well, he started his -- saying -- making sure that we

20 could make money off it, and I told him yes.  And --

21 Q.    We understand --

22         MR. LEACH:  Your Honor, I object as nonresponsive.

23         THE COURT:  Sustained.

24 Q.    (BY MR. KLASSEN)  Mr. San Miguel.

25 A.    I'm sorry.

San Miguel - Direct Examination

1    Q.    We understand that you talked about it for a while.

2    A.    Right.

3    Q.    Okay.  I think everybody understands that.  So maybe just

4    sort of place it in time, if there was a time, that Mr. Ruben

5    Hernandez ultimately did get some meth.

6    A.    Yes, he did.

7    Q.    When did that happen and how do you remember first being

8    aware that he had some meth?

9    A.    I would say maybe about it was April 10th, somewhere

10   around there.

11   Q.    So still a long time before he -- Sean died or closer to

12   when he died?

13   A.    Kind of in between.

14   Q.    Okay.  Regardless of when it was, it was when you were

15   staying there, correct?

16   A.    Right.

17   Q.    Was Sean staying there as well by this time when he had

18   the meth?

19   A.    Yes.

20   Q.    Okay.  Tell us what you remember -- how did you become

21   aware that he had some meth?

22   A.    I remember -- I mean, it was late that night, maybe about

23   10:30 at night.  And I remember him pulling up in -- not a

24   brand-new 2015 car, but it was a new car that he barely

25   recently purchased.  And I remember him showing up, parking in

San Miguel - Direct Examination

 1  the back and got down.  And everybody -- Sean, Steven and Liz

 2  were upstairs and I was downstairs.  And knocked on the back

 3  door.  I opened it and it was Ruben.  And he was telling me, he

 4  was -- he pulled me to the kitchen, you know, so nobody would

 5  see us talking.  And he goes, "Hey, can we still get rid of

 6  that?"

 7          And I was like, "Rid of what?"

 8          And he was like, "The meth."

 9          And I was like, "Yeah."

10  Q.   You said what, I'm sorry?

11  A.   "The meth."

12  Q.   "The meth."  Okay.

13  A.   Yes.

14  Q.   Go ahead.

15  A.   And I was like, "Yeah, we could get rid of it."  And

16  that's when he pulled out the large amount of the meth.

17  Q.   Okay.  And did he show it to you?

18  A.   Yes, sir.

19  Q.   All right.  Describe as best you can what he showed to

20  you.

21  A.   It was a large Ziploc bag.  I would say maybe the size of

22  this right here (Indicating), maybe about the same.  Same size,

23  same width on it (Indicating).  And I would say maybe about

24  this full right here (Indicating) till all the way to the top.

25  Q.   So for the record, I am just going to -- tell me whether I

1  am right or wrong.  What you're holding up is basically an 8 by

2  11 sheet, roughly that size, maybe 7/8 or almost full to the

3  top.

4  A.    Correct.

5  Q.    The methamphetamine that you saw, what form, what color,

6  what did it look like?

7  A.    It was white crystal looking, crystal --

8  Q.    Okay.  Is that a particular type of meth in the

9  methamphetamine world that you have seen before or know what it

10  is called?

11  A.    That's what methamphetamine looks like.  It looks like

12  real crystals, you know.

13  Q.    Okay.  All right.  And you described that as a large

14  amount.

15  A.    Yes.

16  Q.    Was that -- had you ever personally yourself dealt or seen

17  that large amount of meth before?

18  A.    No, sir.

19  Q.    All right.  Do you have any sense of what that weighed?

20  A.    I'm really guessing it was --

21          MR. LEACH:  Objection as to speculation.

22          THE COURT:  Sustained.

23  Q.    (BY MR. KLASSEN)  If you don't know, you don't know.

24  A.    A kilo.

25  Q.    Roughly a kilogram?

San Miguel - Direct Examination

1   A.    Yes.

2   Q.    Did Ruben mention any weights to you?

3   A.    No.

4   Q.    Did he mention any -- how much meth that was worth?

5   A.    No.

6   Q.    Okay.

7   A.    I'm guessing --

8   Q.    No, I don't want you to guess.  I am just asking right now

9   if Ruben mentioned -- did Ruben ever mention any amount of

10  money that that methamphetamine was worth, whether that day or

11  later?

12  A.    No, sir.

13  Q.    Okay.  All right.  Was that amount of meth, is that what a

14  person would typically possess to use his or herself or would

15  it be an amount typically for sale?

16  A.    For sale.

17  Q.    All right.  Now, when you saw that and he was asking you

18  if you could still get rid of it, what did you say?

19  A.    I told him yes.

20  Q.    What happened -- anything else happen that night?  Did you

21  talk to Steven about it?

22  A.    No.  The deal was supposed to be only me and him.  And I'm

23  pretty sure, you know, that he was going to let Liz know about

24  it too, you know, so we -- us three could make money.  But the

25  deal was really supposed to be between me and him.  And I guess

San Miguel - Direct Examination

1  with the excitement --

2          MR. LEACH:  Objection as to speculation.

3          THE COURT:  Sustained.

4  Q.  (BY MR. KLASSEN)  Okay.  I don't want you --

5  A.  I'm sorry.  I'm sorry.

6  Q.  That's okay.  Sometimes we use the word "yes" just kind of

7  as a place holder, but I don't want you to speculate.  If it is

8  based on something that you saw or something that was told you,

9  that's okay.  So just -- we'll kind of take it piece by piece

10 so we understand.

11 A.  Okay.

12 Q.  So he showed it.  It was -- your understanding was it was

13 just going to be between you and him and maybe Liz, correct?

14 A.  Yes.

15 Q.  All right.  Did he keep that methamphetamine -- that first

16 night that you saw it, did he keep it in his possession like on

17 his person or did he put in somewhere or do you know?

18 A.  He kept it in his possession.

19 Q.  All right.  Did he take it with him when he left that

20 night or did he leave it?

21 A.  He took it with him.

22 Q.  Okay.  And where did you leave things, you and Ruben, as

23 far as plans?  Were you going to find some buyers, or what was

24 your understanding of what you were going to do?

25 A.  Yes, I was going to get all my buyers together and make

San Miguel - Direct Examination

1  sure things would go according to plan and let them know that

2  it is there, you know.

3  Q.    Okay.

4  A.    Before I even -- before we even touched it, you know, we

5  started sending it out somewhere, that wasn't for sure.

6  Q.    And in the subsequent or following days, did you work on

7  perhaps lining up some buyers?

8  A.    Yes, sir.

9  Q.    All right.  By yourself or were you working in conjunction

10 with anybody else?

11 A.    Well, that night that he had bring that stuff over --

12          MR. LEACH:  Objection.  Nonresponsive.

13          THE COURT:  Sustained.

14 Q.    (BY MR. KLASSEN)  Okay.  Just answer -- we'll come back,

15 okay, Mr. San Miguel?  But just tell me whether in those days

16 after that you worked with anybody else to line up some buyers?

17 A.    No.

18 Q.    Okay.  Did you tell Sean or Steven about the meth at all?

19 A.    No, not that.

20 Q.    Okay.  When is the next time that you talked to Ruben

21 about this meth that you had seen or the next time that you saw

22 it, that you can remember?

23 A.    He came by the apartment the night after that, late at

24 night.

25 Q.    Okay.  The very next night or a few days later?

San Miguel - Direct Examination

```
 1  A.    The very next night.

 2  Q.    Okay.  What do you remember occurring during that

 3  interaction when Ruben came by again?

 4  A.    Showed up.  You know, we just started talking, you know --

 5  I don't know if it is okay -- I am trying to go back to that

 6  night that he showed up.

 7  Q.    The first time.

 8  A.    The first time.

 9  Q.    Did something else happen that sticks in your memory that

10  relates to the meth?

11  A.    Well, I know there was excitement.  He went upstairs.

12  Q.    Okay.  Just --

13          MR. LEACH:  Your Honor, again, I am going to object

14  as nonresponsive.

15          THE COURT:  Sustained.

16  Q.  (BY MR. KLASSEN)  All right.  Just listen to my question,

17  okay?  You know -- the first night that Ruben came by, okay,

18  you said that Ruben went -- you started to say you saw him go

19  upstairs, correct?

20  A.    Yes, sir.

21  Q.    All right.  Did he take the meth with him when he went

22  upstairs?

23  A.    Yes, sir.

24  Q.    All right.  Did he -- did you witness him interacting with

25  anybody while he was upstairs or hear?
```

1   A.    Yes, sir.

2   Q.    Did you go upstairs yourself?

3   A.    Yes.

4   Q.    All right.  What did you see upstairs?

5   A.    I saw Ruben speaking to Steven, Sean and Liz.

6   Q.    Okay.  And did you witness that conversation?

7   A.    Yes.

8   Q.    And what did they -- what did Ruben say during that

9   conversation that you witnessed between Ruben, his sister,

10  Steven and anybody else there?

11  A.    It was Sean.

12  Q.    And Sean.  What did you witness?

13  A.    Ruben talking about, "I got the meth."  And I just -- it

14  was just like -- he just said that --

15  Q.    Okay.  Just focus on what was said, not interpret it, but

16  focus on what you remember about the conversation.

17  A.    He was just telling Liz that he got the meth and that we

18  need to get rid of it and can we get rid of it.

19  Q.    The same night he talked to you initially, correct?

20  A.    Yes, sir.

21  Q.    Okay.  What was the reaction, if any, amongst Liz and Sean

22  and Steven to this idea?

23  A.    It was a lot of excitement --

24  Q.    Okay.

25  A.    -- for them.  And it was mostly Sean and Steven, like, I

San Miguel - Direct Examination

1  would say rushing him, like, "Yeah, we could do it like this

2  and we could do it like that and this is how we're going to

3  make all the money.  This is how you're going to triple your

4  money back."  And --

5  Q.   What were your thoughts about Ruben having this

6  conversation with these other folks?

7  A.   At the time -- at the time, I was hurt.

8  Q.   Why?

9  A.   Because the deal was only supposed to be between me and

10  him.

11  Q.   Okay.

12  A.   Not everybody in the household.

13  Q.   All right.  But by the time that he left, I take it, a

14  different understanding.

15  A.   Yes, sir.

16  Q.   All right.  Okay.  Anything else about that conversation

17  upstairs between Ruben, Sean, Steven and Liz that you can

18  remember?

19  A.   No, sir.

20  Q.   All right.  But that first night that you saw it, he still

21  left with the meth, as I understood.

22  A.   Yes, sir.

23  Q.   All right.  And then the next night, Ruben returns,

24  correct?

25  A.   Yes.

San Miguel - Direct Examination

1  Q.   And what happens when he returned, as best you can recall
2  it?
3  A.   Well, that night we were just talking about how the -- can
4  we do this and make the money.  But --
5  Q.   Just you and him or were Steven and Sean participating as
6  well?
7  A.   Yes, Sean and Steven participated.
8  Q.   All right.  So basically the four of you.
9  A.   Yes, sir.
10 Q.   Was Liz participating in this discussion?
11 A.   Yes, sir.
12 Q.   All right.  What about Brian, was he in the midst of all
13 of this as well, as you can recall it?
14 A.   No, sir.
15 Q.   Okay.  Just the, I guess, five of you, correct?
16 A.   Yes, sir.
17 Q.   All right.  So tell us about that discussion.
18 A.   We were just talking, and it was -- the discussion was
19 really -- I didn't really say too much because, like I said, I
20 was kind of hurt about it, you know.  So I didn't really --
21          MR. LEACH:  Your Honor, I'm going to object to the
22 narrative form.
23          THE COURT:  Sustained.
24 Q.   (BY MR. KLASSEN)  All right.  I'll ask you what you
25 thought if I feel like it is appropriate, okay?

San Miguel - Direct Examination

1    A.    Okay.

2    Q.    So what I am asking you right now is --

3    A.    Just the conversation.

4    Q.    -- just the nature of the conversation, as you can recall

5    it.

6    A.    Okay.  Like I said, just, how can we get rid of the stuff;

7    and, you know, how much money we're going to make on it.  And

8    it was just -- really just getting high and talking.

9    Q.    Okay.  You were using methamphetamine.

10   A.    Yes.

11   Q.    Okay.  When you talked about how much money you could make

12   on it, were any particular amounts mentioned?

13   A.    I believe it was, I want to say, 45,000.

14   Q.    All right.  Who said the term $45,000?

15   A.    Well, that's what we came up to.

16   Q.    Kind of jointly together.

17   A.    Yes.

18   Q.    Did you talk about particular pricing amounts and what it

19   could -- how it could be broken down and sold for what amounts,

20   as you can remember?

21   A.    Not that I remember.

22   Q.    Okay.  But 45,000 or thereabouts, correct?

23   A.    Right.

24   Q.    All right.  Okay.  And now I'll ask you:  What -- during

25   this conversation, what was going through your mind?

San Miguel - Direct Examination

1  A.    To tell you the truth, not a whole lot.

2           THE COURT:  Next question.

3  Q.   (BY MR. KLASSEN)  All right.  What happened at the end of

4  that night?  Did Ruben leave with the methamphetamine or did he

5  leave it?

6  A.    To tell you the truth, I don't -- really don't know.

7  Q.    Okay.  All right.  When is the next time that you remember

8  seeing or having anything to do with the meth?

9  A.    I would say the night that -- before -- when was it?  It

10 was now I am getting closer to whenever the day --

11 Q.    Sean -- when Sean died.

12 A.    Yes.

13 Q.    All right.  Tell us what you remember on a particular day

14 or night closer to when Sean died.

15 A.    It was a Friday night.  Me, Sean and Steven and Liz were

16 supposed to go out clubbing, you know.  We never --

17 Q.    When we talk the word "clubbing," what did that mean to

18 you?

19 A.    Go to bars and drink.  From what I understand is that we

20 were supposed to go to a bar and drink and have a good time and

21 from there go to a motel room and meet with Ruben.

22 Q.    Okay.  The three of you.

23 A.    Yes.

24 Q.    Okay.  That was the plan.

25 A.    Yes.

San Miguel - Direct Examination

1  Q.   All right.  So this Friday night, were you getting ready

2  to do that?

3  A.   Yes, sir.

4  Q.   All right.  What happened?

5  A.   I changed my mind on it, on going out because at the time

6  when that night happened, Friday night, I didn't really have

7  much money to be doing all that.  And I told Steven, "I'm not

8  going."

9           And he told me, you know, "Why not?"

10          I was like, "I ain't got no money to be doing that."

11          And I remember him telling me --

12          MR. LEACH:  Your Honor, again, I'm going to object to

13  the narrative.

14          THE COURT:  Sustained.

15  Q.   (BY MR. KLASSEN)  Okay.  We're going to take it piece by

16  piece.  So you told Steven that you didn't have enough money,

17  correct?

18  A.   Yes.

19  Q.   And he responded how?

20  A.   He said, "I'll pay for you."

21  Q.   Okay.  Did that convince you to go then?

22  A.   In a way, kind of.

23  Q.   Well, did you end up going that night, clubbing?

24  A.   No.

25  Q.   Why not?

San Miguel - Direct Examination

1   A.    Because we got -- a different situation happened.
2   That's --
3   Q.    Okay.  Let's take it piece by piece, okay?
4   A.    Okay.
5   Q.    So you had this conversation maybe you're going clubbing,
6   who is going to pay, all that kind of stuff.  Did something
7   happen that caused you not to go out that night?
8   A.    Yes.
9   Q.    What happened?
10  A.    That's when the meth was stolen.
11  Q.    Okay.  Tell us how you perceived that the methamphetamine
12  or why you perceived that the methamphetamine was stolen.
13  What -- just walk us through the events of that evening.  Let's
14  do it this way.  Steven is telling you he'll pay for you.  Then
15  what happened next?
16  A.    And then I agreed to it.  I told him, I was like, "You
17  know what?  I am going to go ahead and go."
18  Q.    Okay.  Then you agreed to go.
19  A.    Yes.
20  Q.    Then what happens?
21  A.    Then he tried looking for the keys of the Tahoe.
22  Q.    All right.  The keys to --
23  A.    -- the Tahoe.
24  Q.    And this is a Chevrolet Tahoe.
25  A.    Yes.

San Miguel - Direct Examination

1   Q.   Whose vehicle is this, if you know?

2   A.   Liz.

3   Q.   All right.  This is a vehicle you had seen her drive.

4   A.   Yes, sir.

5   Q.   All right.  So he starts looking for the keys, correct?

6   A.   Yes, sir.

7   Q.   And then what happens?

8   A.   He couldn't find the keys.

9   Q.   Okay.  And then what happened -- I take it -- is he

10  physically going through the apartment looking for them?

11  A.   Yes, sir.

12  Q.   All right.  After he could not find the keys, what happens

13  next, as you can remember?

14  A.   Him and Sean and Martin Cortez had left.  Martin Cortez

15  was there that might.  He was doing tattoos.

16  Q.   Okay.  Stop there just a second because this is a new

17  person.  The person you named is Martin Cortez.

18  A.   Yes, sir.

19  Q.   All right.  Is this somebody you knew before at all?

20  A.   No, sir.

21  Q.   Okay.  And he was at Liz's place that same night, correct?

22  A.   Yes.

23  Q.   And he was doing what, did you say?

24  A.   Tattoos.

25  Q.   Putting tattoos on people?

San Miguel - Direct Examination

1  A.    Yes.

2  Q.    All right.  Who did -- if you know or witness it, who did

3  he give a tattoo to?

4  A.    I believe he gave a tattoo to Sean.

5  Q.    Did you see that?

6  A.    I'm trying to remember.  I swear that I seen it.

7  Q.    Okay.  What kind -- if you can remember, what type of

8  tattoo did he give Sean?

9  A.    I think it was just a name.  I'm not too sure.

10  Q.    If you're not sure -- some kind of tattoo to Sean.

11  A.    Yes, yes.

12  Q.    Do you know where on Sean's body he may have put it?

13  A.    I believe on his arm.

14  Q.    On his arm.  Okay.

15         Anybody else that you can remember that this Martin

16  Cortez perhaps gave tattoos?

17  A.    To Steven.

18  Q.    To Steven.  Okay.  What kind of tattoo did he get?

19  A.    He got that star on his face.

20  Q.    That star that you mentioned before?

21  A.    Yes, sir.

22  Q.    Anybody else that you can remember that Martin may have

23  given a tattoo -- I hate to say tattoo to.  Anybody else drew a

24  tattoo on, thumping?

25  A.    No, sir.

San Miguel - Direct Examination

1  Q.   All right.  So how long was he there that evening?

2  A.   I want to say maybe about three hours.

3  Q.   Was -- was some partying going on as well?

4  A.   Just -- we were just smoking.

5  Q.   Just?

6  A.   Smoking.

7  Q.   Smoking what?

8  A.   Methamphetamines.

9  Q.   Smoking meth.  Okay.  Pretty much everybody?

10 A.   Yes.

11 Q.   Okay.  All right.  So Martin -- or, excuse me, just to

12 pick up the story again.  Steven is looking for the keys.

13 Can't find them.  And you started -- and what happened?

14 A.   And then Steven, Sean and Martin Cortez had tooken [sic]

15 off.

16 Q.   Okay.  How did you know they took off?  Did you see them

17 exit the door?

18 A.   Well, I had went upstairs -- I had started participating

19 looking for the keys.

20 Q.   Okay.

21 A.   And I went upstairs.  And when I went downstairs, they

22 were gone.

23 Q.   They were gone.

24 A.   Yes, sir.

25 Q.   Okay.  Now, Liz, was she there that night as well?

San Miguel - Direct Examination

1   A.    Yes.

2   Q.    Where was -- was she partying with you guys also?

3   A.    No.  She was upstairs sleeping.

4   Q.    All right.  She was asleep --

5   A.    Yes.

6   Q.    -- when all of this searching for the keys was going on?

7   A.    Yes.

8   Q.    What about Brian, was he around that night, as best you

9   can remember?

10  A.    Yes, sir.

11  Q.    Okay.  Where was he at?

12  A.    He was also asleep.

13  Q.    All right.  Sleeping as well.  Did he participate in any

14  of the partying that was going on?

15  A.    No, sir.

16  Q.    All right.  What about the smaller children, were they

17  there that night, if you can remember?

18  A.    I can't -- not that I recall.  I can't remember if they

19  were there or not.

20  Q.    All right.  So you come back.  You're looking for the keys

21  upstairs.  I take it you don't find them either.

22  A.    Yes.

23  Q.    Okay.  You come back down and Steven, Sean and Martin are

24  just not in the house.

25  A.    Correct.

San Miguel - Direct Examination

1  Q.   What did you do when you noticed that they were no longer
2  at the apartment?
3  A.   I had went outside.
4  Q.   Why did you go outside?
5  A.   To see if they were out there.
6  Q.   Okay.
7  A.   And see if the Tahoe was still out there.
8  Q.   What did you see when you went outside.
9  A.   Nothing.  I saw the Tahoe there, but I didn't see nobody
10 outside.
11 Q.   All right.  So the vehicle was there, but the -- you
12 didn't see any of the three of them.
13 A.   No, sir.
14 Q.   All right.  Anywhere in the vicinity.
15 A.   No.
16 Q.   So what did you do next?
17 A.   I went back inside the apartment and still continued to
18 find the keys.  And I went to Brian's room to see if the keys
19 were inside his room.
20 Q.   Okay.  Were they?
21 A.   Yes.
22 Q.   Okay.  Where did you find them?
23 A.   On top of his big screen TV.
24 Q.   All right.  And did you take the keys then?
25 A.   Yes.

San Miguel - Direct Examination

1  Q.   All right.  Did you talk to anybody else then before --

2  well, what did you do next?

3  A.   I took off.  I took off.

4  Q.   Okay.  "Took off" meaning in the --

5  A.   Looking for Steven and Sean.

6  Q.   All right.  In the vehicle or on foot?

7  A.   In the vehicle.

8  Q.   All right.  Did you say anything or tell Liz or anything

9  that you had the keys?

10  A.   No.  I remember her telling us, "Y'all can use the Tahoe.

11  Y'all just bring it back in the morning.  Y'all be careful."

12  Q.   She told you that that night?

13  A.   She had told Steven that.

14  Q.   Okay.  Did you witness that conversation?

15  A.   I was downstairs at the time, but I heard it upstairs.

16  Q.   All right.

17  A.   I heard them overtalking upstairs.

18  Q.   Fair enough.

19        But that's when he couldn't find the keys, though,

20  correct?

21  A.   Correct.

22  Q.   All right.  So you found the keys, started up the Tahoe,

23  and then went -- where did you go?

24  A.   I went around the apartment complex looking for them.  I

25  was figuring maybe they were just walking around.

San Miguel - Direct Examination

1   Q.   Okay.  You're driving now by this time, correct?

2   A.   Yes.

3   Q.   Did you see them anywhere as you drove around the

4   apartment complex?

5   A.   No.

6   Q.   All right.  What did you do next?

7   A.   I took off from the apartment complex, and I found them

8   two blocks away from Snyder Street.  I don't know what exact

9   street it was.

10  Q.   A couple blocks away from the apartment complex.

11  A.   Yes.

12  Q.   What direction, if you know?

13  A.   Going west.

14  Q.   Okay.  And when you saw them, what were they doing?

15  A.   They were walking back.  It looked like they were walking

16  back towards the apartment.  And I saw them, and I flashed the

17  lights at them to let them know it was me.  They waved me down.

18  Q.   This is all three of them, correct?

19  A.   Yes.

20  Q.   All right.  Go ahead.  You flashed your lights and --

21  A.   Yes.  And as soon as I stopped at a stop sign and they

22  were about to get inside the Tahoe, an OPD pulled up.

23  Q.   Okay.  Behind you?  In front of you?

24  A.   They were -- like it was the OPD was following them from

25  behind.

San Miguel - Direct Examination

1   Q.    Okay.

2   A.    And as soon as they were about to step into the vehicle,

3   OPD turned on the lights on them, and we both -- we all

4   panicked, and Steven and Sean had jumped in the vehicle.

5   Martin Cortez stayed like outside the vehicle.  And I panicked.

6   And I also -- we took off in the Tahoe and the OPD stayed with

7   Martin.  And we just took off.

8   Q.    The OPD vehicle didn't chase you.

9   A.    No.

10  Q.    All right.  But you were consciously trying to get away.

11  A.    Yes.

12  Q.    Why?  Did you have any illegal things on your --

13  A.    I had a little small amount of methamphetamine.

14  Q.    Okay.  All right.  You're driving still, correct?

15  A.    Yes.

16  Q.    When Sean and Steven got in the car, what -- where were

17  they situated?

18  A.    Steven was in the passenger and Sean was in the backseat.

19  Q.    Okay.  And where did you drive to?

20  A.    We -- I drove down Murphy going west, by -- it is by a

21  cemetery, next to the Zodiac.  I went a block behind the Zodiac

22  bar, and I pulled over.  And Steven just kept on telling me,

23  "Let me drive, let me drive."

24          So I pull over and let him drive.  And I got in the

25  backseat and Sean got in the passenger's seat.  And we took

San Miguel - Direct Examination

1  off.  And that's when we started going -- he just started

2  driving.  I didn't pay attention to where I was going.

3  Q.   Okay.  We're not going to get too far ahead of the story

4  here.  So Steven is starting to drive, correct?

5  A.   Yes.

6  Q.   Did Steven say we're going to a particular place or he

7  intended to go to a particular place?

8  A.   Not at the moment.

9  Q.   Okay.  Not then.  Maybe later, right?

10  A.   Maybe later.

11  Q.   All right.  So at first he's just driving, right?

12  A.   Yes.

13  Q.   All right.  And you're in the backseat, correct?

14  A.   Yes.

15  Q.   Do you stay awake or what happened?

16  A.   Yes, I was fully awake.  I was just on my phone.

17  Q.   All right.  Talking to who?

18  A.   My girlfriend.

19  Q.   All right.  Were you still in the city limits in Odessa or

20  did that change at some point in time?

21  A.   It change at some point, but I wasn't paying attention to

22  where we were really going.

23  Q.   All right.  So at some point in time did you start to

24  wonder where you were really going?

25  A.   At the last minute.

San Miguel - Direct Examination

1  Q.   Okay.  Let's take it piece by piece.  So you're talking to

2  your girlfriend.  At first you're still in the city, correct?

3  A.   Yes.

4  Q.   At some point did you notice that you were maybe not in

5  the city anymore?

6  A.   Yes.

7  Q.   Where were you as best -- or what were you perceiving as

8  you looked around?

9  A.   We were on the highway.

10 Q.   All right.  Rural, kind of out in the country?

11 A.   Out in the country.

12 Q.   Four lane or two lane?

13 A.   Two lane.

14 Q.   Okay.  And did you make inquiries or ask Steven or anybody

15 where you were or anything like that?

16 A.   No.

17 Q.   Okay.  What did you do then when you noticed that you're

18 out in the country?

19 A.   I asked him when we got to Levelland.

20 Q.   Okay.  All right.  So ultimately you go to, as you recall

21 it, Levelland, correct?

22 A.   Yes, I'm recalling that's what it is.

23 Q.   All right.  That's not real close to Odessa, right?

24 A.   I believe so.

25 Q.   All right.  So what happened during that time between when

San Miguel - Direct Examination

1   you started talking to your girlfriend and you're noticing

2   you're on a two-lane road, what happened during that period of

3   time?

4   A.   Really nothing much until we got to Steven's grandmother's

5   house.

6   Q.   Were you still just keep talking on your phone, did you

7   doze off, or what?

8   A.   No, I kept on talking on the phone.

9   Q.   All right.  So at some point you realized that you're in a

10  different city or still in the country?

11  A.   I realized I was not in Odessa.

12  Q.   Okay.  Did you ask, "Where are we?," or something to that

13  effect?

14  A.   No, not until we got to his grandmother's house.  That's

15  when --

16  Q.   All right.  Where did you end up going?

17  A.   To Steven's grandma's.

18  Q.   And that is in where?

19  A.   I believe in Levelland.

20  Q.   Okay.  When you got to -- had Steven given you any

21  explanation before you got there of why he was taking -- going

22  to his grandma's house in Levelland?

23  A.   No.

24  Q.   Okay.  Once you arrived, was this -- what time of day or

25  night would you say it was?

1   A.   I'm guessing maybe about --

2            MR. LEACH:   Objection as to speculation.

3   A.   I'm sorry.

4   Q.   (BY MR. KLASSEN)   Okay.   Don't use the word "guess."   It's

5   okay to estimate.   Just estimate.   When would you say,

6   estimate?

7   A.   2:30 in the morning.

8   Q.   Okay.   Early in the morning, correct?

9   A.   Yes.

10  Q.   All right.   That's fine.

11           Now, when you got there, what happened?

12  A.   We stayed parked outside of his grandmother's house.   And

13  he turned back and looked at me and said, "We're good."

14           And I was like, "Well, what do you mean?"

15           He said, "We're good."   He's all like, "We're going

16  to get your brother out, and we're going to leave Odessa."

17  Q.   Okay.   When you say "get your brother out," if you know,

18  what -- well, what did you think he was referring to?

19  A.   I knew because at the time my brother was incarcerated and

20  his -- I believe his bond was $10,000.

21  Q.   All right.   This is your brother Frankie.

22  A.   Yes.

23  Q.   Okay.   So he says, "We're good.   We're going to get your

24  brother out."   And what else, do you remember?

25  A.   "We're going to leave Odessa."

San Miguel - Direct Examination

1   Q.   Okay.

2   A.   And he said, "This Tahoe is mine.  I'm keeping the Tahoe."

3   And he -- excuse me language, but he said, "Fuck Liz."

4   Q.   "Fuck Liz"?

5   A.   Yes.

6   Q.   Okay.  And what did you say in response, if anything?

7   A.   I was like -- I kept on telling him, "Well, what do you

8   mean?"

9           And he's all, "Let me see my backpack."

10          So I got his backpack from behind the backseat where

11  I was sitting at.  You know, I got his backpack, and I gave it

12  to him.  And he unzipped it, and that's when he pulled out the

13  meth.

14  Q.   Okay.

15  A.   The large amount.

16  Q.   Did it look to be similar in size and amount to what you

17  had scene in Ruben's possession before?

18  A.   Yes.

19  Q.   Okay.  Did it look like any had been removed from it?

20  A.   No, not that I know of.

21  Q.   Let me ask you this.  If you can -- know, did you

22  personally sell any of the meth from Ruben's pack that he had?

23  A.   No, I -- no, not me.

24  Q.   Did you smoke any of the meth --

25  A.   No.

San Miguel - Direct Examination

1  Q.   -- from that pack, as far as you know?

2  A.   Because we still had from the -- from the batch that was

3  not even from him.

4  Q.   Okay.

5  A.   It was -- it was just a small amount that we had from

6  somebody else.

7  Q.   Okay.  So going back to when you're in Levelland and he's

8  showing you this from the backpack.  When he showed you that,

9  what -- did you make any -- not what was in your mind right

10  now, I am just asking you whether did you say anything in

11  response?

12  A.   No, sir.

13  Q.   All right.  Did he say anything else after he showed you

14  that?

15  A.   No, he just -- well, that's all he kept on telling me was

16  that, "We're going to leave Odessa and we're not going back."

17  Q.   Okay.  Did you stay there in the car and talk?

18  A.   No.  We got down, me, Sean and Steven.

19  Q.   Got down?

20  A.   At his grandmother's house.

21  Q.   All right.  Got out of the car and went to grandmother's

22  house.

23  A.   Yes.

24  Q.   Did Sean witness -- was he awake and participating and

25  watching when Steven showed you the meth?

San Miguel - Direct Examination

1   A.    Yes.

2   Q.    Okay.  When you went to his grandma's house, had you ever

3   been there before yourself?

4   A.    No, sir.

5   Q.    All right.  Did you knock on the door such that somebody

6   would answer or what happened?

7   A.    Steven knocked on the door and his grandmother answered.

8   Q.    Okay.

9   A.    And Steven's dad was there also.

10  Q.    What is his name?

11  A.    Hans Saenz.

12  Q.    Hans Saenz.  Was he awake as well?

13  A.    Yes.

14  Q.    Okay.  I take it they let the three of you in.

15  A.    Yes.

16  Q.    Did you stay up and talk or did you go to bed?

17  A.    Well, we said hi to his dad and his grandmother.  And me,

18  Steven and Sean went to the spare bedroom.  And Steven was --

19  Q.    Okay.  Let's take it piece by piece, okay?

20  A.    Okay.

21  Q.    So you go to the spare bedroom, right?

22  A.    Yes.

23  Q.    I will ask you this.  What did you think -- I am asking

24  just what was in your own mind.  What did you think when Steven

25  showed you the methamphetamine?

San Miguel - Direct Examination

1  A.    Honestly, I knew we were -- that was trouble right there.

2  Q.    And why?  In your mind, why did you have that opinion?

3  A.    Because such it was a large amount and the large amount,

4  something like that, nobody is going to be easy on you about

5  that, especially if it is stolen.

6  Q.    Okay.  All right.  So you go up to the spare bedroom, the

7  three of you, correct?

8  A.    Yes.

9  Q.    Did Steven, as far as you can remember, did Steven show

10 the methamphetamine to either his dad or his grandmother?

11 A.    No.

12 Q.    Did he say anything to his dad or his grandmother about

13 the methamphetamine that you witnessed?

14 A.    No.

15 Q.    All right.  So you go up to the spare bedroom.  Did the

16 three of you have any further conversation before you fell

17 asleep?

18 A.    No.

19 Q.    Okay.  Did Steven still have his backpack with him?

20 A.    Yes.

21 Q.    Do you remember what it is that he did with his backpack?

22 A.    No.  As soon as we got to the spare bedroom, I told

23 Steven, "I am going to go outside and smoke a cig- --"

24         MR. LEACH:  Objection.  Nonresponsive.

25         THE COURT:  Sustained.

San Miguel - Direct Examination

 1  Q.   (BY MR. KLASSEN)  All right.  First of all, did you --
 2  just answer -- I think you said, no, you didn't see what he did
 3  with the backpack, correct?
 4  A.   Correct.
 5  Q.   But did you -- you said Steven didn't talk to you anymore
 6  about the meth, correct?
 7  A.   No.
 8  Q.   But you said something to him, correct?
 9  A.   Yes.
10  Q.   What did you say to him?
11  A.   "I'm going outside to smoking a cigarette."
12  Q.   Okay.  Did he make any verbal response when you said you
13  were going outside to smoke a cigarette?
14  A.   He just told me, "Okay."
15  Q.   Okay.  Did you, in fact, go outside to smoke a cigarette?
16  A.   Yes.  Sean came along.
17  Q.   Okay.  You and Sean.  Did you go to the front or to the
18  back?
19  A.   To the front.
20  Q.   Okay.  All right.  Did the two of -- you and Sean talk
21  while you were out in front?
22  A.   Yes.
23  Q.   Okay.  I don't want you to say what was said, okay?  But
24  did you have the impression that Sean was -- was Sean happy
25  about there being the meth or not happy?

San Miguel - Direct Examination

1    A.    Not happy.

2    Q.    Okay.  Did you express your feelings about the meth to

3    Sean?

4    A.    Yes.

5    Q.    Okay.  Now, after you two finished smoking the cigarette,

6    what did you do next?

7    A.    We were talking.

8    Q.    I know you're talking.  That's all we're going to cover

9    about the talking, okay?

10   A.    Okay.

11   Q.    But did you go back up and go to bed?

12   A.    No, we stayed up.

13   Q.    For how long would you say?

14   A.    Until we got back -- well, I got back to Odessa.

15   Q.    Because you never went to bed that night at all.

16   A.    I never -- I didn't go to bed at all.

17   Q.    All right.  Did Sean ever go to bed?

18   A.    Yes.

19   Q.    Okay.  What time would you say that he went to bed?

20   A.    It was, I think, maybe 6:30, 8:30, somewhere around there.

21   Q.    The sun coming up by this time?

22   A.    Sun coming up is about the time.

23   Q.    All right.  But you stayed up the whole time.

24   A.    Yes.

25   Q.    All right.  Were you -- now, I am just asking what was in

San Miguel - Direct Examination

1    your own mind now.  Were you making any thoughts or plans about

2    what you were going to do given what had just happened?

3    A.    Yes.

4    Q.    What was your intention?

5    A.    To get the methamphetamines back from Steven and take it

6    back to Liz.

7    Q.    Okay.  And why did you want to do that?

8    A.    At the time I was trying to be a good friend.

9    Q.    Good friend to who?

10   A.    Liz.

11   Q.    Okay.

12   A.    And return back what's theirs.

13   Q.    All right.  And that was what your thought was.

14   A.    Yes, sir.

15   Q.    Did you share that thought with Sean or just keep that

16   private?

17   A.    I kept it -- I shared it with Sean.

18   Q.    All right.  Did Sean articulate any disagreement with it,

19   that idea?

20   A.    No, he was --

21   Q.    Okay.  That's all I'm asking you.

22   A.    Okay.

23   Q.    And the reason we do this is there's certain sort of rules

24   of court that we have to do this, okay?

25   A.    Okay.

San Miguel - Direct Examination

1   Q.   And certain questions are proper and certain are not,

2   okay?  That's the only reason, okay?

3   A.   Okay.

4   Q.   Now, so you stayed up.  Sean went to bed.  I take it

5   Steven was sleeping this whole entire time or did he get up?

6   A.   He fell asleep.

7   Q.   Pardon?

8   A.   He fell asleep.

9   Q.   And he stayed sleeping?

10  A.   Yes.

11  Q.   And Steven was sleeping at grandmother's house, correct?

12  A.   Yes.

13  Q.   Up in that spare bedroom?

14  A.   Yes.

15          (Sotto voce discussion between Messrs. Klassen and

16  Lewis)

17  Q.   (BY MR. KLASSEN)  Oh, when Sean went to go sleep, did he

18  go up in the spare bedroom as well or somewhere in the house?

19  A.   Sean didn't fall asleep in the spare bedroom.

20  Q.   Where did he fall asleep, if you know?

21  A.   The Tahoe.

22  Q.   In the car.  Okay.  So he just crashed in the backseat or

23  where?

24  A.   Passenger.

25  Q.   Passenger's seat.  All right.

San Miguel - Direct Examination

1          You stayed up.  At some point in time I take it
2   somebody got up, correct?
3   A.   Well, Sean.
4   Q.   What did you do next?  You stayed up.  The morning comes.
5   Sean is sleeping in the passenger's side of the Tahoe.  What
6   happens next, as you remember?
7   A.   Sean fell asleep when I decide -- I finally got the keys
8   back -- finally got the keys from Steven.
9   Q.   How did you get the keys -- because Steven had the keys,
10  correct?
11  A.   Yes, Steven had the keys.
12  Q.   How did you get the keys from Steven?
13  A.   I told him that I was going to grab my bag from the Tahoe
14  to take a shower.
15  Q.   Okay.
16  A.   And that's how I got the keys.
17  Q.   When you went up to talk to him, he was still in the
18  bedroom?
19  A.   Yeah, he was asleep.
20  Q.   Okay.
21  A.   Yeah, he was --
22  Q.   Did you have to roust him?
23  A.   Yes, sir.
24  Q.   Did he wake up?
25  A.   Not fully waken up.

San Miguel - Direct Examination

1 Q.    Half awake.

2 A.    Half awake.

3 Q.    And you told him what?

4 A.    That I needed to get my bag from the Tahoe and take a

5 shower.

6 Q.    What did he say, if anything?

7 A.    He told me just bring back the keys.

8 Q.    Okay.  Did he give you the keys or tell you where they

9 were?

10 A.    He gave me the keys.

11 Q.    Okay.  Where did he reach for them?

12 A.    His left pocket.

13 Q.    Okay.  Did you have any consciousness at this point in

14 time of where that backpack was when you were up in the

15 bedroom?

16 A.    Well, I --

17 Q.    First of all, did you know where it was?

18 A.    No.

19 Q.    Okay.  That's all -- did you see it up in the bedroom?

20 A.    No, I didn't see it.  No.

21 Q.    All right.  So he gives you the keys once you have them --

22 and this would have been about what time in the morning?

23 A.    Maybe about -- I want to say maybe about 7:00 or 8:00.

24 Q.    Okay.  Still early in the morning.

25 A.    Still early in the morning.

San Miguel - Direct Examination

1   Q.    Okay.  And you do what once you have the keys?

2   A.    Me and Sean take off.

3   Q.    Okay.  You go down to the Tahoe, correct?

4   A.    Yes.

5   Q.    All right.  Who is driving?

6   A.    Me.

7   Q.    All right.  When you first got down to the Tahoe, is Sean,

8   as best you can remember, is he still sleeping or had he woken

9   up?

10  A.    When we first tooken off, he was fully awaken until we got

11  to the highway and that's --

12  Q.    And then what happened?

13  A.    -- and that's when he fell asleep.

14  Q.    He fell back asleep.

15  A.    Yes.

16  Q.    When you first left and got in the Tahoe and Sean is kind

17  of awake, I guess, did you tell him -- verbalize anything to

18  him about what you were going to do?

19  A.    That I was going to go pick up Liz and Ruben and bring

20  them to where Steven was at.

21  Q.    Okay.  And you told Sean that.

22  A.    Yes.

23  Q.    And was that a sincere intention on your part at that

24  time?

25  A.    Yes.

San Miguel - Direct Examination

1  Q.   Okay.  And you were going to do that why?

2  A.   To have the stuff back to Ruben and Liz, the meth, so they

3  could get it back.

4  Q.   Okay.  Did you have a fear of what might happen if you did

5  not get it back to them?

6  A.   Yeah.

7  Q.   What was that fear?

8  A.   Probably end up dead.

9  Q.   Probably what?

10  A.   End up dead.

11  Q.   All right.  When you told Sean this -- don't tell me what

12  he said, but did he articulate any disagreement with you about

13  that plan?

14  A.   Can you rephrase that?

15  Q.   Yes, I'll try.

16       Did he indicate in any way that he disagreed with

17  your idea of going to get Liz and Ruben and taking them to

18  where Steven was?

19  A.   He was agreeing with me.

20  Q.   Okay.  That's what I'm asking.

21       Okay.  So you start driving.  Sean falls asleep

22  again, correct?

23  A.   Correct.

24  Q.   All right.  And where did you go?

25  A.   I don't know -- to tell the truth, I don't know my way

San Miguel - Direct Examination

1  around anywhere.

2  Q.   West Texas.

3  A.   Yeah.

4  Q.   Okay.

5  A.   And I end up on the wrong exit somehow, someway and ended

6  up in Pecos -- somewhere outside of Pecos.

7  Q.   Outside of Pecos.

8  A.   Yes.  I don't know how, but I -- I mean...

9  Q.   All right.  But you know it was outside of Pecos.

10  A.   Yes.

11  Q.   Did you -- how many minutes or hours would you say that it

12  took you to get outside of Pecos?

13  A.   I want to say maybe about two or three hours.

14  Q.   Okay.  Did Sean, was he sleeping during that trip?

15  A.   Yes.

16  Q.   All right.  You knew -- how did you know that you were

17  outside of Pecos?  Did you see a sign that said Pecos, 3 miles

18  or what?

19  A.   When -- how I found out I was somewhere outside of Pecos

20  is because I got stranded, ran out of gas.

21  Q.   Okay.  Tell the jury about that.  You're driving, driving,

22  driving.

23  A.   And the car -- the Tahoe just shuts off.  I pull to the

24  side and I got down and I was trying to wave people down.

25  Q.   Okay.  Had you not been looking at the gas gauge or what?

San Miguel - Direct Examination

```
 1  A.    Not really, no.

 2  Q.    Okay.  When the car ran out of gas and you pulled over,

 3  Sean, was he awake at this time?

 4  A.    He was fully asleep.

 5  Q.    Still fully asleep.

 6  A.    Yes.

 7  Q.    Did you try to wake him and say that you were -- "Hey,

 8  we're out of gas"?

 9  A.    Yes, I tried to wake him.

10  Q.    Did he wake up?

11  A.    No, sir.

12  Q.    All right.  So you did what, once you were out of gas?

13  Was it four-lane road or two lane, what?

14  A.    Two lane.

15  Q.    Out in the country or were you in town?

16  A.    It was out in the country.

17  Q.    All right.  So you start waving -- trying to stop

18  somebody.

19  A.    Yes, sir.

20  Q.    Were you able to wave anybody down?

21  A.    No, sir, until I saw a vehicle on the other side of the

22  highway from where I was coming from and I decide to go ask

23  them for a phone to use.

24  Q.    There was a vehicle that was parked?

25  A.    Yes, parked on the side of the road.
```

San Miguel - Direct Examination

1    Q.    I take it there was somebody in the vehicle.

2    A.    Yes.

3    Q.    All right.  What, male, female?  What?

4    A.    A male.

5    Q.    An older guy, younger guy?

6    A.    Maybe in his mid 30s.

7    Q.    And you go up, walk over to him or do you motion to him to

8    come to you?

9    A.    I walk over to him.

10   Q.    All right.  Was he sleeping or awake?

11   A.    When I knocked on the window, he was asleep.

12   Q.    All right.  Did he wake up?

13   A.    Yes, sir.

14   Q.    All right.  And what did you -- just -- all I am asking

15   you is:  What did you tell him right now?

16   A.    That I was stranded and I needed a phone for somebody to

17   come help me.

18   Q.    All right.  Did you give him any explanation for being

19   stranded or just say that you were stranded?

20   A.    Yeah, I just told him I was stranded.

21   Q.    All right.  Did you tell him specifically you were out of

22   gas or just stranded?

23   A.    I told him I was out of gas.

24   Q.    All right.  Did he agree to let you use his phone?

25   A.    Yes, sir.

San Miguel - Direct Examination

1  Q.   All right.  Okay.  Now, who -- I take it you called

2  somebody, correct?

3  A.   Yes.

4  Q.   Who did you call?

5  A.   I called Liz.

6  Q.   All right.  Did you have -- this wasn't your phone, right?

7  A.   No.

8  Q.   Did you have your own personal cell phone?

9  A.   I had my own personal cell phone; but during that time,

10  like I said, I was using my phone whenever we were on the way

11  over there to his grandmother's house, Levelland, whatever, my

12  phone had got cutoff.  My bill was due and got cut off so I

13  couldn't use the phone so I had to use --

14  Q.   You had to borrow one.

15  A.   Yes.

16  Q.   Did Sean have a phone?

17  A.   Yes, he had a phone, but it was locked so I couldn't

18  access it.

19  Q.   You didn't have the code.

20  A.   Correct.

21  Q.   And he wasn't awake.

22  A.   Correct.

23  Q.   All right.  So you use this phone and you call Liz.  Did

24  you just remember Liz's number?

25  A.   No, I had my cell phone and I had her number in my phone.

San Miguel - Direct Examination

1  Q.    All right.  So you could still access your contacts.

2  A.    Yes, sir.

3  Q.    You just couldn't use it to make a call.

4  A.    Yes, sir.

5  Q.    All right.  Because you hadn't paid your bill.

6  A.    Right.

7  Q.    All right.  So you called.  Were you able -- were you

8  successful in getting in touch with Liz?

9  A.    Yes, sir.

10  Q.    And what I want you to do right now -- I may ask you to

11  talk about your feelings and thoughts here in a minute, but I

12  just want you right now to re-create as best you can the

13  conversation.

14  A.    I called her.  She answers.  And I told her, I was like,

15  "Hey, it's Johnny."

16            And she goes, "What's up?"

17            I said, "We have a problem."

18            She goes, "Yeah."

19            MR. LEACH:  Your Honor, I'm going to object to

20  narrative testimony.

21            MR. KLASSEN:  I just asked him to re-create the

22  conversation.

23            THE COURT:  Sustained.

24            MR. KLASSEN:  All right.

25            THE COURT:  Mr. Klassen.

San Miguel - Direct Examination

 1          MR. KLASSEN:  Yes.

 2          THE COURT:  How much longer do you have with this

 3  witness?

 4          MR. KLASSEN:  It's going to be a little while.

 5          THE COURT:  Okay.  Let me see the attorneys.

 6          (Sidebar conference on the record)

 7          THE COURT:  I'm not sure how -- what relevant a lot

 8  of this is.  It is -- I mean, you're going by minute detail,

 9  and I'm not sure how relevant that is to all the minutia that

10  you brought out of this witness.

11          MR. KLASSEN:  It is really important because the

12  whole premise of Count One is that the killing has to relate to

13  the drug -- the perception that the drugs were stolen or we're

14  going to --

15          THE COURT:  But whether he drives to somewhere or

16  somewhere, whether runs out of gas and whether he does this.

17          MR. KLASSEN:  Because if I try to go through any

18  faster, I'm get an objection because it is calling for a

19  narrative.  The defense can't have it both ways, Judge.

20          THE COURT:  Well, if you ask questions succinctly

21  that deal with the relevant portions of this case -- we're

22  going to take a recess.

23          (Sidebar conference on the record concluded)

24          THE COURT:  We're going to take a recess for about 10

25  or 15 minutes.  And I'd like to ask you to leave your notepads

San Miguel - Direct Examination

```
 1  here in the courtroom.  Don't discuss the case among
 2  yourselves.  And we'll be in recess for about 10 or 15 minutes.
 3            Let's all rise for the jury, please.
 4            (At 10:18 a.m. jury leaves)
 5            THE COURT:  Let me see the attorneys back in
 6  chambers, please.
 7            (Recess from 10:18 a.m. to 10:34 a.m.)
 8            (At 10:34 a.m., jury enters)
 9            THE COURT:  All right.  Let's be seated.  It's 10:34,
10  and we're back in the courtroom with the jury.  The attorneys
11  are all present.  The defendants are all present.  And the
12  witness is still on the stand.
13            And, Mr. Klassen, you may continue your examination.
14            Now, I called -- we have to call General Services
15  Administration in Lubbock, Texas, to get them to turn the air
16  conditioning down.  So I think it is a little bit cooler, but
17  we called them and said, "It's hot in here."  So we'll try
18  to -- if not, we'll hand out fans here in a little bit.
19            All right.  Mr. Klassen, you may proceed.
20            MR. KLASSEN:  I can feel some cool air so it is
21  better.
22  Q.   (BY MR. KLASSEN)  All right.  Mr. San Miguel, when we
23  broke, we were just talking about this first conversation when
24  you called Liz, you greeted her.  She said, "What's up,"
25  something to that effect.  Does that sound right?
```

1   A.   Yes.

2   Q.   Now, let's just kind of go back and forth.  What did you

3   say when she said, "What's up?"

4   A.   I told her, "We got a problem."

5   Q.   All right.  Anything else except for that?

6   A.   No.

7   Q.   What did she say in response?

8   A.   She said, "Yeah, we do."

9            MR. POOL:  Objection.  Hearsay.

10  A.   "We do got a problem."

11           THE COURT:  Overruled.  It is a co-conspirator during

12  the course of the conspiracy, and the Court finds there is a

13  conspiracy and that it is in furtherance of the conspiracy.

14  Q.   (BY MR. KLASSEN)  Okay.  You can answer, sir.

15  A.   That she said that we do got a problem, and that's when I

16  told her about what happened.

17  Q.   What did you specifically say, as best you can recall?

18  A.   That Steven had took the drugs.

19  Q.   Okay.

20  A.   And she was putting it all on me.

21  Q.   I take it you say that because of something she said.

22  A.   Yes.

23  Q.   When you said, "Steven had taken the drugs," what did she

24  say?

25  A.   She said, "No, you took them."

San Miguel - Direct Examination

1  Q.    Okay.  What did you say in response?

2  A.    And I told her, I was like, "How -- you know me better

3  than that.  You know, after all the time that I've been there,

4  I've protected you and your family" --

5  Q.    Okay.

6  A.    -- "you know, from problems, and you're going to come to

7  me and tell me that I took it?"  And I told her, I was like,

8  "You know, Steven.  He's a jack boy."  That's what they call

9  him.

10 Q.    A jack boy?

11 A.    Yes.

12 Q.    Okay.  When you said all those, what did she say in

13 response?

14 A.    And she goes, "No, I believe it is you.  I believe it is

15 you."

16        And I still kept on trying to convince her that it

17 wasn't me, you know.

18 Q.    Were you successful in convincing her?

19 A.    No.

20 Q.    Where did you -- how did the conversation end?

21 A.    I hung up.

22 Q.    Okay.  That's fine for now.

23        When you used -- did you use the term "jack boy" when

24 you were talking to her?

25 A.    Yes.

1   Q.   What did you mean -- you mean by the term "jack boy"?

2   A.   We call people jack boys, people that steal.

3   Q.   Okay.  All right.  That's fine.

4        So you hung up.  Was the conversation calm or more

5   heated?  How would you describe it?

6   A.   I was calm.  She was heated.

7   Q.   Anybody else participate in that conversation except for

8   you and Liz?

9   A.   Not to the last conversation.

10  Q.   Not to that one.  I know there was another one coming up.

11  A.   Yes.

12  Q.   Okay.  So you hung up.  Then what happened?

13  A.   She called back.

14  Q.   All right.  Quickly or after some period of time?

15  A.   Kind of quick.

16  Q.   Okay.  Were you still standing near the man who was -- had

17  loaned you the phone?

18  A.   Yes.

19  Q.   All right.  Again, the phone rang.  You answered.  What

20  was said?

21  A.   She goes, "Just bring back my drugs."

22  Q.   And you said what?

23  A.   I told her, I was like, "I'm trying to.  I got the Tahoe.

24  I am going to pick you up and we're going to come back and I'm

25  going to show you where Steven is at."

San Miguel - Direct Examination

1   Q.   All right.  What did she say when you said that?

2   A.   She goes, "No, I don't care.  Just bring back my stuff."

3   Q.   All right.  And then what response did you make, if any?

4   A.   And I kept on telling her, "I'm trying.  I'm trying."

5   Q.   Okay.  How did that conversation resolve?

6   A.   Not well.

7   Q.   Who hung up?

8   A.   She did.

9   Q.   All right.  Anything else said in that conversation other

10  than what you've told the jury?

11  A.   No.

12  Q.   Okay.  So anybody else on that conversation except for you

13  and Liz?

14  A.   She had called back again after she had hung up and the

15  guy that --

16  Q.   Hang on.  I want to get these in time.

17  A.   Okay.

18  Q.   So you called her first.  It was just you and Liz.  Then

19  she called you back again.

20  A.   Yes.

21  Q.   All right.  And then is there a third conversation?

22  A.   Yes, there's a third conversation.

23  Q.   All right.  Still close in time or is this later?

24  A.   It was like chasing a cat.  You know, like chasing them

25  through the house.  You know, it was like --

San Miguel - Direct Examination

1  Q.   Let me ask you this.  You're still on the side of the

2  road.

3  A.   Yes, on the side of the road.

4  Q.   All right.  Who called who this time?

5  A.   She called back.

6  Q.   Okay.

7  A.   And the guy --

8  Q.   What was that conversation?

9  A.   She talked to the guy that I was borrowing the phone from.

10 She had talked to -- because he knew -- the guy knew -- like,

11 he was hearing our conversation and he knew it wasn't getting

12 nowhere and he answered.

13 Q.   Okay.  Let's make sure the jury -- so the phone rang, but

14 he -- you had given the phone back to him by this time.

15 A.   Yes.

16 Q.   He answered the phone, correct?

17 A.   Yes.

18 Q.   Were you hearing the conversation?

19 A.   Yes.

20 Q.   You could hear what he said, correct?

21 A.   Yes, but I couldn't hear what she was saying.

22 Q.   All right.  So -- all right.  So you didn't hear anything

23 that she said at all?

24 A.   No.

25 Q.   All right.  What was any reaction or anything that he

1  said?

2  A.   He said, "I don't know what is going on, but I am just

3  trying to get the little" -- he's all, "I'm just trying to get

4  this little guy a ride to a gas station so he can put gas

5  inside the truck."

6  Q.   You heard him say that to her.

7  A.   Yes.

8  Q.   Okay.  That's it, correct --

9  A.   Yes.

10  Q.   -- basically?

11  A.   And they started arguing, and he told her, "Look" --

12          MR. POOL:  Objection.  Hearsay.  This person is

13  not --

14  Q.   (BY MR. KLASSEN)  They were arguing, correct?

15  A.   Right.  Right.

16  Q.   And then the phone call ended, correct?

17  A.   They were arguing, yes, and then it ended.

18  Q.   All right.  Did you ever participate in that call at all?

19  A.   No.

20  Q.   Did you get on the phone and talk to anybody?

21  A.   No.

22  Q.   All right.  Okay.  So that phone call is done.  We don't

23  need to get into that part of it, but then -- so the third

24  phone call is over, the one where Liz apparently was talking to

25  the man.  What happened next?

San Miguel - Direct Examination

1  A.    He told me that he would give me a ride.

2  Q.    Okay.  He agreed to give you a ride.  To where?

3  A.    To inside Pecos at a gas station.

4  Q.    All right.  And did he do that?

5  A.    We didn't go to a gas station.

6          MR. POOL:  Your Honor, I'm going to object to the

7  relevancy of this entire line of questioning.

8          THE COURT:  I'm sorry?

9          MR. POOL:  I'm objecting to the relevancy of this

10 entire line of questioning.

11         THE COURT:  Overruled.

12 Q.    (BY MR. KLASSEN)  Okay.  First of all, you do get in the

13 car with him, correct?

14 A.    Yes.

15 Q.    All right.  Does Sean get in the car with him?

16 A.    No.

17 Q.    Do you go back and check on Sean at all?

18 A.    No.

19 Q.    All right.  You just get in the car.  Where do you go?

20 A.    We were supposed to go to the gas station.

21 Q.    Okay.  But where did you go?

22 A.    He agreed to, you know what, to take me --

23         THE COURT:  Let's stop.  The question was:  "Where

24 did you go?"  Not what he did say, where did you go.

25         THE WITNESS:  Odessa.

Ann M. Record, RMR, CRR, CMRS, CRI ********** (432) 685-0361

San Miguel - Direct Examination

```
 1              THE COURT:  Okay.  Next question.
 2   Q.  (BY MR. KLASSEN)  Okay.  And he agreed to take you there,
 3   correct?
 4   A.   He's the one that decided to take me.
 5   Q.   All right.  He took you to Odessa.
 6   A.   Yes.
 7   Q.   How long a drive was it?
 8   A.   Maybe about an hour and a half.
 9   Q.   Where did he take you in Odessa?
10   A.   We ended up at a gas station over there in Odessa.
11   Q.   Okay.  Did you then -- when you got to the gas station,
12   what happened?
13   A.   I told him that I would walk from there, that he's done
14   enough.
15   Q.   Okay.  Was it close to a house or somewhere you were going
16   to?
17   A.   It wasn't too far away from my grandma's house.
18   Q.   Okay.  And did you then leave him there on foot?
19   A.   Yes.
20   Q.   Okay.  Where did you go?
21   A.   I went to my grandmother's.
22   Q.   Okay.  What did you do when you got to grandma's house?
23   A.   I fell asleep.
24   Q.   How long did you sleep?
25   A.   She wasn't there.  I fell asleep --
```

San Miguel - Direct Examination

```
 1   Q.    I asked --
 2   A.    Okay.
 3   Q.    We're just trying to get through this.  How long did you
 4   sleep?
 5   A.    About an hour.
 6   Q.    Okay.  When you woke up, what did you do?
 7   A.    She had woken me up.
 8   Q.    Okay.  How ever you woke up.  She woke you up.  What did
 9   you do?
10   A.    I started telling her about the situation.
11   Q.    Okay.  You told her.  How were you feeling at this point
12   in time?
13   A.    Very emotional.
14   Q.    Okay.  How so?
15   A.    I fell into depression.
16   Q.    Okay.  What did you do?
17   A.    Well, she kicked me out of the house.
18   Q.    Okay.
19   A.    And I took off walking again.
20   Q.    Where did you go?
21   A.    To Floyd Gwin Park.
22   Q.    What park?
23   A.    Floyd Gwin.
24   Q.    Floyd Gwin Park.  And what happened when you were at Floyd
25   Gwin Park?
```

San Miguel - Direct Examination

1  A.   When I got to Floyd Gwin, I was crying; and I tried to

2  commit suicide that day.

3  Q.   How did you try to commit suicide?

4  A.   I tried using my belt and I had a pistol on me.

5  Q.   Okay.  You had a firearm.

6  A.   Yes.

7  Q.   Did you have that firearm with you the whole day before

8  this?

9  A.   Yes.

10  Q.   Okay.  And obviously you were not successful in committing

11  suicide.

12  A.   Obviously.

13  Q.   But what happened?

14  A.   A guy saw me.  He was watching the whole thing.  And when

15  I fell onto floor crying after all that, he picked me up and

16  threw me into his car and dropped me off at Medical Center

17  Hospital.

18  Q.   In Odessa.

19  A.   Yes.

20  Q.   All right.  Were you admitted to the hospital?

21  A.   Yes, sir.

22  Q.   Were you ultimately transferred to another facility?

23  A.   Yes, in San Angelo.

24  Q.   What facility was that?

25  A.   River Crest.

San Miguel - Direct Examination

1  Q.   All right.  Were you, in fact, treated for a psychological

2  condition?

3  A.   Yes, sir.

4  Q.   What psychological condition?

5  A.   They diagnosed me with bipolar and post traumatic stress.

6  Q.   Okay.  Did you receive medication?

7  A.   Yes.

8  Q.   All right.  How long were you at the hospital in

9  San Angelo?

10  A.   A month.

11  Q.   Okay.  Were you at the hospital in San Angelo when Sean

12  got kill and things of that nature?

13  A.   Yes, sir.

14  Q.   Since you've been released from the hospital, are you

15  still taking medication?

16  A.   No, sir.

17  Q.   All right.  When did you quit taking medication?

18  A.   Three months after I got out of the hospital.

19  Q.   Since that time on the side of the road, did you ever see

20  Sean Lamb again?

21  A.   No.

22  Q.   Okay.

23  A.   After --

24  Q.   Okay.  I just asked you that question.

25  A.   Okay.

San Miguel - Direct Examination

1  Q.    You never saw him again.

2  A.    No.

3  Q.    Did you ever speak to him on the phone again before he

4  died?

5  A.    No.

6  Q.    Did you ever speak to Liz again on the phone?

7  A.    No.

8  Q.    Ever speak to Ruben on the phone?

9  A.    No.

10  Q.    What about Brian Hernandez, did you speak to him?

11  A.    No, sir.

12  Q.    Okay.  Now, Mr. San Miguel, are you still using -- you

13  mentioned that you used narcotics back during this period of

14  time.  Would you call yourself back then a heavy narcotics

15  user?

16  A.    Yes.

17  Q.    Are you still using narcotics today?

18  A.    No, sir, I've been seven months clean.

19  Q.    And I asked you earlier back when you were talking about

20  being at Steven's grandmother's house in Levelland seeing the

21  backpack.  Do you remember me asking you about that?

22  A.    Yes.

23  Q.    Did you ever see the meth again after he showed it to you

24  in the car?

25  A.    No.

San Miguel - Cross-Examination

```
 1  Q.    Never did.

 2  A.    No, sir.

 3  Q.    Okay.

 4          MR. KLASSEN:  I'll pass the witness.

 5          THE COURT:  Mr. Leach.

 6          MR. LEACH:  Thank you.

 7                    CROSS-EXAMINATION

 8  BY MR. LEACH:

 9  Q.    Mr. San Miguel, when is the last time you met with any of

10  the gentlemen at this table?

11  A.    I would say maybe about two and a half weeks ago.

12  Q.    Okay.  And they discussed your testimony here today?

13  A.    Yes, sir.

14  Q.    Okay.  And asked that you give them a version of events,

15  correct, your story?

16  A.    Correct.  Yes.

17  Q.    Did any of these gentlemen make a promise to you that you

18  wouldn't be prosecuted for your role in this conspiracy?

19  A.    Yeah, I believe so.

20  Q.    I'm sorry?

21  A.    No.  No.

22  Q.    No or yes?

23  A.    Well, to tell you the truth, I can't really remember.

24  Q.    You can't remember whether they told you you would or

25  would not be prosecuted?
```

San Miguel - Cross-Examination

1   A.   No.

2   Q.   You can't remember this conversation you had two and a

3   half weeks ago.

4   A.   Well, I remember me telling them my side of the story.

5   Q.   Okay.  Did they tell you that you were going to be

6   arrested?

7   A.   No -- they told me that I wouldn't be arrested.

8   Q.   Okay.  So they promised you you wouldn't be arrested.

9   A.   Correct.

10  Q.   Did they promise you you wouldn't be charged?

11  A.   Yes.

12  Q.   Did you tell them about your meth dealing with Steven long

13  before this got started?

14  A.   Yes.

15  Q.   They didn't tell you you would be charged for that.

16  A.   No.

17  Q.   Did you tell them about --

18  A.   I wouldn't be charged for it.

19  Q.   Okay.  Did you tell them about your meth dealing with

20  Ruben?

21  A.   Yes, I told them.

22  Q.   They didn't tell you you would be charged for that.

23  A.   No.

24  Q.   Okay.  Did they ever tell you you would be charged for

25  anything at all, any crime?

San Miguel - Cross-Examination

1  A.    They told me I wouldn't.

2  Q.    Ever been arrested since May of last year for any

3  involvement in methamphetamine -- this methamphetamine

4  conspiracy?

5  A.    That was it.

6  Q.    And how much meth were you using back in May, early May of

7  2014?

8  A.    A lot.  I mean, I was smoking a 50 every day.

9  Q.    Okay.  And that makes you pretty high, I guess?

10  A.    Yeah.

11  Q.    And it makes you paranoid?

12  A.    Yes, sir.

13  Q.    Okay.  Makes you not be able to sleep it sounds like.

14  A.    Yes.

15  Q.    Makes you disoriented?

16  A.    Yes, sir.

17  Q.    You didn't know your directions from Levelland to Odessa?

18  A.    No, sir.

19  Q.    Didn't know where you were when you walked up to this man

20  on the highway.

21  A.    No, sir.

22  Q.    Okay.  Were so distraught that you tried to commit

23  suicide.

24  A.    Yes.

25  Q.    And ended up in a psychiatric hospital.

1  A.    Yes.

2            MR. LEACH:  Pass the witness.

3            THE COURT:  Mr. Garcia.

4                    **CROSS-EXAMINATION**

5  BY MR. GARCIA:

6  Q.    Mr. San Miguel, you had a gun with you --

7  A.    Yes.

8  Q.    -- that entire night?

9  A.    Yes.

10  Q.    Did you see Sean and Steven with guns, too, that night?

11  A.    Yes.

12  Q.    And that was not the first time you had seen them carrying

13  guns, correct?

14  A.    Correct.

15  Q.    They pretty much carried guns on a regular basis, correct?

16  A.    Yes, sir.

17  Q.    And you did the same thing.

18  A.    Yes, sir.

19  Q.    And the tattoo that Sean had on his forehead, 5150, do you

20  remember that?

21  A.    Yes, sir.

22  Q.    What does 5150 mean?

23  A.    To tell you the truth, I have no idea.

24  Q.    You've never seen what that means at all?

25  A.    No, sir.

San Miguel - Cross-Examination

1  Q.   You never asked Sean why he put that particular number on

2  his forehead?

3  A.   No, sir.

4  Q.   Had he had that tattoo for a while?

5  A.   I believe so.

6       MR. GARCIA:  That's all I have, Your Honor.

7       THE COURT:  Okay.

8       Mr. Pool.

9                        **CROSS-EXAMINATION**

10  BY MR. POOL:

11  Q.   Mr. San Miguel, can you describe the gun that Sean had on

12  him that night?

13  A.   I believe it was a Glock .40.

14  Q.   And can you describe the gun that Steven had on him that

15  night?

16  A.   I would say -- I think it was a .45 Beretta.

17  Q.   Did you ever see Steven or Sean with a gray camouflage

18  gun?

19  A.   No, sir.

20       MR. POOL:  That's all I have, Your Honor.

21       THE COURT:  Okay.

22       Mr. Stroder.

23                        **CROSS-EXAMINATION**

24  BY MR. STRODER:

25  Q.   While you lived with Liz Hernandez, you and her smoked

San Miguel - Cross-Examination

```
 1  meth frequently?

 2  A.   Yes, sir.

 3  Q.   You say you smoked every day?

 4  A.   Yes, sir.

 5  Q.   How about Liz, every day?

 6  A.   Yes, sir.

 7  Q.   Did you use any other kind of drugs?

 8  A.   No, sir.

 9  Q.   No other kind of drugs at all?

10  A.   No, sir.

11  Q.   Did you use marijuana?

12  A.   Yes, sir.

13  Q.   Did you smoke every day?

14  A.   I used to.

15  Q.   I'm talking --

16  A.   Yes.

17  Q.   -- about in the spring of 2014.

18  A.   Okay.  Yes, sir.

19  Q.   So you used meth every day and you used marijuana every

20  day?

21  A.   Yes, sir.

22  Q.   Okay.  Did you use heroin every day?

23  A.   No, sir.

24  Q.   Did you use cocaine?

25  A.   No, sir.
```

San Miguel - Cross-Examination

1  Q.   Crack?

2  A.   No, sir.

3  Q.   Any other kind of illegal drug?

4  A.   No, sir.

5  Q.   Okay.  So -- and you're telling us that Liz drove up and

6  put you in a motel room for a while; is that right?

7  A.   Yes, sir.

8  Q.   And that she took you in; is that right?

9  A.   Yes, sir.

10  Q.   Did she take you in to help push dope?

11  A.   I believe so.

12  Q.   What was your role in that arrangement?

13  A.   Can you --

14  Q.   Were you to supply the dope or was she to supply the dope

15  or what?

16  A.   It was like half and half.

17  Q.   Okay.  And did you not, in fact, agree and help her to

18  sell dope?

19  A.   Yes, sir, I agreed.

20  Q.   What kind of firearm did you have?

21  A.   A 9mm.

22  Q.   What kind of rounds did you put in it?

23  A.   It was -- I think it was a 16 shot, 16.

24  Q.   16?  Okay.  Any particular brand?

25  A.   Smith & Wesson.

San Miguel - Cross-Examination

1   Q.   Were you ever charged with using a firearm in the course
2   of the conspiracy to distribute methamphetamine?
3   A.   No, sir.
4   Q.   And you haven't been charged with any kind of conspiracy,
5   right --
6   A.   Correct.
7   Q.   -- to distribute meth?
8   A.   I haven't been charged.
9   Q.   Okay.  You haven't been charged with any kind of murder.
10  A.   No, sir.
11  Q.   You admitted to us that you -- not only this conspiracy,
12  but you were involved in another conspiracy with another
13  supplier, is that right, named Ruben; is that correct?
14  A.   Yes.
15  Q.   Who was that?
16  A.   I can't tell the name.
17  Q.   Why not?
18  A.   I don't know.  I mean, it's been so long.
19  Q.   What, did you just --
20  A.   It wasn't somebody that I was --
21  Q.   Did you just leave it in the bushes or what?  I mean,
22  where did you get the meth?
23  A.   I can't you tell the name.  I don't know -- I don't know
24  the name.
25  Q.   How did you get ahold of him?

San Miguel - Redirect Examination

1   A.    Through a number.

2   Q.    What number?

3   A.    I don't know the number.  I don't have the phone.  I don't

4   have it.

5   Q.    The fact of the matter is you know exactly who was giving

6   you that meth, don't you?

7   A.    No, sir.

8   Q.    You just don't want to tell us.

9   A.    No.

10  Q.    Okay.  Did you tell the prosecutors -- did they ask you

11  who gave you that -- your other supplier was?

12  A.    No.

13  Q.    They didn't even ask you?

14  A.    No.

15  Q.    Did you tell them about the other supply?

16  A.    I told them that I was dealing meth before but --

17  Q.    Nobody asked you about it?

18  A.    No.

19  Q.    You got any meth convictions?

20  A.    No, sir.

21          MR. STRODER:  Pass the witness.

22          THE COURT:  Mr. Klassen.

23                      **REDIRECT EXAMINATION**

24  BY MR. KLASSEN:

25  Q.   Mr. San Miguel, when you were at the hospital in

San Miguel - Redirect Examination

```
 1  San Angelo, did an Odessa Police Department officer come and
 2  talk to you at that time?
 3  A.   Yes, two detectives.
 4            MR. KLASSEN:  I'll pass the witness.
 5            THE COURT:  Okay.
 6            Mr. Leach?
 7            MR. LEACH:  I don't have anything else, Your Honor.
 8  Thank you.
 9            THE COURT:  Mr. Garcia?
10            MR. GARCIA:  Nothing further, Your Honor.
11            THE COURT:  Mr. Pool?
12            MR. POOL:  Nothing further, Your Honor.
13            THE COURT:  Mr. Stroder?
14            MR. STRODER:  Nothing further, Your Honor.
15            THE COURT:  May this witness be excused, Mr. Klassen?
16            MR. KLASSEN:  No objection, Your Honor.
17            MR. LEACH:  No objection.
18            THE COURT:  Mr. Garcia?
19            MR. GARCIA:  I don't have an objection, Your Honor.
20            THE COURT:  Mr. Pool?
21            MR. POOL:  No objection, Your Honor.
22            THE COURT:  Mr. Stroder?
23            MR. STRODER:  No objection.
24            THE COURT:  All right.  You are excused.  I am going
25  to ask you not to discuss the case or your testimony with
```

San Miguel - Redirect Examination

1  anyone except the attorneys until the jury begins its

2  deliberations, okay?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Okay.  Thank you.  You're excused.

5          Call your next witness, please.

6          MR. LEWIS:  Your Honor, the government would called

7  Jacqueline Pineda.  This witness has not been sworn, Your

8  Honor.

9          (Witness sworn by the clerk)

10          THE CLERK:  Have a seat.

11          THE COURT:  Would you state your name for me, please.

12          THE WITNESS:  Jacqueline Pineda.

13          THE COURT:  And you're going to have to speak up

14  because we have -- it is a big room and everything.  Get close

15  to that microphone so you can talk loud.  If you and I were

16  just having a conversation or having a conversation with the

17  lawyers, we kind of say "uh-huh" and "Huh-uhs."  Don't say

18  "uh-huh" or "huh-uh."  Say "yes" or "no," please, and let them

19  finish their question before you answer, okay?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Okay.  Thank you.

22          Go ahead, Mr. Lewis.

23          MR. LEWIS:  Thank you, Your Honor.

24

25

1                          JACQUELINE PINEDA,

2            GOVERNMENT'S WITNESS SWORN AT 10:54 A.M.

3                          DIRECT EXAMINATION

4    BY MR. LEWIS:

5    Q.   Ms. Pineda, could you, first, spell your last name for the

6    record, please?

7    A.   P-I-N-E-D-A.

8    Q.   And, Ms. Pineda, what city do you currently live in?

9    A.   Odessa.

10   Q.   And were you living in Odessa back, say, about May of last

11   year?

12   A.   Yes, sir.

13   Q.   How long have you lived in Odessa?

14   A.   All my life.

15   Q.   Are you currently employed?

16   A.   No.

17   Q.   Okay.  Back in May of last year, were you working?

18   A.   Yes, sir.

19   Q.   What were you doing for a living?

20   A.   I was working at Sally Beauty Supply.

21   Q.   And how long had you worked there?

22   A.   About a year and a half.

23   Q.   Now, back in May of 2014, did you own a vehicle?

24   A.   Yes, sir.

25   Q.   Can you describe that vehicle for us?

1   A.   It was a 2007 -- or 2002 Ford Expedition.

2   Q.   Do you remember or recall what color it is?

3   A.   Blue.

4   Q.   Now, do you know a person by the name of Sean Lamb?

5   A.   Yes, sir.

6   Q.   How do you know Sean?

7   A.   He was a friend.

8   Q.   How long had you and Sean been friends?

9   A.   A couple of years.

10  Q.   Friends in the sense of socializing?

11  A.   Yeah, we hung out with some of the same people.

12  Q.   Did Sean ever borrow your vehicle?

13  A.   Yes, sir.

14  Q.   Okay.  And was that okay with you?

15  A.   Yes, sir.

16  Q.   Did Sean own a vehicle, if you know?

17  A.   Not that I'm aware of, no.

18  Q.   Do you recall the last time Sean wanted to borrow your

19  vehicle?

20  A.   Yes, sir.

21  Q.   Where were you when Sean contacted you about needing to

22  borrow the vehicle?

23  A.   I was at work.

24  Q.   Okay.  And did he come by or call first?

25  A.   He texted me first.

Pineda - Direct Examination

1  Q.   And how did you feel about letting him borrow your car?

2  A.   I told him that it was fine as long as he went to where he

3  was supposed to and that was it and then to be back to pick me

4  up at work by the time I got out.

5  Q.   When were you going to be off work?

6  A.   At 8:30 that night.

7  Q.   And were your terms acceptable to Sean?

8  A.   Yes, sir.

9  Q.   When did you understand he would be there to get the

10 vehicle?

11 A.   It was about an hour after he had texted me.

12 Q.   What time of day are we talking about?

13 A.   Before lunchtime.

14 Q.   Did Sean come to your place of business where you were

15 working?

16 A.   Yes, sir.

17 Q.   And do you know how he got there?

18 A.   With two of his friends in a brown car.

19 Q.   Somebody was there to drop him off.

20 A.   Yes.

21 Q.   Did he come inside the store?

22 A.   No, I met him outside.

23 Q.   Did you have the keys?

24 A.   Yes, sir.

25 Q.   Okay.  Did you give any further instructions to Sean on

1   his using your car that day?

2   A.   No, sir.

3   Q.   Did you give the keys over to him?

4   A.   Yes, sir.

5   Q.   What was his mood that day when you met with Sean?

6   A.   He was -- seemed just himself.

7   Q.   Nothing -- was there anything out of the ordinary?

8   A.   No, sir.

9   Q.   Anything in your mind that you recall from that day that

10  seemed to you that he was not the typical Sean that you knew?

11  A.   No, sir.

12  Q.   What was your understanding of what he was going to be

13  doing with your car that day?

14  A.   I was told that he was -- he was going to go take a

15  friend's mom to the store or something like that, and then he

16  was going to go and wash my car and clean out my car for me.

17  Q.   And then return it.

18  A.   Yes.

19  Q.   Did you get your car back that day?

20  A.   No, sir.

21  Q.   What happened?

22  A.   Sean Lamb was killed in my car.

23  Q.   Okay.  Do you recall how you found out about that?

24  A.   Yes.

25  Q.   How did you find out about that?

Pineda - Direct Examination

1    A.   My sister had called me because the detectives had showed

2    up at my house.

3             THE COURT:  Ronnie, get the lights.

4             MR. LEWIS:  Just real quick, please.

5    Q.   (BY MR. LEWIS)  Let me show you a photograph that's been

6    admitted into evidence, Ms. Pineda.  Let's see, not that one.

7    Let's try -- do you see the rear-end of the vehicle in

8    Government's Exhibit 45?

9    A.   Yes, sir.

10   Q.   Do you recognize that vehicle?

11   A.   Yes, sir.

12   Q.   Whose vehicle is that?

13   A.   That is my vehicle.

14   Q.   Okay.

15            THE COURT:  Turn the lights on.

16            MR. LEWIS:  You can go ahead and turn on the lights.

17   Q.   (BY MR. LEWIS)  Did Sean tell you who this person was or

18   give a name of the person he was giving the ride to?

19   A.   No.

20   Q.   And then the two people that you said that came with Sean,

21   dropped him off, did you recognize those two people?

22   A.   No, I didn't know who they were.

23   Q.   From what you saw or observed, can you tell us were they

24   male or female?

25   A.   They were both male.

Pineda - Cross-Examination

```
 1  Q.   And after Sean got out of that vehicle, do you recall
 2  whatever those two males did?  Did they leave or stay?
 3  A.   They waited until he had left and then they left.
 4  Q.   If you could tell, did it appear they followed him or --
 5  A.   I'm not sure if they did.
 6  Q.   Okay.
 7            MR. LEWIS:  Pass the witness.
 8            THE COURT:  Mr. Leach?
 9            MR. LEACH:  I have no questions for Ms. Pineda.
10            THE COURT:  Mr. Garcia?
11            MR. GARCIA:  No questions, Your Honor.
12            THE COURT:  Mr. Pool?
13            MR. POOL:  No questions, Your Honor.
14            THE COURT:  Mr. Stroder?
15            MR. STRODER:  Just one, Your Honor.
16                       CROSS-EXAMINATION
17  BY MR. STRODER:
18  Q.   Ms. Pineda, you said Sean had two males with him?
19  A.   Yes, sir.
20  Q.   How did they get to your place of work?
21  A.   They were in a vehicle.
22  Q.   What vehicle was that?
23  A.   It was a brown four-door car.  I don't know what kind of
24  car it was.
25  Q.   Brown Ford?
```

Pineda - Cross-Examination

```
 1  A.    No, a four-door car.

 2  Q.    What color was it?

 3  A.    Like a brownish gold.

 4  Q.    Do you know why they didn't just use that car?

 5  A.    No, I didn't.

 6            MR. STRODER:  Pass the witness.

 7            THE COURT:  Anything else, Mr. Lewis?

 8            MR. LEWIS:  No, Your Honor.

 9            THE COURT:  May this witness be excused, Mr. Lewis?

10            MR. LEWIS:  Yes, Your Honor.

11            THE COURT:  Mr. Leach?

12            MR. LEACH:  Yes, Your Honor.

13            THE COURT:  Mr. Garcia?

14            MR. GARCIA:  No objection, Your Honor.

15            THE COURT:  Mr. Pool?

16            MR. POOL:  No objection, Your Honor.

17            THE COURT:  Mr. Stroder?

18            MR. STRODER:  No objection.

19            THE COURT:  Okay.

20            Ms. Pineda, we appreciate you being here.  You're

21  excused.  I'd ask you not to discuss the case or your testimony

22  with anyone except the attorneys until the jury begins its

23  deliberations, okay?

24            THE WITNESS:  Okay.

25            THE COURT:  Thank you.
```

Patel - Direct Examination

1          Call your next witness, please.

2          MR. LEWIS:  Your Honor, the government would call

3   Babubhai Patel.

4          THE COURT:  Mr. Patel, if you would come up here.  I

5   think you were already sworn as a witness; is that correct?

6          Was he already sworn?

7          THE CLERK:  Yes, sir.

8          THE COURT:  Have a seat right here.  Mr. Patel, state

9   your name for us, please.

10          THE WITNESS:  Yes, sir.

11          THE COURT:  State your name.  Say your name.

12          THE WITNESS:  I cannot understand.

13          THE COURT:  What is your name?

14          THE WITNESS:  My name is Babubhai Patel.

15          THE COURT:  Okay.  You may be a little too close to

16   the microphone there.

17          Ronnie, could you do -- it's just a little too loud.

18          All right.  Mr. Lewis, you may proceed.

19          MR. LEWIS:  Thank you, Your Honor.

20                    **BABUBHAI PATEL,**

21     **GOVERNMENT'S WITNESS SWORN AT 8:55 a.m. on April 6, 2015**

22                    **DIRECT EXAMINATION**

23   BY MR. LEWIS:

24   Q.   Mr. Patel, what city do you live in currently?

25   A.   Odessa.

Patel - Direct Examination

1   Q.   How long have you lived in Odessa?

2   A.   Ten years.

3   Q.   And what do you do for a living?

4   A.   I am working -- I am managing the motel.

5   Q.   What motel do you manage?

6   A.   Parkway Inn.

7   Q.   And where is that located, what city?

8   A.   It is located in Odessa.  The address is 3071 East

9   Business 20, Odessa, Texas 79761.

10  Q.   Is there more than one Parkway Inn in Odessa?

11  A.   No.

12  Q.   And you've been the manager of this Parkway for how long?

13  A.   I am -- since last three years, I am managing the motel.

14  Q.   For three years.

15  A.   Yeah.

16  Q.   Okay.  And as the manager of this hotel, are you familiar

17  with the day-to-day operations of the hotel?

18  A.   Yes, sir.

19  Q.   Okay.  As part of the operations of the hotel, does it

20  have a security system?

21  A.   Yes, we have installed a CC TV camera for the security

22  purpose or by motel property as well as the other office

23  monitoring.

24  Q.   Okay.  You have cameras around the hotel; is that correct?

25  A.   Correct.

Patel - Direct Examination

```
 1   Q.    Okay.  And do those cameras come back into the office and
 2   record what they see?
 3   A.    Will you please repeat the question, please?
 4   Q.    Fair enough.
 5         You described a CC TV system; is that correct?
 6   A.    Correct.
 7   Q.    Okay.  The cameras, are they part of that CC TV system?
 8   A.    Yes, sir.
 9   Q.    Okay.  What is the purpose of that system?  What do you
10   keep that for?
11   A.    It is kept for monitoring the activity in the motel area.
12   Q.    In case something happens, can you go back to that system
13   to see what happened?
14   A.    No, I never go back to the system because I do not know
15   how to operate.
16   Q.    Okay.  Have you provided or allowed others to go back and
17   look at the system to see what's recorded on that?
18   A.    Yeah, sometimes police is coming and monitoring the --
19   they are looking at the camera.
20   Q.    Okay.  To see what's been recorded on there.
21   A.    Yeah.
22   Q.    Okay.  And do you recall the police coming back around May
23   of last year to look and see what was on your CC TV system,
24   what it had recorded?
25   A.    Yeah.  Police is coming and asking permission to see the
```

Patel - Direct Examination

1  recording and we are allowing to them and they are looking

2  there.  And whatever they want to copy, they do copy and...

3  Q.   And they asked for your permission.

4  A.   Yeah, ask permission.

5  Q.   Did you give them permission?

6  A.   Yeah, I gave them.  I gave them permission.

7  Q.   To look at whatever your system had recorded and copy

8  whatever they needed to copy.

9  A.   Yeah.

10  Q.   Okay.

11        MR. LEWIS:  Pass the witness, Your Honor, subject

12  redirect.

13        THE COURT:  Mr. Leach?

14        MR. LEACH:  No questions for Mr. Patel, Your Honor.

15        THE COURT:  Mr. Garcia?

16        MR. GARCIA:  No questions, Your Honor.

17        THE COURT:  Mr. Pool?

18        MR. POOL:  No questions, Your Honor.

19        THE COURT:  Mr. Stroder?

20        MR. STRODER:  None.

21        THE COURT:  May this witness be excused?

22        MR. LEWIS:  He can be excused, Your Honor.

23        MR. LEACH:  Yes, Your Honor.

24        THE COURT:  Mr. Garcia?

25        MR. GARCIA:  Yes, Your Honor.

Brian Hernandez - Direct Examination

```
 1            THE COURT:  Mr. Pool?

 2            MR. POOL:  No objection, Your Honor.

 3            THE COURT:  Mr. Stroder?

 4            MR. STRODER:  No objection.

 5            THE COURT:  We appreciate you being here, Mr. Patel.

 6  You're excused.  You can go back to work.  I'd ask you not to

 7  discuss the case with anybody except the attorneys, okay?

 8            THE WITNESS:  Thank you, sir.

 9            THE COURT:  Thank you, sir.  You may leave.

10            Government call its next witness.

11            MR. KLASSEN:  Your Honor, the government calls Brian

12  Hernandez who is in custody.

13            THE COURT:  Okay.

14            (Witness sworn by the clerk)

15            THE COURT:  Okay.  You may proceed.

16            MR. KLASSEN:  Thank you, Your Honor.

17                      BRIAN HERNANDEZ,

18          GOVERNMENT'S WITNESS SWORN AT 11:09 a.m.

19                     DIRECT EXAMINATION

20  BY MR. KLASSEN:

21  Q.   Mr. Hernandez, if you could please state your full name

22  for the ladies and gentlemen of the jury.

23  A.   Brian Hernandez.

24  Q.   And, Mr. Hernandez, how old are you, sir?

25  A.   18.
```

Brian Hernandez - Direct Examination

1  Q.   When did you turn 18?

2  A.   Last year.

3  Q.   Okay.  In 2014.

4  A.   Yes, sir.

5  Q.   All right.  Brian, you're wearing orange today.  Why is

6  that?

7  A.   Because I am at Kermit.

8  Q.   You're in custody; is that correct?

9  A.   Yes, sir.

10 Q.   And you're currently housed where?

11 A.   In Kermit.

12 Q.   All right.  Why are you in custody in Kermit?

13 A.   For conspiracy.

14 Q.   Conspiracy to do what?

15 A.   To methamphetamine.

16 Q.   Okay.  And that's a case in this court, correct?

17 A.   Yes, sir.

18 Q.   All right.  We'll come back and talk about that a little

19 later.

20          Before you were arrested, Mr. Hernandez, what city

21 did you live in?

22 A.   In Odessa.

23 Q.   And do you remember your address?

24 A.   Yes, sir.

25 Q.   What address was that?

Brian Hernandez - Direct Examination

1  A.    1101 Fitch.

2  Q.    Was that a house or an apartment?

3  A.    An apartment.

4  Q.    Okay.  About when did you live -- move into the Fitch

5  apartment?

6  A.    I am going to say in January of 2013.

7  Q.    Okay.  About how old were you when you moved in?

8  A.    15.

9  Q.    And who lived there at that 1101 Fitch apartment?

10  A.    Me, my two little brothers, my little sister, and my mom.

11  Q.    And what is your mom's name?

12  A.    Liz Hernandez.

13  Q.    All of your brothers and sisters are younger than you; is

14  that correct?

15  A.    Yes, sir.

16  Q.    And did you continue to live at 1101 Fitch -- did you have

17  a particular apartment number, too, at 1101 Fitch, if you

18  remember?

19  A.    No, sir, I don't remember.

20  Q.    Okay.  Fair enough.

21         4 something, does that ring a bell?

22  A.    I think so.  401, I think.

23  Q.    Okay.  You lived in that Fitch apartment through 2013 as

24  well as through 2014, correct?

25  A.    Yes, sir.

Brian Hernandez - Direct Examination

1  Q.   All right.  Mr. Hernandez, during 2013 and 2014, were you

2  attending school?

3  A.   Yes, sir.

4  Q.   At some point in time did you drop out?

5  A.   Yes, sir.

6  Q.   When did you drop out of high school?

7  A.   I dropped out last year in January.

8  Q.   Of what year?  2014?

9  A.   2014.

10  Q.   Okay.  And then from January, February, March, April,

11  during that time period, were you working or just --

12  A.   Yes, sir, I was working.

13  Q.   Where were you working?

14  A.   I was working at Mr. Gatti's, and then that's when I ended

15  up moving to Subway.

16  Q.   Okay.  Full-time work or part-time?

17  A.   Full-time.

18  Q.   Your mom, did she have a job during that same time period?

19  A.   Yes, sir.

20  Q.   Where did she work?

21  A.   She worked at Mr. Gatti's also.

22  Q.   And was that a full-time or part-time?

23  A.   Yes, sir, it was full-time.

24  Q.   Mr. Hernandez, if I could direct your attention to the

25  early months of 2014.  Could you tell the jury whether or not

Brian Hernandez - Direct Examination

```
 1  at some point in time in those months in the early part of
 2  2014, whether or not you came to know a young man by the name
 3  of Sean Lamb?
 4  A.   Yes, sir.
 5  Q.   Okay.  And how did you come to know Sean Lamb?
 6  A.   His brother started staying with us at the apartment.
 7  Q.   And his brother's name was what?
 8  A.   Steven Saenz.
 9  Q.   Steven Saenz, you understood that he was his brother.
10  A.   Yes, sir.
11  Q.   Okay.  When did Steven start staying there?
12  A.   He started staying there in about a month before his
13  brother got out, so May.
14  Q.   Okay.  And how did it come about that Steven started
15  staying at that apartment?
16  A.   Because my mom's boyfriend was staying with her and then
17  they were friends with Steven.  Steven needed somewhere to
18  stay, and so my mom gave him a place.
19  Q.   How -- what was your mom's boyfriend's name?
20  A.   Frankie.  Frankie San Miguel.
21  Q.   Okay.  And during this same time period, was there another
22  person staying at the apartment -- other than your brothers and
23  sister, another person staying at --
24  A.   Johnny.
25  Q.   Johnny what?
```

Brian Hernandez - Direct Examination

```
 1  A.    San Miguel.
 2  Q.    All right.  And how did Johnny and Frankie come to start
 3  staying there?
 4  A.    They got kicked out of their apartment so my mom decided
 5  to move them in.
 6  Q.    Okay.  Had you -- before all that happened, before Steven
 7  starts staying there and Johnny and Frankie start staying
 8  there, did you know any of those three people before?
 9  A.    I knew like -- I knew Frankie.  I've seen him around the
10  apartments every once in a while.  And the other ones -- I knew
11  Steven -- I didn't know Steven until they moved in.
12  Q.    Okay.  All right.  And Steven, he's the one that got Sean
13  to stay there?
14  A.    Yes, sir.
15  Q.    All right.  How did that happen, as best you can recall?
16  A.    From what I remember, he got out on March 7th -- or
17  May 7th.
18  Q.    When you say "got out," got out of what?
19  A.    Got out of county.
20  Q.    Jail.
21  A.    Yes, sir.
22  Q.    All right.  Go ahead.
23  A.    And so I am guessing he needed somewhere to stay and his
24  brother brought him in with him.
25  Q.    Okay.  And while they were at the apartment, when Sean
```

Brian Hernandez - Direct Examination

1  started staying there with Steven, where did they sleep?

2  A.    They slept downstairs on the couch.

3  Q.    Okay.  How many bedrooms did that apartment have?

4  A.    It had three.

5  Q.    Who slept in what bedroom?

6  A.    My sister and my mom slept in her room and then I had my

7  own room and my two brothers shared one room.

8  Q.    All right.  So Steven slept where?

9  A.    Downstairs.

10 Q.    And Johnny slept?

11 A.    All three of them slept downstairs.

12 Q.    Okay.  What about Frankie, was he staying there too?

13 A.    No, he -- whenever they moved in, he was locked up.  He

14 got locked up.

15 Q.    Okay.  All right.  So how long would you say that Sean

16 stayed at you and your mom's place total if you were to

17 estimate?

18 A.    From May 7th to the time he died.

19 Q.    Okay.  Maybe that would be about a week or so?

20 A.    It was from the 7th to the 21st, isn't it?

21 Q.    A couple of weeks.

22 A.    Yes, sir.

23 Q.    Okay.  Fair enough.

24        All right.  Who is Ruben Hernandez?

25 A.    That's my uncle.

Brian Hernandez - Direct Examination

```
 1   Q.    And is Ruben your mom's brother?

 2   A.    Yes, sir.

 3   Q.    Okay.  Have you known him most or all of your life?

 4   A.    All my life.

 5   Q.    Did he live there as well?

 6   A.    He lived there off and on.

 7   Q.    Often did he stay there?

 8   A.    Every once in a while.

 9   Q.    In 2014, did he live there for any periods of time?

10   A.    No, sir.  He would stay one day and then he would leave.

11   Q.    All right.  Was your uncle -- from your own personal

12   knowledge, was your Uncle Ruben, was he involved with drugs?

13   A.    From what I knew of, yes.

14   Q.    And what did he do in terms of drugs?

15   A.    He would sell them.

16   Q.    What particular kind of drugs would he sell?

17   A.    Meth and coke.

18   Q.    Okay.  Most -- more one than the other?

19   A.    Probably.

20   Q.    Which one did you see the most often?

21   A.    Coke.

22   Q.    Okay.  Did your mom, Liz, did she ever help your uncle

23   sell drugs?

24   A.    Not coke, but the meth she did.

25   Q.    Okay.  Did she ever store drugs for your uncle?
```

Brian Hernandez - Direct Examination

1   A.   Yes, sir.

2   Q.   And by -- what did she allow your uncle to do?

3   A.   Just to leave it in her room.

4   Q.   Okay.  Coke or meth or both?

5   A.   Both.

6   Q.   Did you ever participate yourself in selling drugs?

7   A.   No, sir.  No, sir.

8   Q.   Okay.  Did your mom sell drugs?

9   A.   Probably.

10   Q.   Okay.  Did you see it ever yourself?

11   A.   No, sir.

12   Q.   All right.  But your understanding was that she did.

13   A.   Uh-huh, yes, sir.

14   Q.   All right.  Going back to the time period now just that

15   couple weeks or how ever many days that Sean was staying there,

16   do you recall an occasion where your Uncle Ruben brought

17   perhaps a large amount of drugs over there?

18   A.   Yes, sir.

19   Q.   All right.  Tell the jury what you remember about that.

20   A.   He got there one night, and he talked to my mom.  And then

21   he called Steven, Sean and Johnny upstairs.

22   Q.   Okay.  Now, did you witness this yourself?

23   A.   Yes, sir.

24   Q.   So you were upstairs as well.

25   A.   I was downstairs whenever everybody got there when

Brian Hernandez - Direct Examination

1  everybody was sitting down.

2  Q.   All right.  We're going to take it slow because it is

3  important to understand what you saw, okay?  So just talk about

4  what you saw that night when Ruben got there.

5  A.   Everybody went upstairs and then they closed the door.

6  They put the knife on the door so nobody would walk in.

7  Q.   So you weren't in there for that.

8  A.   No, sir.

9  Q.   At the time they went up and put the knife on the door so

10 nobody would walk in, had you seen anything before they went

11 upstairs?

12 A.   No, sir, till after.

13 Q.   All right.  Did you hear them talk about anything while

14 they were downstairs before they went upstairs?

15 A.   He just called them upstairs.

16 Q.   All right.  So all you know so far is they just go

17 upstairs.

18 A.   Yes, sir.

19 Q.   All right.  Could you hear what anybody was talking about?

20 A.   No, sir, I stayed downstairs.

21 Q.   All right.  So how long were they up in that room?

22 A.   I would say like an hour or two.

23 Q.   Okay.  And then what happens?

24 A.   And then after that, that's when everybody started coming

25 downstairs.  And then --

Brian Hernandez - Direct Examination

1  Q.    "Everybody" is who?

2  A.    Johnny, Sean and Steven, they came downstairs and then I

3  went upstairs because I needed to tell my mom something.  And

4  then I looked in the restroom, and that's whenever I saw my

5  uncle.

6  Q.    What did you see -- your Uncle Ruben, correct?

7  A.    Yes, sir.  He covered the methamphetamine.

8  Q.    Okay.  Tell me -- tell the jury what exactly you saw in

9  the bathroom.

10  A.    It looked like a very large amount of like clear stuff,

11  like, I guess how the meth look.  It was a large amount

12  (Indicating).

13  Q.    When you say -- you're making a motion with your hands.

14  A.    It's because I could barely even --

15  Q.    Right.  What did it look like?  Did you see it?

16  A.    It was like a big ol' clear bag.  A big ol' clear bag.

17  Q.    Okay.

18  A.    And like he had to turn his whole body away.  He didn't

19  cover it like this (Indicating).  He had to put his whole body

20  against it so I wouldn't see it.

21  Q.    All right.  He tried to keep it from you.

22  A.    Yes, sir.

23  Q.    But you saw it was a bag of something, correct?

24  A.    Uh-huh.

25  Q.    What did you think it was at that time?

Brian Hernandez - Direct Examination

1   A.   Drugs.

2   Q.   Okay.  Did you know what kind of drugs?

3   A.   No, sir.

4   Q.   You just -- did he talk to you about it at all?

5   A.   No, sir.

6   Q.   All right.  Were you -- did you find your mom?

7   A.   Yes, sir, she was on the bed.

8   Q.   Any conversation with her?

9   A.   No, sir, she was on her phone.

10  Q.   She wasn't what?

11  A.   She was on her phone.

12  Q.   All right.  You didn't talk to her.

13  A.   Yeah, I ended up talking to her just to see if she needed

14  something to drink or something, tea.

15  Q.   But nothing about the drugs.

16  A.   No, no, no.

17  Q.   All right.  Did you talk to anybody, whether it be -- that

18  night now, whether it be Ruben, Johnny, Steven or Sean or

19  anybody that night about the drugs?

20  A.   No, sir.

21  Q.   Do you know whether or not one way or the other, did Ruben

22  leave those drugs there that night or did he take them?

23  A.   Yes, sir, he left some with my mom.  He left some with

24  Sean.  He left some with Johnny.

25  Q.   Okay.  Slow down, first of all, so the court reporter can

Brian Hernandez - Direct Examination

1  get it down and then also so that everybody can understand what

2  you're saying.

3  A.   Okay.

4  Q.   Okay.  So the question was:  Did he leave some or all of

5  that drugs there that night?  And your answer was?

6  A.   Yes, sir, he took some -- he left some with my mom.  He

7  took some with himself.  Then he left some with Sean, some with

8  Steven, and some with Johnny.

9  Q.   Okay.  Did you see that happen?  Did you see them all?

10 A.   No, sir, because you could hear them talking about it.

11 That's what they talked about all night.

12 Q.   They talked about it.

13 A.   Yes, sir.

14 Q.   But you don't know -- you didn't see any of these people

15 with any of the drugs.

16 A.   No, sir.  But that's what they talked about.

17 Q.   Okay.  Fair enough.

18         Now, at some point that night did Ruben leave?

19 A.   Yes, sir.

20 Q.   Okay.  Did you -- in the days that followed, did you see

21 any of the people you mentioned with any of those drugs?

22 A.   No, sir.

23 Q.   All right.  Did you see any drugs anywhere in your

24 apartment in the days that followed?

25 A.   Upstairs I would see -- I saw pipes and stuff.

Brian Hernandez - Direct Examination

1  Q.    Just pipes like to smoke meth.

2  A.    Yes.

3  Q.    Any baggies of meth or any other kind of drugs?

4  A.    No, sir.

5  Q.    Did there come a time, Brian, when -- from your perception

6  that your mom or your uncle came to believe that some kind of

7  drugs had been stolen?

8  A.    Yes, sir.

9  Q.    All right.  What do you remember -- how do you remember

10  about that first coming up that you understood or thought that

11  maybe something had been stolen?

12  A.    Well, because I needed to go -- I woke up.  I got home

13  from work.

14  Q.    Okay.  Stop there.  How close in time was this to that

15  night when Ruben came over and they all went upstairs?  Close

16  in time or was this -- had some time passed?

17  A.    No, I think it was close in time.

18  Q.    Within a few days?

19  A.    Yes, sir.

20  Q.    Okay.  All right.  So you had been at work, you said?

21  A.    Yes, sir.

22  Q.    And that's work at Mr. Gatti's.

23  A.    No, I was at Subway.

24  Q.    At Subway, I apologize.

25  A.    I was working at Subway now.

Brian Hernandez - Direct Examination

1  Q.   Okay.  And you were working and you came home?

2  A.   I came home and I saw my mom.  She was getting a tattoo.

3  And then --

4  Q.   Who was giving her a tattoo?

5  A.   I don't know his name.

6  Q.   Okay.

7  A.   But he's here.

8  Q.   "He's here" meaning he's downstairs.

9  A.   Yes, sir.

10  Q.   Okay.

11  A.   So I didn't talk to anybody.  I was tired from work.  And

12  I just went right upstairs, took a shower and went to asleep.

13  Q.   Okay.  How did it come up that you -- you went to sleep

14  after your shower.

15  A.   Yes, sir.

16  Q.   How did it come up that you believe your mom thought that

17  something has been stolen?

18  A.   Because I woke up the next day because I needed to go to

19  work and then I looked out the window to make sure the car was

20  here.  And it wasn't here and --

21  Q.   What car are you talking about?

22  A.   The Tahoe.

23  Q.   Whose car was it?

24  A.   My mom's.

25  Q.   All right.  Did you drive the Tahoe sometimes?

1  A.    Yes, sir.

2  Q.    All right.  The Tahoe wasn't there.

3  A.    And so I went up to my mom and I told her, "Who has the

4  car?"  And then she's like -- her eyes got big.  And then the

5  first thing she did was look in her purse and then she's like,

6  "Damn, they just jacked me."

7  Q.    They just what?

8  A.    They just stole from me.

9  Q.    They did what, I'm sorry?

10 A.    They just stole from me.

11 Q.    She used the word "stole" or "jacked"?

12 A.    "Jacked."

13 Q.    And "jacked" means -- you took that to mean stolen.

14 A.    Stolen.

15 Q.    Okay.  Go ahead.

16 A.    And that's the first thing she did was look in her purse,

17 and she couldn't find it.  Then she call up my uncle.

18 Q.    All right.  Your Uncle Ruben.

19 A.    Yes, sir.

20 Q.    Did you hear any of that conversation?

21 A.    That they jacked her.  That's what --

22 Q.    Okay.  What I want you to tell the jury is the part of the

23 conversation that you heard.  Maybe you just heard your mom's

24 side or maybe you heard both sides, but tell the jury what you

25 heard your mom say at least?

Brian Hernandez - Direct Examination

1  A.   That they jacked her.  And then I guess he asked who.  And

2  then she all three of them:  Johnny, Steven and Sean.

3  Q.   You heard your mom say "all three of them."

4  A.   Yes, sir.

5  Q.   Okay.  Go ahead.

6  A.   So after that they were yelling back and forth saying how

7  can you -- she's like, "I was asleep."

8          And then I don't know what he was saying.

9          Then she's like, "I don't know."

10         And then they finally hung up.  And like a couple of

11 hours later, that's whenever my uncle came over.

12 Q.   Okay.  Your Uncle Ruben.

13 A.   Yes, sir.

14 Q.   Okay.  The conversation that you heard at least part of

15 when your mom was talking to Ruben, what was your mom's mood?

16 Was she calm or upset?

17 A.   She was mad and scared, I guess.  Yeah, she was mad and

18 scared.

19 Q.   Okay.  Sounded mad and scared.

20 A.   Yes, sir.

21 Q.   All right.  Did you hear your mom say what in particular

22 has been stolen?

23 A.   She said the ice.

24 Q.   She used the term "ice."

25 A.   Yes, sir.

Brian Hernandez - Direct Examination

1  Q.   And that term, did that mean anything to you?  Are we

2  talking like ice in the refrigerator?

3  A.   No.  It was the meth.

4  Q.   Okay.  It's a term for meth.

5  A.   Yes, sir.

6  Q.   All right.  Now -- so a couple hours later Ruben shows up,

7  correct?

8  A.   Yes, sir.

9  Q.   Did you see him come in and witness whatever conversation

10  occurred?

11  A.   Yes, sir.  After he came in, he went upstairs straight to

12  my mom's room and they closed the door.

13  Q.   So you didn't hear any of that conversation, or did you?

14  A.   Yes, sir.  They were yelling back and forth.

15  Q.   They were yelling.

16  A.   Yes, sir.

17  Q.   Or loud voice.

18  A.   Yes, sir.

19  Q.   What did you hear them say back and forth?

20  A.   He was like, "How can you let this happen?  I counted on

21  you.  You weren't supposed to let this happen."

22         She was just yelling back and forth saying, "Sorry, I

23  went to sleep early," and that --

24         And he called her stupid saying that "I shouldn't

25  have trusted you" and stuff like that.

Brian Hernandez - Direct Examination

1  Q.   Okay.  The conversation, how did it end?

2  A.   My uncle stormed out.

3  Q.   All right.  Stormed out of the bedroom?

4  A.   Yes, sir.

5  Q.   Did he stay in the house or did he leave altogether?

6  A.   He left.  He left right away.

7  Q.   All right.  Did you talk to your mom then after Ruben had

8  left about --

9  A.   No, sir, she closed her door.

10  Q.   All right.  Did Ruben come back that day?

11  A.   Yes, sir.

12  Q.   All right.  And pretty quickly or later on?

13  A.   No, later on.

14  Q.   How many hours would you say?

15  A.   I want to say like about three or four hours later.

16  Q.   And when he came back, what do you remember happening?

17  A.   He's like, "We need to" -- he wanted to find the drugs and

18  the car.

19  Q.   Okay.  Let's stop there.  I take it he comes in.

20  A.   Yes, sir.  And then he goes up to my mom's room.

21  Q.   Did you witness -- okay.  A little bit at a time.  And the

22  other thing that will really help, Brian, this lady that's

23  sitting right in front of you, she's trying to get all of this

24  down, okay?  And so when people talk in normal conversation,

25  just on the street or whatever, very often, you know, you know

Brian Hernandez - Direct Examination

1  how half way through what I am going to ask so you start

2  answering, but it's hard for her to get that down.  So if

3  you'll do your best to wait, I'll do my best to wait till

4  you're done answering before I ask, okay?

5  A.    Yes, sir.

6  Q.    All right.  So Ruben comes in.  Did you witness the

7  conversation when he came back?

8  A.    He went upstairs.

9  Q.    Again, he went upstairs.

10  A.    Yes, sir.

11  Q.    To where?

12  A.    He went into my mom's room.

13  Q.    All right.  Door closed?  Door open?

14  A.    Door closed.

15  Q.    Did you hear any of the conversation the second time?

16  A.    No, sir.

17  Q.    All right.  What happened -- how long were they in there?

18  A.    For like an hour.

19  Q.    Okay.  What happened?  Did someone come out eventually?

20  A.    Yes, sir, my mom did.

21  Q.    Your mom came out.

22  A.    Yes, sir.

23  Q.    All right.  And what did she do?

24  A.    Nothing.  She went straight to the kitchen and then she

25  got something to drink and she went back upstairs.

Brian Hernandez - Direct Examination

1  Q.   All right.  And they talked some more?

2  A.   Yes, sir.

3  Q.   Did you hear any of that?

4  A.   No, sir, they closed the door.

5  Q.   All right.  How did any of that end?

6  A.   My uncle ended up leaving.

7  Q.   Okay.

8  A.   He was pissed.  He was mad.

9  Q.   Why do you say he was pissed or he was mad?

10  A.   I have known him for a while to see how his facial

11  expressions are.  So whenever he's mad, I know he's mad.

12  Q.   He didn't say anything to you.

13  A.   No, sir.  He just walked out.

14  Q.   All right.  Now, did you talk to your mom at all that

15  night?

16  A.   No, sir.

17  Q.   At some point in time in these days, Brian, did you become

18  aware of some sort of plan to maybe try to get this ice or this

19  stuff back?

20  A.   Yes, sir.

21  Q.   Tell the jury how you became aware of some plan that was

22  in the works.

23  A.   It was morning and then I went downstairs and I saw my

24  mom.  She was talking on the phone.  And then my uncle ended up

25  showing up.  And then he's like, "So what's going to happen?"

Brian Hernandez - Direct Examination

1  Q.   All right.  So you heard this conversation yourself.

2  A.   Yes, sir.

3  Q.   All right.  So he said what?

4  A.   He said, "So what's going to happen?"

5  Q.   Who was he talking to?

6  A.   He was talking to my mom.

7  Q.   Okay.  All right.  Go ahead.  What was said?

8  A.   And she's like, "We could probably try to find people so

9  we could try to find Sean and everybody -- Sean, Steven and

10 Johnny, see if we could try to find them."

11 Q.   Okay.  What did Ruben say?

12 A.   He says, "Well, let's go for it.  Let's try to find them

13 because we need the stuff."

14 Q.   Okay.  So what happened?

15 A.   Then after that, like a couple hours later, that's

16 whenever Stacey and her friend showed up.

17 Q.   Stacey and her friend showed up at you and your mom's

18 place.

19 A.   Yes, sir.

20 Q.   All right.  Is the Stacey person, is this somebody that

21 you knew previously?

22 A.   I seen her every once in a while around the apartments.

23 Q.   All right.  Do you see the Stacey that showed up, do you

24 see her in the courtroom today?  Take a look around.  You can

25 stand up if you need to so you can see everybody.

Brian Hernandez - Direct Examination

```
1   A.    Yes, sir.

2   Q.    All right.  Where is Stacey located?

3   A.    Over there in the blue shirt.

4   Q.    In the blue shirt.

5         MR. KLASSEN:  Your Honor, may the record reflect --

6   Q.    (BY MR. KLASSEN)  The female in the blue shirt or the

7   male?

8   A.    Female.

9         MR. KLASSEN:  Your Honor, may the record reflect that

10  the witness has identified Defendant Castillo.

11        THE COURT:  The record will so reflect.

12  Q.    (BY MR. KLASSEN)  This friend that was with her, a man or

13  a woman?

14  A.    It was Anthony.

15  Q.    All right.  You learned his name later.

16  A.    Yes, sir.

17  Q.    All right.  But when you first saw him, you didn't know --

18  had you ever seen him before?

19  A.    No, sir.

20  Q.    All right.  Do you see Stacey's friend or you later

21  learned as Anthony, do you see him in the courtroom today?

22  A.    Yes, sir.

23  Q.    Okay.  Could you point at him and identify an article of

24  clothing?

25  A.    He's at the far end.  He's at the far end.
```

Brian Hernandez - Direct Examination

```
 1   Q.   He's at the far end of the table over here.
 2   A.   Yes, sir.
 3        MR. KLASSEN:  Your Honor, may the record reflect that
 4   the witness has identified Defendant Gonzales.
 5        THE COURT:  The record will so reflect.
 6   Q.   (BY MR. KLASSEN)  All right.  So these two show up,
 7   correct?  And who do they talk to, if anybody?
 8   A.   They talk to my mom and Ruben.
 9   Q.   Were you a witness to that conversation?
10   A.   Yes, sir.
11   Q.   What do you remember being said?  And try as best you can
12   to say who said what.
13   A.   Okay.  Stacey said that she had friends that could help
14   her out because -- she had friends in Odessa that could try to
15   help her out like spread it out so they could try to find --
16        MR. STRODER:  Your Honor.
17        THE COURT:  Just a second.
18        MR. STRODER:  Your Honor, may we approach?
19        THE COURT:  Sure.
20        (Sidebar conference on the record)
21        THE COURT:  Go ahead.
22        MR. STRODER:  Just for the record, Judge, before they
23   start getting into co-conspirator statements, we need a finding
24   or a hearing or somewhat to establish --
25        THE COURT:  Right now she is a defendant and so her
```

Ann M. Record, RMR, CRR, CMRS, CRI ********** (432) 685-0361

Brian Hernandez - Direct Examination

1  statements are a statement of a party of the case so it is

2  not --

3          MR. KLASSEN:  And you're right, as to the statement.

4          THE COURT:  Yeah, yeah.

5          MR. KLASSEN:  But anything that these folks say...

6          MR. STRODER:  Well, what I am saying is -- isn't

7  that -- it's admissible other than the co-conspirator.

8          THE COURT:  This one here is admissible.  What she

9  says is admissible without being a co-conspirator because she's

10 a party to the action.  She is a party.

11         MR. LEWIS:  And information against interest.

12         THE COURT:  Information against interest, yeah.

13         MR. GARCIA:  Would it be hearsay as to us?

14         THE COURT:  Well, of course it comes in -- we'll put

15 it in.  The Court finds that there is a conspiracy that has

16 been alleged and the Court finds that the conspiracy -- there

17 is sufficient evidence to bring that forward.  And the Court

18 finds that the statements were made during the course of the

19 conspiracy by members of the conspiracy and overrules your

20 objection.  And y'all can have a running objection.

21         MR. GARCIA:  And we'll have a running objection?

22         MR. LEACH:  As to all defendants?

23         THE COURT:  You'll have a running objection, yeah,

24 for all defendants.

25         MR. GARCIA:  All right.

Brian Hernandez - Direct Examination

```
 1          MR. LEACH:  Thank you, Your Honor.

 2          (Sidebar conference on the record concluded)

 3          THE COURT:  You may proceed.

 4          MR. KLASSEN:  Thank you, Your Honor.

 5   Q.  (BY MR. KLASSEN)  Brian, before we broke, we just were

 6   talking about what was said when Stacey and her friend came in

 7   to talk to your mom and to your uncle.  And we were -- started

 8   to -- if you could again talk about what you remember being

 9   said, and to the extent you're able to, try to remember who

10   said what.

11   A.   Stacey told my mom and Ruben that she could -- that she

12   has friends that could help them try to find Steven, Sean and

13   Johnny.

14   Q.   Okay.  What was the response when she said that?

15   A.   And they said, yeah, because they needed help so they

16   could find the ice.

17          MR. STRODER:  Your Honor, I object.  "They said."

18          MR. KLASSEN:  I'm going to clarify.

19          It's a good objection, Mr. Stroder.

20   Q.  (BY MR. KLASSEN)  When you said "they" -- this is what I'm

21   talking about.  When "they" -- who was expressing that?

22   A.   It was my mom -- my mom and Ruben.

23   Q.   Your mom and your uncle.

24   A.   Yes, sir.

25   Q.   All right.  Then what was said?  Anything else that you
```

Brian Hernandez - Direct Examination

1  can remember?

2  A.   And then they said --

3  Q.   "They" again.

4  A.   My mom and Ruben said the best possible -- the faster --

5  the faster the best -- like -- yeah, the faster the best.

6  Q.   The faster the best.

7  A.   Like the sooner the best.

8  Q.   Okay.  And when they said that, did Ms. Castillo and her

9  friends say anything in response?

10  A.   They said that they were going to call up their friends.

11  Q.   "Call up their friends."

12  A.   Yes, sir, Stacey.

13         MR. STRODER:  Again, Your Honor, when --

14         THE COURT:  Okay.  Yes, sir.

15         MR. STRODER:  "They," which one?

16  Q.   (BY MR. KLASSEN)  Which one said they were going to call

17  friends?

18  A.   Stacey.

19  Q.   Stacey.  Anthony didn't say that.

20  A.   No, sir.

21  Q.   But Stacey did?

22  A.   Yes, sir.

23  Q.   Okay.  But Anthony was there.  Her friend was there when

24  all of this was being talked?

25  A.   Yes, sir.

Brian Hernandez - Direct Examination

1  Q.   Okay.  All right.  Anything else that you can remember

2  about that conversation?

3  A.   No, sir.

4  Q.   All right.  Did Stacey and a friend leave at that point or

5  stay?

6  A.   Yes, sir, a couple of hours later that's when Stacey --

7  Q.   Well, first of all, did they leave?

8  A.   Yes, sir.

9  Q.   Okay.  And were you introduced to Stacey's friend on that

10 occasion?

11 A.   No, sir.

12 Q.   You learned his name later.

13 A.   Yes, sir.

14 Q.   Okay.  All right.  So they left, correct?  And a couple

15 hours later what happened?

16 A.   That's whenever Stacey and Anthony and her friends came

17 over.

18 Q.   Stacey and Anthony --

19 A.   And Anthony.

20 Q.   -- and some additional people came over.

21 A.   Yes, sir.

22 Q.   All right.  Who else came over, if you -- did you know any

23 of these people?

24 A.   No, sir.

25 Q.   Were you introduced to them later?

Brian Hernandez - Direct Examination

1  A.    No, sir.

2  Q.    Do you remember any names of those people?

3  A.    I only know Ray.  Ray was the only one that I -- that

4  popped into my head.

5  Q.    All right.  You're pointing over here at somebody named

6  Ray.  All right.  Who is -- which of these people over here is

7  named Ray?

8  A.    The one in the blue shirt.

9  Q.    Okay.  Close to me?

10  A.    Yes, sir.

11  Q.    All right.

12         MR. KLASSEN:  Your Honor, may the record reflect that

13  the witness has identify Defendant Olgin.

14         THE COURT:  The record will so reflect.

15  Q.    (BY MR. KLASSEN)  All right.  Did you know him at all

16  before?

17  A.    No, sir.

18  Q.    All right.  But you remember him being one of the people

19  there?

20  A.    Yes, sir.

21  Q.    How many other people were there that Stacey and Anthony

22  brought over besides Ray?

23  A.    Like five or four people.

24  Q.    Four or five.

25  A.    Yes, sir.

Brian Hernandez - Direct Examination

1  Q.    Men, women, both?

2  A.    Just men.

3  Q.    Just men.  Okay.  What occurred when they all came over?

4  A.    That's whenever Stacey, my mom, Ruben and Anthony started

5  talking.

6  Q.    All right.  Did you witness that conversation?

7  A.    Yes, sir.

8  Q.    All right.  What do you remember being said?  And here

9  again, because these good attorneys are going to object if you

10  don't say who is saying what, okay?  So recount the

11  conversation or tell us what you remember about the

12  conversation being as careful as you can to tell us who said

13  what.

14  A.    All right.  My mom was -- Liz was talking to Stacey and

15  Anthony and Ruben to -- and all the other people so they could

16  try to find Sean, Steven and Johnny.

17  Q.    Okay.  What did she say?

18  A.    Who said?

19  Q.    What did Stacey say when she was talking?

20  A.    My mom was talking to all --

21  Q.    Oh, I'm sorry.  What did your mom say?

22  A.    She was like, "We need help so we could try to find

23  Steven, Johnny and Sean so we could get to -- what we need back

24  from them."

25  Q.    Okay.  And what was said next after she made that

Brian Hernandez - Direct Examination

1   statement?

2   A.   That's whenever -- that's whenever everybody started

3   saying, "Yeah, like, we've got you.  Like, we'll help you out."

4   Q.   All right.  And then what was the plan then as you

5   witnessed the plan unfolding?

6   A.   Like we were supposed to like try to find them -- we were

7   just supposed to find them.  So they were just supposed to find

8   them and get the stuff back.

9   Q.   Okay.  Who was saying -- as best you can remember, who

10  specifically was saying that "we need to find them" or "we're

11  going to find them"?

12  A.   Ruben.

13  Q.   Ruben was.

14  A.   Yes, sir.

15  Q.   Okay.  And so what was the end result of that discussion?

16  A.   That we need to like find -- we needed to find them.

17  Q.   Okay.  I got it, but what was done, if anything, to find

18  them?

19  A.   Like, that's -- after that, that's when I started getting

20  texts from Sean.

21  Q.   Okay.  All right.  So you're listening to this

22  conversation and then you started receiving text messages,

23  correct?

24  A.   Yes, sir.

25  Q.   And how do you know they were from Sean?

Brian Hernandez - Direct Examination

1  A.    Because I had his name in my phone.

2  Q.    All right.  So it was a contact for you.

3  A.    Yes, sir.

4  Q.    All right.  And were those text messages, did they come in

5  literally while these people were there?

6  A.    Yes, sir.

7  Q.    And what were the general nature of those text messages?

8  A.    That he was sorry for doing us wrong and that if it was

9  possible for him just to get his clothes back.

10 Q.    Okay.  And did you share those text messages with your mom

11 or your uncle or any of these people?

12 A.    Yes, sir.

13 Q.    Did you just tell them about it or did you show it to

14 them?

15 A.    No, I showed it to my uncle.

16 Q.    Okay.  Ruben.

17 A.    Yes, sir.

18 Q.    All right.  When you did that, what was the result?

19 A.    That's when my uncle told me to text him, see if we could

20 try to meet up with him somewhere.

21 Q.    Okay.  Now, did Sean, were there some -- actually some

22 clothes there that he had left?

23 A.    Yeah, he had some in a duffle bag in the closet.

24 Q.    So your uncle asked you to do what again?

25 A.    To text him and see if we could try to meet up with him

Brian Hernandez - Direct Examination

1  somewhere.

2  Q.    And did you agree to do that?

3  A.    Yes, sir.

4  Q.    Okay.  And did they tell you what to text or did you do it

5  on your own?

6  A.    No, they told me what to text.  They told me try to find

7  the place to where they can't find us like around -- they told

8  me to text him like around -- to met us like somewhere around

9  Dixie.

10  Q.    Around Dixie.

11  A.    Yes, sir.

12  Q.    Okay.  Did you then send a text message to Sean?

13  A.    Yes, sir.

14  Q.    I know -- you don't have a copy of that anymore, do you?

15  A.    No, sir.

16  Q.    As best you can, tell the jury what the general nature of

17  what you remember texting.

18  A.    I told him, "I got you.  I'm about to go into work.  I'm

19  about to go into work.  I will tell my cousin to take me so we

20  could meet up somewhere and I can give you your duffle bag."

21  Q.    Okay.  Did Sean respond to that text?

22  A.    Yes, sir.  He said, "All right.  I'll met you there."

23  Q.    All right.  Did you give him a specific location?

24  A.    Yes, 17th and Dixie.

25  Q.    All right.  Why did you pick that particular location?

Brian Hernandez - Direct Examination

1  A.   My mom told me to -- my mom told me to put it -- to tell

2  him to go there.

3  Q.   To 17th and Dixie?

4  A.   Yes, sir.

5  Q.   Okay.  All right.  So after this text message exchange,

6  what happens next?

7  A.   That's whenever he told me to fill up the duffle bag up

8  with clothes, my uncle --

9  Q.   Who told you?

10 A.   Ruben.  Ruben told me to fill up the duffle bag up with

11 clothes from the closet.  Then that's whenever we told --

12 Stacey decided who is going to go in what car.

13 Q.   When you say "Stacey decided who was going to go in what

14 car," why do you describe it that way, "Stacey decided"?  Was

15 she giving instructions?

16 A.   Yes, sir, to her friends.

17 Q.   All right.  And who did she say was to go in what car?

18 A.   She told -- because there was -- there was a total of four

19 or five cars.

20 Q.   Okay.  Which cars were all involved?

21 A.   There was a Kia, a Dodge and then a GMC and an Expedition.

22 Q.   Who did these cars belong to, if you know?

23 A.   Stacey.  Stacey had the Kia.  My uncle had the -- Ruben

24 had the GMC.

25 Q.   Is that a pickup?

Brian Hernandez - Direct Examination

```
 1  A.    Yes, sir.

 2  Q.    Okay.

 3  A.    And Rudy had the blue Expedition.

 4  Q.    Blue Expedition was Rudy.

 5  A.    Yes, sir.

 6  Q.    Okay.  Now, this is the first time you've mentioned Rudy.

 7  Who is Rudy?

 8  A.    Rudy, he's one of my mom's friends.

 9  Q.    One of your mom's friends.

10  A.    Yes, sir.

11  Q.    Okay.  Was he there as part of this group?

12  A.    Yes, sir.

13  Q.    All right.  Did he come with Stacey or was he already

14  there?

15  A.    He came with his girlfriend.

16  Q.    And separate from Stacey or all together?

17  A.    Yes, sir, separate from Stacey.

18  Q.    Were Ruben and his girlfriend, were they there before

19  Stacey and her group got there or after?

20  A.    They got there after.

21  Q.    Okay.  And -- but you knew Ruben from before.

22  A.    Ruben?

23          MR. LEWIS:  Rudy.

24  Q.    (BY MR. KLASSEN)  Or, excuse me, Rudy.  Thank you.  You

25  knew -- there's too many Rs.  You knew Rudy from before,
```

Brian Hernandez - Direct Examination

1  correct?

2  A.   Yes, sir.

3  Q.   Do you see Rudy in the courtroom today?

4  A.   No, sir.

5  Q.   Okay.  So who was going in what vehicle?

6  A.   My uncle told me to go with his friend Bruno.

7  Q.   His friend Bruno.

8  A.   Yes, sir.

9  Q.   All right.  And which car was he in?

10 A.   He was in a brown Dodge.

11 Q.   Okay.  Anybody else -- this Bruno fella, is that anybody

12 you had ever met before?

13 A.   No, sir, it was the very first time I ever met him.

14 Q.   All right.  Anybody else in that vehicle beside you and

15 Bruno?

16 A.   And it was Bruno's girlfriend.

17 Q.   Did you know who that was?

18 A.   No, sir.

19 Q.   All right.  And you were all -- just those three in that

20 vehicle.

21 A.   Yes, sir.

22 Q.   Who was driving?

23 A.   Bruno's girlfriend.

24 Q.   And if you know or perceived it -- if you didn't, that's

25 the fine.  But if you know or perceived it, who went in the

Brian Hernandez - Direct Examination

1  other vehicles?

2  A.   In the brown GMC, it was my -- Ruben and Noe.  And then in

3  the Kia, it was my mom -- it was my mom, Stacey and Anthony.

4  And then in the blue Expedition, it was Ray, Rudy and Stacey's

5  friends.

6  Q.   And how many others of Stacey's friends were there?

7  A.   Like three or four people that were there.

8  Q.   Okay.  All right.  Now, you mentioned this person named

9  Noe.  Was this somebody that came with Stacey or was this

10  person come --

11  A.   He came with my Uncle Ruben.

12  Q.   He came with Ruben.

13  A.   Yes, sir.

14  Q.   Okay.  Is this somebody you'd ever met before?

15  A.   Yes, sir.

16  Q.   So you knew who he was.

17  A.   Yes, sir.

18  Q.   Do you know his last name?

19  A.   Galan.

20  Q.   Okay.  All right.  So you're all in these vehicles.  Where

21  do you-all go?

22  A.   We go to where we're supposed to meet Sean.

23  Q.   Okay.  How long did it take to get there?

24  A.   Like about ten minutes.

25  Q.   All right.  All vehicles traveling separately or together?

Brian Hernandez - Direct Examination

1  A.   Together.

2  Q.   All right.  Before you-all left, Brian, did anybody have

3  any -- did you see any firearms on anybody?

4  A.   Yes, sir.

5  Q.   All right.  Tell us what guns, if any, you remember

6  seeing.

7  A.   I saw a pink and gray .38.

8  Q.   Okay.  Who had that?

9  A.   Stacey.  Stacey brought it.

10 Q.   Did she show it to you?

11 A.   Yes, sir.

12 Q.   All right.  And any other firearms that you can remember?

13 A.   A MAC-10.

14 Q.   Who had that?

15 A.   Anthony brought it.

16 Q.   Okay.  What did it look like, as best you can recall?

17 A.   It looked like an airsoft gun.  It had brown camo on it

18 and it looked -- brown and green camo on it.

19 Q.   Okay.  You said it looks like an airsoft gun.

20 A.   Yes, sir.

21 Q.   What do you mean by that?  Why do you say that?

22 A.   Because it looked plastic and it had a big suppressor on

23 it.

24 Q.   Like a suppressor looking thing?

25 A.   Yes, sir.

Brian Hernandez - Direct Examination

1  Q.   Okay.  Any other firearms?

2  A.   No, sir, that was it.

3  Q.   Before you-all left and the discussion that was had, did

4  anybody talk about the firearms or anything or what anybody was

5  going to do with them?

6  A.   They were just going to -- they were just supposed to be

7  used to scare Sean.

8  Q.   Who said that?

9  A.   Ruben.

10 Q.   Did anybody verbalize that, "We're going to scare Sean"?

11 A.   Ruben.

12 Q.   Ruben said that.  Okay.  Anybody else talk about the

13 firearms?

14 A.   No, sir.

15 Q.   All right.  Did anybody articulate or verbalize they were

16 going to try to scare Sean to do what?

17 A.   To try to give up Steven.

18 Q.   Give up Steven meaning -- what did you take it to mean,

19 "to give up Steven"?

20 A.   To give up Steven so we could find the car and the ice.

21 Q.   Get the meth back.

22 A.   Yes, sir.

23 Q.   Okay.  All right.  So you all go -- how did Anthony bring

24 the gun into the home, did he have it loose or was it in some

25 kind of case?

Brian Hernandez - Direct Examination

1   A.   It came into some case, some black case.

2   Q.   Okay.  What about the pink firearm, was that --

3   A.   Stacey already had that whenever she got to the apartment.

4   Q.   Just holding it or did she have it in a purse or --

5   A.   A purse, I think.

6   Q.   Okay.  And were you inside when you first saw the firearm

7   or did you see it outside?

8   A.   I was inside.

9   Q.   So the first time you saw it was when they came inside.

10  A.   Yes, sir.

11  Q.   Okay.  All right.  So we're on our way to this location at

12  17th and Dixie.  Anything happen on the way?

13  A.   Yes.  We were the first ones and then we turned -- we were

14  supposed to turn right on to Dixie and -- on to 17th and Dixie,

15  and we ended turning the wrong way.  And so everybody else that

16  was following us ended up going to the right way and it took us

17  a couple of minutes so I could get ahold of my uncle.

18  Q.   Okay.  You called your uncle?

19  A.   Yes, because we couldn't find it.  We didn't know where

20  they were at.

21  Q.   All right.  Did your uncle give you directions?

22  A.   No, sir, he -- that's whenever I started -- that's

23  whenever I heard them yelling at Sean.

24  Q.   Okay.  When you said you heard them yelling at Sean, like

25  over the phone?

Brian Hernandez - Direct Examination

1  A.    Yes, sir.

2  Q.    All right.  What do you remember being said?

3  A.    I just heard, "Well, where is he?"  And then that's when

4  he hung up.  And I called him two more times, three more times

5  and he didn't answer until like the tenth time that I called

6  him saying for us to meet them at the hotel.

7  Q.    At the hotel.  All right.  So whatever happened with Sean

8  initially, you and Bruno and Bruno's girlfriend weren't there.

9  A.    No, sir.

10 Q.    Okay.  All right.  So he tells you to -- finally when you

11 reach Ruben, he says, "Meet me at the hotel."

12 A.    Yes, sir.

13 Q.    All right.  And did he tell you what hotel?

14 A.    I don't remember what it was, but it is somewhere over

15 there close to the FunDome.

16 Q.    Near the FunDome.

17 A.    Yes, sir.

18 Q.    Okay.  In Odessa.

19 A.    Yes, sir.

20 Q.    All right.  Did you, in fact, go over to some kind of

21 motel --

22 A.    Yes, sir.

23 Q.    -- or hotel?

24 A.    Yes, sir.

25 Q.    All right.  And what did you witness when you got over to

Brian Hernandez - Direct Examination

1  the hotel?

2  A.   We parked away from where they were at.  And then once we

3  stopped, that's when everybody rushed the Expedition that Sean

4  was in.

5  Q.   Okay.  Did you see that?

6  A.   Yes, sir.

7  Q.   What did you see happen when you say they rushed?

8  A.   That's when everybody rushed over there, and then they

9  started yelling at Sean saying, "Where's Steven?," and,

10 "Where's the drugs?," and, "Where's the car?"  And that's

11 whenever I saw people hitting him.

12 Q.   Who did you see hit Sean?

13 A.   I saw everybody.

14 Q.   Everybody?

15 A.   Yes, sir.

16 Q.   Meaning?

17 A.   My mom and then I saw -- I saw my mom, I seen the people

18 in the car hitting him.

19 Q.   Okay.  Were you one of the people who rushed?

20 A.   No, sir.

21 Q.   What about Bruno, did he rush up?

22 A.   Yes, sir, he went up there.

23 Q.   What about Bruno's girlfriend?

24 A.   No, she stayed in the truck.

25 Q.   You two stayed in the truck.

Brian Hernandez - Direct Examination

```
 1  A.    Yes, sir.

 2  Q.    Did you see -- you saw your uncle there.

 3  A.    Yes, sir.

 4  Q.    You saw your mom.  Yes?

 5  A.    Yes, sir.

 6  Q.    Did you see Stacey?

 7  A.    Yes, sir.

 8  Q.    Did you see Anthony?

 9  A.    Yes, sir.

10  Q.    Did you see the person that you understood to be Rudy, was

11  he there?

12  A.    Yes, sir.

13  Q.    Okay.  And you said there was a lot of yelling.

14  A.    Yes, sir.

15  Q.    All right.  After the yelling and all that, what do you

16  remember, if anything, happened?

17  A.    That's whenever my uncle -- my uncle and Rudy went

18  upstairs to bang on supposedly where Steven was at.

19  Q.    Okay.

20  A.    They were knocking hard on the door to see if Steven would

21  show up.

22  Q.    Your understanding is that's because that's where Steven

23  was.

24  A.    Yes, sir.

25  Q.    That understanding, did someone tell you that or is that
```

Brian Hernandez - Direct Examination

1   just you surmising?

2   A.   You could heard them yelling, "Steven, come out."

3   Q.   Now, who went up there again?

4   A.   My uncle and Rudy.

5   Q.   And Rudy.  And you heard them yell, "Steven, come out"?

6   A.   Yes, sir.

7   Q.   Did anybody answer the door?

8   A.   No, sir.

9   Q.   All right.  How long were they up there?

10  A.   Like about, like, five minutes.

11  Q.   All right.  And what happened after nobody answered?

12  A.   That's whenever everybody got back in the cars and then

13  that's when we took off towards the FunDome.

14  Q.   Towards the FunDome.

15  A.   Yes, sir.

16  Q.   Did Bruno -- Bruno was driving the vehicle you were in,

17  correct?

18  A.   Yeah -- it was the girlfriend that was still driving.

19  Q.   Oh, the girlfriend was driving.

20  A.   Yes, sir.

21  Q.   I apologize.

22       But you were part of the group that went over to the

23  FunDome.

24  A.   Yes, sir.

25  Q.   All the cars went over there.

Brian Hernandez - Direct Examination

1   A.    Yes, sir.

2   Q.    How many cars would you say there were?

3   A.    The four cars.  It was the GMC, the Expedition, the Kia,

4   and us.

5   Q.    And what about the car that Sean was in?

6   A.    He was in the blue Expedition.

7   Q.    All right.  So four cars total.

8   A.    Yes, sir.

9   Q.    Okay.  Did you actually lay eyes on Sean at the hotel?

10  Did you see him sitting in the car?

11  A.    Yes, sir, I could see him trying -- like struggling.

12  Q.    All right.  Was he wearing a shirt or was he shirtless by

13  this time or did you perceive it?

14  A.    He was shirtless.

15  Q.    All right.  You say he was struggling, why do you say

16  that?

17  A.    Because he was still -- he was still buckled in whenever

18  he was trying to get away or something.

19  Q.    Okay.  All right.  So you got over to the FunDome which is

20  nearby?

21  A.    Yes, sir.

22  Q.    What happens at the FunDome that you can remember?

23  A.    My uncle -- my uncle -- the Expedition, my uncle's truck,

24  they went into some alley.

25  Q.    Your uncle?

Brian Hernandez - Direct Examination

1    A.    My uncle and the Expedition.

2    Q.    Went into an alley.

3    A.    Yes, sir.

4    Q.    Did you go to the alley?

5    A.    No, sir.

6    Q.    Was that alley right adjacent to the FunDome or a ways

7    away?

8    A.    That was a couple of blocks away.

9    Q.    All right.  So you don't know what happened in the alley.

10   A.    No, sir.

11   Q.    All right.  The car you were in did not go to the alley.

12   A.    No, sir.

13   Q.    So the Expedition went to the alley.

14   A.    Yes, sir.

15   Q.    And who was in that again?

16   A.    Noe, Rudy and then Stacey's friends and then Ray.

17   Q.    Okay.  And then the other car that went to the alley --

18   A.    That was Noe and my uncle.

19   Q.    Noe and your uncle were in which car?

20   A.    The brown GMC.

21   Q.    The brown GMC with Noe and your uncle; and then the

22   Expedition was Sean and who else?

23   A.    Ray and then Noe and Rudy.

24   Q.    Okay.  All right.  What's the next thing that you remember

25   happening after these vehicles go somewhere?

Brian Hernandez - Direct Examination

1  A.   We end up pulling behind Stacey and Anthony behind the

2  FunDome.

3  Q.   Still at the FunDome.

4  A.   Yes, sir.

5  Q.   Okay.  Any conversation while you were sitting there at

6  the FunDome.

7  A.   No, sir.

8  Q.   Okay.  What's the next thing that you remember happening?

9  A.   That's whenever Stacey got a call saying that he's stupid,

10  and that's whenever --

11  Q.   Okay.  Stop there a second.  Did you hear this phone call?

12  A.   Yes, sir.

13  Q.   Did you hear both sides of it or just Stacey's side?

14  A.   Just Stacey's.

15  Q.   What do you remember Stacey saying?

16  A.   That "he's stupid and why the hell did he do that?," and,

17  "he wasn't supposed to do that."

18  Q.   Okay.  And who -- did you know at that time who she was

19  talking about?

20  A.   No, sir.

21  Q.   All right.  You just remembered who -- she was saying

22  "he."

23  A.   Yes, sir.

24  Q.   What was her -- was she calm?

25  A.   No, she was mad.

Brian Hernandez - Direct Examination

1  Q.   She was really mad.  Why do you say she was mad?

2  A.   Because he wasn't supposed -- he wasn't supposed to die

3  like that.  He wasn't supposed to get killed.

4  Q.   All right.  How long did that phone conversation last?

5  A.   A couple of -- just like a minute or two.

6  Q.   Do you know who she was even talking to?

7  A.   No, sir.

8  Q.   All right.  When the conversation ended, when Stacey

9  finished that conversation, did she say anything to the rest of

10 y'all?

11 A.   That Noe shot Sean.

12 Q.   Okay.  And how did she say that to you-all?

13 A.   She was mad.  She said it in a mean way, in a mad way.

14 Q.   Okay.  Of the group that was still at the FunDome, did

15 anybody make any -- you or anybody else make any verbal

16 response to that?

17 A.   No, sir, I stayed quiet.

18 Q.   What was going through your mind when you heard that?

19 A.   I was shocked because, you know -- that wasn't supposed to

20 happen.  They were just supposed to leave him alone after they

21 got their answers.  He wasn't supposed to even shoot him.  They

22 were just supposed to leave him alone after that.

23 Q.   Okay.  All right.  So once you get this -- you and the

24 group get this piece of information, what happens next?

25 A.   That's whenever we went to the south side to Blue Bonnet.

Brian Hernandez - Direct Examination

1   Q.   To the where?

2   A.   To Blue Bonnet on the south side.

3   Q.   And Blue Bonnet is what?

4   A.   It's a street.

5   Q.   It's a street.

6   A.   Yes, sir.

7   Q.   Why were you going there, if you know?

8   A.   Just to meet up right there so everybody could get settled

9   in.

10  Q.   You're not driving, correct?

11  A.   No, sir.

12  Q.   All right.  When you got there to this Blue Bonnet, was it

13  a house or apartment or business or what was it?

14  A.   It was a street with houses.

15  Q.   All right.  You just met on the street.

16  A.   Yes, sir.

17  Q.   Was there some additional conversation there?

18  A.   Just saying that he's stupid.

19  Q.   Who was saying that?

20  A.   Everybody.  Everybody was saying that he's stupid for

21  doing that.

22  Q.   Okay.  Was Noe there?

23  A.   No, sir.

24  Q.   All right.  He wasn't there.

25  A.   No.

Brian Hernandez - Direct Examination

1  Q.   Who all was there that you can remember at Blue Bonnet?

2  A.   It was Stacey, Anthony, me and my mom, Bruno, Rudy, Ray,

3  and then that's it.  And then we couldn't find our uncle.

4  Q.   Okay.  So Ruben was not there.

5  A.   Neither was Noe.

6  Q.   And Noe was not there.

7  A.   No, sir.

8  Q.   And you don't know where they were.

9  A.   No, sir.

10  Q.   Okay.  Ruben, was there a woman with him at all during any

11  of this -- these events at your mom's place or in the alley

12  where -- or at the motel, any woman that was in his vehicle?

13  A.   A woman?

14  Q.   Yeah.

15  A.   No.

16  Q.   Excuse me, in Rudy's vehicle.  I apologize.  Was Rudy

17  with -- I keep getting these Rs mixed up.  Was anybody with

18  Rudy, that you can remember?

19  A.   I think it was his girlfriend.

20  Q.   Did you know who that was?

21  A.   No, sir.

22  Q.   All right.  Rudy's girlfriend was there for what part of

23  it?

24  A.   She was just driving the Expedition.

25  Q.   Okay.  She was there in the alley --

Brian Hernandez - Direct Examination

1  A.    No, sir.

2  Q.    -- when they got Sean?

3  A.    Because it was her Expedition and then there was Sean's

4  Expedition.

5  Q.    Okay.  All right.  Did -- was there a child with Rudy at

6  all?

7  A.    I think so.

8  Q.    A baby?

9  A.    A baby.

10  Q.    All right.  So how long are you-all at Blue Bonnet?

11  A.    Just for like five minutes and then after that is just

12  everybody went their own ways.  And Stacey and Anthony dropped

13  me and my mom off a block away from the apartments.

14  Q.    Okay.  Was Ray at Blue Bonnet?

15  A.    No, sir.

16  Q.    He never got there.

17  A.    Oh, yeah, he was there.  He was there in Bruno's truck.

18  Q.    All right.  In whose truck?

19  A.    In Bruno's truck.

20  Q.    In Bruno's truck.  I thought you came with Bruno.

21  A.    No.  To Blue Bonnet?

22  Q.    Yes.

23  A.    No, I was with Stacey.  I was with Stacey and my mom.

24  Q.    I'm sorry.  You probably said that and I didn't catch

25  that.  You were with Stacey and your mom from the hotel over to

Brian Hernandez - Direct Examination

1  Blue Bonnet.

2  A.    Yes, sir.

3  Q.    And Ray was with -- came in Bruno's truck.

4  A.    Yes, sir.

5  Q.    Do you know -- from your personal knowledge, do you know

6  how Ray came to be in that truck?

7  A.    In the back, because he -- because Bruno, he dropped me

8  off, remember?  Bruno dropped me off behind Stacey and them

9  whenever we got to the FunDome.  And that's when Bruno peeled

10  off and went to the alley.

11  Q.    Okay.  So it must have happened somewhere over there.

12  A.    Yes, sir.

13  Q.    You didn't see it yourself.

14  A.    No, sir.

15  Q.    Okay.  All right.  So you and your mom get dropped off

16  near your house, correct?

17  A.    Yes, sir.

18  Q.    And what do you and your mom do?

19  A.    My uncle calls me on my phone saying, "Break your phone

20  because we couldn't find Sean's phone."  And once I hung up, I

21  broke my phone and threw it in the trash can.

22  Q.    Did he say why to break the phone.

23  A.    He couldn't find Sean's phone.

24  Q.    He told you to "break the phone because I can't find

25  Sean's phone"?

Brian Hernandez - Direct Examination

```
 1  A.    Yes, sir.

 2  Q.    And you did that.

 3  A.    Yes, sir.

 4  Q.    And you did what with it?

 5  A.    I threw it in the trash can.

 6  Q.    All right.  And have you seen that phone since?

 7  A.    No, sir.

 8  Q.    All right.  What happened during -- what time of day or

 9  night would you say this was by the time you and your mom got

10  back?

11  A.    It was like around 5:00 or 6:00.

12  Q.    Okay.  Early evening.

13  A.    Yes, sir.

14  Q.    All right.  And what happened during that evening?

15  A.    We went to the apartment because my uncle was supposed to

16  take me and my brothers and my mom to a hotel to just stay

17  there so everything could cool down, and then he never showed

18  up.  So what I did, I called up my cousin to see if I could go

19  stay with them.

20  Q.    Your cousin's name is who?

21  A.    Dominick.

22  Q.    Dominick?

23  A.    Yes, sir.  And later that night, that's whatever I was

24  getting messages from my mom saying that there was people

25  knocking on the door and that she was scared because she didn't
```

Brian Hernandez - Direct Examination

1  want to be there by herself so I decided -- I told my cousin to

2  take me home.

3  Q.   And did your cousin take you home?

4  A.   Yes, sir.

5  Q.   All right.  Did you have any conversation with your mom

6  when you got home?

7  A.   No.  She was upstairs.  She kept looking out the window.

8  Q.   Okay.  Did she say why -- tell you why she was looking?

9  A.   She kept on trying to get to my uncle -- trying to get

10  ahold of my uncle.

11  Q.   Was she successful?

12  A.   No, sir.

13  Q.   All right.  Did you talk to your uncle?

14  A.   No, sir.

15  Q.   At some point in time that night or the next day, did you

16  have some contact with the police?

17  A.   Yes, sir, they came to the apartment looking for Sean,

18  saying that something happened to Sean.

19  Q.   All right.  Did they talk to you?

20  A.   They talked to me and my mom.

21  Q.   All right.  Did you tell them what had occurred?

22  A.   Yes, sir.

23  Q.   Were you fully truthful?

24  A.   No, not till later that I talked to the officer.

25  Q.   What part were you -- as best you can remember, were you

Brian Hernandez - Direct Examination

1  not truthful about initially?

2  A.   Saying that my cousin -- whenever -- saying that my cousin

3  was going to take me to meet him.

4  Q.   Were you arrested by the Odessa Police Department?

5  A.   The next day -- later that day, yes.

6  Q.   All right.  And you have been in custody ever since,

7  correct?

8  A.   Yes, sir.

9  Q.   All right.  Now, Brian, after this incident, have you

10 spoken to Ruben again after all this?

11 A.   No, sir.

12 Q.   Have you spoken to Noe again?

13 A.   No, sir.

14 Q.   Do you know -- have any idea where they are?

15 A.   No, sir.  Just -- what I think they should do --

16 Q.   Okay.  I'm not asking that.  The reason is it's just court

17 rules.  Okay?  I am just asking if you had any contact with

18 them.

19 A.   Okay.

20 Q.   So the answer is no.

21 A.   No, sir.

22 Q.   All right.  Have you had any contact with Stacey or

23 Anthony, talked to them?

24 A.   No, sir.

25 Q.   All right.  What about with Ray?

Brian Hernandez - Direct Examination

1  A.    No, sir.

2  Q.    And what about with the person you knew as Rudy?

3  A.    No, sir.

4  Q.    Now, Brian, you have entered into a plea agreement with

5  the government, correct?

6  A.    Yes, sir.

7  Q.    All right.  And you pled guilty to what?

8  A.    To conspiracy to methamphetamine.

9  Q.    All right.  An agreement to get this methamphetamine back.

10 A.    Yes, sir.

11 Q.    All right.  And did you know when you were making those

12 text messages to Sean that that was the plan, correct?

13 A.    Yes.

14 Q.    All right.  And what potential sentence are you looking

15 at?

16 A.    Zero to five.

17 Q.    Okay.  Who is going to decide what sentence you're

18 ultimately going to get?

19 A.    Y'all are, the government.

20 Q.    I am going to make the decision?  Mr. Lewis and I are

21 going to make the decision or somebody else?

22 A.    The judge.

23 Q.    The judge.

24 A.    Okay.

25 Q.    The man up there, correct?

Brian Hernandez - Direct Examination

1  A.   Yes, sir.

2  Q.   All right.  Now, there is something that the government

3  potentially can do to maybe help you -- you'd like to have less

4  time rather than more, right?

5  A.   Yes, sir.

6  Q.   What can potentially the government do to perhaps help you

7  with that?

8  A.   Lower the sentence.

9  Q.   Okay.  Is there something we can tell the judge?

10 A.   Just hopefully he could do it.

11 Q.   And your part of the deal is what?

12 A.   To --

13 Q.   What is your part of the plea agreement with the

14 government?  What does it require you to do?

15 A.   To plead guilty to methamphetamine.

16 Q.   And also -- yes.  And also what else?  Remember the part

17 about being cooperative and truthful?

18 A.   Oh, yes, and by helping with y'all and to help everybody.

19 Q.   All right.  As you sit here today, do you know what

20 sentence you're going to get in this case?

21 A.   No, sir.

22 Q.   All right.

23        MR. KLASSEN:  If I could just have a moment.

24        (Sotto voce discussion between Messrs. Klassen and

25 Lewis)

Brian Hernandez - Direct Examination

1          MR. KLASSEN:  I'll pass the witness.

2          THE COURT:  We're going to take our recess, and then

3  we'll come back after lunch and let the attorneys do their

4  cross-examination.

5          I'd ask the jury, if you'd take your notepads and put

6  them in your envelopes there in the courtroom.  Don't discuss

7  the case among yourselves.  Don't let anybody discuss it with

8  you.  Don't do any research about the case or investigation.

9  Let's be back here ready to go at 1:30 then, okay?

10         Let's all rise for the jury, please.

11         (At 12:40 p.m., jury leaves)

12         THE COURT:  I am going to ask everybody in the

13  courtroom to wait until the jury gets out of the courthouse.

14  It will take them just a few minutes.  And then y'all can go

15  for lunch.  And I appreciate how everybody has acted so

16  responsibly here today.  So thank you very much.  And we'll be

17  in recess until 1:30.

18         (Luncheon recess from 12:05 p.m. to 1:30 p.m.)

19         (At 1:30 p.m., jury enters)

20         THE COURT:  All right.  Let's all be seated.  It's

21  1:30.  We're back in the courtroom with the jury.  The

22  attorneys are all present.  The defendants are all present.

23  And Mr. Hernandez is still on the witness stand.

24         And, Mr. Leach, you may cross-examine.

25         MR. LEACH:  Thank you, Your Honor.

Brian Hernandez - Cross-Examination

1                          **CROSS-EXAMINATION**

2  BY MR. LEACH:

3  Q.   Mr. Hernandez, how old are you today?

4  A.   18.

5  Q.   18.  And how old were you back on May 1st -- I'm sorry,

6  May 13th of 2014?

7  A.   17.

8  Q.   17.  And were you in school at that time?

9  A.   No, sir.

10  Q.   Had you dropped out?

11  A.   Yes, sir.

12  Q.   Okay.  When did you drop out of school?

13  A.   I dropped out last year in January.

14  Q.   Okay.  What grade were you in when you dropped out,

15  Mr. Hernandez?

16  A.   I was in tenth grade.

17  Q.   Tenth grade.  Okay.  And I believe when Mr. Klassen was

18  speaking with you, he talked to you about your plea agreement;

19  is that correct?

20  A.   Yes, sir.

21  Q.   And you pled guilty to Count One of this indictment on

22  March the 2nd; is that correct?

23  A.   Yes, sir.

24  Q.   And you pled guilty, Mr. Hernandez, to knowingly and

25  intentionally combining, conspiring, and confederating and

Brian Hernandez - Cross-Examination

1  agreeing with other codefendants to possess with intent to

2  distribute a controlled substance; is that correct?

3  A.    Yes, sir.

4  Q.    And you're not the only person charged with that, are you?

5  A.    I don't think so.

6  Q.    Okay.  Well, you know that these other people here are

7  standing charged with that.

8  A.    Yes, sir.

9  Q.    Is that your understanding, if you know?

10 A.    Yes, sir.

11 Q.    Okay.  But you weren't ever charged with murder, were you,

12 Mr. Hernandez?

13 A.    No, sir.

14 Q.    Okay.  And you'll agree with me that when Mr. Klassen says

15 you weren't fully truthful, that's another way of saying you

16 lied to the police, correct?

17 A.    Yes, sir.

18 Q.    And you lied because you wanted to make sure or try at

19 least to keep Brian out of trouble, correct?

20 A.    Pretty much.

21 Q.    Or --

22 A.    Yes, sir.

23 Q.    -- keep Brian and my mom out of trouble.

24 A.    Yes.

25 Q.    You didn't want to accept any responsibility for anything

Brian Hernandez - Cross-Examination

1  you had done as a result of those events on May 13th.

2  A.   No, sir.

3  Q.   Well, you lied when they said -- they came and interviewed

4  you at your house that evening or a couple of days later,

5  didn't they?

6  A.   Yes, sir.

7  Q.   And you didn't tell them, "Hey, I was there.  I know what

8  happened.  Let me help you out," did you?

9  A.   No, sir.

10  Q.   Okay.  And, again, you did that because you just held out

11  even the slightest hope that if you can get out of it by lying,

12  you would rather lie than to tell the truth, correct?

13  A.   Yes, sir.

14  Q.   Is that correct?

15  A.   Yes, sir.

16  Q.   Okay.  And how many times have you met with Agent Sikes --

17  Officer Sikes?

18  A.   A couple of times.

19  Q.   At least -- maybe even three or four?

20  A.   Three or four times.

21  Q.   You met with him probably at the courthouse sometime; is

22  that correct?

23  A.   Yes, sir.

24  Q.   You met with him over at the jail in Kermit; is that

25  correct?

Brian Hernandez - Cross-Examination

1  A.    Yes, sir.

2  Q.    Okay.  Anybody ever tell you you're responsible for the

3  death of Sean Lamb, anyone?

4  A.    No, sir.

5  Q.    Okay.  Anybody ever tell you you should have foreseen that

6  it could happen?

7  A.    No, sir.

8  Q.    Okay.  Anybody ever say, "If you get involved in this, it

9  is likely to happen and you should have known it"?

10 A.    No, sir.

11 Q.    Anybody you ever say, "You play with guns, you can't be

12 surprised"?

13 A.    No, sir.

14 Q.    And earlier in your testimony you testified it wasn't your

15 idea what was going to happen to Sean, was it?

16 A.    No, it wasn't.

17 Q.    In fact, nobody thought that would happen, did they?

18 A.    No, sir.

19 Q.    Okay.  When you lied to him via text message, you didn't

20 do that with the foresight that, "Gosh, he might get killed,"

21 did you?

22 A.    No, sir.

23 Q.    You wouldn't have lied to him ever had you thought that

24 would have been a chance, that he be killed?

25 A.    No, I wouldn't have.

Brian Hernandez - Cross-Examination

1  Q.   Not -- 100 percent would not have been involved if you

2  thought that was going to happen?

3  A.   I wouldn't have even texted him back.  I wouldn't have

4  told my uncle about it.

5         MR. LEACH:  I'll pass the witness.

6         THE COURT:  Okay.

7         Mr. Garcia.

8                    **CROSS-EXAMINATION**

9  BY MR. GARCIA:

10  Q.   Just very briefly, Brian.  Did killing Sean get the dope

11  back?

12  A.   No, sir.

13         MR. GARCIA:  That's all I have.

14         THE COURT:  Mr. Pool.

15                    **CROSS-EXAMINATION**

16  BY MR. POOL:

17  Q.   Good afternoon, Brian.

18  A.   Good afternoon.

19  Q.   Brian, what happened during this three- or four-period day

20  back in May 2014 had a very serious impact on your family,

21  didn't it?

22  A.   Yeah, it did.

23  Q.   As a matter of fact, there was a lot of crying and

24  screaming by your mom --

25  A.   Uh-huh.

Brian Hernandez - Cross-Examination

1  Q.    -- right after this happened?

2  A.    (Witness nodding head.)

3  Q.    When you were initially talking to the police during your

4  very first interview, could you hear your mom whaling in the

5  next room?

6  A.    Yeah, a couple of doors down, yeah.

7  Q.    You could hear it from a few doors down.  She was crying

8  and screaming?

9  A.    Yes, sir.

10  Q.    And you heard all that while you were talking to the

11  police, correct?

12  A.    Yes, sir.

13  Q.    Now, Brian, you're the one that set up the meeting with

14  Sean, correct?

15  A.    Yes, sir.

16  Q.    And you told your uncle and he told you to set it up?

17  A.    Yes, sir.

18  Q.    And your mom also encouraged you to do that.

19  A.    No, it was just my uncle.

20  Q.    It was just your uncle.

21        Was it -- your mom told you to go to 17th and Dixie?

22  A.    Yes, sir.

23  Q.    And Noe Galan is the one that came with your uncle?

24  A.    Yes, sir.

25  Q.    Now, you went through several conversations during the

Brian Hernandez - Cross-Examination

1  questioning with Mr. Klassen.  It sounded like you were

2  describing one day.  All of those conversations you were

3  talking about, did they happen at one day or was it split up

4  over several days?

5  A.   It happened -- the meeting and everything happened that

6  day -- in one day.

7  Q.   Okay.  Was there any discussion the day before?

8  A.   No, sir.

9  Q.   You've described the firearm that you observed as looking

10 like an airsoft gun.  Now, I've listened to all of your

11 recorded interviews.  I've watched the video interviews and

12 I've read all of your reports and I never saw you describe it

13 like that before.  When did you first come up with that?

14 A.   No, I remember because I saw it -- because I saw it right

15 there right, like, in person.

16 Q.   When did you first come up with that term, that it looked

17 like an airsoft gun?

18 A.   Because it came to my head.  It was running through my

19 head.  Because the more I thought about the case, then

20 everything started popping up clear.

21 Q.   Was that during one of the meetings with the prosecutors

22 and law enforcement?

23 A.   No, it was by myself.  Like, I think to myself.  I think

24 about the case.

25 Q.   Okay.  During your first interview with Detective Sikes,

Brian Hernandez - Cross-Examination

 1  he asked you if you set it up so that Lamb would show up and

 2  get his ass whipped because he took stuff from your family.  Do

 3  you remember that?

 4  A.    Yes, sir.

 5  Q.    Do you remember how you responded?

 6  A.    Yes, sir.

 7  Q.    How did you respond?

 8  A.    I really don't remember.

 9  Q.    You laughed out loud, didn't you?

10  A.    I think so.

11  Q.    When you were in the car and you testified about

12  Ms. Castillo talking to someone on the phone and becoming

13  upset, she was upset because somebody killed Sean, correct?

14  A.    Yeah.

15  Q.    And she said that wasn't supposed to happen.

16  A.    It wasn't supposed to happen.

17  Q.    And she was very angry, correct?

18  A.    Yes, sir.

19         MR. POOL:  I'll pass the witness, Your Honor.

20                      **CROSS-EXAMINATION**

21  BY MR. STRODER:

22  Q.    On the day of Sean's death when y'all had that meeting at

23  your mother's apartment, you said there were -- I'm not sure I

24  heard all.  Who all was there again?

25  A.    It was my mom, Ruben, Stacey, Ray, Rudy and Anthony.

Brian Hernandez - Cross-Examination

1    Q.    That's all?

2    A.    And then some other friends of Stacey's.

3    Q.    You don't know who those were?

4    A.    No, sir.

5    Q.    And they all came in separate cars?

6    A.    When -- yes, when -- yeah.

7    Q.    Did they come in and trickle in or all show up at exactly

8    the same time?

9    A.    The same time.

10   Q.    You said some of them showed up later, though, right?

11   A.    Yes, sir.

12   Q.    Who was that?

13   A.    Rudy -- Rudy and Bruno.

14   Q.    And they all left in separate cars --

15   A.    Yes, sir.

16   Q.    -- in various cars; is that right?

17   A.    Yes, sir.

18   Q.    Have you talked to your mom since this -- you have been

19   arrested?

20   A.    Yeah, we're downstairs together, but we don't talk about

21   the case or anything like that.  We have highs and lows, how

22   are you doing, and stuff like that.

23   Q.    You may have been asked this.  I don't know.  Did you help

24   your mom and Ruben sell dope at any time?

25   A.    No, sir.

Brian Hernandez - Redirect Examination

1  Q.    Do you know who Noe Galan is?

2  A.    Yes, sir.

3  Q.    So you'd recognize him.

4  A.    Yes, sir.

5  Q.    Did anybody with the government or the police officers,

6  the agents, the U.S. Attorneys, did they mention anything about

7  helping your mom out if you talked to them?

8  A.    No, sir.

9  Q.    You never talked to your mom about pleading guilty?

10  A.    No, sir.

11  Q.    And according to you -- or according to Ruben, the plan

12  was just to scare him, right?

13  A.    Yes, sir.

14  Q.    That was the plan.

15  A.    Yes, sir.

16          MR. STRODER:  Pass the witness.

17          THE COURT:  Mr. Klassen, anything else?

18                  **REDIRECT EXAMINATION**

19  BY MR. KLASSEN:

20  Q.    Brian, the airsoft looking gun that counsel was just

21  asking you about, do you remember what room -- perhaps you

22  don't -- but do you remember what room you were in in your

23  apartment when you first saw that gun?

24  A.    It was in the kitchen.

25  Q.    In the kitchen.  And it was in whose possession when you

Brian Hernandez - Recross-Examination

1  first saw it?

2  A.   It was in Anthony's.  Then he put it down on the stove.

3  Q.   Put it down on the what?

4  A.   On the stove.

5  Q.   On the stove.  All right.

6        Brian, are you doing your best to be truthful today?

7  A.   Yes, sir.

8  Q.   Okay.  And a couple of the lawyers asked you what was in

9  your mind and whether or not you intended Sean to die.  Do you

10  remember that?

11  A.   Yes, sir.

12  Q.   All right.  Do you know what was in Noe Galan's mind?

13  A.   No.

14  Q.   Okay.  Do you know what was in your uncle's mind -- you

15  know what he said, but do you know what was in his mind?

16  A.   No, sir.

17  Q.   Do you know what is in the mind of any of the four

18  defendants on trial?

19  A.   No, sir.

20        MR. KLASSEN:  Pass the witness.

21        THE COURT:  Mr. Leach.

22                    **RECROSS-EXAMINATION**

23  BY MR. LEACH:

24  Q.   You don't think it would be fair to hold you accountable

25  for what's in Noe Galan's mind, do you?

Brian Hernandez - Recross-Examination

1   A.    No, sir.

2              MR. LEACH:  Pass the witness.

3              THE COURT:  Mr. Garcia.

4              MR. GARCIA:  No further questions, Your Honor.

5              THE COURT:  Mr. Pool.

6              MR. POOL:  No further questions, Your Honor.

7              THE COURT:  Mr. Stroder.

8                      **RECROSS-EXAMINATION**

9   BY MR. STRODER:

10  Q.    Was the gun still at your house when you were arrested,

11  you know, the --

12  A.    When I was arrested?

13  Q.    When you were arrested?

14  A.    No, sir.

15  Q.    No, the gun you're talking about, the -- what did you call

16  it, the one with the --

17  A.    The airsoft gun?

18  Q.    Okay.  Was it still in your possession?

19  A.    No, sir.

20  Q.    Do you know what happened to it?

21  A.    No, sir.

22  Q.    Was it put on the stove and you didn't see it again?

23  A.    No.  After that, I didn't see it.

24              MR. STRODER:  That's all.

25              THE COURT:  Anything else, Mr. Klassen?

Brian Hernandez - Recross-Examination

1        MR. KLASSEN:  No further questions.

2        THE COURT:  May this witness be excused, Mr. Klassen?

3        MR. KLASSEN:  Yes, Your Honor.

4        THE COURT:  Mr. Leach?

5        MR. LEACH:  No objection.

6        THE COURT:  Mr. Garcia?

7        MR. GARCIA:  No, Your Honor.

8        THE COURT:  Mr. Pool?

9        MR. POOL:  No objection, Your Honor.

10        THE COURT:  Mr. Stroder?

11        MR. STRODER:  No objection.

12        THE COURT:  Mr. Hernandez, we appreciate you being

13  here today.  You are instructed not to discuss the case with

14  anybody except your own lawyer and the lawyers involved in this

15  case, okay?  Thank you.

16        THE WITNESS:  Okay.  Thank you.

17        THE COURT:  Call your next witness, please.

18        MR. LEWIS:  Your Honor, the government would call

19  James Chadwick.

20        THE COURT:  Come up here, Mr. Chadwick, to be sworn

21  as a witness.

22        THE WITNESS:  Yes, sir.

23        (Witness sworn by the clerk)

24        THE CLERK:  Please take a seat.

25        THE COURT:  All right.  You may proceed.

1      MR. LEWIS:  Thank you, Your Honor.

2                  **JAMES CHADWICK,**

3      **GOVERNMENT'S WITNESS SWORN AT 1:46 p.m.**

4                  **DIRECT EXAMINATION**

5  BY MR. LEWIS:

6  Q.   Sir, would you state your full name for the record,

7  please.

8  A.   James Patrick Chadwick.

9  Q.   And spell your last name for the court reporter.

10  A.   C-H-A-D-W-I-C-K.

11  Q.   Sir, how are you employed?

12  A.   I'm currently employed with the Odessa Police Department.

13  Q.   In what capacity?

14  A.   I am a sergeant for the Professional Standards Unit.

15  Q.   Okay.  And how long have you been sergeant of the

16  Professional Standards Unit?

17  A.   Approximately four months.

18  Q.   What is Professional Standards Unit?  What do you do on a

19  day-to-day basis?

20  A.   I investigate complaints against other police officers, to

21  sustain or validate them.

22  Q.   Prior to being assigned to this unit four months ago,

23  where were you assigned?

24  A.   I was assigned to the Crimes Against Persons Unit, robbery

25  and homicide for the Odessa Police Department.

Chadwick - Direct Examination

1   Q.   How long had you been in that unit?

2   A.   Approximately three years.

3   Q.   Take you back to May 13th, 2014.  Were you working that

4   day as a detective in the robbery and homicide unit?

5   A.   Yes, I was.

6   Q.   Okay.  What, if anything, happened that day, as best you

7   remember?

8   A.   I remember being assigned to assist with the investigation

9   of a deceased person.

10   Q.   Where was that deceased person?

11   A.   They were located in an alley behind number 30 Neta Place

12   in Odessa, Texas.

13   Q.   Who was the lead investigator, if that's a term that

14   you-all use in your department?

15   A.   At that time it was assigned to Detective John Sikes.

16   Q.   Did you go to the alley at 30 Neta Place?

17   A.   For a few moments, yes, I did.

18   Q.   Okay.  Were other officers already there when you arrived?

19   A.   Yes, they were.

20   Q.   Did you provide or perform any investigative functions in

21   connection with that case while you were there at 30 Neta Place

22   that day?

23   A.   Other than a brief view of the scene, that was all I did.

24   Q.   Okay.  Did you provide any other investigative assistance

25   that day?

Chadwick - Direct Examination

1   A.   Yes, I did.

2   Q.   What did that consist of?

3   A.   That consisted of locating the owner of the vehicle that

4   was there in the alley and contacting her.

5   Q.   Okay.  And did you make contact with that lady?

6   A.   Yes, I did.

7   Q.   Do you recall her name today?

8   A.   I believe it was Jacqueline Pineda.

9   Q.   Anything else that you recall doing that day?

10  A.   I also performed some background investigations on several

11  subjects that she had identified along with herself.

12  Q.   Let's go to the next day.  Did you continue to assist in

13  this investigation?

14  A.   Yes, I did.

15  Q.   Okay.  And on May 14th, 2014, what actions did you take in

16  furtherance of this investigation involving the death of Sean

17  Lamb?

18  A.   I followed up on three Crime Stoppers' tips that day.

19  Q.   Okay.  What was the nature of the tips?

20  A.   Basically it -- all three tips came from a different

21  source.  They all stated that the subject by the name of Steven

22  Saenz and Johnny San Miguel and Sean Lamb had in some way or

23  form taken a black Tahoe and a large amount of narcotics during

24  a robbery and were supposed to have been hiding out -- or

25  Steven Saenz and Johnny San Miguel were hiding out at a

1  person's home identified as Liz Hernandez.

2  Q.   Okay.  Based upon that information, did it include an

3  address?

4  A.   I don't remember.  I believe it just named the apartments

5  as Arbor Terrace.

6  Q.   Okay.  Based upon that information, what did you do?

7  A.   I followed up.  That's a well-known apartment complex in

8  the city of Odessa to the police officers.  I followed up with

9  background information for Liz Hernandez and was able to obtain

10  the address at 1101 Fitch, No. 404, which is Arbor Terrace

11  apartments.

12  Q.   Okay.  Did you go to that location?

13  A.   Yes, sir, I did.

14  Q.   Did you go by yourself?

15  A.   No, I did not.

16  Q.   Who else went with you?

17  A.   I took Detective Pete Gonzales with me.

18  Q.   Okay.  Do you recall which apartment you went to?

19  A.   I believe it was No. 404.

20  Q.   Did you meet with anybody there?

21  A.   Yes, sir, I did.

22  Q.   Who did you meet with?

23  A.   I met with Liz Hernandez and Brian Hernandez.

24  Q.   Did you have a chance to talk to them?

25  A.   Yes, I did.

Chadwick - Direct Examination

1  Q.   What was the nature of that conversation?  Did you tell

2  them what you were there for or why you were there?

3  A.   Yes, I did.  I informed them I was looking for Steven

4  Saenz and Johnny San Miguel.

5  Q.   Were you able to locate them there?

6  A.   No, I was not.

7  Q.   Were you provided any information by either Liz or Brian

8  as to their whereabouts?

9  A.   No, I was not.

10  Q.   Did Brian or Liz know those names?

11  A.   Yes, they did.

12  Q.   Okay.  But they had no idea where those two individuals

13  were?

14  A.   Correct.

15  Q.   Okay.  Anything else that you did while you were there?

16  A.   We attempted to look for a cell phone which had received

17  messages from Sean Lamb at the time which belonged to Brian

18  Hernandez.

19  Q.   So you talked to Brian Hernandez.

20  A.   Yes.

21  Q.   What did you learn about the cell phone?

22  A.   I learned that Sean Lamb and Brian Hernandez had exchanged

23  messages -- excuse me -- exchanged messages on May 13th, that

24  afternoon.  And that upon hearing that Sean Lamb was deceased,

25  Liz Hernandez instructed Brian Hernandez to destroy the phone

1  and get rid of it.

2  Q.    Did you also have an opportunity to speak with Liz

3  Hernandez?

4  A.    Yes, I did.

5  Q.    Okay.  And what information were you able to learn from

6  Liz Hernandez about Sean Lamb's murder?

7  A.    She denied knowing anything at first, but she was telling

8  us -- or was telling me that --

9          MR. GARCIA:  Excuse me, Your Honor.  Before we get

10  into the conversation with Ms. Hernandez, and I am assuming

11  with Brian also, I am going to object at this point to any

12  testimony concerning what Liz or Brian Hernandez said.  It

13  would seem to me that any conspiracy is by this time over with

14  and so it is no longer statements that would be admissible

15  under that theory.

16          THE COURT:  Mr. Lewis.

17          MR. LEWIS:  Your Honor, they were defendants at the

18  time under investigation.  They would be considered statements

19  against interests as to --

20          THE COURT:  Well, statements of interest, but they

21  can't -- let me see the attorneys up here.

22          (Sidebar conference on the record)

23          THE COURT:  How can they cross-examination her on the

24  statements?  Don't you have an issue there, that they can't --

25  are you going to call her as a witness?

Chadwick - Direct Examination

1          MR. LEWIS:  Liz Hernandez, yes, I am.

2          THE COURT:  Well, then you can get it out of her when

3  she is called as a witness.

4          MR. LEWIS:  Okay.

5          (Sidebar conference on the record concluded)

6          MR. LEWIS:  May I proceed, Your Honor?

7          THE COURT:  You may.

8  Q.   (BY MR. LEWIS)  Detective Chadwick, let me ask you:  Did

9  you receive information from Liz Hernandez?  Yes or no.

10 A.   Yes.

11 Q.   Based upon the information that you received, how did it

12 affect the nature of the investigation or what you already knew

13 about some of the facts surrounding the death of Sean Lamb?

14 A.   It led me to believe that she was hiding more information.

15 That she knew about it.

16 Q.   Was she forthcoming as you inquired further?

17 A.   No, she was not.

18 Q.   Okay.  At some point did you make a decision or did you

19 come to some conclusion of what needed to done while you were

20 there at 1101 Fitch?

21 A.   Yes.

22 Q.   And what was that?

23 A.   The decision was made to actually leave from the apartment

24 and confer with the lead detective and provide him what I had

25 obtained from them along with my suspicions.

1   Q.    And did you do that?

2   A.    Yes, I did.

3   Q.    You conveyed your suspicions, your contact with Liz and

4   Brian Hernandez to who?

5   A.    To Detective John Sikes.

6   Q.    And what decision, if any, was made at that time?

7   A.    To obtain a search warrant and attempt to locate any

8   evidence.

9   Q.    And the search warrant would be located where?  Where

10  would it be?

11  A.    What's in Apartment 404, Liz and Brian's apartment.

12  Q.    Okay.  Was a search warrant obtained that day?

13  A.    Yes, it was.

14  Q.    And do you recall whether a search warrant was, in fact,

15  executed on May 14th, 2014?

16  A.    It was executed that day.

17          MR. LEWIS:  May I approach the witness, Your Honor?

18          THE COURT:  You may.

19  Q.    (BY MR. LEWIS)  Detective Chadwick, if you could please

20  take a look at what has been marked for identification purposes

21  as Government's Exhibits 2 through 12, please.

22  A.    (Witness complies.)

23  Q.    Have you had an opportunity to look at Government's

24  Exhibits 2 through 12?

25  A.    Yes, sir.

Chadwick - Direct Examination

1   Q.   What are Government's Exhibits 2 through 12?

2   A.   These are photographs of the Arbor Terrace apartment

3   complex along with the apartment belonging to Liz Hernandez and

4   Brian Hernandez.

5   Q.   Do those photographs appear to represent or depict the

6   scene on May 14th, 2014, when you were there to conduct the

7   search?

8   A.   Yes, they do.

9   Q.   Do those photographs appear to accurately depict what's

10  contained in them?

11  A.   Yes, they do.

12  Q.   Do those photographs, any of them, Government's Exhibits 2

13  through 12, do they appear to be altered or tampered with in

14  any way?

15  A.   No, sir.

16  Q.   Okay.

17          MR. LEWIS:  Government would offer Government's 2

18  through 12 at this time.

19          MR. LEACH:  No objection to 2 through 12, Your Honor.

20          THE COURT:  Mr. Garcia?

21          MR. GARCIA:  No objection, Your Honor.

22          THE COURT:  Mr. Pool?

23          MR. POOL:  No objection, Your Honor.

24          THE COURT:  Mr. Stroder?

25          MR. STRODER:  No objection.

1          THE COURT:  Government's Exhibits 2 through 12 are

2  admitted.

3          MR. LEWIS:  Thank you, Your Honor.  And permission to

4  publish to the jury, please?

5          THE COURT:  You may.

6  Q.   (BY MR. LEWIS)  Looking at Government's Exhibit 4, does --

7  what are we looking at there, Detective?

8  A.   We're looking at the north of Apartment 404 -- the north

9  side of Apartment 404, the front door.

10 Q.   Now, did you participate in the search itself?

11 A.   Yes, sir, I did.

12 Q.   Okay.  Approximately how many officers were there that day

13 to do that search?

14 A.   Four officers and one crime scene tech.

15 Q.   What about Liz Hernandez and Brian Hernandez, were they

16 still there at the house?

17 A.   They were there on initial contact.  They were not there

18 during the search of the residence.

19 Q.   Do you recall whether or not any items -- physical items

20 were obtained during the course of the search?

21 A.   Yes, sir, there were.

22 Q.   Okay.  And what do you recall specifically?

23 A.   I recall recovering a white plastic bag with two boxes of

24 9mm ammunition, Winchester ammunition in it, along with a

25 digital scale.

Chadwick - Direct Examination

1  Q.   Okay.  Let's take a look at Government's Exhibit 5.

2  What's depicted in that picture, Detective?

3  A.   The white plastic bag.

4  Q.   And where did you find this white plastic bag?

5  A.   That is in the cabinet in the kitchen above the stove

6  area.

7  Q.   Okay.  And did you pull it down then?

8  A.   Yes, sir, I did.

9  Q.   Okay.  Did you make an inspection of it?

10  A.   Yes, I did.

11  Q.   Okay.  Let's take a look at Exhibit 6.  Do you see

12  Exhibit 6?

13  A.   Yes, sir.

14  Q.   That's the two boxes that you're describing?

15  A.   Yes, sir.

16  Q.   Could you take a look, please, at what's been marked for

17  identification purposes as Government's Exhibit 13 that you

18  have in front of you?

19  A.   (Witness complies.)

20  Q.   You can put them back in the bag.  I just need to know:

21  Are you familiar with those items that are marked as

22  Government's Exhibit 13?

23  A.   Yes, sir, I am.

24  Q.   Okay.  And at the same time, if you can go ahead and take

25  a look at what's been marked for identification purposes as

Chadwick - Direct Examination

1  Government's Exhibit 14, please.

2  A.    (Witness complies.)

3  Q.    Have you had a chance to look at Government's Exhibit 14?

4  A.    Yes, sir.

5  Q.    Are you familiar with Government's Exhibit 14?

6  A.    Yes, sir, I am.

7  Q.    Okay.

8          MR. LEWIS:  Permission to approach the witness, Your

9  Honor?

10         THE COURT:  You may.

11         MR. LEWIS:  Your Honor, at this time I am tendering

12  Government's Exhibits 13 and 14 to the defense.

13         THE COURT:  Turn the lights back on for a minute,

14  please.

15         (Defense attorneys reviewing exhibits)

16         MR. LEACH:  Your Honor, no objection to 13 and 14.

17         THE COURT:  Okay.

18         Mr. Garcia, any objection?

19         MR. GARCIA:  No objection, Your Honor.

20         THE COURT:  Any objections, Mr. Pool?

21         MR. POOL:  No objection, Your Honor.

22         MR. STRODER:  None.

23         THE COURT:  All right.  Government's Exhibits 14 and

24  13 -- or 13 and 14 are admitted.

25         MR. LEWIS:  Thank you, Your Honor.

Chadwick - Direct Examination

1  Q.   (BY MR. LEWIS)  Detective Chadwick, with regards to

2  Government's Exhibit 13, what is Government's Exhibit 13?

3  A.   A plastic --

4  Q.   Do you need me to bring it back up to you so you can

5  double-check it?

6  A.   No, sir.

7  Q.   Okay.  What is Government's Exhibit 13?

8  A.   13 is a white plastic bag with two boxes of 9mm Winchester

9  ammunition.

10 Q.   Okay.  Is it the same as what's depicted in Government's

11 Exhibit 6?

12 A.   Yes, it is.

13 Q.   Okay.  Did you make any further examination of the

14 contents of those two boxes?

15 A.   Yes, sir, I did.

16 Q.   What was the result of that examination?

17 A.   One box was significantly heavier than the other.

18 Q.   That told you what?

19 A.   That the box that was lighter was missing bullets in it.

20 Q.   And approximately how many?

21 A.   If I had to judge, half, at least half a box.

22 Q.   Okay.  Then what about Government's Exhibit 14?  Do you

23 recall what Government's Exhibit 14 is?

24 A.   Yes, sir.

25 Q.   And what is Government's Exhibit 14?

Chadwick - Direct Examination

```
 1   A.    It's a large digital scale.

 2   Q.    And where was the scale located?

 3   A.    The scale was located in the kitchen pantry area.

 4   Q.    I'm showing you now what's marked as Government's

 5   Exhibit 8.  Is that the scale that we're talking about?

 6   A.    Yes, sir.

 7   Q.    And that's the same as what's Government's 14; is that

 8   correct?

 9   A.    Yes, sir.

10   Q.    And as we look at Government's Exhibit 8 up there on the

11   screen, is that the location where you found it in the pantry?

12   A.    Yes, it is.

13   Q.    You thought this was significant.  Why did you think this

14   scale was significant to you as part of your investigation?

15   A.    It contained a white powdery residue on the scale itself.

16   Q.    Okay.  Anything else about it?

17   A.    That scale, I would not normally find in a kitchen pantry

18   such as that.  To me, that depicts a narcotics sized scale for

19   large quantities.

20   Q.    Other than the box of bullets and the digital scale, were

21   any other physical items as evidence, that you recall,

22   recovered?

23   A.    I believe there were, but not by me.

24   Q.    Okay.  Did you provide any additional investigative

25   assistance to the Sean Lamb murder case?
```

Chadwick - Direct Examination

1   A.   Yes, sir, I did.

2   Q.   What else did you do?  What did it involve?

3   A.   I also participated in an interview with Johnny San Miguel

4   the following day, on the 15th.  And on the 16th, I recovered

5   video from the Parkway Inn surveillance system.

6   Q.   What led you to the Parkway Inn on May 16th?

7   A.   Detective Hudgens had found video there at the Parkway Inn

8   based off of information obtained during the investigation.

9   Q.   Did you travel to the Parkway Inn?

10  A.   Yes, I did.

11  Q.   And once at the Parkway Inn, was Detective Hudgens there?

12  A.   Yes, he was.

13  Q.   Were you able to make your way to the video system that

14  the hotel maintains there?

15  A.   Yes, sir, I was.

16  Q.   Okay.  And specifically what did you do first?

17  A.   The first thing I did was view the video that Detective

18  Hudgens had located.

19  Q.   Okay.  You viewed it?

20  A.   Yes, sir.

21  Q.   What did you see as you viewed this video?

22  A.   It was a multi-camera system at the time where it was on a

23  multi-camera angle so it showed all the cameras for the entire

24  complex.  We played it back and he was able to show me a time

25  for May 13th, 2014, between 4 p.m. and 4:30 p.m. where several

Chadwick - Direct Examination

1  vehicles had entered the parking lot, one of which matched the

2  description of the vehicle Sean Lamb was found in.

3  Q.   What did you do at that point, based upon your initial

4  observation?

5  A.   After we played the video all the way through and we

6  observed several subjects, at that time I conducted -- or I

7  basically created a duplicate of the video.

8  Q.   How did you do that?

9  A.   I used a police-issued -- or, excuse me, a

10 department-issued laptop and what we call the Omnivore video

11 and photograph capture system.

12 Q.   How does that system work?

13 A.   I plug that system into the DVR or the security system

14 itself, and I transfer the imagine off of the DVR system onto

15 my laptop.  The Omnivore thumb drive enables me to create a

16 picture in picture basically, and I am able to record the

17 actual picture.  And it was recorded without damaging the

18 Parkway Inn surveillance system.

19 Q.   And did you do this?

20 A.   Yes, I did.

21 Q.   Have you received training on how to do this or utilize

22 this software system or this Omnivore system that you're

23 describing?

24 A.   Yes, sir, I have.

25 Q.   And have you used this system before?

Chadwick - Direct Examination

1  A.    Yes, sir, I have.

2  Q.    And have you had any problems in operating this system or

3  being able to capture video from another operating system?

4  A.    No, I have not.

5  Q.    Now, as you went through this process, did you pay

6  particular attention or did you focus your attention on any one

7  particular camera that was there at the Parkway Inn?

8  A.    Yes, I did.

9  Q.    And specifically which ones were those?

10 A.    I remember paying specific attention to Camera No. 7 and

11 Camera No. 8 and I believe it is Camera 14.

12 Q.    And for what time frame did you record or capture the

13 imagines that were being displayed on this system as you sat

14 there at Parkway Inn.

15 A.    Judging from the time bar, because the actual picture did

16 not have the time on it, it was set for a time which I judged

17 to be between 4:10 and 4:15 that afternoon.

18 Q.    Did you capture those images or what was on each one of

19 those cameras for that same time frame?

20 A.    Yes, I did.

21 Q.    Do you know whether or not those images were accurately

22 captured by you using this system that you had been trained on?

23 A.    Yes, I do.  They were.

24 Q.    How do you know that?

25 A.    After it is captured, the video, it gives you the option

1  to replay it and make sure that all of the information you have

2  chosen is there.  So I am able to scroll through it or replay

3  it.  It also records it minute by minute, second by second.  So

4  it is not a fast forward-type situation where you just hit it

5  and it automatically downloads.  You have to record minute by

6  minute.

7  Q.   And did the system do that?

8  A.   Yes, it did.

9  Q.   As you looked at it, did it appear that your operation and

10 use of this software system worked like it was supposed to and

11 you were able to accurately duplicate the copy, what videos

12 appeared at the Parkway Inn on their security system?

13 A.   Yes.

14           MR. LEWIS:  May I approach the witness, Your Honor?

15           THE COURT:  You may.

16           Turn the lights back on, please.

17 Q.   (BY MR. LEWIS)  Detective Chadwick, I show you and I've

18 placed before you three items that have been marked for

19 identification purposes as Government's Exhibits 33, 34 and 35.

20 Do you see those?

21 A.   Yes, sir.

22 Q.   What are Government's Exhibits 33, 34 and 35?

23 A.   These are CDs, sir, with the identities of the Parkway Inn

24 showing upstairs, downstairs and video multi-camera.

25 Q.   Okay.  And what do those CDs represent then?

1   A.    They would represent the camera angles that I obtained

2   from the surveillance system.

3   Q.    On May 16th, 2014?

4   A.    Yes, sir.

5          MR. LEWIS:  Government would offer Government's

6   Exhibits 33, 34 and 35.

7          THE COURT:  Mr. Leach?

8          MR. LEACH:  No objection to 33 through 35.

9          THE COURT:  Mr. Garcia?

10         MR. GARCIA:  No objection, Your Honor.

11         THE COURT:  Mr. Pool?

12         MR. POOL:  No objection, Your Honor.

13         THE COURT:  Mr. Stroder?

14         MR. STRODER:  No objection.

15         THE COURT:  Government's Exhibits 33, 34 and 35 are

16   admitted.

17         MR. LEWIS:  Permission to publish to the jury, Your

18   Honor?

19         THE COURT:  You may.

20         (Video played)

21   Q.    (BY MR. LEWIS)  Detective Chadwick, let me ask one

22   question.  As we watch these videos, is there any sound?

23   A.    No, sir, no sound.

24         (Video played)

25   Q.    (BY MR. LEWIS)  At the time you made this recording and

Chadwick - Direct Examination

 1  captured this video, Detective Chadwick, did you know who some

 2  of these people were or had they been identified to you?

 3  A.    Yes.

 4  Q.    Okay.  Let me back up.  Start here.

 5          (Video played)

 6  Q.    (BY MR. LEWIS)  Do you see that person that has just

 7  gotten out of the car --

 8  A.    Yes, sir.

 9  Q.    -- in the middle of the screen?  Do you know who that

10  person is?

11  A.    No, sir, I do not.

12  Q.    Okay.

13          (Video played)

14  Q.    (BY MR. LEWIS)  Do you know that person is?

15          THE COURT:  Which one are you talking about?

16  Q.    (BY MR. LEWIS)  The person in the red shirt, do you

17  recognize who that person is or do you know who that person

18  was?

19  A.    We believed it was Ruben Hernandez at the time.

20  Q.    Okay.  What about this person now in the red shirt?

21  A.    I believe that was Rudy Perez.

22          (Video played)

23  Q.    (BY MR. LEWIS)  Do you see the person in the white shirt?

24  A.    Yes, sir.

25  Q.    Do you know who that person is or were you able to

Chadwick - Direct Examination

1  identify that person?

2  A.   We believed it was Stacey Hernandez -- correction --

3  Stacey Castillo.

4            (Video played)

5  Q.   (BY MR. LEWIS)  Do you see the person that's at the

6  passenger's side doors as the Expedition is pulling away?

7  A.   Yes, sir.

8  Q.   And who -- were you able to identify that person?

9  A.   Yes, sir.

10 Q.   Who was that person?

11 A.   Liz Hernandez.

12 Q.   Now, Government's Exhibit 34, does it provide a different

13 angle than what's provided here in Government's Exhibit 33?

14 A.   Yes, sir.

15 Q.   What angle does it provide?

16 A.   It would be a video of the upstairs, the second floor of

17 the apartment complex, also just above this parking area.

18 Q.   Apartment or hotel?

19 A.   Sorry, hotel.

20 Q.   Okay.  Playing Government's Exhibit 34.

21            (Video played)

22 Q.   (BY MR. LEWIS)  And in Government's Exhibit 35 is what you

23 described as the multi-camera view?

24 A.   Correct.

25 Q.   How many cameras did they have at the Parkway Inn?

1  A.   I believe it actually had 16 slots.  I believe 14 of those

2  were accurately working.

3           MR. LEWIS:  Turn the lights on.

4  Q.   (BY MR. LEWIS)  The people that you saw in the video, the

5  ones that you've describe, Stacey Castillo and I think you said

6  Rudy Perez, would you recognize them again if you saw them

7  today?

8  A.   I believe so, yes.

9  Q.   Okay.  Do you see Stacey Castillo in the courtroom today

10 that you saw in this video?

11 A.   Yes, sir, I do.

12 Q.   And if you could point to where she is sitting and

13 describe what she's wearing for the jury, please.

14 A.   The female with glasses and blue shirt (Indicating).

15 Q.   Okay.  And in the video, is she the one that was wearing

16 the white shirt?

17 A.   Yes, sir.

18           MR. LEWIS:  Your Honor, let the record reflect the

19 witness has identified Defendant Castillo.

20           THE COURT:  The record will so reflect.

21 Q.   (BY MR. LEWIS)  And then with regards to Mr. Paredes, he

22 was wearing a red shirt in the video, do you see him in the

23 courtroom today?

24 A.   I can't see all of them.  Is it all right if I stand?

25 Q.   If that will help you.

Chadwick - Direct Examination

```
1   A.    Yes, sir.

2   Q.    Where do you see Mr. Paredes?

3   A.    I see him sitting at the end table in the suit and

4   glasses.

5   Q.    This Mr. Paredes with glasses?

6   A.    I believe so, yes, sir.

7   Q.    Okay.

8              MR. LEWIS:  Your Honor, let the record reflect the

9   witness has identified who he believes to be Defendant Paredes.

10             THE COURT:  The record will so reflect.

11             MR. LEWIS:  Thank you.  Pass the witness.

12             THE COURT:  Mr. Leach?

13             MR. LEACH:  I don't have any questions for Officer

14  Chadwick, Your Honor.  Thank you.

15             THE COURT:  Mr. Garza -- Mr. Garcia, any questions?

16             MR. GARCIA:  Your Honor, I have no questions of this

17  witness.

18             THE COURT:  Mr. Pool?

19             MR. POOL:  No questions, Your Honor.

20             THE COURT:  Mr. Stroder?

21             MR. STRODER:  None, Your Honor.

22             THE COURT:  Okay.  May this witness be excused?

23             MR. LEWIS:  Yes, Your Honor.

24             THE COURT:  Mr. Leach?

25             MR. LEACH:  Pardon me.  Yes, Your Honor.
```

```
 1              THE COURT:  Mr. Garcia?

 2              MR. GARCIA:  Yes.

 3              THE COURT:  Mr. Pool?

 4              MR. POOL:  No objection.

 5              THE COURT:  Mr. Stroder?

 6              MR. STRODER:  No objection.

 7              THE COURT:  We appreciate you being here and you're

 8   excused.  We'd ask you not to discuss the case or your

 9   testimony with anyone except the attorneys before the jury

10   begins its deliberations, all right?

11              THE WITNESS:  Yes, sir.

12              THE COURT:  Thank you, sir.

13              Call your next witness, please.

14              MR. LEWIS:  The government would call Liz Hernandez,

15   Your Honor.  She's in custody, Your Honor.

16              THE COURT:  All right.

17              MR. LEWIS:  Permission to retrieve the exhibits?

18              THE COURT:  You may.

19              (Witness sworn by the clerk)

20              THE CLERK:  Please have a seat.

21              THE COURT:  All right.  You may proceed.

22              MR. LEWIS:  Thank you, Your Honor.

23                        LIZ HERNANDEZ,

24            GOVERNMENT'S WITNESS SWORN AT 2:22 p.m.

25                     DIRECT EXAMINATION
```

Liz Hernandez - Direct Examination

```
 1  BY MR. LEWIS:
 2  Q.   Ma'am, would you state your full name for the record,
 3  please.
 4  A.   Liz Hernandez.
 5  Q.   And spell your last name for the record, please.
 6  A.   H-E-R-N-A-N-D-E-Z.
 7  Q.   Ms. Hernandez, I noticed you're wearing an orange
 8  jumpsuit.  You're currently in custody; is that correct?
 9  A.   Yes, sir.
10  Q.   Okay.  Let's go back to 2014, about a year ago.  Where
11  were you living at the time?
12  A.   Arbor Terrace apartments.
13  Q.   Okay.  Do you recall the particular apartment number?
14  A.   404.
15  Q.   And how long had you lived at those apartment?
16  A.   Close to a year.
17  Q.   And who lived in the apartment with you at that time about
18  a year ago today?
19  A.   Me; my son, Brian; and my other three kids.
20  Q.   Okay.  What are the ages of those children?
21  A.   15, 12 and 11.
22  Q.   Anybody else living in that apartment with you?
23  A.   No, sir.
24  Q.   Okay.  Do you know a Johnny San Miguel?
25  A.   Yes, sir.
```

Liz Hernandez - Direct Examination

1  Q.    Okay.  Who is he?

2  A.    He was a friend.

3  Q.    Okay.  How did you know him?

4  A.    I was dating his brother Frankie at the time.

5  Q.    Okay.  And what about Johnny and Frankie, about a year ago

6  at this time, where were they living?

7  A.    I had met them just at a party.

8  Q.    Okay.  Do you know where they were living?

9  A.    At the Sahara Motel.

10 Q.    Okay.  At some point did Johnny and Frankie San Miguel

11 come to live with you or stay with you at your apartment?

12 A.    Yes, sir.

13 Q.    Okay.  About when did that occur?

14 A.    Around March.

15 Q.    March of last year.

16 A.    Yes, sir.

17 Q.    Okay.  And when they stayed there in your apartment,

18 where -- how many bedrooms did you have?

19 A.    I had three bedrooms.

20 Q.    And was one bedroom for you?

21 A.    Yes, sir.

22 Q.    What about the other two bedrooms?

23 A.    For my kids.

24 Q.    Okay.  So where did Johnny and Frankie San Miguel then

25 stay?

Liz Hernandez - Direct Examination

1  A.    Frankie slept in my room and Johnny slept in the living

2  room.

3  Q.    You were dating Frankie at the time.

4  A.    Yes, sir.

5  Q.    Now, at that time were you working?

6  A.    Yes, sir.

7  Q.    Okay.  Where were you working?

8  A.    At Mr. Gatti's and at the Comfort Inn.

9  Q.    And anybody else working that was living --

10 A.    No, sir.

11 Q.    -- in this apartment?

12 A.    No.

13 Q.    What about Brian, was he working?

14 A.    Oh, yes, sir.

15 Q.    Okay.  What was he doing?

16 A.    He was working at Subway.

17 Q.    Okay.  What about Johnny San Miguel, was he working?

18 A.    No, sir.

19 Q.    What about Frankie San Miguel?

20 A.    No, sir.

21 Q.    Okay.  So what would you do all day?  Did Johnny and

22 Frankie just stay and hang out at your apartment?

23 A.    Yes, sir, while I worked.

24 Q.    Did they provide any income or any finances or any money

25 to sustain this life that you were living there at the

Liz Hernandez - Direct Examination

1    apartment?

2    A.    No, sir.

3    Q.    Do you know what they did during the day?

4    A.    No, sir.

5    Q.    During this time, Liz, were you using any illegal drugs?

6    A.    Yes, sir.

7    Q.    What drugs were you using?

8    A.    Methamphetamine, Xanax and marijuana.

9    Q.    And with regards to the methamphetamine, how often?

10   A.    Daily.

11   Q.    For how long had this been going on?

12   A.    For, I'd say, like almost a year.

13   Q.    How much of a habit was it?  How much was it costing you

14   on a daily basis?

15   A.    150 to 200.

16   Q.    A day?

17   A.    Yes, sir.

18   Q.    What about Xanax, how often did you engage in using that?

19   A.    As often as I could get ahold of them.  Daily.

20   Q.    What about the marijuana?

21   A.    Daily.

22   Q.    How much was this habit of yours costing you then?  For

23   all three different drugs, how much was this costing you on a

24   daily basis?

25   A.    Quite a bit.  Like almost $200 a day.  Sometimes a little

Liz Hernandez - Direct Examination

1  bit more.

2  Q.   While Johnny and Frankie San Miguel were staying there,

3  did they engage in that same activity that you did and using

4  illegal drugs?

5  A.   Yes, sir.

6  Q.   What did they tend to use or engage in that you saw?

7  A.   Methamphetamines and the marijuana.

8  Q.   Do you know how they got theirs, how they got their drugs?

9  A.   No, sir.

10  Q.   Okay.  Did you share a common source or did you get drugs

11  and share with them?

12  A.   Yes, sir.

13  Q.   Did you ever wonder where they were getting money to

14  purchase or obtain their drugs if they weren't working?

15  A.   No.

16  Q.   Who is Ruben Hernandez?

17  A.   My brother.

18  Q.   And where -- and back then, say a year ago or back in

19  March of last year, where did Ruben live?

20  A.   He would stay with me sometimes.

21  Q.   Did he have his own place?

22  A.   Not at the time.

23  Q.   When -- how often would he stay with you?

24  A.   Not all the time.  Just -- he would mainly go around, like

25  when he needed somewhere to shower.

Liz Hernandez - Direct Examination

1  Q.   Ruben didn't have a house in Odessa.

2  A.   He was with my sister-in-law, Erica, but they weren't

3  together at the time.  He would just stay in different places.

4  Q.   Did Ruben work?  Did he have a job?

5  A.   Yes, sir.

6  Q.   Okay.  What did Ruben do?

7  A.   He used to do flooring.

8  Q.   Okay.  What else did Ruben do?

9  A.   Sold drugs.

10  Q.   What kind of drugs did Ruben sell?

11  A.   Cocaine, methamphetamine and marijuana.

12  Q.   Okay.  Did Ruben ever ask you to help him in distributing

13  his drugs?

14  A.   Yes, sir.

15  Q.   And for how long did you do that at his request?

16  A.   For a couple of months.

17  Q.   Give me a time frame.

18  A.   Probably from like about February to like about May.

19  Q.   Of last year?

20  A.   Yes, sir.

21  Q.   Okay.  And when he asked you to help sell drugs or

22  distribute the drugs, was there -- which drugs in particular

23  did he seek your assistance?

24  A.   The marijuana.

25  Q.   What about the methamphetamine?

Liz Hernandez - Direct Examination

1  A.   Yes, sir.

2  Q.   Okay.  And did Ruben ever ask you to store or keep drugs

3  at your house for him?

4  A.   Yes, sir.

5  Q.   Okay.  How often did he ask you to do that?

6  A.   Often.

7  Q.   Well, are we talking about on a daily basis or a weekly

8  basis or twice a month?  What?

9  A.   Probably like every month sometimes.

10 Q.   And how long would the drugs stay in your house generally?

11 A.   Sometimes overnight.

12 Q.   Sometimes longer?

13 A.   Yes, sir.

14 Q.   When you agreed to help Ruben sell and distribute

15 marijuana and methamphetamine for him, did you recruit anybody

16 else or get anybody else to help you sell those drugs for

17 Ruben?

18 A.   No, sir.

19 Q.   What about Johnny and Frankie, did they help Ruben?

20 A.   I believe so, yes.

21 Q.   At some time, did somebody else -- after Johnny and

22 Frankie moved in and were staying there, did another party come

23 to live in your apartment?

24 A.   Yes, sir.

25 Q.   Okay.  Do you remember or recall who that person was?

Liz Hernandez - Direct Examination

1  A.    Steven Saenz.

2  Q.    And did you know Steven Saenz when he came to your

3  apartment?

4  A.    Not really.

5  Q.    Who knew Steven Saenz?

6  A.    He was related to Johnny and Frankie.

7  Q.    And did you allow him to stay at your place?

8  A.    Yes, sir.

9  Q.    And where did he stay when he started staying at your

10 place?

11 A.    Downstairs.

12 Q.    With Johnny and Frankie?

13 A.    Yes, sir.

14 Q.    About when -- give me the time frame, if you can, when did

15 Steven Saenz then move into your apartment?

16 A.    It was like towards the end of April.

17 Q.    Of last year?

18 A.    Yes, sir.

19 Q.    Steven Saenz work?

20 A.    No, sir.

21 Q.    Do you know what he did to make money or earn money to be

22 able to have or spend or buy things with?

23 A.    No, sir.

24 Q.    At this particular point in time, tell me, what are you

25 and Johnny and Frankie and Steven all doing in the evenings or

Liz Hernandez - Direct Examination

1  on the weekends at this apartment if nobody's got any money to

2  do anything?

3  A.   Well, I was at work -- I was working.  And when we were at

4  home, I was -- we were getting high.

5  Q.   Was Brian still -- I'm sorry.  Was Ruben still coming by

6  your apartment?

7  A.   Yes, sir.

8  Q.   At some point a third individual now shows up at your

9  apartment; is that correct?

10  A.   Yes, sir.

11  Q.   Who was that person?

12  A.   Sean.

13  Q.   Sean Lamb?

14  A.   Yes, sir.

15  Q.   Do you recall the approximate time when Sean Lamb showed

16  up at your apartment?

17  A.   It was like the beginning of May.

18  Q.   Of last year.

19  A.   Yes, sir.

20  Q.   And did you know Sean before he showed up at your door?

21  A.   No, sir.

22  Q.   Did you find out any information about him?

23  A.   No, sir, just that he had barely got out of jail and he

24  needed a place to stay.

25  Q.   Well, how did he come to be at your doorstep needing a

Liz Hernandez - Direct Examination

1   place to stay?

2   A.   Steven had picked him up from jail.

3   Q.   Was Steven a friend or an associate of Sean's?

4   A.   Yes, sir.

5   Q.   Was that your understanding?

6   A.   Yes, sir.

7   Q.   Who -- did somebody vouch for Sean so that he could stay

8   at your place?

9   A.   Not really, no.

10  Q.   You just let somebody you didn't know come into your house

11  and stay there.

12  A.   Yes, sir.

13  Q.   And he was friends of Steven's.

14  A.   Yes, sir.

15  Q.   So after Sean gets there, describe for me what's going on

16  in your house at that time.

17  A.   I go to work every day and just come back, and they're

18  there at home.  And we just continued to get high when I'm

19  home.

20  Q.   Where were the drugs coming from that you were using to

21  get high?

22  A.   From my brother, Ruben.

23  Q.   What did Ruben bring into the house?

24  A.   Methamphetamine.

25  Q.   Okay.  Do you recall a particular instance with Ruben

Liz Hernandez - Direct Examination

1   bringing an amount of methamphetamine into your house?

2   A.   Yes, sir.

3   Q.   Was it more than you had normally seen him bring?

4   A.   Yes, sir.

5   Q.   What would -- and when you saw this, where were you in

6   your apartment?

7   A.   In my bedroom.

8   Q.   Okay.  Were you there by yourself?

9   A.   No, sir.

10  Q.   Who else was there?

11  A.   Johnny, Steven and Sean.

12  Q.   And where was Ruben -- did Ruben come into the bedroom

13  with you?

14  A.   Yes, sir.

15  Q.   Did he have something in his hands?

16  A.   Yes, sir.

17  Q.   What did he show to you?

18  A.   A clear bag with methamphetamine in it.

19  Q.   Can you describe the bag to me or for me, please, the

20  size?

21  A.   It was a gallon size.  It was like the seal tight air

22  bags.

23  Q.   Okay.  And approximately how much methamphetamine was in

24  that gallon-sized sealed-up bag?

25  A.   He had said it was 9 ounces.

1  Q.    Who said?

2  A.    Ruben.

3  Q.    When you had this conversation with Ruben in your bedroom,

4  was Johnny and Steven and Sean also there?

5  A.    Yes, sir.

6  Q.    Did they hear the same conversation?

7  A.    Yes, sir.

8  Q.    What did Ruben -- did Ruben explain or offer what he

9  expected of you and the others concerning this methamphetamine

10  he brought?

11  A.    Yes, sir.

12  Q.    And what was that?

13  A.    For us to help him get rid of it.

14  Q.    What did that mean to you?

15  A.    To help him sell it.

16  Q.    Were you willing to do that?

17  A.    Yes, sir.

18  Q.    What about Sean and Steven and Johnny?

19  A.    Yes, sir.

20  Q.    Did you know at that time or was there ever discussion

21  about how much money you and Johnny, Steven and Sean would make

22  from selling this?

23  A.    No, sir.

24  Q.    Did Ruben ever offer to you how much he would cut you in

25  or you could make for selling this methamphetamine for him?

Liz Hernandez - Direct Examination

1  A.    No, sir.

2  Q.    When was this supposed to take place?  When was this going

3  to happen?

4  A.    He was supposed to give everybody their part.

5  Q.    Who is "he"?

6  A.    Ruben.

7  Q.    Ruben was going to give everybody their part.

8  A.    Yes, sir.

9  Q.    Do you know how much that was going to be or how much each

10 person was supposed to get?

11 A.    No, sir.

12 Q.    Was that supposed to be done at a later time?

13 A.    Yes, sir.

14 Q.    What happened -- and how long did this meeting take place

15 with you and Ruben and the other three in your bedroom?

16 A.    Probably about 30, 45 minutes.

17 Q.    What happened after that?

18 A.    We went downstairs and he started --

19 Q.    Who is "we"?

20 A.    Me, Sean, Johnny, Steven and Ruben.

21 Q.    You went downstairs?

22 A.    Yes, sir.

23 Q.    And then what happened?

24 A.    He started splitting it up into bags --

25 Q.    Who did?

Liz Hernandez - Direct Examination

```
 1  A.    -- smaller amounts.

 2            Ruben.

 3  Q.    And then what happened?

 4  A.    And then he gave all of us I believe he said it was a

 5  quarter.

 6  Q.    A quarter?

 7  A.    Yes.

 8  Q.    "Quarter" meaning what?

 9  A.    I'm not sure.

10  Q.    You didn't understand what a quarter meant?

11  A.    No.

12  Q.    And what were you supposed to do with this?

13  A.    Get rid of it, sell it.

14  Q.    And how were you supposed to sell it?

15  A.    Just calling people and letting them know I had some.

16  Q.    Well, do you know how much to sell it for?

17  A.    Not really.

18  Q.    Well, how much -- you were buying you said I think earlier

19  $150 a day?

20  A.    Yes, sir.

21  Q.    Okay.  What amounts and quantities would you buy on a

22  daily basis?

23  A.    Mostly grams or 20s.

24  Q.    Okay.  So you know what a gram and a 20 costs, correct?

25  A.    Yeah.
```

Liz Hernandez - Direct Examination

1   Q.   Is that how -- you were given no other directions on how

2   you were supposed to sell this?

3   A.   No, sir.

4   Q.   What about a time frame?  How quickly were you supposed to

5   sell this?

6   A.   He didn't say.

7   Q.   And the money that you collected from the sale, what were

8   you supposed to do with that?

9   A.   Give it to him, to Ruben.

10  Q.   Was that the instructions provided to you?

11  A.   Yes, sir.

12  Q.   Were those the same instructions that were provided to

13  Johnny, Steven and Sean?

14  A.   Yes, sir.

15  Q.   What did -- what happened at that time?  After he cuts it

16  up and hands it to you and tells you go and sell, what happens

17  after that?

18  A.   He leaves and I -- we just stay there at the apartment.

19  Q.   You and the three boys?

20  A.   Yes, sir.

21  Q.   Okay.  Getting high?

22  A.   Yes, sir.

23  Q.   And what else happened that night, anything?

24  A.   No, sir.

25  Q.   Okay.  So we go on.  You go to the next day.  Do you and

Liz Hernandez - Direct Examination

1  Johnny, Sean and Steven have any discussions about what Ruben

2  has given to you and what you're supposed to do?

3  A.   No, sir.

4  Q.   Okay.  Is there any further partying by you and Johnny,

5  Sean and Steven?

6  A.   Yes, sir.

7  Q.   Okay.  Tell me about that party.  What happens during that

8  party?

9  A.   We're just sitting around getting high, me and Sean and

10 Steven getting tattoos.

11 Q.   Who brought -- who did the tattoos?

12 A.   A guy named Martin.

13 Q.   And do you recall what day of the week this was when this

14 happened?

15 A.   It was a weekend.

16 Q.   It was a weekend?

17 A.   Yes, sir.

18 Q.   Can you remember or recall whether it was a Saturday or a

19 Sunday then or Friday night?

20 A.   Saturday night, I believe.

21 Q.   Saturday night.

22       Okay.  And what do you remember as the night wore on?

23 A.   We were there at my apartment just getting high, getting

24 tattoos.  Ruben walks in and we're just all there, all of us

25 getting high.  And he ends up leaving.  And then it comes to

Liz Hernandez - Direct Examination

 1  the time that Brian has to be picked up from work.  Steven and

 2  Johnny, I believe, go and pick him up.  And me, Sean and Martin

 3  stay back at the house.  Martin is finishing up my tattoo.

 4            And they come back -- Sean -- I mean, Steven and

 5  Johnny come back and Brian comes back.  And we continue getting

 6  high -- well, I hide everything before Brian walks in because

 7  at the time he didn't know I was doing meth.  The only thing

 8  that was out was like the marijuana.

 9            And we were there, and Martin finishes my tattoo.

10  And we were doing Xanax at the time also and I remember asking

11  Steven for a glass of tea.  And after that glass of tea, I

12  don't remember nothing till I woke up the next day.

13  Q.   Do you remember even getting the glass of tea?

14  A.   I remember getting the glass of tea.

15  Q.   But after that?

16  A.   I don't remember nothing else.

17  Q.   When you woke up the next day, where were you?

18  A.   In my bedroom.

19  Q.   Okay.  Let me show you --

20            MR. LEWIS:  Get the lights, please.

21  Q.   (BY MR. LEWIS)  Show you what's already been offered into

22  evidence as Government's Exhibit 11 and ask you -- can you tell

23  us what's represented in Government's Exhibit 11?

24  A.   My bedroom.

25  Q.   And that's the bed that you woke up on?

Liz Hernandez - Direct Examination

1   A.    Yes, sir.

2   Q.    Okay.  When you woke up that next morning, tell me what

3   happened.

4   A.    I woke up to Ruben walking in the -- in my room, waking me

5   up, and I was surprised because I didn't know I was -- I mean,

6   finding myself in my bedroom.  And he starts asking me where

7   the stuff was at, in other words, where the meth was at.

8            And I told him, "What meth?"

9            And he's like, "What I put in your purse last night."

10           I said, "You didn't put nothing in my purse."

11           He said, "Yes, I did.  Before I left last night."

12   He's like, "I came up here and I put it in your purse."

13           I said, "Well, I don't remember that."

14   Q.    Okay.  When you were -- when you would be in your bedroom

15   as represented in Government's Exhibit 11, where would your

16   purse generally be?

17   A.    On the floor by my bed.

18   Q.    Okay.  To the left side of the bed or to the right side of

19   the bed?

20   A.    To the right side.

21   Q.    Okay.

22           THE COURT:  Looking at which direction?

23   Q.    (BY MR. LEWIS)  Looking at it from the foot of the bed

24   towards the headboard, would it be on the left or the right?

25   A.    Right.

Liz Hernandez - Direct Examination

1  Q.   On the right side.

2  A.   Yes, sir.

3  Q.   Okay.

4          MR. LEWIS:  Thank you, Your Honor.

5  Q.   (BY MR. LEWIS)  And just show you Government's Exhibit 7.

6  Do you see that object on the table?

7  A.   Yes, sir.

8  Q.   What is that object?

9  A.   My purse.

10  Q.   That's the purse that would have been on the right side of

11  your bed.

12  A.   Yes, sir.

13  Q.   When you woke up that morning when Ruben was there --

14          MR. LEWIS:  You can go ahead and turn the lights back

15  on.

16  Q.   (BY MR. LEWIS)  When you woke up that morning, was your

17  purse there?

18  A.   Yes, sir.

19  Q.   Okay.  Was the methamphetamine in the purse?

20  A.   No, sir.

21  Q.   Describe for us, if you can, what you see in Ruben as he

22  questioned you about this.

23  A.   He's upset.

24  Q.   How upset?

25  A.   Very upset.

Liz Hernandez - Direct Examination

1   Q.   Was his voice raised?

2   A.   Yes, sir.

3   Q.   What was your response?

4   A.   I told him I didn't know he had put it in my purse.   I

5   never saw him put it in my purse.

6          He's like, "I told you before I left last night it

7   was in there."

8          I don't remember him telling me that.

9   Q.   This was an amount of meth separate and apart from what he

10  had already cut up and had given to each of you; is that

11  correct?

12  A.   Yes, sir.

13  Q.   How much methamphetamine did you understand he to have

14  placed in your purse the night before?

15  A.   He said it was 6 ounces.

16  Q.   What did you believe at that time?  Or what did you

17  explain to Ruben at that time?

18  A.   I told him I didn't know what was going on.

19         He's like, "What do you mean you don't know?"  He's

20  like, "I put it there last night."  He's like, "Where's the

21  boys at?," asking for Sean, Steven and Johnny.

22         I said, "They should be downstairs."

23         He's like, "Nobody is here."

24         Then he asked me, "Where's your car at?"

25         I said, "It should be outside."

Liz Hernandez - Direct Examination

1          And he's like, "No, it's not."

2          I said, "Well, they probably took it."  I said, "They

3 always borrow it.  I usually let them borrow it."

4          So when we -- he started yelling at me asking me

5 where the stuff -- I mean -- he -- the impression I got is like

6 he thought that I had something to do with them getting away

7 with the stuff, with the meth, because he started yelling at

8 me.

9 Q.   He was accusing you.

10 A.   Yeah, he started kind of accusing me.

11 Q.   So what -- as you continue to argue with your brother over

12 this, what happens, if anything?

13 A.   We start calling the boys.

14 Q.   Who is "we"?

15 A.   Me and Ruben.

16 Q.   Okay.  What numbers are you calling?

17 A.   I was calling Johnny's phone.

18 Q.   What about Ruben, do you know what number Ruben was

19 calling?

20 A.   I believe he was calling all three of them:  Steven, Sean

21 and Johnny.

22 Q.   With regards to your efforts, were you able to get in

23 touch with Johnny?

24 A.   Yes, sir.

25 Q.   But calling his phone.

Liz Hernandez - Direct Examination

1  A.    Yes, sir.

2  Q.    Did you speak with Johnny?

3  A.    Yes, sir.

4  Q.    What did you tell Johnny?

5  A.    I told him that -- what was going on.  I said, "Where are

6  y'all at?"

7            He said, "We're broke down on the side of the road

8  leaving Pecos."

9            I said, "What are y'all doing over there?"

10            He said, "We all came over here with Steven."

11            And I said, "For what?"

12            And he's like, "I don't know.  He said he had to come

13  do some business over here."

14  Q.    Did you confront Johnny at that time about the stolen or

15  the missing methamphetamine?

16  A.    Yes, sir.

17  Q.    What did you tell him about?

18  A.    I asked him if they had gotten the stuff that my brother

19  left in my purse.

20  Q.    What response, if any, did he give you?

21  A.    He said, "I don't know what you're talking about."

22  Q.    How many conversations did you have with Johnny?

23  A.    I'd say a couple.

24  Q.    And were the tone and tenor of your conversations with

25  Johnny about the same?

Liz Hernandez - Direct Examination

1  A.   I kind of got -- I kind of got louder after a while with
2  him.
3  Q.   In what respects?  When you say you got louder, what --
4  A.   I started talking crack to him.
5  Q.   About what?  What were you trying to get across to him?
6  What was the message you were trying to convey to Johnny?
7  A.   For him to tell me where my car and the meth was at --
8  Q.   Okay.
9  A.   -- because my brother was mad about it.
10  Q.   You needed to recover those two items.
11  A.   Yes, sir.
12  Q.   During these phone calls that you had with Johnny, where
13  is Ruben?
14  A.   He's right there standing by me.
15  Q.   Listening?
16  A.   Yes, sir.
17  Q.   Was he providing any instructions to you or offering
18  suggestions to you of things you could tell Johnny?
19  A.   No, sir.
20  Q.   Just listen.
21  A.   Yes, sir.
22  Q.   Did you talk to anybody else?  Were you able to get in
23  touch with either Sean or Steven that day?
24  A.   No, sir.
25  Q.   What about Ruben, were you present for any conversations

Liz Hernandez - Direct Examination

1   Ruben might have had with either Steven or Sean that day?

2   A.   He got in contact with Sean.

3   Q.   He did get in contact with Sean?

4   A.   Yes, sir.

5   Q.   Were you present for that conversation?

6   A.   Yes, sir.

7   Q.   What was the nature of that conversation?

8   A.   He was just asking him the same thing, where they were at,

9   where they had taken the stuff to, where -- he wanted to know

10  exactly where they were at so he can go where they were at.

11  Q.   Did Ruben obtain that information from Sean?

12  A.   No, sir.

13  Q.   And, again, as you listen in, what is Ruben asking about?

14  A.   About the methamphetamine.

15  Q.   He's more concerned about the methamphetamine.

16  A.   Yes, sir.

17  Q.   Not so much concerned about your car.

18  A.   No, sir.

19  Q.   What is it like in your apartment that day, that next day

20  as the day wears on as it relates you and Ruben trying to

21  recover this methamphetamine?

22  A.   We just keep contact -- trying to contact them, contact

23  the guys and if -- Johnny ends up saying that he ends up

24  catching a ride back to Odessa, but he never makes it back to

25  my house.

Liz Hernandez - Direct Examination

1  Q.   Okay.  Does anybody make it back to your house?

2  A.   Sean does.

3  Q.   Sean made it back to your house.

4  A.   Yes, sir.

5  Q.   About what time.

6  A.   I'm not sure what time it was.

7  Q.   Well, was it -- was the sun going down?  Was the sun still

8  up?  Was it dark?  Was it around lunchtime?

9  A.   Sun was up.

10  Q.   The sun was up.

11  A.   Yes, sir.

12  Q.   Was it the afternoon or morning?

13  A.   Afternoon.

14  Q.   Okay.  Sometime that afternoon Sean shows up.  Tell me

15  what happens when Sean comes to your apartment.

16  A.   We just start asking him where Steven and Johnny are at.

17  And he says that Steven stayed at his grandmother's house

18  somewhere in Pecos, I don't know.  And he woke up on the side

19  of the road and in my car.  And he was the only one in the car.

20  Johnny was gone.  Steven was gone.

21       So we start asking him, "Well, do you know where

22  they're at?"

23       He said, "No."

24       At that time he hands me the keys to my car and tells

25  me where the car is at.  He said it just needs gas.  It's on

Liz Hernandez - Direct Examination

```
 1  the side of the road somewhere.  And he tries to gather his
 2  stuff -- his and Steven's stuff, their clothes that they had
 3  left at my house and --
 4  Q.   Was he able to take his clothes?
 5  A.   No.
 6  Q.   What prevented him from taking his clothes?
 7  A.   Ruben.
 8  Q.   What did you see Ruben do?
 9  A.   He just told him, "Put that stuff down."  He's like,
10  "You're not taking nothing out till you tell me where Steven is
11  at."
12  Q.   And why did Ruben want to know where Steven was?
13  A.   Because Sean had said that Steven was the one that had
14  took the methamphetamine.
15  Q.   And that was what Ruben was concerned about.
16  A.   Yes, sir.
17  Q.   And did Ruben indicate when Sean could come back and get
18  his stuff?
19  A.   No, sir.
20  Q.   But he wasn't allowed to take it then.
21  A.   No, sir.
22  Q.   How long did this meeting take place?
23  A.   I'd say about 15, 20 minutes.
24  Q.   And then what happened?
25  A.   He was on the -- Sean was on the phone trying to get a
```

Liz Hernandez - Direct Examination

```
 1  ride, and he finally got somebody to pick him up in the back of
 2  my apartment.
 3  Q.   Did he leave?
 4  A.   Yes, sir.
 5  Q.   After Sean left, what's the mood in your house at this
 6  particular time?
 7  A.   My brother is still very upset.  Ruben is very upset.
 8  Q.   Is he -- how is he taking Sean's explanation about what
 9  happened to the methamphetamine?
10  A.   He doesn't believe it.
11  Q.   What does -- does he indicate to you or provide anything
12  to you about what he wants to do or what needs to be done?
13  A.   He just starts saying that we need to find that
14  methamphetamine or he was going to be in big trouble.  And he
15  started bringing my mom into it.
16  Q.   How did he bring your mom into it?
17  A.   Saying that something was going to -- the people that he
18  was working for were going to end up finding her in Mexico and
19  they would hurt her.
20  Q.   Your mother doesn't live here in the United States.
21  A.   No, sir.
22  Q.   Where does she live?
23  A.   She lives in Ojinaga.
24  Q.   When your brother started saying that to you, how did that
25  make you feel?
```

Liz Hernandez - Direct Examination

1  A.   Worried, scared.

2  Q.   Were you willing to help and assist Ruben in recovering

3  this methamphetamine?

4  A.   Yes, sir.

5  Q.   Did he ask for your assistance?

6  A.   Yes, sir.

7  Q.   Did you-all come up with a plan on what you could do to

8  try and get this methamphetamine back?

9  A.   We tried to keep contacting them, but they weren't

10  answering anymore.

11  Q.   So when those efforts failed, was there another plan or

12  another decision made on how you could best go about trying to

13  recover the drugs?

14  A.   Yes, sir.

15  Q.   And what was that?

16  A.   I called a friend of mine.

17  Q.   Who was that?

18  A.   Shaunte.

19  Q.   Shaunte.  What's her last name?

20  A.   Galan.

21  Q.   Galan?

22  A.   Yes, sir.

23  Q.   And what did you call Shaunte Galan for?

24  A.   To ask her if she knew -- asking her about -- for her to

25  get in contact with her cousin Stacey.

Liz Hernandez - Direct Examination

1   Q.   Stacey is who?

2   A.   Stacey Castillo.

3   Q.   Is a cousin to Shaunte Galan?

4   A.   Yes, sir.

5   Q.   Why did you reach out to Shaunte Galan to get in touch --

6   to have her get in touch with Stacey Castillo?  What about

7   Stacey Castillo made you think, "This is who I need to

8   contact"?

9   A.   Because I had heard that she had had problems with Steven

10  before.

11          MR. STRODER:  Your Honor, I would object to the

12  hearsay.

13          THE COURT:  Sustained.

14          The jury will disregard the witness' answer.

15  Q.   (BY MR. LEWIS)  Was there some reason in your mind that

16  you thought Stacey might be able to help you?

17  A.   Yes, sir.

18  Q.   Okay.  So you contacted Shaunte?

19  A.   Yes, sir.

20  Q.   And what happened after you contacted Shaunte Galan?

21  A.   Stacey shows up at my house.

22  Q.   At your apartment?

23  A.   Yes, sir.

24  Q.   Okay.  How long after you had called Shaunte,

25  approximately, if you remember?

Liz Hernandez - Direct Examination

1  A.    Maybe an hour.

2  Q.    Okay.  And do you know what vehicle she used, what vehicle

3  she came in or how she got to your house?

4  A.    I didn't see the vehicle at first.

5  Q.    Did she come by herself?

6  A.    No, sir.

7  Q.    Who else was with Stacey Castillo?

8  A.    Anthony Gonzales.

9  Q.    Okay.  Now, as you sit there -- and we're talking about a

10  couple of people -- do you see those people that came to your

11  apartment that night, Stacey Castillo and Anthony Gonzales, in

12  the courtroom today?

13  A.    Yes, sir.

14  Q.    Okay.  And if you could, for the Court and for the jury,

15  please, let me ask you:  Could you identify Stacey Castillo,

16  please?

17  A.    Yes, sir.

18  Q.    And describe where she is sitting maybe or what she is

19  wearing.

20  A.    She's sitting over there with the turquoise shirt

21  (Indicating).

22  Q.    Okay.

23        MR. LEWIS:  Let the record reflect the witness has

24  identified Defendant Castillo.

25        THE COURT:  The record will so reflect.

Liz Hernandez - Direct Examination

1          MR. LEWIS:  Thank you.

2   Q.   (BY MR. LEWIS)  And do you see the person Anthony Gonzales

3   that came to your apartment that night?

4   A.   Not from here, I can't.

5   Q.   Well, if you need to, stand up.

6   A.   (Witness complies.)  Yes, sir.

7   Q.   Okay.  Do you see Anthony Gonzales?

8   A.   Yes, sir.

9   Q.   And if you can, describe where he's sitting, what he's

10  wearing.

11  A.   At the end of the table in a suit, black suit.

12  Q.   Okay.

13         MR. LEWIS:  Let the record reflect the witness has

14  identified Defendant Gonzales.

15         THE COURT:  The record will so reflect.

16  Q.   (BY MR. LEWIS)  What -- when they came to your house, was

17  there anybody else besides them?

18  A.   No, sir.

19  Q.   Just those two.

20  A.   Yes, sir.

21  Q.   What did you -- tell me about the nature of the

22  conversation.  What did you talk to them about?

23  A.   About the methamphetamine being stolen, about my car being

24  stolen, and that if she could help us locate Sean and Steven

25  and Johnny.

Liz Hernandez - Direct Examination

1   Q.    For what purpose?

2   A.    To get the methamphetamine back.

3   Q.    And were they agreeable to that?

4   A.    Yes, sir.

5   Q.    Did you talk about how they would be able to assist you or

6   help you or aid you in finding these three?

7   A.    No, sir.

8   Q.    Did you know what methods that they used?

9   A.    No, sir.

10  Q.    How long did this meeting last between you -- was Ruben

11  there as well for this meeting?

12  A.    Yes, sir.

13  Q.    And you and Ruben, Stacey and Anthony, how long did that

14  meeting take place?

15  A.    Maybe 30 minutes.

16  Q.    And at the end of that, did they leave?

17  A.    Yes.

18  Q.    And when they left, how did you feel about how the meeting

19  went?

20  A.    I don't know.

21  Q.    How did Ruben feel?

22  A.    I have no idea, sir.

23  Q.    Well, did you have some hope you might get your car back?

24  A.    Maybe, yes.

25  Q.    Was there some hope by you and Ruben that the

Liz Hernandez - Direct Examination

1  methamphetamine would be recovered?

2  A.   Yes.

3  Q.   Okay.  Was there ever any discussion during this meeting

4  about any kind of payment or what was expected if Stacey

5  Castillo and Anthony Gonzales were successful in recovering

6  these items for you and your brother?

7  A.   No, sir.

8  Q.   So after they left, did anything else happen that evening?

9  A.   No.

10  Q.   So go into the next day, then.  It's now been two days

11  since the methamphetamine has gone stolen; is that correct?

12  A.   Yes, sir.

13  Q.   What, if anything, happens that day concerning the

14  attempts to locate these three individuals?

15  A.   Just trying to find them.  I mean, following one of --

16  Q.   What efforts -- let me ask you:  What personal efforts are

17  you making to try and find them?

18  A.   Just trying to contact them by phone, Facebook.

19  Q.   What about Ruben, is Ruben still at your place?

20  A.   Yes, sir.

21  Q.   Okay.  And does he -- he is becoming -- I guess what I'm

22  trying to ask, is he still calm or is his mood changing?

23  A.   He seems a little bit calmer.

24  Q.   A little bit calmer now?

25  A.   Yes, sir.

Liz Hernandez - Direct Examination

1  Q.   As you and Ruben are there, are you aware of any efforts

2  being performed by Stacey Castillo and Anthony Gonzales to

3  locate Johnny San Miguel, Steven Saenz or Sean Lamb?

4  A.   Yes, sir.

5  Q.   Okay.  What kind of information is provided to you?

6  A.   She had some other --

7  Q.   "She" is?

8  A.   Stacey had some other friends of hers that she had -- one

9  of them was contacting, I believe, was either Sean or Steven on

10 Facebook.  They were trying to purchase some methamphetamine.

11 And they ended up saying they would meet them at a car wash

12 somewhere, and they -- Sean or Steven never showed up.  And

13 that basically just kept going like that.

14 Q.   So was there any success in snatching up or getting

15 Johnny, Sean or Steven that day?

16 A.   No, sir.

17 Q.   Is there frustration setting in?

18 A.   A little bit.

19 Q.   And who is becoming frustrated?

20 A.   My brother, Ruben.

21 Q.   Why?  Does he tell you why?  Does he express this

22 frustration to you?

23 A.   He just starts saying that, I mean -- that he couldn't

24 believe I let that happen, you know, and why I trusted the boys

25 there.  He was just starting to get upset with me.  That if I

Liz Hernandez - Direct Examination

1   would have never had nobody living at my house like that,

2   nothing would have happened.

3   Q.   Did the search efforts continue?

4   A.   Yes, sir.

5   Q.   Now into the next day, the third day; is that correct?

6   A.   Yes, sir.

7   Q.   What do you recall happening the third day?

8   A.   Me, my brother --

9   Q.   Where are you at?

10  A.   At my apartment, in the living room.

11  Q.   Okay.

12  A.   By that time Noe Galan is in the house.

13  Q.   Do you know Noe Galan?

14  A.   Yes, sir.

15  Q.   Okay.  And how do you know Noe?

16  A.   Childhood friend.

17  Q.   Now you mentioned a name earlier Shaunte Galan.

18  A.   Yes, sir.

19  Q.   Are they relate, do you know?

20  A.   She is married to Noe's brother, Sammy Galan.

21  Q.   Shaunte is married to Noe's brother?

22  A.   Yes, sir.

23  Q.   And his name is?

24  A.   Sammy Galan.

25  Q.   Thank you.

Liz Hernandez - Direct Examination

1              Do you know why Noe is there?

2  A.   He had just showed up with my brother the next day.

3  Q.   So he's there with Ruben.

4  A.   Yes, sir.

5  Q.   Okay.  But you don't have any idea why he's there or if

6  there is a particular reason why he's there?

7  A.   No, sir.

8  Q.   Okay.  So who else is there besides Ruben and Noe, anybody

9  else?

10 A.   Me, Stacey, Anthony, Ruben, Noe and Stacey's other friends

11 and Rudy.

12 Q.   Rudy?

13 A.   Yes, sir.

14 Q.   Okay.  Do you know Rudy's last name?

15 A.   Paredes.

16 Q.   Okay.  Have you met Rudy Paredes before that day?

17 A.   Yes, sir.

18 Q.   Okay.  And do you see Rudy Paredes in the courtroom today?

19 A.   Yes, sir.

20 Q.   And if you could, describe where he's sitting and describe

21 what he's wearing for the Court and the jury.

22 A.   He's sitting right in that table right there with the

23 black suit.

24 Q.   Okay.

25              MR. LEWIS:  Let the record reflect the witness has

Liz Hernandez - Direct Examination

1  identified the Defendant Paredes.

2         THE COURT:  The record will so reflect.

3  Q.   (BY MR. LEWIS)  Do all of these people come to your

4  apartment at the same time?

5  A.   Yeah.  Yes, sir.

6  Q.   And where is everybody congregated?

7  A.   In my living room.

8  Q.   Now, when Rudy Paredes shows up at your house -- or at

9  your apartment, does he come by himself?

10 A.   No, sir.

11 Q.   Who is with him?

12 A.   His wife and I believe she had a baby with her.

13 Q.   Okay.  So you've described four or five, six people that

14 have come to your house.

15 A.   Yes, sir.

16 Q.   What is the discussion?  What's being talked about during

17 this time?

18 A.   Trying to -- still trying to get ahold of either Sean,

19 Steven or Johnny.

20 Q.   For what purpose?

21 A.   To get -- to find the meth.

22 Q.   And what's being talked about?  What new efforts or what

23 efforts are going to be utilized this day that have not proven

24 successful in prior days?

25 A.   Can you rephrase that?

Liz Hernandez - Direct Examination

1  Q.   Sure.  This is the third day now that you're look for

2  these three individuals.  Are there any new efforts or new

3  thoughts, plans put into place that are going to be tried today

4  that haven't been used before?

5  A.   No, sir.

6  Q.   Any idea where any of these three are?

7  A.   No, sir.

8  Q.   What is the general mood of Ruben Hernandez during this

9  time?

10 A.   He's a little bit more -- he starts getting upset at the

11 time.

12 Q.   Okay.  Does he -- and does his anger escalate?

13 A.   Yes.

14 Q.   At some time during the day, this third day, is there a

15 discussion or do you recall hearing anybody talk about guns?

16 A.   No, sir.

17 Q.   Is there ever any talk about guns that you hear?

18 A.   No, sir.

19 Q.   You don't hear anything about guns.

20 A.   No, sir.

21 Q.   Do you see any guns in your apartment?

22 A.   Yes, sir.

23 Q.   Okay.  And in particular, which guns do you see?  Or

24 describe the first one, if there is more than one.  Is there

25 more than one gun?

```
 1  A.    Yes, sir.

 2  Q.    Okay.  Describe the first one for us that you recall

 3  seeing.

 4  A.    It was like -- it was a big gun, and it was like

 5  camouflaged.  And then there was a --

 6  Q.    Okay.  Where were you standing when you first saw that

 7  gun?

 8  A.    I was in the dining room.

 9  Q.    Okay.  And where was the gun when you saw it?

10  A.    In my brother's hand, Ruben's hand.

11  Q.    Okay.  Do you know how it got into your apartment?

12  A.    Yes, sir.

13  Q.    How did it get into your apartment?

14  A.    Anthony.

15  Q.    Anthony Gonzales?

16  A.    Yes, sir.

17  Q.    Okay.  Do you know what caused him to bring that gun to

18  your apartment?

19  A.    No, sir.

20  Q.    But you saw Anthony bring it in?

21  A.    Yes, sir.

22  Q.    When Anthony brought it in, describe for us, did he just

23  carry it in his hand or what did you see?

24  A.    He had it under his shirt, tucked in his pants -- shorts,

25  I believe, he had on.
```

Liz Hernandez - Direct Examination

1  Q.   And this was the gun that you described as being green

2  camouflage.

3  A.   Yeah.  Yes, sir.

4  Q.   Okay.  And after you saw it in Ruben's hand, what happened

5  to it at that point, if you know?

6  A.   I don't remember what Ruben did with it.  He just had it

7  there in the kitchen.

8  Q.   Ruben was standing in the kitchen when you saw it?

9  A.   Yes, sir.

10  Q.   Okay.  And after that, where it went, who got it, or

11  whatever happened to it, you're not aware at that time?

12  A.   No, sir.

13  Q.   Was there a second gun that you saw?

14  A.   Yes, sir.

15  Q.   Okay.  Describe this second gun for us, please.

16  A.   A silver and pink I believe it was like a revolver-type

17  gun.

18  Q.   And where was that gun when you first saw it?

19  A.   Stacey had it in her hand when she walked in the

20  apartment.

21  Q.   Stacey Castillo had that.

22  A.   Yes, sir.

23  Q.   Now, when Stacey Castillo walked in with that revolver,

24  did she also walk in at the same time that Anthony was coming

25  in with his gun?

Liz Hernandez - Direct Examination

1   A.   Yes, sir.

2   Q.   They walked in together.

3   A.   Yes, sir.

4   Q.   Now, when they walked in with those guns, was that the

5   first time they had been at your house that day?

6   A.   No.

7   Q.   They had been at your house earlier.

8   A.   Yes, sir.

9   Q.   At some point they left?

10  A.   Yes, sir.

11  Q.   Only to return later and that's when you saw the guns.

12  A.   Yes, sir.

13  Q.   Okay.  What did you see Stacey do with the revolver after

14  you came in to your apartment?

15  A.   She was just showing it to Ruben.

16  Q.   Do you remember what their discussion was?

17  A.   No, sir.

18  Q.   Were they talking about anything in particular or anything

19  about the gun?

20  A.   No, sir.

21  Q.   She just showed the gun.

22  A.   Yeah.  Yes, sir.

23  Q.   Okay.  And where did this display take place?

24  A.   In the kitchen.

25  Q.   After that happened, what do you recall happening with

Liz Hernandez - Direct Examination

1  that silver revolver?

2  A.   I think I saw my brother with it in his hand.

3  Q.   Do you know what happened to it after your brother had it?

4  A.   No, sir.

5  Q.   Let me ask you:  What was going through your mind at that

6  particular point in time when you see two guns, two different

7  types of guns come into your house with all of these people?

8  What's going through your mind at this time?

9  A.   That things are starting to get bad.

10  Q.   Bad in what sense?

11  A.   Well, actually because there's guns involved already and

12  obviously they were -- my brother was already getting

13  frustrated of not getting that dope back, the drugs back.

14  Q.   Okay.  Is there anything else being talked about with

15  regards to what's going to happen with the meth or trying to

16  get it back during this same time frame?

17  A.   I just remember Stacey offered to pay my brother's debt

18  and --

19  Q.   What was your brother's debt?  Was it discussed?  Did you

20  ever hear a number?

21  A.   2500.

22  Q.   2500?

23  A.   Yes, I believe so.

24  Q.   And 2500, as far as you understood, represented what?

25  A.   The meth that was stolen.

Liz Hernandez - Direct Examination

1   Q.   Or the debt that was owed by your brother?

2   A.   Yes, sir.

3   Q.   And why did -- did you understand why Stacey Castillo

4   offered to pay the $2,500 to your brother?

5   A.   Because after that debt was paid, she was -- my brother

6   was supposed to start giving her methamphetamine.

7   Q.   Would she also be receiving the methamphetamine that would

8   be recovered from Sean, Steven and Johnny?

9   A.   I don't understand that.

10  Q.   Okay.  When she paid Ruben the debt for the

11  methamphetamine that was stolen, did that give her ownership

12  interest in that meth then once you recovered it from Sean,

13  Steven and Johnny?

14  A.   Yes, sir.

15  Q.   Okay.  Now, during this time all of these conversations

16  are happening, is the same people that you've described still

17  in your apartment?

18  A.   After they came back, that's when Ray was with them.

19  Q.   Okay.  When you're talking about "they came back," are you

20  referring to Stacey --

21  A.   Stacey and Anthony.

22  Q.   When Stacey and Anthony came back with the guns.

23  A.   Yes, sir.

24  Q.   This time another person is with them.

25  A.   Yes, sir.

Liz Hernandez - Direct Examination

1  Q.    And who is that again?

2  A.    Ray.

3  Q.    And do you see Ray in the courtroom today that came back

4  with them?

5  A.    Yes, sir.

6  Q.    And if you can, describe where Ray is sitting, describe

7  what Ray is wearing for the Court and jury, please.

8  A.    He's sitting at that table with the light blue shirt.

9  Q.    Okay.  Does he have a dark tie on?

10 A.    Yes, sir.

11         MR. LEWIS:  Your Honor, let the record reflect the

12 witness has identified the Defendant Olgin.

13         THE COURT:  The record will so reflect.

14 Q.    (BY MR. LEWIS)  Did you know Ray Olgin before he came to

15 your apartment that day?

16 A.    Not really, no, sir.

17 Q.    Now, is there anybody else that's come to your apartment

18 now besides Ray coming?

19 A.    No, sir.

20 Q.    Is everybody still in the main floor of this apartment?

21 A.    Yes, sir.

22 Q.    In the dining room, kitchen area of this apartment?

23 A.    Yes, sir.

24 Q.    What is the conversation?  What's going on?  What's being

25 talked about at this time?

Liz Hernandez - Direct Examination

1  A.   Mainly just about trying to find them, and Stacey makes a

2  comment -- Stacey Castillo makes a comment that they have to

3  hurry up and find them and get rid of them because supposedly

4  they were informants -- Sean and Steven were informants.

5  Q.   Stacey makes this statement?

6  A.   Yes, sir.

7  Q.   Was that news to you?  Had you already heard that before

8  or --

9  A.   No, sir.

10  Q.   When she says, "We have to find them and get rid of them,"

11  was that her words?

12  A.   Yes, sir.

13  Q.   What did that mean you to?  What did that tell you?

14  A.   I guess she wanted to kill them.

15  Q.   And when she said this, who all else was standing there?

16  Was Anthony standing there, Anthony Gonzales?

17  A.   Yes, sir.

18  Q.   Okay.  Was Rudy Paredes standing there?

19  A.   Yes, sir.

20  Q.   And was Ray Olgin standing there?

21  A.   Yes, sir.

22  Q.   What discussion then transpired?  What came of her

23  statement that they had -- that it was necessary to get them

24  and take care of them because they were snitches?  What came

25  from them, any comments?

Liz Hernandez - Direct Examination

 1  A.    No, sir.

 2  Q.    Any disagreements?

 3  A.    No, sir.

 4  Q.    What's going through your mind at this time?

 5  A.    Scared.

 6  Q.    Any thought run through your mind, "this has gotten out of

 7  hand"?

 8  A.    Yes, sir.

 9  Q.    Any thought run through your mind to stop this or --

10          MR. STRODER:  Your Honor, objection to leading.

11          THE COURT:  Overruled.

12  Q.    (BY MR. LEWIS)  Any thought to picking up the phone and

13  making a call?

14  A.    No, sir.

15  Q.    So as this continues on, what happens next?

16  A.    Brian comes -- because Brian was upstairs, and he comes

17  downstairs and starts telling me that Sean had messaged him,

18  that he was going to pick up his and Steven's stuff from the

19  house.  And I told him, "No, don't tell him to come here."

20  Q.    Why didn't you want -- you were looking for Sean.  Why

21  didn't you want Sean to come to you?

22  A.    Because I didn't want him to get hurt.  Because by that

23  point I already knew that something was going to happen.

24  Q.    Brian tells you about this message he's gotten from Sean.

25  A.    Yes, sir.

Liz Hernandez - Direct Examination

1   Q.    Does he tell it to anybody else or does anybody else

2   overhear this conversation that you had with Brian?

3   A.    Ruben and Stacey.

4   Q.    Do they join in on the conversation?

5   A.    Ruben starts telling him --

6   Q.    Telling who?

7   A.    -- telling Brian, "Just tell him to come over here."

8           And I start -- I tell Brian, "No, don't listen to

9   them."

10          And that's when Stacey says -- well, my brother

11  starts telling my son Brian, "You have to do this.  You have to

12  tell him to meet us somewhere.  You have to do it for your

13  grandma or something is going to happen to her.  You already

14  know I'm already in big trouble.  And if the people find out,

15  they're going to get to her and -- or to the rest -- or

16  somebody in the family."

17          And that's when Stacey Castillo says, "Tell him to

18  meet us at -- on 16th and Dixie."

19  Q.    And this meeting is going to take place just in the street

20  at 16th and Dixie?

21  A.    In the alley.

22  Q.    In the alley.

23  A.    Yes, sir.

24  Q.    And what is supposed to happen there in the alley?  Is

25  there a story concocted about what to tell Sean?

Liz Hernandez - Direct Examination

1  A.   Just to confront him about where the meth and where Steven

2  was at.

3  Q.   But is there a message that's going to be given to Sean as

4  to why he's meeting them -- why he's going to be meeting you in

5  the alley?

6  A.   No, sir.

7  Q.   What about his clothes?

8  A.   My brother Ruben gets his clothes and puts it in the truck

9  that Brian was in with the -- I don't remember who the female

10  was.

11  Q.   But that was going to be the ruse.   That was the purpose

12  of the meeting --

13  A.   Yes, sir.

14  Q.   -- to get Sean to that alley was you were going to give

15  him his clothes.

16  A.   Yes, sir.

17  Q.   Did that message get conveyed to Sean?

18  A.   Yes, sir.

19  Q.   Who conveyed that message?

20  A.   Brian.

21  Q.   And who directed Brian to convey that message to Sean?

22  A.   Ruben.

23  Q.   Do you know whether or not that was successful?

24  A.   Yes, sir.

25  Q.   Okay.   And how do you know that it was successful?

Liz Hernandez - Direct Examination

1  A.   Because Brian at the time said that Sean had said, "Okay.

2  I'll meet y'all there in the alley."

3  Q.   Was there a particular time set for that meeting?

4  A.   No.  He just said, "I'm on my way over there."

5  Q.   Okay.  So it was imminent.

6  A.   Uh-huh.

7  Q.   Okay.

8          THE COURT:  Is that "yes"?

9          THE WITNESS:  Yes, sir.

10         MR. LEWIS:  Thank you, Your Honor.

11 Q.   (BY MR. LEWIS)  Now, who was it that you said that came up

12 with the location for 16th and Dixie in the alley?

13 A.   Stacey Castillo.

14 Q.   Do you know when she said that, 16th and Dixie in the

15 alley, did that have -- make any wheels spin in your brain as

16 to why that location was chosen?

17 A.   No, sir.

18         MR. STRODER:  Your Honor, I am going to object to

19 getting into the intent of Ms. Castillo.  She doesn't know

20 that.

21         THE COURT:  Overruled.

22 Q.   (BY MR. LEWIS)  Anything significant about that location

23 for you?

24 A.   No, sir.

25 Q.   Okay.  Do you know anybody that lives near that area or in

Liz Hernandez - Direct Examination

1  that general vicinity of 16th and Dixie?

2  A.   Yes, sir.

3  Q.   Who?

4  A.   Ray.

5  Q.   And when you say "Ray," are you talking about the

6  defendant Ray Olgin?

7  A.   Yes, sir.

8  Q.   Do you know where he lives in connection with this

9  particular location?

10 A.   I believe it was a white house on the corner.

11 Q.   The corner of what?

12 A.   I believe it was 16th or 17th on Dixie.

13 Q.   Okay.  His house is on Dixie?

14 A.   Yes, sir.

15 Q.   And either -- corners either 17th Street or 16th Street?

16 A.   Yes, sir.

17 Q.   Okay.  So Sean is on his way now to the alley.  What plans

18 are being made by you and everybody in the house to go and

19 confront Sean?

20 A.   Just for all of us to get in whatever cars we were getting

21 into and just following each other to that alley.

22 Q.   Okay.  How many vehicles go to that alley?

23 A.   I think it was four.

24 Q.   Okay.  Which car did you go in?

25 A.   With Stacey and Anthony.

Liz Hernandez - Direct Examination

```
 1   Q.    Who was driving?
 2   A.    Anthony.
 3   Q.    And do you know what car they've got -- or what car they
 4   had at the time?
 5   A.    It was a four-door, bluish gray, dark gray car.  I'm not
 6   sure what kind it was.
 7   Q.    Okay.  Who else is in the car besides you, Anthony and
 8   Stacey?
 9   A.    Ray.
10   Q.    I'm sorry?
11   A.    Ray.
12   Q.    Ray is?
13   A.    Yes, sir.
14   Q.    Ray Olgin.
15   A.    Yes, sir.
16   Q.    What kind of conversation are you having, if you recall,
17   as you drive to this location to meet Sean?
18   A.    There wasn't really no conversation.
19   Q.    Okay.  From your apartment to the alley, about how long
20   did it take?
21   A.    Say like five, ten minutes.
22   Q.    Pretty close by?
23   A.    Yeah.  Yes, sir.
24   Q.    What other vehicles did you see traveling with you to that
25   same location?
```

Liz Hernandez - Direct Examination

1  A.   The truck that my brother was in, the truck Brian was in,

2  and Rudy Paredes' Expedition.

3  Q.   Now, generally give me a description, if you can recall,

4  what was the vehicle like that your brother was driving?

5  A.   It was a brown, I believe a Chevrolet truck.

6  Q.   Okay.  You said Brian also went?

7  A.   Yes, sir.

8  Q.   Why did Brian go?

9  A.   Because he was supposed to give Sean his clothes.

10  Q.   Sean was part of the plan.

11  A.   Yes, sir.

12  Q.   Or, I'm sorry, Brian was part of the plan to make sure

13  Sean showed up?

14  A.   Yes, sir.

15  Q.   How did that make you feel?

16  A.   It didn't make me feel good.

17  Q.   I mean, Brian at the time was how old?

18  A.   17.

19  Q.   And you said he was in what kind of vehicle again, Brian?

20  A.   I believe it was a brown Dodge.

21  Q.   Do you remember who else was in that vehicle, if anybody?

22  A.   I just remember a female.

23  Q.   Okay.  And then the fourth vehicle you said was Rudy

24  Paredes' vehicle?

25  A.   Yes, sir.

Liz Hernandez - Direct Examination

1    Q.    Do you remember or recall what kind of vehicle that was?

2    A.    It was a gray Expedition, I believe.

3    Q.    Did those vehicles that you've described as well as the

4    one that you were in, did that comprise the entire search party

5    for Sean at that time?

6    A.    Yes, sir.

7    Q.    Was there anybody else involved in going to this meeting

8    at 16th and Dixie other that these people that we're talking

9    about right now?

10   A.    No, sir.

11   Q.    What about Noe Galan?

12   A.    He was in the truck with my brother.

13   Q.    Okay.  So he was also going.

14   A.    Yes, sir.

15   Q.    Okay.  When you got to the alley at 16th and Dixie, tell

16   me, what did you see first?

17   A.    When we pull in, we see the blue Expedition that Sean said

18   he was going to be in.

19   Q.    Okay.  The vehicle that you were in -- you were in the Kia

20   with Stacey Castillo and Anthony Gonzales -- where did you go

21   when you pulled into the alley?

22   A.    We drove in and I believe we parked like towards the

23   passenger's side.

24   Q.    Of the Expedition?

25   A.    Yes, sir.

Ann M. Record, RMR, CRR, CMRS, CRI ********** (432) 685-0361

Liz Hernandez - Direct Examination

1  Q.    Okay.  And then what?

2  A.    The truck my brother was in followed us and --

3  Q.    Did you see where it went?

4  A.    It parked behind the Expedition.

5  Q.    Okay.  And what about Rudy Paredes' vehicle, did you see

6  that?

7  A.    From what I recall, I think he came in the other way in

8  the alley, because the alley would form a T.  And he came in

9  the other way facing Sean's Expedition.

10  Q.    Okay.

11  A.    They were -- his Expedition and Sean's Expedition were

12  facing each other.

13  Q.    Okay.  And he came down from that direction.

14  A.    Yes, sir.

15  Q.    Did you see Rudy Paredes come down from that area?

16  A.    Yes, sir.

17  Q.    Okay.  When all of you encircle the blue Expedition, tell

18  me, what is the next thing you remember happening?

19  A.    Everybody gets out of the vehicles.  And the two people

20  that were in the Expedition with Sean get out and stand to the

21  side.  And at that time he's being assaulted.

22  Q.    Who is assaulting -- when you say "he's being assaulted,"

23  who is?

24  A.    Sean.

25  Q.    And who is doing the assaulting?

Liz Hernandez - Direct Examination

1  A.    My brother, Noe, myself.

2  Q.    Who else?  Anybody else?

3  A.    I believe Anthony.

4  Q.    Where is Sean at this time as this assault takes place?

5  A.    He's on the passenger's side.

6  Q.    He's on the passengers' side?

7  A.    Yes, sir.

8  Q.    Okay.  Was he on the passenger's side when you-all first

9  approached the Expedition?

10 A.    No, sir.

11 Q.    Where was he -- where was Sean sitting, if you remember,

12 when you-all first approach the Expedition?

13 A.    On the driver's side.

14 Q.    Okay.  And tell me when you confront him what's being

15 said.  When you first get to the Expedition, what's being said

16 by you and by the others that are also there?

17 A.    Just asking him where Steven was at, where the meth was at

18 and --

19 Q.    What response are you getting?

20 A.    He said he didn't take it.  He's like, "It wasn't me."

21 He's like, "Y'all need to find Steven."  He's like, "I'll help

22 y'all find Steven."

23 Q.    As he's responding, what do you sense in Sean?

24 A.    Fear.

25 Q.    And as we're having this conversation today and you're

Liz Hernandez - Direct Examination

1  telling me that you're confronting him and you're asking him

2  these questions, this conversation that took place with Sean in

3  that alley didn't happen at the level you and I are talking

4  about -- or talking at right now, correct?

5  A.    No, sir.

6  Q.    Safe to say people were yelling.

7  A.    Yes, sir.

8  Q.    Maybe the language was not proper language; is that

9  correct?

10  A.    Yes, sir.

11  Q.    Sean was in the driver's side?

12  A.    Yes, sir.

13  Q.    How did he get from the driver's side to the passenger's

14  side?

15  A.    I believe Noe tells him to move over to the other side.

16  Q.    Okay.  And does he?

17  A.    Yes, sir.

18  Q.    As he does this, is he still being assaulted?

19  A.    Yes, I believe so.

20  Q.    And who are the main actors or who are the continuing

21  actors that continue to assault Sean Lamb?

22  A.    Ruben.

23  Q.    After he's in the passenger's side, is the passenger's

24  side door open?

25  A.    No, sir.

Liz Hernandez - Direct Examination

1  Q.    It's closed?

2  A.    Yes.

3  Q.    Do you recall whether the windows are up or down at that

4  time on that car?

5  A.    Down.

6  Q.    Okay.  Because in that alley after Sean gets on the

7  passenger's side, even though the door is closed, is he still

8  continuing to be hit?

9  A.    Yes, sir.

10  Q.    And continuing to be assaulted.

11  A.    Yes, sir.

12  Q.    And continuing to be subject to a verbal barrage from

13  everybody.

14  A.    Yes, sir.

15  Q.    Even you.

16  A.    Yes, sir.

17  Q.    Okay.  And what information do you get from Sean while

18  you're in that alley, you and the other people that are there?

19  A.    He just keeps repeating that he didn't take the meth and

20  that he would just let us know where Steven was at.

21  Q.    Well, did he?

22  A.    He said yes, that he would take us to where Steven was at.

23  Q.    Okay.  Did he provide any information on -- as to where

24  Steven would be?

25  A.    He said at a motel.

Liz Hernandez - Direct Examination

1    Q.    Did he provide the name of the motel?

2    A.    At the Parkway Inn.

3    Q.    Other than just the Parkway Inn, any other additional

4    information?

5    A.    No, sir.

6    Q.    Okay.  Just all you knew is that Steven would be at the

7    Parkway Inn.

8    A.    Yes, sir.

9    Q.    So what was the plan then?  What decisions were made based

10   upon that information provided by Sean?

11   A.    For everybody to follow each other to the Parkway Inn.

12   Q.    Who is going to drive?  Or who is going to be -- is there

13   a decision made on who goes first, who goes second, who goes

14   third?

15   A.    No, sir.

16   Q.    Okay.

17   A.    Everybody just gets in the cars.

18   Q.    And who makes -- is there any one particular person that

19   makes the decision that, "fine, we'll all go to the Parkway"?

20   A.    Stacey.

21   Q.    Stacey?

22   A.    Yes, sir.

23   Q.    Stacey Castillo.  What is the decision she makes?

24   A.    For us to go to the Parkway Inn and see if Steven was

25   there.

Liz Hernandez - Direct Examination

1  Q.   Okay.

2           THE COURT:  Can I ask a question?  About how much

3  longer do you have on direct?

4           MR. LEWIS:  It could be probably --

5           THE COURT:  Let's take a recess right now.  We've

6  been in here for a couple of hours so let's take a recess.

7           Ask the jury to leave your notepads here.  Don't

8  discuss the case among yourselves, and we'll take about a

9  15-minute recess.

10           Let's all rise for the jury, please.

11           (At 3:33 p.m., jury leaves)

12           THE COURT:  Okay.  We'll be in recess for about 15

13  minutes.

14           (Recess from 3:34 p.m. to 3:56 p.m.)

15           THE COURT:  All right.  Let's all be seated.  We're

16  back in the courtroom.  It is about 5 till 4:00.  And the

17  attorneys are all present, the defendants are all present, and

18  the witness is still on the stand.

19           Mr. Lewis, you may continue your examination.

20           MR. LEWIS:  Thank you, Your Honor.

21  Q.   (BY MR. LEWIS)  Ms. Hernandez, before we go with the next

22  question I was asking you before the break, I have placed

23  before you what's been marked for identification for purposes

24  as Government's Exhibit 15.  Do you see that?

25  A.   Yes, sir.

Liz Hernandez - Direct Examination

1  Q.   Okay.  Are you familiar with what's depicted in

2  Government's Exhibit 15?

3  A.   My vehicle.

4  Q.   Which is a what?

5  A.   A Tahoe.

6  Q.   And is it an accurate photograph of your Tahoe on or about

7  May 13th, 2014?

8  A.   Yes, sir.

9       MR. LEWIS:  Government would offer Government's

10 Exhibit 15 at this time.

11      MR. LEACH:  No objection to 15.

12      MR. GARCIA:  No objection, Your Honor.

13      MR. POOL:  No objection, Your Honor.

14      MR. STRODER:  None, Your Honor.

15      THE COURT:  Government's Exhibit 15 is admitted.

16 Q.   (BY MR. LEWIS)  Now, Ms. Hernandez, what vehicle -- when

17 you left the alley to go to Parkway, what vehicle did you get

18 into?

19 A.   The four-door car with Stacey.

20 Q.   Okay.  And who else got in the car with you at that time?

21 A.   It was me, Anthony and Stacey.

22 Q.   Where was Ray Olgin?

23 A.   He was on the other side of the Expedition that Sean was

24 in.

25 Q.   When you say "the other side"?

1   A.   On the driver's side.

2   Q.   Sean was on the passenger and Ray was the driver now?

3   A.   Yes, sir.

4   Q.   Where did -- so y'all went to the Parkway.  Who all went

5   to the Parkway?  You did.  Did you see some other people there?

6   A.   It was me; Stacey; Anthony; Rudy; Ray; Noe; my brother,

7   Ruben.

8   Q.   Brian?

9   A.   I didn't know he was there till afterwards.  I didn't see

10  him till he got out of that vehicle that he was in.

11  Q.   Okay.  But suffice it to say, whoever was at Parkway, was

12  it the same people that were there in the alley to abduct Sean?

13  A.   Yes, sir.

14  Q.   Now, you've seen video of the Parkway Inn when you-all --

15  A.   Yes, sir.

16  Q.   -- were out there, correct?

17  A.   Yes, sir.

18  Q.   Okay.

19         MR. LEWIS:  If I could have the lights dimmed.

20  Q.   (BY MR. LEWIS)  Let me play you Government's Exhibit 34.

21         (Video played)

22  Q.   (BY MR. LEWIS)  And I'm going to pause it.  Do you see the

23  dark color car in the center of that picture?

24  A.   Yes, sir.

25  Q.   Okay.  And do you recognize that car?

Liz Hernandez - Direct Examination

1   A.    It's the car that Stacey, me and Anthony were in.

2   Q.    And do you see another car coming into the frame, into the

3   picture?

4   A.    Yes, sir.

5   Q.    Okay.  Tell me, who -- and for purposes here, I'm going to

6   circle the vehicle I'm talking about.  Do you see where I've

7   circled in blue?

8   A.    Yes, sir.

9   Q.    Okay.  Who is in that vehicle?

10  A.    Sean, Noe, Rudy and Ray.

11  Q.    Who is driving the vehicle?

12  A.    Ray.

13  Q.    Where is Sean?

14  A.    Passenger's side.

15  Q.    In the front or the back?

16  A.    Front.

17  Q.    Okay.  And do you know -- you also said Noe and Rudy.  Do

18  you know where they are?

19  A.    Rudy was sitting behind Ray and Noe was behind Sean.

20  Q.    Okay.

21          (Video played)

22  Q.    (BY MR. LEWIS)  Let me pause it at this point.  Do you see

23  me circling in blue a person?  Who is that?

24  A.    Anthony.

25  Q.    Okay.  And he's gotten out of the vehicle that you're in.

Liz Hernandez - Direct Examination

1    A.    Yes, sir.

2    Q.    Okay.

3              (Video played)

4    Q.    (BY MR. LEWIS)  Can you make out or do you know who this

5    person is here that I'm circling now in blue (Indicating)?

6    A.    Ruben.

7    Q.    Your brother?

8    A.    Yes, sir.

9    Q.    Okay.

10             (Video played)

11   Q.    (BY MR. LEWIS)  Can you make out the third person that

12   comes up the stairs?

13   A.    Rudy.

14             (Video played)

15   Q.    (BY MR. LEWIS)  He's the third one in line here as I

16   circle in blue?

17   A.    Yes, sir.

18   Q.    What are the three people -- Anthony, Ruben and Rudy --

19   what are they doing up there on that second floor at that time?

20   A.    Going to the room that Sean said that Steven was in.

21   Q.    And what are they going to do -- what is your

22   understanding of what they're going to do if Steven is in that

23   room?

24   A.    Ask him about where the meth was at, to see if he had it

25   there with him.

Liz Hernandez - Direct Examination

1   Q.   Play this out.

2            (Video played)

3   Q.   (BY MR. LEWIS)  Now, who is this person that's gotten out

4   of the car?

5   A.   Stacey.

6   Q.   Okay.

7            (Video played)

8   Q.   (BY MR. LEWIS)  Who is -- let me back this up a little

9   bit.  A little bit more.  Okay.  Who is this person now that I

10  am circling in blue that's at the rear of Stacey's vehicle?

11  A.   Me.

12  Q.   Okay.

13           (Video played)

14  Q.   (BY MR. LEWIS)  You got in the driver's side of Stacey's

15  vehicle.

16  A.   Yes, sir.

17  Q.   For what purpose?  Why did you get in the car?

18  A.   I don't recall.  I don't remember.

19  Q.   You do see yourself going --

20  A.   Yes, sir.

21  Q.   For what purpose now, you can't remember?

22  A.   No.

23           (Video played)

24  Q.   (BY MR. LEWIS)  Do you see the Dodge pickup that just

25  pulled in?

Liz Hernandez - Direct Examination

1   A.    Yes, sir.

2   Q.    Okay.  Do you know who is in that Dodge pickup?

3   A.    Brian.

4              (Video played)

5   Q.    (BY MR. LEWIS)  Is he driving the vehicle?

6   A.    No, sir.

7   Q.    Somebody else is?

8   A.    Yes, sir.

9              (Video played)

10  Q.    (BY MR. LEWIS)  Now, at this point I've stopped it here

11  and I am circling you.  You've gotten out of Stacey's car; is

12  that correct?

13  A.    Yes, sir.

14  Q.    Okay.  And what are you going to do or where are you going

15  to go?

16  A.    To the Expedition where everybody was at, gathered, where

17  Sean was at.

18  Q.    Okay.

19              (Video played)

20  Q.    (BY MR. LEWIS)  Okay.  You've now seen this video.  You

21  have approached the passenger's side of the blue Expedition,

22  correct?

23  A.    Yes, sir.

24  Q.    Tell us what's being said, what's going on at this

25  particular moment on the passenger's side of the Expedition.

Liz Hernandez - Direct Examination

1  A.   Letting him know that Steven wasn't --

2  Q.   Letting who know?

3  A.   Letting Sean know that Steven wasn't up there, that the

4  room wasn't even occupied, that it didn't look like anybody had

5  been staying there.  And we just keep asking him -- everybody

6  keeps asking him, "Where he's at?  You need to say the truth."

7  Q.   Is this conversation occurring at a normal level like you

8  and I are speaking?

9  A.   No, sir.

10 Q.   Okay.  Is he being assaulted at this point?

11 A.   Yes, sir.

12 Q.   Okay.  And by who?  Who do you see assaulting Sean Lamb at

13 this particular point in time?

14 A.   Mostly Noe.

15 Q.   And Noe is sitting where?

16 A.   Behind him.

17 Q.   What, if anything, is Sean saying at this time?

18 A.   That he'll tell us where he's at.  He's like, "I know this

19 is the last place I saw him at."  He's like, "But I know

20 somewhere else where he might be."

21 Q.   Does he give you a location?  Do you hear him give a

22 location?

23 A.   Yes, sir.

24 Q.   What is that location?

25 A.   He said at a friend's house right there at the Country

Liz Hernandez - Direct Examination

1  Club.

2  Q.   Did you understand where that area to be?

3  A.   No, sir.

4  Q.   What was the general mood of the other people standing

5  there?  Do they believe that statement, disbelieve the

6  statement, if you know?

7  A.   No, sir.

8  Q.   "No, sir" what?

9  A.   I don't know what they were --

10  Q.   Well, did you hear anybody make any comments about when he

11  said he had another place that he thought Steven might be?

12  Were there any comments --

13  A.   My brother was saying, "Well, you better not be lying."

14  Q.   Okay.

15        (Video played)

16  Q.   (BY MR. LEWIS)  Let me back this up just a little bit

17  here.  Who is this person (Indicating)?

18  A.   My son.

19  Q.   Is that Brian?

20  A.   Yes, sir.

21  Q.   Okay.  Is that the first time that you knew he had gotten

22  out of the vehicle?

23  A.   Yes, sir.

24  Q.   You're upset about this.  Why?

25  A.   Because he's my son, and I didn't want him there.

Liz Hernandez - Direct Examination

1  Q.   Okay.  Did he come over to the Expedition at all?

2  A.   No, sir.

3            (Video played)

4  Q.   (BY MR. LEWIS)  Where are you standing at this particular

5  point in time?

6  A.   By the Expedition.

7  Q.   Okay.  This is you, correct, what I've circled?

8  A.   Yes, sir.

9  Q.   What are you doing at this particular point in time?

10 A.   Talking to Sean.

11 Q.   Well, what are you telling Sean?

12 A.   Just why is he lying, that he needs to say the truth.

13 Q.   About what?

14 A.   About where Steven is at.

15 Q.   So that you find Steven and do what?  Recover the meth?

16 A.   Just recover the -- yes, recover the meth.

17 Q.   Okay.  And you're not nice about this, are you?

18 A.   No, sir.

19           (Video played)

20 Q.   (BY MR. LEWIS)  What did you just do?  Did you see it?

21 A.   Yes, sir.

22 Q.   What did you just do?

23 A.   Hit Sean.

24 Q.   How many times?

25 A.   Once.

Liz Hernandez - Direct Examination

1   Q.   Do you think it was once?

2   A.   Yes.

3   Q.   Why did you hit him?

4   A.   I was mad.

5   Q.   Mad how?  What are you mad about?

6   A.   About what he had done.

7   Q.   Well, what had he done?

8   A.   Taken my car and the drugs from my brother.

9            (Video played)

10  Q.   (BY MR. LEWIS)  At this point what is the plan now?  What

11  is going to happen now?

12  A.   To follow the Expedition that he was in to where Steven

13  supposedly was at, at the other person's house.

14  Q.   In the Country Club area?

15  A.   Yes, sir.

16  Q.   Okay.  Do you-all leave this location together?

17  A.   Yes, sir.

18  Q.   When you leave the Parkway Inn --

19           MR. LEWIS:  You can turn the lights back on, please.

20  Q.   (BY MR. LEWIS)  When you leave the Parkway Inn, where do

21  you go?  And let me ask it a little bit better way.

22           As you leave the Parkway Inn, do you-all make a left

23  or a right out of the exit?

24  A.   Left.

25  Q.   What about the other vehicles, which direction do they go?

Liz Hernandez - Direct Examination

1  A.    Same direction.

2  Q.    Y'all follow each other?

3  A.    Yes, sir.

4  Q.    Okay.  Do you follow Sean in the blue Expedition into the

5  Country Club area there near Parkway Inn?

6  A.    Yes, sir.

7  Q.    Okay.  How long did it take you to get from the Parkway

8  over there to the Country Club area?

9  A.    Not even five minutes.

10 Q.    Do you turn off into the Country Club area there in

11 Odessa?

12 A.    Yes, sir.

13 Q.    Are you still in the car with Stacey and Anthony following

14 the Expedition?

15 A.    Yes, sir.

16 Q.    Okay.  What happens as you follow the Expedition?

17 A.    We turn off -- Stacey, me and Anthony turn off to the

18 left, a different way.  The other cars follow the Expedition

19 Sean was in straight.  And Stacey says that we're going to go

20 meet them on the other side.

21 Q.    So what do you do?

22 A.    We try and find where they're at, but we never find the

23 street that they ended up at.

24 Q.    Was Stacey driving at the time?

25 A.    No, sir.

Liz Hernandez - Direct Examination

1  Q.   Who was driving?

2  A.   Anthony.

3  Q.   Okay.  Was she giving directions to Anthony on where it

4  drive?

5  A.   Yes.

6  Q.   Did you ever locate the blue Expedition again after you

7  got up into the Country Club area?

8  A.   No, sir.

9  Q.   Okay.  While you were in the -- while you were in this

10  Country Club area, did anything happen that you remember or

11  recall?

12  A.   No, just she -- Stacey gets a call, I believe, from Rudy.

13  Q.   Okay.  So she gets a phone call?

14  A.   Yes.

15  Q.   Okay.  You're sitting in the car.

16  A.   Yes, sir.

17  Q.   Can you hear her having this conversation with Rudy?  Can

18  you hear the call?

19  A.   I can't hear Rudy, but I can hear her.

20  Q.   Okay.  What do you hear Stacey say?

21  A.   She's just yelling like, "What happened?  Where y'all at?"

22          And I'm asking her what's going on, where is

23  everybody at, and she's telling me to be quiet.  She's trying

24  to hear what Rudy is saying.  And she turns around and just

25  says -- well, Anthony is asking at the same time, "What's going

Liz Hernandez - Direct Examination

1  on?  Where is everybody at?"

2          And she ends up saying that -- she yells, "Why?  What

3  happened?  What did y'all do or what?"

4          And I keep asking her, "What happened?"

5          And she finally says that, "They took him out."

6  Q.   Those were the words she used, "They took him out"?

7  A.   Yes, sir.

8  Q.   What did that mean to you?

9  A.   That he was dead.

10 Q.   That Sean Lamb was dead.

11 A.   Yes, sir.

12 Q.   Was Stacey Castillo surprised by this news?

13          MR. STRODER:  Objection, Your Honor.  Speculation.

14          THE COURT:  Overruled.  Did she indicate any --

15          MR. LEWIS:  That's -- let me rephrase the question,

16 Your Honor.  I apologize.

17 Q.   (BY MR. LEWIS)  In your mind, did Stacey's response, did

18 she appear to be surprised to you by the news?

19 A.   Yes.

20 Q.   Based upon what you heard, was she surprised -- or did you

21 believe she was surprised as to the shooting happening in the

22 Country Club area or that it happened at all?

23          MR. STRODER:  Your Honor, I am going to object to

24 leading.

25          THE COURT:  Overruled.

Liz Hernandez - Direct Examination

1  A.    I believe that it happened at all.

2  Q.    (BY MR. LEWIS)  Now, when you last saw Sean at the Parkway

3  Inn just minutes before and you struck him, at any time during

4  that meeting there inside of the vehicle, was there anybody

5  there talking about stopping what they were doing or stopping

6  what they were doing with Sean?

7  A.    Back in my apartment I did.

8  Q.    Back at your apartment.

9  A.    But not during --

10 Q.    That's a long time ago.

11 A.    Yes.

12 Q.    You've now been in the alley where he's been assaulted.

13 A.    Yes, sir.

14 Q.    You've been at the Parkway where he's been assaulted.  Has

15 anybody -- anywhere along the line at all these different

16 stops, has anybody said -- stood up and said, "Stop this.  We

17 don't need to be doing this anymore"?

18 A.    No, sir.

19 Q.    Did everybody to you appear to be a participant in what

20 was going on?

21 A.    Yes, sir.

22 Q.    Now, when you saw Sean at the Parkway the last time, do

23 you recall whether or not Sean was wearing a shirt or not?

24 A.    No, he wasn't.

25 Q.    He didn't have a shirt on?

Liz Hernandez - Direct Examination

1  A.    No, sir.

2  Q.    When you first saw Sean when he was abducted and taken at

3  16th and Dixie in the alley, was he wearing a shirt at that

4  time, if you remember?

5  A.    No.

6  Q.    When you saw him in the alley at 16th and Dixie, he wasn't

7  wearing a shirt either.

8  A.    No, sir.

9  Q.    Okay.  After you heard the news that Sean had been shot,

10 what did you and Stacey and Anthony do at that time?

11 A.    We drove to a street on the south side.

12 Q.    Do you recall the name of the street?

13 A.    No, sir.

14 Q.    Okay.  Was there a particular reason you went to that

15 location?

16 A.    No, sir.

17 Q.    Had you ever been to that location before, that house or

18 that area before?

19 A.    No, sir.

20 Q.    Okay.  You, Anthony and Stacey go to that location.

21 A.    Yes, sir.

22 Q.    What happens after you get there?

23 A.    My brother shows up in his truck.  It wasn't drivable

24 because it had -- one of the bullets had gone through the

25 radiator, I believe, and he couldn't drive it anymore.

Liz Hernandez - Direct Examination

1  Q.   Okay.  So your brother showed up, Ruben.

2  A.   Noe.

3  Q.   Noe was there?

4  A.   Yes, sir.

5  Q.   Okay.  Who else?

6  A.   Rudy, Brian.

7  Q.   Okay.  Anybody else?  What about Ray?  Is Ray there?

8  A.   I don't remember seeing him there anymore.

9  Q.   How did Rudy get there to that location?

10  A.   In his Expedition.

11  Q.   Did anybody else come in the Expedition with Rudy?

12  A.   I believe it was his wife.

13  Q.   Did you see anybody else get out of the Expedition?

14  A.   No, sir.

15  Q.   Okay.  How does Bryan get there?

16  A.   With my brother and Noe.

17  Q.   He came with your brother and Noe.

18  A.   Yes.

19  Q.   Now, you said Noe was there.  Was there any conversation

20  with Noe about what had just happened?

21  A.   Everybody was mad at him yelling at him, "Why did he

22  do" -- "why did he shoot Sean?"

23  Q.   And?  Was there any response that you can recall?

24  A.   No.

25  Q.   Nothing?

1  A.   He was -- he didn't have any reaction on him or anything.

2  Q.   Did you confront Noe about what he had just done?

3  A.   Yes.

4  Q.   Similar to how you maybe confronted Sean as we've seen on

5  the video?  Did you do it with as much energy and as much vigor

6  as you did -- as what we see you do with Sean?

7  A.   Yes.

8  Q.   What does Noe tell you?

9  A.   Nothing.  He just doesn't say nothing back.  He's just

10 quiet.  He's just pacing back and forth.

11 Q.   So what happens then?

12 A.   My brother gets in his truck and Noe, and my brother says

13 he's going to take the truck somewhere.  I don't know where.

14 Rudy and his wife leave.  And me and Brian get in the car with

15 Stacey and Anthony, and they dropped us off at my -- like a

16 block away from my house.

17 Q.   And then what do you and Brian do after they drop you off?

18 A.   I take his phone from him and smash it and throw it in the

19 trash.

20 Q.   Why?

21 A.   Because of the message that my brother had told him to

22 send to Sean.

23 Q.   Did you expect or believe that there would be questions

24 asked about what happened?

25 A.   Yes, sir.

Liz Hernandez - Direct Examination

1  Q.    Did you believe that there would be police coming to your

2  house to talk to you about this?

3  A.    Yes, sir.

4  Q.    In fact, did the police come to talk to you?

5  A.    Yes, sir.

6  Q.    Okay.  When?  How long did it take for the police to get

7  to your house?

8  A.    The next day.

9  Q.    Okay.  And when the police came the next day, did they

10 talk to you about what knowledge, what information you had

11 about the death of Sean Lamb?

12 A.    Yes, sir.

13 Q.    What did you tell them?

14 A.    They just asked me if I knew who Sean was and that if I

15 knew he had been murdered, and I said yes.  They started asking

16 Brian questions.  And we answered their questions, and they

17 just said they would be back that day.

18 Q.    Did you -- I'm sorry.

19 A.    They said they would be back later on that day to ask us

20 more questions.

21 Q.    Did you think you were a hundred percent truthful and

22 candid with those officers when they came by your house that

23 day?

24 A.    Yes, sir.

25 Q.    You answered all of their questions.

Liz Hernandez - Direct Examination

1  A.    Yes, sir.

2  Q.    You told them you knew how Sean Lamb died and who shot

3  Sean Lamb, right?

4  A.    Yes, sir.

5  Q.    At your apartment that day you told them that?

6  A.    I don't remember if it was that day or the day I got

7  arrested, that when they had me at the police station.

8  Q.    Do you recall being less than truthful, less than candid

9  with the police officers when they first came by your

10 apartment?

11 A.    Can you rephrase that?

12 Q.    When the police first came to your apartment to question

13 you and Brian or to get information and you said, "I know who

14 Sean Lamb is," okay, were you totally 100 percent candid in

15 answering their questions and telling them everything they

16 needed to know?

17 A.    Yes, sir.

18 Q.    You believe you were.

19 A.    Yes, sir.

20 Q.    Okay.  Let me go back a little bit.  After the shooting

21 when you-all got down there on the south side and regrouped,

22 did you see any guns at that time?

23 A.    No, sir.

24 Q.    You didn't see any of the guns.

25 A.    Huh-uh.

Liz Hernandez - Direct Examination

1    Q.    Don't know what happened to them.

2    A.    No, sir.

3    Q.    Noe didn't have one?

4    A.    No, sir.

5    Q.    You said you were arrested, correct?

6    A.    Yes, sir.  Yes, sir.

7    Q.    And you went to the police department -- or the police

8    station and you spoke with some officers there and you gave

9    them a statement as well; is that correct?

10   A.    Yes, sir.

11   Q.    And you were subsequently charged in an indictment.  Do

12   you recall that --

13   A.    Yes, sir.

14   Q.    -- the three-count indictment?

15         And you pled guilty, did you not?

16   A.    Yes, sir.

17   Q.    To which count?

18   A.    To all three.

19   Q.    And specifically what's the most serious offense you pled

20   guilty to?

21   A.    The murder of Sean Lamb.

22   Q.    And did you do so with a plea agreement with the

23   government?

24   A.    Excuse me?

25   Q.    When you pled guilty to that offense, did you do that plea

Liz Hernandez - Direct Examination

1  pursuant to -- or did you have an -- a plea agreement with the

2  government?

3  A.   No, sir.

4  Q.   You just did it open.  There was no written documents or

5  anything.

6  A.   No, sir.

7  Q.   Okay.

8          MR. LEWIS:  May I approach the witness, Your Honor?

9          THE COURT:  You may.

10  Q.   (BY MR. LEWIS)  I show you this and ask you to take a look

11  at that, please.

12  A.   (Witness complies.)

13  Q.   Have you had a chance to look at that?

14  A.   Yes, sir.

15  Q.   Okay.  Does that refresh your memory as to whether or not

16  you have a plea agreement with the government as part --

17  resolving your criminal case?

18  A.   Yes, sir.

19  Q.   Okay.  Did you have a plea agreement?

20  A.   Yes, sir.

21          MR. LEWIS:  I'm sorry, may I approach?

22          THE COURT:  You may.

23  Q.   (BY MR. LEWIS)  Ms. Hernandez, as part of that plea

24  agreement with the government, was there a recommendation

25  concerning a punishment range that you might be facing?

Liz Hernandez - Direct Examination

1  A.    No, sir.

2  Q.    In other words, no less than a certain period of time to

3  no more than a certain period of time?  Do you recall that?

4  A.    I believe they said 30 years.

5  Q.    You could be facing up to 30 years; is that correct?

6  A.    Yes, sir.

7  Q.    Okay.  Now, additionally, was there another agreement you

8  made with the government to be cooperative and to come testify

9  and provide information when the government requested?

10  A.    Yes, sir.

11  Q.    And as part of that, what might you be hoping for in

12  return?

13  A.    (Witness shaking head.)

14  Q.    You don't know.

15  A.    No.

16  Q.    You have no expectations.

17  A.    No, sir.

18  Q.    Okay.  As you sit here today, do you know what your

19  sentence is going to be?

20  A.    No, sir.

21  Q.    Do you have an expectation or a hope of what possibly your

22  sentence might be?

23  A.    No.

24  Q.    Who is going to make that determination?

25  A.    The judge.

Liz Hernandez - Direct Examination

1  Q.   And do you have any hope or expectation that the

2  government will make any type of recommendation on your behalf

3  to the Court that -- when he sentences you?

4  A.   No.

5  Q.   Okay.  Real quick, Ms. Hernandez.  Going back to 16th and

6  Dixie and the abduction, when you were in that alley and

7  everybody was rushing Sean, did you at any time observe any of

8  the guns you'd previously described to us being possessed or

9  displayed in that alley?

10 A.   Yes, sir.

11 Q.   Okay.  Who had the weapons that you recall in the alley?

12 A.   My brother, Ruben, and Noe.

13 Q.   Ruben and Noe had the guns?

14 A.   And Anthony.

15 Q.   And Anthony had a gun?

16 A.   Yes, sir.

17 Q.   Okay.  Previously you had told us there were -- you saw

18 two guns.

19 A.   Yes, sir.

20 Q.   One that Stacey Castillo showed to your brother and

21 another that Anthony brought in.

22 A.   Yes, sir.

23 Q.   Okay.  Do you know which gun it was that you saw Ruben

24 holding in the alley?

25 A.   I don't remember.

Liz Hernandez - Direct Examination

1   Q.   Okay.  What about the one that Noe had?

2   A.   No, sir.

3   Q.   Did either of the guns they saw -- did they appear to you

4   to be the ones that you had seen earlier in your apartment?

5   A.   Yes, sir.

6   Q.   Okay.  You're now telling us as well that while you were

7   in the alley Anthony Gonzales also had another weapon.

8   A.   Yes, sir.

9   Q.   Okay.  Can you describe that one for us?

10  A.   It was like the -- it looked like the camouflage one, but

11  it was all black.

12  Q.   It was all black?

13  A.   Yes, sir.

14  Q.   But it looked like the camouflage one that you had seen in

15  your apartment?

16  A.   Yes, sir.

17  Q.   Okay.

18          MR. LEWIS:  I'll pass the witness at this time, Your

19  Honor.

20          THE COURT:  Let me see the attorneys for just a

21  second.

22          (Sidebar conference on the record)

23          THE COURT:  Are y'all going to take a lengthy time on

24  cross?  Then we're going to --

25          MR. LEACH:  (Nodding head.)

Liz Hernandez - Direct Examination

1          THE COURT:  That's fine.  I am going to stop right

2   now.  Then y'all can come back in the morning.

3          MR. LEACH:  Yeah, that will be more organized, to be

4   honest with you.

5          THE COURT:  Then we can start in the morning rather

6   than quit at 5:00 or something like that.

7          MR. LEACH:  Okay.

8          THE COURT:  So let's do that, okay?

9          MR. LEACH:  Okay.  Thank you, Your Honor.

10         (Sidebar conference on the record concluded)

11         THE COURT:  We're going to recess for the evening

12  right now.  And the attorneys are obviously going to have some

13  cross-examination of Ms. Hernandez, and so that may take a

14  while so I thought it would be better to have the examination

15  from the beginning.

16         So what I'm going to ask you to do is take your

17  notepads back into the jury room.  Put them in the brown

18  envelopes.  Don't take them home with you.  Don't talk about

19  the case.  Don't let anybody talk to you with the case.  Don't

20  do any research, investigation about the case, and we'll see

21  you back here ready to go at 8:30 a.m. in the morning.

22         Let's all rise for the jury, please.

23         (At 4:29, the jury leaves)

24         THE COURT:  So, Marshals, we'll need Ms. Hernandez

25  back here in the morning for cross-examination of the witness.

Liz Hernandez - Direct Examination

1              U.S. MARSHAL:  Yes, Your Honor.

2              THE COURT:  Okay.  And we'll be ready to go at 8:30.

3              And if I can see the attorneys back in chambers.

4              And I would appreciate the Marshals keeping our crowd

5  here until the jurors have a chance to get out of the building

6  so they don't inadvertently run into each other.

7              So if the attorneys can come back in chambers, we'll

8  work on the jury charge for a little bit.

9              MR. LEWIS:  One thing, Your Honor.

10             THE COURT:  Yes, sir.

11             MR. LEWIS:  We do have a witness here that if we

12  could go ahead and get her sworn in and be placed under the

13  rule.

14             THE COURT:  We can do that.  Where is she?

15             MR. KLASSEN:  Do you want to do it now?

16             MR. LEWIS:  Yes.

17             THE COURT:  Do it now, yes.

18             Y'all can be seated.

19             Come on up here.  Come right around here, young lady.

20             And you're going to swear her in.

21             Tell me your name, please.

22             THE WITNESS:  Anabell Flores.

23             THE COURT:  You're going to have to speak up a little

24  bit.

25             THE WITNESS:  Anabell Flores.

Liz Hernandez - Direct Examination

1          THE COURT:  Okay.  And, Ms. Flores, I understand
2  you're going to testify in this case; is that right?
3          THE WITNESS:  Yes.
4          THE COURT:  Okay.  Could you raise your right hand
5  and she's going to swear you as a witness.
6          (Witness sworn by the clerk)
7          THE COURT:  Okay.  Now, I've got some special
8  rules -- not just for you, but any of the witnesses, okay?  All
9  right.  Smile a little bit.  Okay.  Look me in the eye.  One is
10  you're not to talk to anybody about the case or your testimony
11  except the attorneys.  You can talk to the government's
12  attorneys and if you want to, you can talk to the defense
13  attorneys, but you can't talk to anybody else about the case,
14  what you know about it, your testimony, or anything like that
15  except them, okay?
16          THE WITNESS:  (Nodding head.)
17          THE COURT:  Is that a "yes"?
18          THE WITNESS:  Yes.
19          THE COURT:  Okay.  And then in the morning we'll have
20  you back over here.  We've got another witness we've got to
21  finish up, and that might take an hour or so to get through
22  that.  And so I guess you'll be the next one after that, okay?
23          THE WITNESS:  Okay.
24          THE COURT:  All right.  So we'll see you back over
25  here in the morning.  Why don't you be back here at 8:30

Ann M. Record, RMR, CRR, CMRS, CRI ********** (432) 685-0361

1  anyway?

2          Mr. Lewis, is that sufficient for the government?

3          MR. LEWIS:  That's sufficient, Your Honor.

4          THE COURT:  So be back over here in the morning at

5  8:30, okay?

6          THE WITNESS:  Okay.

7          THE COURT:  Thank you very much.

8          All right.  So if I can see the attorneys back in

9  chambers.  And with that, we'll be adjourned until 8:30 in the

10  morning.

11          (At 4:55 p.m., proceedings adjourned)

12                    *  *  *  *  *  *

13              C E R T I F I C A T E

14

15          I, ANN M. RECORD, RMR, CRR, CMRS, CRI, Federal

16  Official Court Reporter, certify that the foregoing is a

17  correct transcript from the proceedings in the

18  above-entitled matter.

19

20

21

22                    _____/s/Ann M. Record_____
         Date: 10/05/2015   Ann M. Record, RMR, CRR, CMRS, CRI
23                           United States Court Reporter
                             200 East Wall Street, Suite 117
24                           Midland, Texas  79701
                             Telephone:  (432) 685-0361
25