USA vs. Olgin, et al. - Jury Trial - Volume 3 - April 8, 2015

```
1                IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
2                    MIDLAND-ODESSA DIVISION

3
   UNITED STATES OF AMERICA,         )
4                                    )
        Plaintiff,                   )
5                                    ) Case No. 7:14-CR-0227 RAJ
        vs.                          )
6                                    ) Midland, Texas
   RAYMOND HERNANDEZ OLGIN, JR.;     )
7  RUDOLFO ROMERO PAREDES;           ) April 8, 2015
   STACEY LOUISE CASTILLO; and       )
8  ANTHONY RYAN GONZALES;            )
                                     )
9       Defendants.                  )
   _____) 8:27 a.m.
10

11
               TRANSCRIPT OF JURY TRIAL - VOLUME 3
12           BEFORE THE HONORABLE ROBERT A. JUNELL
                SENIOR UNITED STATES DISTRICT JUDGE
13

14
   APPEARANCES:
15

16 FOR THE GOVERNMENT:   WILLIAM FRANKLIN LEWIS, JR., AUSA
                         Office of the U.S. Attorney
17                       400 W. Illinois, Suite 1200
                         Midland, Texas  79701
18  - and -

19                       JOHN S. KLASSEN, AUSA
                         Office of the U.S. Attorney
20                       400 W. Illinois, Suite 1200
                         Midland, Texas  79701
21

22 FOR THE DEFENDANT, RAYMOND HERNANDEZ OLGIN, JR.:
                         E. JASON LEACH
23                       Law Office of E. Jason Leach, PLLC
                         The Grant Building
24                       307 N. Grant Avenue, Suite 300
                         Odessa, Texas  79761
25
```

USA vs. Olgin, et al. - Jury Trial - Volume 3 - April 8, 2015

1                    **APPEARANCES (CONTINUED)**

2


3  **FOR THE DEFENDANT, RUDOLFO ROMERO PAREDES:**
                       ROBERT V. GARCIA, JR.
4                      Attorney at Law
                       413 N. Texas Avenue
5                      Odessa, Texas  79761

6


7  **FOR THE DEFENDANT, STACEY LOUISE CASTILLO:**
                       JOHN L. POOL
8                      Law Office of John L. Pool
                       117 N. W. Avenue A
9                      Andrews, Texas  78714

10


11  **FOR THE DEFENDANT, ANTHONY RYAN GONZALES:**
                       ALLEN R. STRODER
12                     Attorney at Law
                       6010 Highway 191, Suite 230
13                     Odessa, Texas  79762

14


15


16  **COURT REPORTER:**      Ann M. Record, RMR, CRR, CMRS, CRI
                       200 East Wall Street, Suite 117
17                     Midland, Texas  79701
                       (432) 685-0361
18

19
            Proceedings reported by machine shorthand reporter.
20          Transcript produced by Computer-Aided Transcription.

21

22

23

24

25

USA vs. Olgin, et al. - Jury Trial - Volume 3 - April 8, 2015

1                            **I N D E X**

2

3     **WITNESSES FOR THE GOVERNMENT:**                              **PAGE**

4     BETTY PANDO
          Direct Examination By Mr. Klassen                      11
5         Cross-Examination By Mr. Garcia                         24
          Redirect Examination By Mr. Klassen                     25
6
      ANABELL FLORES
7         Direct Examination By Mr. Lewis                         28
          Cross-Examination By Mr. Garcia                         56
8
      VINCENT BENSON
9         Direct Examination By Mr. Lewis                         67
          Cross-Examination By Mr. Leach                          86
10        Cross-Examination By Mr. Pool                           90
          Cross-Examination By Mr. Stroder                        94
11
      ANTHONY DRAPER
12        Direct Examination By Mr. Klassen                      110
          Cross-Examination By Mr. Stroder                       116
13
      TASHA GREENBERG
14        Direct Examination By Mr. Klassen                      119
          Cross-Examination By Mr. Garcia                        140
15        Cross-Examination By Mr. Leach                         144
          Cross-Examination By Mr. Garcia                        151
16        Cross-Examination By Mr. Pool                          152
          Cross-Examination By Mr. Stroder                       154
17
      WILL WERNER
18        Direct Examination By Mr. Lewis                        158

19    HEATH HARDWICK
          Direct Examination By Mr. Lewis                        163
20        Voir Dire Examination By Mr. Pool                      170
          Direct Examination Continued By Mr. Lewis              172
21
      JOHN SIKES
22        Direct Examination By Mr. Lewis                        174

23

24

25

Ann M. Record, RMR, CRR, CMRS, CRI ********** (432) 685-0361

USA vs. Olgin, et al. - Jury Trial - Volume 3 - April 8, 2015

1                 **I N D E X (CONTINUED)**

2

3  **DEFENDANT PAREDES EXHIBITS:**                                    RCVD

4   DX Paredes 1   Dentist note                                      59

5

   **GOVERNMENT EXHIBITS:**                                          RCVD
6
    GX 29      Photograph of Anabell Flores' Ford                    30
7              Expedition
    GX 30      Photograph of Anabell Flores' Ford                    30
8              Expedition
    GX 31      Photograph of Kia                                     186
9   GX 32      Photograph of Kia                                     186
    GX 36      Photographs from backyard of 30 Neta                  17
10             Place
    GX 37      Photographs from backyard of 30 Neta                  17
11             Place
    GX 38      Photographs from backyard of 30 Neta                  17
12             Place
    GX 39      911 Call Recording 30 Neta Place                      22
13             (5/13/2014)
    GX 124     Satchel obtained from Anabell Flores                  51
14  GX 126     Interview of Stacey Castillo 03:42 -                  194
               06:05
15  GX 127     Interview of Stacey Castillo 06:15 -                  194
               06:28
16  GX 128     Interview of Stacey Castillo 06:34 -                  194
               07:08
17  GX 129     Interview of Stacey Castillo 07:41 -                  194
               08:32
18  GX 130     Interview of Stacey Castillo 08:51 -                  194
               11:30
19  GX 131     Interview of Stacey Castillo 12:19 -                  194
               14:46
20  GX 132     Interview of Stacey Castillo 15:04 -                  194
               15:31
21  GX 133     Interview of Stacey Castillo 15:59 -                  194
               16:46
22  GX 134     Interview of Stacey Castillo 17:25 -                  194
               19:40
23  GX 135     Interview of Stacey Castillo 20:00 -                  194
               20:31
24  GX 136     Interview of Stacey Castillo 20:47 -                  194
               21:06
25

Case 7:14-cr-00227-DC Document 251 Filed 10/05/15 Page 5 of 224

5

USA vs. Olgin, et al. - Jury Trial - Volume 3 - April 8, 2015

1               I N D E X (CONTINUED)

2

3    GOVERNMENT EXHIBITS:                                        RCVD

4    GX 137   Interview of Stacey Castillo 22:09 -        194
              22:54
5    GX 138   Interview of Stacey Castillo 23:15 -        194
              24:50
6    GX 139   Interview of Stacey Castillo 25:08 -        194
              25:22
7    GX 140   Interview of Stacey Castillo 25:50 -        194
              29:08
8    GX 141   Interview of Stacey Castillo 29:44 -        194
              32:30
9    GX 142   Interview of Stacey Castillo 32:43 -        194
              37:30
10   GX 143   Interview of Stacey Castillo 37:54 -        194
              38:38
11   GX 144   Interview of Stacey Castillo 38:58 -        194
              40:04
12   GX 145   Interview of Stacey Castillo 42:15 -        194
              44:09
13   GX 146   Interview of Stacey Castillo 44:19 -        194
              44:52
14   GX 147   Interview of Stacey Castillo 45:14 -        194
              45:53
15   GX 148   Interview of Stacey Castillo 46:09 -        194
              46:44
16   GX 149   Interview of Stacey Castillo 49:48 -        194
              52:45
17   GX 150   Interview of Stacey Castillo 53:25 -        194
              56:30
18   GX 151   Interview of Stacey Castillo 57:45 -        194
              59:00
19   GX 152   Interview of Stacey Castillo 59:09 -        194
              1:00:18
20   GX 153   Interview of Stacey Castillo 1:28:34 -      194
              1:29:08
21   GX 154   Interview of Stacey Castillo 1:32:37 -      194
              1:36:06
22   GX 155   Interview of Stacey Castillo 1:40:50 -      194
              1:42:00
23   GX 156   Interview of Stacey Castillo 2:03:30 -      194
              2:03:54
24   GX 157   Interview of Stacey Castillo 2:05:52 -      194
              2:07:11
25

USA vs. Olgin, et al. - Jury Trial - Volume 3 - April 8, 2015

1                    **I N D E X (CONTINUED)**

2

3  **GOVERNMENT EXHIBITS:**                                      **RCVD**

4     GX 158   Interview of Stacey Castillo 2:07:51 -           194
                2:09:09
5     GX 159   Interview of Stacey Castillo 2:17:45 -           194
                2:18:43
6     GX 160   Interview of Stacey Castillo 2:46:25 -           194
                2:48:01
7     GX 161   Interview of Stacey Castillo 2:51:00 -           194
                2:57:33
8     GX 162   Interview of Stacey Castillo 3:00:06 -           194
                3:00:29
9     GX 163   Interview of Stacey Castillo 3:01:40 -           194
                3:01:44
10    GX 164   Interview of Stacey Castillo 3:06:30 -           194
                3:07:25
11    GX 165   Interview of Stacey Castillo 3:09:32 -           194
                3:10:30
12    GX 166   Interview of Stacey Castillo 3:10:59 -           194
                3:12:53
13    GX 167   Interview of Stacey Castillo 4:02:48 -           194
                4:03:20
14

15 **NOTE:**  Government's Exhibits 126, 127, 128, 129, 130, 132, 133,
   134, 135, 136, 137, 139, 140, 141, 143, 144, 145, 146, 147,
16 148, 151, 153, 154, 155, 156, 159, 161, 162 and 163 were
   withdrawn on Thursday, April 9, 2015)
17

18

19

20

21

22

23

24

25

Case 7:14-cr-00227-DC  Document 251  Filed 10/05/15  Page 7 of 224

7

USA vs. Olgin, et al. - Jury Trial - Volume 3 - April 8, 2015

**P R O C E E D I N G S**

1

2          (At 8:27 a.m., proceedings commenced)

3          (Defendants present)

4          THE COURT:  It is about 8:27.  We're outside the

5  presence of the jury.  The attorneys are present.  The

6  defendants are present.

7          Mr. Leach, I understand you got some late discovery.

8          MR. LEACH:  I did, Your Honor.  This morning

9  Mr. Lewis told me that last night about eleven o'clock, the

10  two-hour interview of Ms. Hernandez was discovered.  And this

11  is an interview that was recorded, I believe, here at the

12  courthouse.  It is an interview that we as the defense have not

13  had the opportunity to listen to, and I am asking the Court to

14  not proceed on Ms. Hernandez's cross-examination until such

15  time as I can listen to this fully.

16          THE COURT:  Mr. Lewis, why was it just discovered

17  last night at eleven o'clock?

18          MR. LEWIS:  In discovery previously provided to

19  defense counsel, there were reports detailing the interview of

20  Ms. Hernandez.  Yesterday during the direct of Ms. Hernandez,

21  Mr. Pool brought to my attention that in the discovery and in

22  the reports of that interview, there was an indication of a

23  recording.

24          We had not -- we did not have the recording.  We told

25  Mr. Pool we would look for it to see if there was, in fact, a

USA vs. Olgin, et al. - Jury Trial - Volume 3 - April 8, 2015

1  recording that existed because we were just not aware of it.

2  Officers after the end of testimony yesterday went looking for

3  it and secured it and located it at eleven o'clock last night,

4  made copies, and we've provided it this morning.

5         THE COURT:  Okay.  Then we will continue the

6  cross-examination of Ms. Hernandez until the attorneys have had

7  a chance to do that.  So you got your -- I sworn in a young

8  lady here yesterday.  Is she going to -- is she your next

9  witness?

10        MR. LEWIS:  She would be, Your Honor.  I know that

11  she called this morning indicating that she wasn't feeling

12  well, but she is on her way --

13        MR. KLASSEN:  She's just now in the parking lot, and

14  we also have another witness we can proceed with, Judge.

15        THE COURT:  Okay.  Would y'all do this.  Instead of

16  waiting until you offer the exhibits and then we have to let

17  the lawyers look, give them to them ahead of time because, I

18  mean, they've probably already had them anyway but let them --

19        MR. KLASSEN:  I am going to transmit them.  I have

20  three exhibits, photos from Mrs. Pando's house who was right

21  before -- she lived right behind where Mr. Lamb was shot and

22  then there is an audio of 911.

23        THE COURT:  And so your first witness is the young

24  lady from yesterday, or are you going to call somebody else

25  first?  What are you going to do?

Ann M. Record, RMR, CRR, CMRS, CRI ********** (432) 685-0361

USA vs. Olgin, et al. - Jury Trial - Volume 3 - April 8, 2015

1          MR. KLASSEN:  We'll probably call Mrs. Pando first,
2    the lady who lived near where Mr. Lamb was shot so she can go
3    about her business.
4          THE COURT:  And she has not been sworn; is that --
5          MR. KLASSEN:  She has not.  She was on vacation until
6    last night.
7          THE COURT:  What I am probably going to do, we'll
8    kind of see what the timing is, but we may recess for lunch at
9    11:00, let the lawyers listen to that, and then we'll come back
10   at 1:00.  That will give y'all two hours or so to listen to the
11   tape and then come back at 1:00, 1:30, and you can start your
12   cross-examination of Ms. Hernandez.
13         MR. KLASSEN:  We'll certainly, if need be, make one
14   of our laptops available for counsel to --
15         MR. LEACH:  The one day I don't bring mine.
16         THE COURT:  Have y'all had a chance to look at the
17   exhibit there?
18         MR. LEACH:  I have, Your Honor.
19         MR. GARCIA:  We have.
20         THE COURT:  Okay.
21         MR. KLASSEN:  All they are is just views of where she
22   would have looked over the fence is all.
23         THE COURT:  Okay.  All right.  So your first witness
24   is to go to be?
25         MR. KLASSEN:  Mrs. Betty Pando.

Ann M. Record, RMR, CRR, CMRS, CRI ********** (432) 685-0361

USA vs. Olgin, et al. - Jury Trial - Volume 3 - April 8, 2015

1          THE COURT:  Why don't you bring her in here and we'll

2    get started here in just a second.

3               (Recess from 8:31 a.m. to 8:33 a.m.)

4          THE COURT:  Let's bring the jury in.

5          And I am going to tell the jury that the

6    cross-examination of Ms. Hernandez will be after lunch today

7    and not give them a reason or anything.

8          MR. KLASSEN:  Yes, Your Honor.

9          (At 8:32 a.m., jury enters)

10         (Cry of the Court)

11         THE COURT:  Please be seated.  Thank you.  It's about

12   8:32.  We're in the courtroom with the jury and the attorneys

13   are all present and the defendants are all present.

14         And Ms. Hernandez, who was the last witness yesterday

15   and we were going to start her cross-examination this morning,

16   I am delaying that until right after lunch.  So we'll do -- the

17   lawyers will do their cross-examination after lunch of

18   Ms. Hernandez so she will be back.

19         So would the government call its next witness,

20   please.

21         MR. KLASSEN:  Yes, Your Honor.  The government calls

22   Ms. Betty Pando who is up right at the witness stand.

23         THE COURT:  Would you raise your right hand and let

24   the clerk swear you in.

25              (Witness sworn by the clerk)

Pando - Direct Examination

1          THE COURT:  Okay.  If you'll come around and have a

2    seat.

3          All right.  You may proceed.

4          MR. KLASSEN:  Thank you very much, Your Honor.

5                          **BETTY PANDO,**

6          **GOVERNMENT'S WITNESS SWORN AT 8:34 a.m.**

7                     **DIRECT EXAMINATION**

8    BY MR. KLASSEN:

9    Q.   Ms. Pando, tell us where you live, ma'am.

10   A.   I live at 30 Neta Place in Odessa, Texas.

11   Q.   All right.  How long have you lived there at 30 Neta

12   Place?

13   A.   A little over ten years.

14   Q.   Okay.  You live there with your family?

15   A.   Yes.

16   Q.   Okay.  Ms. Pando, I want to direct your attention to some

17   events that happened in approximately May of last year, an

18   incident perhaps in your alley.  Are you familiar with the

19   incident I'm asking about?

20   A.   Yes.

21   Q.   All right.  Ms. Pando, describe your house just a little

22   bit.  Is it a condominium, an apartment, a single family

23   residence or what is it?

24   A.   Just a family residence.

25   Q.   Okay.  Does it have a yard?

Pando - Direct Examination

1   A.    A huge yard.

2   Q.    In the back, in the front or both?

3   A.    Both.

4   Q.    Okay.  In your backyard in particular, is that fenced in

5   some way?

6   A.    Yes, all the way.

7   Q.    All right.  To the point where if you were looking out

8   your back door, can you see outside the fence or is it an

9   opaque fence?

10  A.    No, I mean, it is pretty tall.  I have to like step on top

11  of something to be able to look out.

12  Q.    All right.  And what is immediately behind your fence?

13  A.    Just the alley, the garbage disposal, and that's about it.

14  Q.    Is the alley kind of a standard dirt-type alley or caliche

15  or is it paved?

16  A.    No, it is dirt.

17  Q.    All right.  Ms. Pando, think back with me, an incident

18  perhaps in the late afternoon of about May 13th.  Tell us what

19  you were doing and when you first noticed that maybe something

20  out of the ordinary was going on.

21  A.    I was there in my kitchen, my mom and I, and my little

22  nephew.  We had just gotten home maybe 15 minutes before that.

23  And my kitchen window was open.

24  Q.    What were you doing?

25  A.    My mom had just walked over to the sink area.  I have a

1  little plug-in area there, and she was charging her cell phone,

2  and I was talking to her at the time -- actually, my

3  brother-in-law had just walked in --

4  Q.   Okay.

5  A.   -- to pick up my nephew because I was taking care of him.

6  Q.   All right.  Did you see or hear something?

7  A.   No.

8  Q.   Okay.  What happened that first drew your attention?

9  A.   Well, we're sitting there talking.  I'm standing kind of

10  looking out the kitchen window looking toward that way because

11  I was talking to my mother.  My brother-in-law was gathering up

12  the backpack and all that stuff in the living room when all of

13  a sudden I hear a bunch of gunshots -- what we thought were

14  gunshots.  We didn't know what it was.

15  Q.   All right.  What did it sound like as best you can

16  describe it or even re-create the noise, if you can?

17  A.   Like loud firecrackers maybe, you know, one after the

18  other.  At the time it sounded like maybe five or so, you know,

19  just bang, bang, bang, bang, you know, real fast.

20  Q.   Pretty close together.

21  A.   Oh, yeah.

22  Q.   Okay.  When you were looking out, did -- anything visible

23  at all to you -- well, were you actually looking in that

24  direction when you heard the noise or did you turn that way?

25  A.   No, I was looking in that direction; but I was, you know,

1  like talking to my mom because she had already turned around to

2  walk towards me.  And she just like stopped and it was so loud

3  it hurt her ears.  And she had just suffered a stroke so she is

4  real sensitive to stuff like that.

5  Q.   Okay.

6  A.   And I stopped and I said, "Were those gunshots we just

7  heard?"

8         And everybody was like, "I don't know," you know.

9  Q.   Okay.  So what did you do at that point now that you think

10 it perhaps could have been gunshots?

11 A.   We all just kind of froze for a minute, you know.  And

12 then at that time, you know, I was looking that way which was

13 east when I saw a bunch of dirt, like, you know, in the alley.

14 Q.   When you say "dirt in the alley," like kicked up in the

15 air?

16 A.   Yeah.

17 Q.   Okay.

18 A.   And then I heard like somebody peeling out real quick.

19 Q.   Okay.

20 A.   And --

21 Q.   In a vehicle.

22 A.   Yes, it seemed to be maybe a truck.  My fence is so high I

23 couldn't really tell.

24 Q.   I understand.  Could you see anything, any part of the

25 vehicle as you looked --

1  A.    Just the very roof top, barely.

2  Q.    Okay.  Anything about the color of the roof top or

3  anything that you can remember?

4  A.    The only -- to me, it seemed like it was gray, but I saw

5  it real fast.

6  Q.    All right.  The peeling out that you saw, did it appear to

7  be going forward, the vehicle, the top of the vehicle or

8  reversing or could you tell one way or the other?

9  A.    It kind of seemed reversing, but I'm not real sure.

10 Q.    I understand.  Okay.  So you hear that.  You see that, the

11 dirt kicking up.  What do you do next?

12 A.    That's when I said, "Oh, my gosh, something's going on out

13 there.  You know, those probably were gunshots.  Something's

14 going on in the alley."

15        And my nephew was standing there by the door.  And

16 I'm like, "No, don't open the door.  Don't go outside," because

17 we don't know what was going on.

18 Q.    All right.  So what did you do?

19 A.    My brother-in-law was there and I'm like, "Oh, gosh."  So

20 we pause for a minute and then we walked out.

21 Q.    To the back?

22 A.    To my backyard, yes.

23 Q.    Okay.

24 A.    And we're just kind of looking.  You can barely see

25 through the cracks of the fence, you know, because it is a

1  wooden fence, and you could see like a blue vehicle there.

2  Q.   Through the cracks.

3  A.   Through the cracks, yes.

4  Q.   By this point in time are you up close at the fence

5  looking through the cracks or are you still a distance away?

6  A.   I am walking towards it.  And you can barely see, but you

7  could tell it's blue.

8  Q.   Okay.  Did you proceed then to the fence?

9  A.   Yeah, but I hadn't -- I had to get on top of a stool that

10  I had there to look at, and I hadn't yet.  And then that's when

11  I got close and I looked towards -- out the cracks and --

12  Q.   What did you see?

13  A.   You could see the doors were open and you could kind of

14  see someone was in there, but you couldn't really tell because,

15  I mean, you know the cracks are not that wide.

16  Q.   All right.  Before you, Mrs. Pando, are some government's

17  exhibits marked 36, 37 and 38.  Could you take a look at those,

18  please, and tell me if you recognize them?

19  A.   (Witness complies.)  Yes.

20  Q.   What are they depicting?

21  A.   Pictures of my backyard and my patio.

22  Q.   All right.  Do those pictures look roughly the same, maybe

23  decorations might be different, but roughly the same of the

24  layout and the fence as it appeared on the afternoon that

25  you're describing for the jury?

Pando - Direct Examination

1   A.   Yes.

2          MR. KLASSEN:  The government would offer Exhibits 36,

3   37 and 38 into evidence.

4          THE COURT:  Any objection, Mr. Leach?

5          MR. LEACH:  No objection, Your Honor.

6          THE COURT:  Mr. Garcia?

7          MR. GARCIA:  None, Your Honor.

8          THE COURT:  Mr. Pool?

9          MR. POOL:  No objection, Your Honor.

10         THE COURT:  Mr. Stroder?

11         MR. STRODER:  None.

12         THE COURT:  Government's Exhibits 36, 37 and 38 are

13  admitted.

14         MR. KLASSEN:  May I display those for the jury?

15         THE COURT:  You may.

16  Q.   (BY MR. KLASSEN)  Mrs. Pando, whatever is more convenient

17  for you, you can -- hopefully that screen right next to you is

18  working.

19  A.   Yes.

20  Q.   And -- or you can look up here if that's easier.

21         On Government's Exhibit 36, what are we looking at

22  here?

23  A.   My back patio.

24  Q.   Okay.  Is this what it looks like as you step out of your

25  door, your back door?

Pando - Direct Examination

```
1   A.    Yes.
2   Q.    Okay.  Now, it looks as if there is a fence sort of in the
3   distance that's visible.  Do you see that?
4   A.    Yes.
5   Q.    Is that the fence that you've been referring to talking to
6   the jury that you walked toward?
7   A.    Yes.
8   Q.    All right.  Is roughly the place that you walked to look
9   through the slats, is that depicted on this photograph or not?
10  A.    Yes.
11  Q.    Okay.  If you take your finger on that screen right next
12  to you and maybe place an X approximately in the -- and the
13  jury will be able to see it -- just use your hand like a tablet
14  and place an X about where you looked out.
15  A.    (Witness complies.)
16  Q.    Okay.  Let's look at Government's Exhibit 37.  Okay.  Here
17  again, what are we looking at 37?
18  A.    The same.  I mean, my backyard and the back patio.
19  Q.    Okay.  And once again, place an X about where you think
20  that you looked out and -- through the slats and saw the blue
21  vehicle.
22  A.    (Witness complies.)
23  Q.    I see.  So it looks like maybe just to the left of where
24  kind of that grill is that's visible, correct?
25  A.    Yes.
```

1    Q.   All right.  And Government's Exhibit 38, what are we

2    looking at here?

3    A.   My doors to get in my kitchen.

4    Q.   All right.  This is the door you exited as you went

5    towards the fence.

6    A.   Yes.

7    Q.   All right.  Very good.

8         Now, so you see the --

9         MR. KLASSEN:  The lights can come back on, Your

10   Honor.  We're finished with that.

11   Q.   (BY MR. KLASSEN)  You see this bluish color vehicle.  What

12   type of vehicle did it appear to be, if you can remember?

13   A.   An SUV.  I mean, I could tell -- you know, when I got

14   close to look, it looked like an Expedition.

15   Q.   And you said that you thought there might be -- you might

16   have seen initially somebody in there at first, but you weren't

17   certain.

18   A.   Yes.

19   Q.   All right.  So was the car running or not running or do

20   you have a recollection one way or the other?

21   A.   I believe it was running.

22   Q.   Okay.  So you see that.  What do you do next?  Do you go

23   outside to look at it?

24   A.   No.  That's when I called 911.

25   Q.   Okay.  And you called 911 at that point why?

1   A.   Because that's when I said, I mean, obviously something

2   happened.   Those were gunshots, and it looks like there is

3   someone in there.

4   Q.   Okay.

5   A.   So we called.

6   Q.   And what did the 911 -- what did you tell the 911

7   operator?

8   A.   That we had just heard some gunshots in my alley and there

9   was a vehicle back there and it looked like someone was in it.

10  Q.   Did the -- the conversation went on for a few moments,

11  correct?

12  A.   Yes.

13  Q.   We're going to listen to it here in just a second.   But at

14  some point in time, did the 911 operator ask you to do

15  something?

16  A.   Yes.   She asked me to look and see if there was someone in

17  there and what they were doing.

18  Q.   Did you make that 911 call from the backyard like on a

19  cell phone of some sort or did you go back inside the house?

20  A.   No, from the backyard.

21  Q.   All right.   When she asked you to take a closer look, did

22  you do so?

23  A.   Yes.   I got on top of that stool that I had there.

24  Q.   All right.   Were you still on the line with the 911

25  operator when you took a look on the stool?

1  A.    Yes.

2  Q.    And tell the jury what it is that you saw.

3  A.    We saw a young man on the passenger's side of the front

4  seat laying there.

5  Q.    Okay.  Did he appear to be moving or breathing?

6  A.    No.

7  Q.    Okay.  What did the young man look like, as best you can

8  remember?

9  A.    White male, tattoos.

10 Q.    All right.  And you relayed the information of what you

11 saw to the 911 operator?

12 A.    Well, I told her that -- she asked me, you know, "Does he

13 look like he's alive or breathing?"

14 Q.    What did you say?

15 A.    I said, "No, I mean, he's not moving."  And I think his

16 eyes were kind of open and you know the blood was on his body.

17 Q.    Had you ever seen anything like that before?

18 A.    No.

19 Q.    All right.  Mrs. Pando, a week or so ago myself and the

20 people at this table visited you in your home, correct?

21 A.    Correct.

22 Q.    Did we play for you an audio of your 911 call?

23 A.    Yes.

24 Q.    Did it appear to be an accurate recording of what you

25 remember saying to the 911 operator and what she said to you,

Pando - Direct Examination

1  meaning nothing was added or edited away?

2  A.   Yes, everything seemed right.

3           MR. KLASSEN:  Your Honor, we have Government's

4  Exhibit 39 which is that 911 call, and we'd offer that into

5  evidence.

6           MR. LEACH:  No objection.

7           THE COURT:  Mr. Garcia?

8           MR. GARCIA:  No objection, Your Honor.

9           THE COURT:  Mr. Pool?

10           MR. POOL:  No objection, Your Honor.

11           THE COURT:  Mr. Stroder?

12           MR. STRODER:  None, Your Honor.

13           THE COURT:  Okay.  Government's Exhibit 39 is

14  admitted.

15           MR. KLASSEN:  With the Court's permission, we would

16  like to publish that for the jury.

17           THE COURT:  You may.

18           (Audio played)

19  Q.   (BY MR. KLASSEN)  All right.  I take it -- we heard the

20  sirens there at the end, correct?

21  A.   Yes.

22  Q.   The police did show up shortly after that.

23  A.   Yes.

24  Q.   When you indicated that you were going to try to wave them

25  down, wave them down from the backyard or were you out in front

Pando - Direct Examination

1    by this time?

2    A.    No, I -- because the fire department that, I assume, came

3    is real close to my house right off of University and the loop,

4    and I just went out to the alley so that I could, you know,

5    flash them to go where it was.

6    Q.    And eventually that afternoon or that night the police

7    came and talked to you, correct?

8    A.    Yes.

9    Q.    All right.  You mentioned that your nephew had just been

10   out there.  How old is your nephew?

11   A.    He's 4.

12   Q.    All right.  He had been out just a little bit playing or

13   something out there?

14   A.    Yes, because, I mean, we had been home maybe 15, 20

15   minutes and he was just out there messing around and he had

16   just come in.

17   Q.    Mrs. Pando, the 911 operator asked you some additional

18   questions about anything distinctive about this grayish looking

19   truck.  There is nothing else that you can remember today other

20   than what you told her, correct?

21   A.    Correct.

22   Q.    All right.  Whether it was looking through the slats

23   initially or when you got up on the stool to look over, did you

24   see any other people at all around this vehicle?

25   A.    No, I never saw anyone.

Pando - Cross-Examination

```
 1  Q.   Any other vehicles other than the top of the grayish
 2  looking truck possibly that you saw, any other vehicles there
 3  in the alley?
 4  A.   No.
 5            MR. KLASSEN:  I'll pass the witness, Your Honor.
 6            THE COURT:  Mr. Leach?
 7            MR. LEACH:  No questions, Your Honor.
 8            THE COURT:  Mr. Garcia?
 9            MR. GARCIA:  Just briefly, Your Honor.
10                      CROSS-EXAMINATION
11  BY MR. GARCIA:
12  Q.   Good morning, Ms. Pando.
13  A.   Good morning.
14  Q.   I was listening to the 911 call, and you were describing
15  what the truck looked like.
16  A.   Uh-huh.
17  Q.   And you said the doors were open on the truck?
18  A.   On the Expedition?
19  Q.   Yes.
20  A.   Yes.
21  Q.   I mean, the Expedition.  I'm sorry.
22  A.   Yes.
23  Q.   Which doors were open on the Expedition?
24  A.   From what I can remember, it was the driver and the two
25  back doors.
```

Pando - Redirect Examination

```
 1  Q.   Okay.  The driver's side passenger door was open?

 2  A.   No.  The driver's door and then the two back doors, the

 3  passenger -- the right and the left.

 4  Q.   Okay.  Those doors remained open?

 5  A.   Yes.

 6  Q.   And the car was still running.

 7  A.   Yes.

 8            MR. GARCIA:  That's all I have.

 9            THE COURT:  Mr. Pool?

10            MR. POOL:  No questions, Your Honor.

11            THE COURT:  Mr. Stroder?

12            MR. STRODER:  None, Your Honor.

13            THE COURT:  Okay.

14            MR. KLASSEN:  Just to follow-up, one question from

15  Mr. Garcia.

16                    REDIRECT EXAMINATION

17  BY MR. KLASSEN:

18  Q.   Where the young man was, the body, the door nearest him,

19  was that open or closed, as best you can remember?

20  A.   The best I can remember it was closed.

21            MR. KLASSEN:  I'll pass the witness.  No further

22  questions.

23            THE COURT:  Anything else, Mr. Leach?

24            MR. LEACH:  Nothing, Your Honor.

25            THE COURT:  Mr. Garcia?
```

Pando - Redirect Examination

```
 1              MR. GARCIA:  Nothing further, Your Honor.

 2              THE COURT:  Mr. Pool?

 3              MR. POOL:  Nothing, Your Honor.

 4              THE COURT:  Mr. Stroder?

 5              MR. STRODER:  Nothing.

 6              THE COURT:  May this witness be excused?

 7              MR. KLASSEN:  No objection, Your Honor.

 8              THE COURT:  Mr. Leach?

 9              MR. LEACH:  No objection.

10              THE COURT:  Mr. Garcia?

11              MR. GARCIA:  No objection, Your Honor.

12              MR. POOL:  No objection, Your Honor.

13              MR. STRODER:  None.

14              THE COURT:  Okay.  We appreciate you being here.

15    You're excused.  I'd ask you not to discuss the case or your

16    testimony with anyone except the attorneys until the jury

17    begins its deliberations, okay?

18              THE WITNESS:  Okay.

19              THE COURT:  Thank you.

20              Call your next witness, please.

21              MR. LEWIS:  The government will call Anabell Flores,

22    Your Honor.

23              THE COURT:  Have a seat, Ms. Flores.  Would you state

24    your name for me, please.

25              THE WITNESS:  Anabell Flores.
```

Pando - Redirect Examination

1          THE COURT:  Okay.  And, Ms. Flores, you were sworn as

2    a witness yesterday; is that correct?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  And you understand you're still under

5    oath.

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.  Now, this is a big room and I am

8    an old judge and I can't hear very well.  So it's real

9    important that I hear everything.  So can I get you to move

10   that microphone up a little bit closer to you.  Now say -- just

11   say, "Judge, can you hear me now?"

12         THE WITNESS:  Judge, can you hear me now?

13         THE COURT:  I can hear you now.  That's great.

14   Mr. Lewis is going to ask you some questions.  And if you

15   would, instead of saying "uh-huh" and "huh-uh" like we would if

16   we're at McDonald's or somewhere like that, say "yes" or "no,"

17   if that's the correct answer.  And then let him finish his

18   question before you answer it, okay?

19         THE WITNESS:  Okay.

20         THE COURT:  All right.  Thank you very much.

21         Mr. Lewis, you may proceed.

22         MR. LEWIS:  Thank you, Your Honor.

23                         **ANABELL FLORES,**

24      **GOVERNMENT'S WITNESS SWORN AT 4:31 p.m. on April 7, 2015**

25                    **DIRECT EXAMINATION**

Flores - Direct Examination

1  BY MR. LEWIS:

2  Q.   Ms. Flores, don't tell me the exact address, but what city

3  do you live in?

4  A.   Odessa.

5  Q.   How long have you lived in Odessa?

6  A.   Maybe like 19 years.

7  Q.   Okay.  And how old are you?

8  A.   32.

9  Q.   Now, do you know a person by the name of Rudy Paredes?

10 A.   Yes.

11 Q.   Are you in a relationship with Mr. Paredes?

12 A.   Yes.

13 Q.   Do you know a person by the name of Stacey Castillo?

14 A.   Yes.

15 Q.   Do you know a person by the name of Anthony Gonzales?

16 A.   Yes.

17 Q.   Do you recall the day that Sean Lamb died?

18 A.   Not a lot of it, but yes.

19 Q.   Okay.  You know the person that I am talking about?

20 A.   Yes, through TV.

21 Q.   Okay.  You saw the story about it on TV, correct?

22 A.   Yes, sir.

23 Q.   Okay.  On that particular day, do you recall some of the

24 events surrounding what you were doing that day?

25 A.   Yes.

Flores - Direct Examination

```
 1  Q.    Okay.  Were you with Rudy Paredes that day?

 2  A.    Yes.

 3  Q.    Were you at home or were you out running errands?

 4  A.    We were at home and we went to go run errands.

 5  Q.    Okay.  And do you have a vehicle that you use to run those

 6  errands?

 7  A.    Yes.

 8  Q.    Can you describe that vehicle for me, please?

 9  A.    2006 Ford Expedition.

10  Q.    Okay.

11          MR. LEWIS:  May I approach, the witness, Your Honor?

12          THE COURT:  You may.  Have you shown those to the

13  attorneys?

14          MR. LEWIS:  I have, Your Honor.

15          THE COURT:  Okay.

16  Q.    (BY MR. LEWIS)  Ms. Paredes, I've placed in front of you

17  what's been marked for identification purposes as Government's

18  Exhibit 29 and Government's Exhibit 30.  Do you see those?

19  A.    Yes.

20  Q.    Okay.  Do you recognize what's in Government's Exhibit 29

21  and Government's Exhibit 30?

22  A.    Yes.

23  Q.    Are Government's Exhibits 29 and 30 photographs?

24  A.    Yes.

25  Q.    Okay.  And what are they photographs of?
```

Flores - Direct Examination

```
1  A.    My Expedition.
2  Q.    Are those photographs, do they accurately depict what your
3  car looked like -- what your vehicle looked like on the day
4  that Sean Lamb died?
5  A.    Yes.
6           MR. LEWIS:  Government would offer Government's
7  Exhibits 29 and 30.
8           MR. LEACH:  No objection to 29 and 30.
9           THE COURT:  Mr. Garcia?
10          MR. GARCIA:  No objection, Your Honor.
11          THE COURT:  Mr. Pool?
12          MR. POOL:  No objection, Your Honor.
13          THE COURT:  Mr. Stroder?
14          MR. STRODER:  None.
15          THE COURT:  Government's Exhibits 29 and 30 are
16 admitted.
17          MR. LEWIS:  May I approach the witness?
18          THE COURT:  You may.
19          MR. LEWIS:  Permission to publish one of the
20 photographs for the jury?
21          THE COURT:  You may.
22          Lights, turn the lights off.
23 Q.    (BY MR. LEWIS)  I'm showing the jury, Ms. Flores, and on
24 the screen right there to your left you should be able to see
25 it as well.  Is that a photograph of your vehicle?
```

Flores - Direct Examination

```
 1  A.    Yes.

 2  Q.    Okay.  Can you tell me what's the color of that vehicle?

 3  A.    Gray.

 4            THE COURT:  I'm sorry, I couldn't hear.

 5  Q.   (BY MR. LEWIS)  I'm sorry.  Could you speak up,

 6  Ms. Flores?  What color is it?

 7  A.    Gray.

 8            THE COURT:  Gray.  Okay.

 9            MR. LEWIS:  Thank you.  You can turn the lights back

10  on.

11  Q.   (BY MR. LEWIS)  On the day that Sean Lamb died, tell me

12  about the day, what did you have planned for that day?

13  A.    I had a dentist appointment for my daughter.

14  Q.    Ms. Paredes, if you can bring that microphone a little bit

15  closer to you, I'd appreciate it.  Thank you.

16  A.    (Witness complies.)

17  Q.    What did you have planned?

18  A.    I had a dentist appointment for my daughter.

19  Q.    About what time was that dentist appointment?

20  A.    I think around 2:00.

21  Q.    And did you get up early that morning or normal time that

22  morning?

23  A.    Yes.

24  Q.    Was Mr. Paredes at the house with you?

25  A.    Yes.
```

1    Q.    Okay.  Was anybody else at the house with you?

2    A.    Yes.

3    Q.    Who else was at the house with you?

4    A.    Stacey and Anthony.

5    Q.    Okay.  And did you know why they were there?

6    A.    They were there visiting and then I let them spend the

7    night.

8    Q.    They spent the night?

9    A.    Uh-huh.

10   Q.    Is there any type of familial relationship that exists

11   between Rudy Paredes and Stacey Castillo?

12           THE COURT:  What does "familial relationship" mean?

13           MR. LEWIS:  I'll rephrase --

14           THE COURT:  In plain English.

15           MR. LEWIS:  Okay.

16   Q.    (BY MR. LEWIS)  Are Rudy Paredes and Stacey Castillo

17   related?

18   A.    Yes.

19   Q.    How are they related?

20   A.    I really don't know.

21   Q.    Is it an understanding you have, though?

22   A.    Yes.

23   Q.    Now, when Stacey and Anthony were at your house that

24   morning, do you recall what the nature of the conversation or

25   what anybody was talking about that morning?

Flores - Direct Examination

```
 1  A.    No, not really.

 2  Q.    Okay.

 3  A.    We really didn't have words because we had to go into

 4  town.

 5  Q.    You had to go into town?

 6  A.    Uh-huh, yes.

 7         MR. STRODER:  Your Honor, I can barely hear.

 8         THE COURT:  Yes, you're going to have to speak up a

 9  little bit for us, please, okay?

10  A.    I had to go into town.  I really didn't have a

11  conversation.

12  Q.    (BY MR. LEWIS)  You had to go into town.

13  A.    Yes.

14  Q.    Okay.  And when did you leave your house?

15  A.    I don't recall the time.

16  Q.    Well, was it in the morning, around lunch, in the

17  afternoon?

18  A.    It was in the morning I think like 10:30, 11:00, maybe.

19  Q.    Okay.  And when you left your house, did you go in the

20  Ford Expedition that we've seen?

21  A.    Yes.

22  Q.    When you left, did you leave by yourself or did others go

23  with you?

24  A.    I left with Rudy.

25  Q.    Anybody else in your vehicle?
```

Flores - Direct Examination

1   A.    Yes, my baby and my daughter.

2   Q.    Your baby.  How old is your baby?

3   A.    He's a year and three months.

4   Q.    Back about a year ago would have been about three months

5   old then?

6   A.    Yes.

7   Q.    What about Stacey and Anthony when you left your house,

8   where were they?

9   A.    They were leaving too.

10  Q.    Okay.  Did you see --

11          MR. STRODER:  I just can't -- flat can't hear her.

12          THE COURT:  Ma'am, you're going to have to speak up

13  real loud so we can all hear you.

14  A.    They were leaving too.

15  Q.    (BY MR. LEWIS)  Did you see what they left in?

16  A.    No, sir, I didn't.

17  Q.    Okay.  Did they follow you into town?

18  A.    No, sir.

19  Q.    Okay.  When you left, do you recall where you and Rudy

20  went to first?

21  A.    No, I don't.

22  Q.    At some point did you stop for lunch?

23  A.    Yes.

24  Q.    Where did you have lunch that day?

25  A.    At Jalisco's on 8th Street.

Flores - Direct Examination

1   Q.   Jalisco's?

2   A.   Yes.

3   Q.   Is that a Mexican food place?

4   A.   Yes.

5   Q.   And who all was there for lunch?

6   A.   Me, Rudy, my daughter and my baby and Anthony and Stacey.

7   Q.   And was Rudy there?

8   A.   Yes.

9   Q.   Okay.  How long were you there for lunch?

10  A.   I don't remember.

11  Q.   Okay.  After lunch, what did you do?

12  A.   We were going to leave, and we were told to go to hang out

13  with his friends.

14  Q.   Okay.  Who told you to go hang out with Rudy's friends?

15  A.   Stacey.

16  Q.   Okay.  Did you know where you were supposed to go to hang

17  out with her friends?

18  A.   No, I don't know them.  But Rudy's known them for a while,

19  and he knew where it was.

20  Q.   Who was driving the car?

21  A.   Rudy.

22  Q.   Rudy was driving the car?  And when Rudy drove the car, do

23  you know where you went?

24  A.   I was told it was Liz's apartment.

25  Q.   Had you ever been to Liz's apartment?

Flores - Direct Examination

```
 1  A.    No, sir.

 2  Q.    When you got -- did you arrive at Liz's apartment?

 3  A.    Yes.

 4  Q.    Did you go inside?

 5  A.    Yes.

 6  Q.    When you went inside, what did you see?

 7  A.    Just a few friends hanging out.

 8  Q.    Okay.  Who were some of those friends that you recognized?

 9  A.    Just Stacey and Anthony, Noe.  The rest of the people I

10  did not know.

11  Q.    Okay.  You recognized a person that you know as Noe; is

12  that correct?

13  A.    Yes.

14  Q.    Do you know Noe's last name?

15  A.    Galan.

16  Q.    Were there other people there you didn't know?

17  A.    Yes.

18  Q.    At any time while you were there, did you come to know or

19  were you made aware of who these other people were?

20  A.    I got introduced.

21  Q.    Okay.  And do you remember who introduced you?

22  A.    Rudy, I think.

23  Q.    Rudy.  And who did Rudy introduce you to?

24  A.    Liz, some Ray, Ruben, and other ones I do not know.

25  Q.    There were some other people you did not know.
```

Flores - Direct Examination

1   A.   Yes.

2   Q.   Okay.  And were there -- where was everybody situated or

3   where was everybody located inside this apartment?

4   A.   Everybody was inside.  They went outside a little bit to

5   the patio.

6   Q.   Okay.  And when you --

7   A.   To talk.

8   Q.   I'm sorry.  When you said people went out to the patio, is

9   it the people that you've identified that were inside the

10  apartment that went out to the patio?

11  A.   Yes.

12  Q.   Where did you stay?

13  A.   Inside for a little bit with the baby.

14  Q.   Okay.  At some point did you go outside?

15  A.   Yes.

16  Q.   When you went outside, did you go to where the other

17  people were?

18  A.   I went to where Rudy was.  Everybody was just standing

19  around.

20  Q.   Okay.  Could you make out what the conversation was or

21  what people were talking about?

22  A.   It was just a normal conversation.

23  Q.   During this time, what are you doing while you're outside?

24  A.   Smoking a cigarette.

25  Q.   How long do you believe you were at that apartment?

1   A.    If anything, maybe a good 15 minutes.

2   Q.    Why were you there for that short of a period of time?

3   A.    Because I didn't want to be late to my daughter's dentist

4   appointment.

5   Q.    Do you recall when that dentist appointment was?

6   A.    What do you mean, like the time?

7   Q.    Approximately, yes.

8   A.    I think it was at 2:00.

9   Q.    Did you have a discussion while you were there with Rudy

10  about the dental appointment?

11  A.    Yes, I did.

12  Q.    And what do you recall telling Rudy about the dental

13  appointment?

14  A.    Just that we had to go so we wouldn't be late for the

15  appointment.

16  Q.    Did you leave for the dental appointment?

17  A.    Yes, I did.

18  Q.    And when you left, who went with you?

19  A.    Rudy and my kids.

20  Q.    Okay.  Did anybody else follow you?

21  A.    No, sir.

22  Q.    And the dental appointment, the dentist that you had to go

23  see, was it close by to where you were?

24  A.    No, it was quite a distance.

25  Q.    Okay.  Was that in Odessa?

Flores - Direct Examination

```
1   A.    Yes.

2   Q.    Did you make it to the dental appointment?

3   A.    Yes.

4   Q.    Okay.  How long do you believe you were at the dentist's

5   office?

6   A.    An hour and a half, two hours.

7   Q.    When you were done with the dental appointment, what did

8   you do?

9   A.    Put the babies in the car, smoked a cigarette and

10  conversated [sic] for a while.

11  Q.    Who did you have a conversation with?

12  A.    Rudy.

13  Q.    And this is -- you're still at the dentist office?

14  A.    Yes.

15  Q.    Okay.  Does anything happen while you're at the dentist

16  office?

17  A.    No.

18  Q.    Okay.  Do you recall receiving a phone call?

19  A.    When we had barely left.

20  Q.    You had just left the dentist office?

21  A.    Yes.

22  Q.    Okay.  But was it your phone that rang or Rudy's phone?

23  A.    Mine, I think.

24  Q.    Okay.  And who was the person calling you?

25  A.    Stacey.
```

Flores - Direct Examination

```
 1              THE COURT:  We can't hear you, I'm sorry.
 2              THE WITNESS:  Stacey.
 3              THE COURT:  I still -- speak up, please, ma'am.
 4              THE WITNESS:  Stacey.
 5    Q.  (BY MR. LEWIS)  Okay.
 6              THE COURT:  Move the microphone up closer to her,
 7    please.
 8              MR. STRODER:  Your Honor, may we approach?
 9              THE COURT:  Okay.
10              (Sidebar conference on the record)
11              MR. STRODER:  Is it your position she's a
12    co-conspirator?  Otherwise, we're going to object on hearsay.
13              MR. LEACH:  Did you hear?
14              MR. LEWIS:  No.
15              MR. LEACH:  Say it again.
16              MR. LEWIS:  I'm sorry.
17              MR. LEACH:  It's all right.
18              MR. STRODER:  Is it your position that she's a
19    co-conspirator?
20              MR. LEWIS:  She potentially is a co-conspirator.
21              MR. STRODER:  Well, we're going to object to hearsay
22    and have the judge make a ruling.
23              THE COURT:  Sustained.  The objection is sustained.
24              (Sidebar conference on the record concluded)
25    Q.  (BY MR. LEWIS)  Ms. Flores --
```

Flores - Direct Examination

1   A.   Yes.

2   Q.   -- when your phone rang, who was calling your phone?

3   A.   Stacey.

4   Q.   Did you talk to Stacey?

5   A.   I don't recall.  I think Rudy talked to her.

6   Q.   Okay.  Based upon that call, what did you do?

7   A.   I was mad.

8   Q.   Okay.  And why were you mad?

9   A.   I don't know.

10  Q.   But there was -- was there something about that phone call

11  that upset you?

12  A.   Yes.

13  Q.   Okay.  When you left the dentist office, what was the plan

14  you had for the rest of the day?

15  A.   I wanted to go buy my daughter some ice cream.

16  Q.   Did you have anything else planned?  Any other errands to

17  take care of that day?

18  A.   No, I don't believe so.

19  Q.   After the phone call, did you go to get your daughter ice

20  cream?

21  A.   No, sir.

22  Q.   At this time, who is driving the Expedition?

23  A.   I was.

24  Q.   When -- and after the phone call, where did you drive the

25  Expedition?

Flores - Direct Examination

1  A.   To this alleyway.

2  Q.   Okay.  And where was this alley, do you know?

3  A.   No, sir, I don't.

4  Q.   I'm sorry?

5  A.   No, sir, I don't.

6  Q.   How did you get to the alley?

7  A.   Rudy was telling me where to go.

8  Q.   Had you ever been in this area before?

9  A.   No, sir.

10 Q.   Did it appear to you that Rudy knew the way?

11 A.   I don't know.

12 Q.   Did you follow his introductions?

13 A.   Yes, sir.

14 Q.   Did you end up in an alley?

15 A.   Yes.

16 Q.   Do you recall where this alley was in particular?

17 A.   No, sir.

18 Q.   Was it in Odessa?

19 A.   Yes.

20 Q.   Once you were in the alley, what did you do?

21 A.   I was parked by a garbage can.

22 Q.   And do you know, was there a particular reason why you

23 parked by this garbage can?

24 A.   No, I was just told to park there.

25 Q.   Who told you to park there?

Flores - Direct Examination

1  A.    Rudy.

2  Q.    And when we say a "garbage can," you're talking about a

3  little residential-type garbage can or a large Dumpster?

4  A.    A large Dumpster.

5  Q.    After you parked near the Dumpster, did you stay in the

6  Expedition?

7  A.    Yes.

8  Q.    What about Rudy?

9  A.    He got off.

10  Q.    "He got off."  You mean he got out of the vehicle?

11  A.    Yes.

12  Q.    What did you see Rudy do when he got out of the vehicle?

13  A.    He just went through another alleyway.

14  Q.    Was there another alley nearby?

15  A.    Yes.

16  Q.    Did he walk down that alley?

17  A.    Yes.

18  Q.    When he walked down that alley, could you see where he was

19  going?

20  A.    No, sir.

21  Q.    You lost sight of him?

22  A.    Yes.

23  Q.    Did you try to move the vehicle so that you could see down

24  the alley where Rudy walked?

25  A.    No, sir.

Flores - Direct Examination

1  Q.   Could you hear anything that was going on?

2  A.   No, sir.

3  Q.   What are you thinking at this time?

4  A.   I didn't know what to think.

5  Q.   Did you know why you were in that alley?

6  A.   No, sir.

7  Q.   What's the next thing you remember?

8  A.   I just remember being there and all these cars were just

9  racing out of the other alleyway.

10  Q.   From where you were parked, you saw other cars come out of

11  the alley.

12  A.   Yes.

13  Q.   When you say they came out of the alley, which alley did

14  they come out of?

15  A.   The alley that turns to the right.

16  Q.   Was it the alley that Rudy had walked down?

17  A.   Yes.

18  Q.   Can you remember or describe those vehicles that you saw?

19  A.   No, sir.

20  Q.   Do you remember or recall how many vehicles there were?

21  A.   No.

22  Q.   Was there something that scared you about those vehicles?

23  A.   They were just driving really fast.  I didn't know if one

24  was going to turn my way.

25  Q.   You were concerned about that.

Flores - Direct Examination

```
 1  A.    Yes.

 2  Q.    Did the vehicles turn your way?

 3  A.    No.

 4  Q.    Did they turn away from you?

 5  A.    Yes.

 6  Q.    Okay.  At this point, what's going through your mind?

 7  A.    "Where is Rudy?"

 8  Q.    Rudy has not come back to your vehicle.

 9  A.    No.

10  Q.    Are you concerned?

11  A.    Yes.

12  Q.    Did Rudy ever come back to your vehicle?

13  A.    No.

14  Q.    He did not.

15  A.    No.

16  Q.    What did you do at that point?

17  A.    I started driving a little bit to see if I could see him

18  and finally I did and he called me to go get him.

19  Q.    Okay.  Where was he located?

20  A.    Towards the end of the other alley.

21  Q.    He was at the other end of the alley?

22  A.    Yes.

23  Q.    You drove down to that alley?

24  A.    Yes.

25  Q.    You picked him up.
```

Flores - Direct Examination

```
 1  A.    Yes.

 2  Q.    Did he get in your vehicle?

 3  A.    Yes.

 4  Q.    When he got in the vehicle, did you notice anything about

 5  him?

 6  A.    No.

 7  Q.    Okay.  What did you do at this point?

 8  A.    He just told me to follow these other cars.

 9  Q.    Did you know where to go?

10  A.    No, sir.

11  Q.    How were you able to follow these other cars if you didn't

12  know where to go?

13  A.    Another phone call.

14  Q.    Okay.  On your phone?

15  A.    I believe so.

16  Q.    Who was the phone call from?

17  A.    Stacey.

18  Q.    After that phone call -- well, let me ask you:  Did you

19  talk to Stacey?

20  A.    No.

21  Q.    Who talked to Stacey?

22  A.    Rudy.

23  Q.    After that phone call, what did you do?

24  A.    I followed his directions on where to go.

25  Q.    Okay.  And by following his directions, where did you go?
```

Flores - Direct Examination

1   A.    To a motel room.

2   Q.    Do you recall what motel room?

3   A.    I don't know the name.

4   Q.    Had you ever been to that motel before?

5   A.    No, sir.

6   Q.    When you got to the motel, were you in the right spot or

7   in the right location based upon Rudy's directions?

8   A.    Yes.

9   Q.    When you got to that hotel, did you park?

10   A.    Yes.

11   Q.    Did you stay in your vehicle?

12   A.    Yes.

13   Q.    What about Rudy?

14   A.    He got off.

15   Q.    He got out of the vehicle.  What did you see Rudy do?

16   A.    Just go and talk to some people.

17   Q.    How -- about how far away from you was he?

18   A.    I don't recall.

19   Q.    Did you recognize any of the people that he was talking to

20   at the hotel?

21   A.    No, not really.

22   Q.    Let me back up just a brief minute, Ms. Flores, and go

23   back to the alley where you picked up Rudy.  When you went to

24   pick up Rudy in the alley, did you see anybody else in the

25   alley?

Flores - Direct Examination

1  A.    No.

2  Q.    Okay.  Did you see anybody walking down the alley?

3  A.    Yes.

4  Q.    Okay.  Describe what people you saw walking down the

5  alley.

6  A.    It was a white older couple.

7  Q.    Male and a female?

8  A.    Yes, sir.

9  Q.    Did you stop and ask them any questions?

10  A.    No.

11  Q.    How did they appear to you?  Did you notice anything

12  strange or odd about them?

13  A.    Kind of shocked, I guess.

14  Q.    And which direction were they walking?

15  A.    To the right side of the alley.

16  Q.    To the right?

17  A.    Yes.

18  Q.    When you saw them then, were you still parked at the

19  Dumpster?

20  A.    No, I had scooted up a little bit.  I just didn't turn

21  yet.

22  Q.    Had you started down the alley that Rudy had walked down?

23  A.    I was going to.

24  Q.    Okay.  Is that about the time that you saw these two

25  people walking?

Flores - Direct Examination

1   A.    Yes.

2   Q.    Okay.  When you saw them walking, they turned to the

3   right, you said; is that correct?

4   A.    Well, it looked like they were going to walk to the right.

5   Q.    Would that have been in the same direction that you saw

6   the vehicles go earlier?

7   A.    Yes.

8   Q.    Okay.  They were not walking in the direction where you

9   found Rudy.

10  A.    No.

11  Q.    Okay.  After -- now, you're at the hotel.  Rudy has gotten

12  out.  What's going through your mind at this time?

13  A.    I was just upset.  I was really mad and angry.

14  Q.    What were you mad and angry about?

15  A.    That he even just wanted to go there.

16  Q.    What were your thoughts and plans as far as what Rudy

17  should have done?

18  A.    Go get some ice cream for my daughter and go home.

19  Q.    And did you make this -- these thoughts known to Rudy at

20  any time?

21  A.    I believe so.

22  Q.    Were you upset about having to go to the hotel?

23  A.    (No verbal response.)

24  Q.    Ms. Flores?

25              THE COURT:  Did you understand the question?

Flores - Direct Examination

```
 1              THE WITNESS:  Yes.

 2              THE COURT:  Okay.

 3  Q.   (BY MR. LEWIS)  How long were you at the hotel,

 4  Ms. Flores?

 5  A.   Not that long.

 6  Q.   Not very long?

 7  A.   No.

 8  Q.   Did you leave the hotel?

 9  A.   Yes.

10  Q.   When you left the hotel, was anybody in your car?

11  A.   My daughter and my son.

12  Q.   What about Rudy, did he get back in the car?

13  A.   No.

14  Q.   Okay.  Did Rudy -- do you recall Rudy coming back to your

15  car, though?

16  A.   At one point.

17  Q.   Okay.  Do you recall what he came back to your car for?

18  A.   To put my diaper bag in there.

19  Q.   Okay.  Speak up a little bit, Ms. Flores.  What did he do

20  with the diaper bag?

21  A.   He put it back in my car.

22  Q.   Okay.  Can you describe for us this diaper bag?

23  A.   It's a gray Fila bag.

24              MR. LEWIS:  May I approach the witness, Your Honor?

25              THE COURT:  You may.
```

Flores - Direct Examination

1   Q.   (BY MR. LEWIS)  Ms. Flores, if you would, please, I've

2   placed before you what's been marked for identification as

3   Government's Exhibit 124.  Do you see that?

4   A.   Yes.

5   Q.   Do you recognize Government's Exhibit 124?

6   A.   Yes.

7   Q.   And what is Government's Exhibit 124?

8   A.   My baby's diaper bag.

9   Q.   Your baby's diaper bag?

10  A.   Yes.

11  Q.   Okay.  Is that the diaper bag that you previously referred

12  to moments ago that you saw Rudy bring back and drop in your

13  car?

14  A.   Yes.

15          MR. LEWIS:  Government would offer Government's

16  Exhibit 124.

17          THE COURT:  Any objection?

18          MR. LEACH:  No objection to 124.

19          MR. GARCIA:  No objection, Your Honor.

20          MR. POOL:  No objection, Your Honor.

21          MR. STRODER:  None.

22          THE COURT:  Government's Exhibit 124 is admitted.

23  Q.   (BY MR. LEWIS)  When Rudy came back to your vehicle, do

24  you recall where he put that diaper bag?

25  A.   He just kind of threw it.

1  Q.    Threw it where?

2  A.    Passenger's side on the floor.

3  Q.    Okay.  Now, when you got to the hotel, did Rudy -- Rudy

4  got out with this diaper bag?

5  A.    No, I don't remember him getting out with anything.

6  Q.    As far as you know, was that diaper bag in your car

7  earlier that day?

8  A.    Of course.

9  Q.    After Rudy approached the car and placed the diaper bag

10 back in, what did you do?

11 A.    I'm sorry, can you repeat the question?

12 Q.    Sure.  When you were at the hotel and you were getting

13 ready to leave, did Rudy place this diaper bag back in your

14 car; is that correct?

15 A.    Yes.

16 Q.    What did you do after that?

17 A.    I went to my dad's house.

18 Q.    When you left, what can you tell us about what Rudy did?

19 Did you see where he went?

20 A.    Just -- he went to the left-hand side of the hotel.  After

21 that, I don't know.

22 Q.    Okay.  Did you see him get in any vehicle?

23 A.    Yes.

24 Q.    Okay.  Tell us what vehicle you recall him getting into.

25 A.    I don't remember the vehicles.

1  Q.    Okay.  Do you remember a color?

2  A.    No, sir, I don't.

3  Q.    Okay.  Did you see anybody else in that vehicle?

4  A.    No, sir.

5  Q.    When you saw him get into the vehicle, do you recall

6  whether he was on the driver's side or the passenger's side

7  when he got in?

8  A.    I don't know.  I don't recall.

9  Q.    When he got -- do you know if he was the one driving the

10 vehicle?

11 A.    No, he wasn't.

12 Q.    You know he wasn't the one driving the vehicle.

13 A.    Yeah, I know he wasn't.

14 Q.    Did you ever see or could you tell if there were any other

15 people in the vehicle?

16 A.    I don't know.

17 Q.    Now, did you leave at the same time -- leave the hotel at

18 the same time as the vehicle that you saw Rudy get into?

19 A.    Yes.  There was other vehicles there and I left too.

20 Q.    Okay.  Did you recognize any of those other vehicles?

21 A.    No, sir.

22 Q.    Okay.  And when you left the hotel parking lot, which

23 direction did you turn when you left that parking lot?

24 A.    I thought I turned to the right-hand side.

25 Q.    You believe you went right?

Flores - Direct Examination

1  A.    Yes.

2  Q.    Okay.  What direction did you see the vehicle go that Rudy

3  was in?

4  A.    To the left.

5  Q.    Now, did you still have your cell phone at that time?

6  A.    I think so.  I believe so.

7  Q.    Did Rudy have a cell phone?

8  A.    No.

9  Q.    Okay.

10 A.    He didn't.

11 Q.    Did you --

12            MR. LEACH:  Your Honor, I can't hear.

13            THE COURT:  Ma'am, you're going to have to speak up.

14            THE WITNESS:  No, he didn't.

15 Q.    (BY MR. LEWIS)  Did you try to reach Rudy somehow?

16 A.    No.

17 Q.    Did you, in fact, go to your father's house?

18 A.    Yes, sir.

19 Q.    And did you have any contact with Rudy after the hotel

20 parking lot?

21 A.    Just when he got home.

22 Q.    And when did he get home?

23 A.    I don't know what time it was.

24 Q.    Was it later that evening after the hotel?

25 A.    No, it wasn't that long later.

Flores - Direct Examination

1  Q.   Was it the same day, though?

2  A.   Yes.

3  Q.   Okay.  When Rudy got to your house, do you know how he got

4  there?

5  A.   I think I recall Stacey taking him.

6          THE REPORTER:  I'm sorry?

7          MR. LEACH:  I --

8          THE WITNESS:  I think I recall Stacey taking him.

9  Q.   (BY MR. LEWIS)  Okay.  You recall Stacey taking him.  Did

10  Stacey come in the house at the same time?

11  A.   No, sir.

12  Q.   Okay.  And when Rudy came into the house, did you talk

13  with him?

14  A.   Yes.

15  Q.   Okay.  How did he appear to you?  What kind of a mood was

16  he in?

17  A.   I was the one that was mad.

18  Q.   And did you let him know you were mad?

19  A.   Yes.

20  Q.   Okay.  Did you argue about what had happened earlier that

21  day?

22  A.   Yes.

23  Q.   Okay.  What explanation or what type of response, if any,

24  did you get from Rudy?

25          MR. LEACH:  Your Honor, I'm going to object.  That's

1   confrontational problem, hearsay.

2           THE COURT:  Sustained.

3   Q.   (BY MR. LEWIS)  Was Rudy's mood or attitude different than

4   it has been earlier in the day?

5   A.   I don't really recall.  I was really mad.  And when I get

6   mad, I get into these -- this little -- I kind of block

7   everything out.

8   Q.   Do you know what happened after Rudy left that hotel that

9   day?

10  A.   No, sir.

11          (Sotto voce discussion between Messrs. Lewis and

12  Klassen)

13          MR. LEWIS:  Pass the witness, Your Honor, subject to

14  redirect.

15          THE COURT:  Mr. Leach.

16          MR. LEACH:  I have nothing for Ms. Flores, Your

17  Honor.

18          THE COURT:  Mr. Garcia.

19                    **CROSS-EXAMINATION**

20  BY MR. GARCIA:

21  Q.   Ms. Flores, how long have you been in a relationship with

22  Rudy?

23  A.   Three years.

24  Q.   And you have a child with him?

25  A.   Yes, sir.

Flores - Cross-Examination

```
 1  Q.    And you-all live together?
 2  A.    Yes.
 3  Q.    And that particular day that we're -- that we've been
 4  talking about, you and Rudy and your daughter, Alyssa, were
 5  together; is that correct?
 6  A.    Yes.
 7  Q.    Along with your baby.
 8  A.    Yes.
 9  Q.    What's your baby's name?
10  A.    Emiliano.
11  Q.    I'm sorry?
12  A.    Emiliano.
13  Q.    Emiliano?
14  A.    Yes.
15  Q.    And at that point he was just three months old?
16  A.    Yes.
17  Q.    And that's -- Rudy is Emiliano's father?
18  A.    Yes.
19  Q.    Now, Alyssa is -- how old is Alyssa?
20  A.    She's 9.
21  Q.    She was 9 years old?  She's 10 today; is that correct?
22  A.    No, I guess she was 8 at the time.
23  Q.    Okay.  She was 8 at the time.  And you said she had an
24  appointment at the dentist office; is that correct?
25  A.    Yes.
```

Flores - Cross-Examination

```
 1              MR. GARCIA:  May I approach the witness, Your Honor?
 2              THE COURT:  Yes.
 3  Q.   (BY MR. GARCIA)  Are you okay?
 4  A.   (Witness shaking head.)
 5  Q.   Ms. Flores, let me show you what I've marked as
 6  Defendant's Exhibit Paredes 1 and ask you if you recognize what
 7  this document is.
 8  A.   Yes.
 9  Q.   Okay.  Can you speak a little bit closer to the
10  microphone?
11  A.   Yes.
12  Q.   Okay.  And what is this paper?  What is this document?
13  A.   It's a doctor's note -- the dentist note.
14              THE COURT:  I can't hear a word you're saying, ma'am.
15  A.   It is the dentist note that they gave me.
16  Q.   (BY MR. GARCIA)  This is the note that you got from the
17  dentist when you took Alyssa to the dentist; is that correct?
18  A.   Yes.
19  Q.   And does it show that there is a note from the dentist to
20  whom it may concern, stating that Alyssa had a dentist
21  appointment on May 13, 2014, from 2:00 to 3:40 p.m.; is that
22  right?
23  A.   Yes.
24  Q.   And so at least --
25              MR. GARCIA:  Your Honor, I'll move to admit
```

Flores - Cross-Examination

```
 1  Defendant's Exhibit Paredes 1.
 2           THE COURT:  Any objection?
 3           MR. LEWIS:  No objection, Your Honor.
 4           THE COURT:  Any objection?
 5           MR. LEACH:  None.
 6           MR. POOL:  No objection, Your Honor.
 7           MR. STRODER:  None, Your Honor.
 8           THE COURT:  Defendant Paredes Exhibit 1 is admitted.
 9  Q.   (BY MR. GARCIA)  Now, you talked about being over at Liz's
10  apartment.
11  A.   Yes.
12  Q.   Was that before this appointment?
13  A.   Yes.
14  Q.   I'm sorry?
15  A.   Yes.
16  Q.   Is that a "yes"?
17  A.   Yes.
18  Q.   Okay.  And about how long were you at Liz's apartment?
19  A.   A good 15 minutes, maybe.
20  Q.   Okay.  And that's -- you were there with -- was Alyssa
21  there with you?
22  A.   Yes, sir.
23  Q.   And so was your baby?
24  A.   Yes.
25  Q.   And you and Rudy; is that right?
```

Flores - Cross-Examination

1   A.    Yes.

2   Q.    And you said there were other people there?

3   A.    Yes.

4   Q.    Did you -- what were they doing basically?

5   A.    Pretty much just hanging out like friends, you know, just

6   chitchatting.

7   Q.    Okay.  Was there any discussion that you remember -- well,

8   let me ask you this.  Did you see any guns there at that

9   apartment?

10  A.    No, sir, I didn't.

11  Q.    Did you hear any talk or mention about any guns?

12  A.    No, sir.

13  Q.    Did -- so after 15 minutes -- and were you around Rudy

14  pretty much all the time?

15  A.    Just when I smoked outside.

16  Q.    Okay.  And how long would that have been?

17  A.    I don't know, maybe like five minutes.

18  Q.    However long it takes you to smoke a cigarette, a couple

19  of minutes?

20  A.    Yes, a couple of minutes.

21  Q.    Okay.  And then all the others times you were there with

22  Rudy; is that right?

23  A.    I would go inside and check up on the baby and then I went

24  back outside for a little bit.

25  Q.    Okay.  And then otherwise Rudy was with the baby or with

Flores - Cross-Examination

```
 1  Alyssa?
 2  A.   No, they were inside -- the kids were inside and Rudy was
 3  outside, the patio.
 4  Q.   Okay.  So after about 15 minutes, you leave and go to the
 5  dentist; is that correct?
 6  A.   Yes, sir.
 7  Q.   And you're there, you say, until -- she's at the dentist
 8  until 3:40 that afternoon.
 9  A.   Yes.
10  Q.   Is that right?
11  A.   Yes.
12  Q.   And then you said you stuck around for another 30 minutes
13  waiting for the anesthesia of Alyssa to sort of wear off; is
14  that correct?
15  A.   Putting them back into the car and smoking a cigarette and
16  chitchatting, but this was -- at 3:40 is when they wrote the
17  letter and put the time on there.  And I guess we still stayed
18  in there because they had to give me another paper for another
19  appointment, and I had to wait on it.  So it was probably
20  another five, ten minutes, maybe.
21  Q.   Okay.  And Alyssa had been put under anesthesia; is that
22  right?
23  A.   Yes.
24  Q.   What kind of procedure did she have?
25  A.   She got a molar pulled out.
```

Flores - Cross-Examination

1  Q.   Okay.  And to pull out her molar, they had to put her

2  under; is that right?

3  A.   Just give her that gas.

4  Q.   Now, after you left the dentist office, you said you went

5  to that alley; is that correct?

6  A.   Yes.

7  Q.   While you were parked in that alley, did you see anybody

8  with an AK-47?

9  A.   No, sir.

10  Q.   Did you see any guns at all?

11  A.   No, sir.

12  Q.   And then you said you picked up Rudy; is that correct?

13  A.   Yes.

14  Q.   So if anybody described that Rudy left that alley in

15  another vehicle, that would be incorrect; is that right?

16  A.   Yes.

17  Q.   During the time that you were at Liz's apartment, did you

18  ever hear any talk about anybody going out and killing

19  somebody?

20  A.   No, sir, never.

21  Q.   Any talk about somebody needing to die because they were

22  informants or anything like that?

23          MR. LEWIS:  Objection, Your Honor.

24  A.   No, sir.

25          MR. LEWIS:  Now he's asking a hearsay question.

Flores - Cross-Examination

1              THE COURT:  Sustained.

2   Q.   (BY MR. GARCIA)   The diaper bag that's in front of you,

3   that's the bag that Rudy put back in the car; is that correct?

4   A.   Yes, sir.

5   Q.   And you said that -- did you ever see him put it on?

6   A.   No, sir, I didn't.

7   Q.   Did you ever check the bag before he -- or after he left

8   it in there?

9   A.   Yes.

10  Q.   What was in the bag?

11  A.   Nothing.

12  Q.   Was there a gun in the bag?

13  A.   No, sir.

14  Q.   Were there any diapers in the bag?

15  A.   I think so, because I had all my stuff in there.

16  Q.   And that's the stuff for your 3-month-old baby; is that

17  right?

18  A.   Yes, sir.

19  Q.   You have bottles and things of that nature.

20  A.   And my makeup.

21  Q.   And all that was still there?

22  A.   Yes.

23  Q.   Did you ever see Rudy with a gun that day?

24  A.   No, sir, I didn't.

25  Q.   And just to be clear, you were on time for the appointment

Flores - Cross-Examination

1  at two o'clock; is that right?

2  A.   I think I arrived earlier.

3  Q.   I'm sorry?

4  A.   I think I arrived earlier than the time.

5  Q.   Okay.

6        MR. GARCIA:  That's all I have.  If I may -- may I

7  hand this to the jury, Your Honor?

8        THE COURT:  Not to the jury, no.  You can hand it to

9  the clerk.

10        (Sotto voce discussion between Messrs. Klassen and

11  Garcia)

12        MR. GARCIA:  Can you get the lights, please?

13        THE COURT:  Turn the lights off, too.

14  Q.   (BY MR. GARCIA)  Ms. Flores, let me show you what we had

15  marked as Paredes Exhibit 1.  And this here is the actual

16  little note that you get from the doctor; is that correct?

17  A.   Yes.

18  Q.   And then attached to this note is the actual receipt for

19  the services that you paid for that day; is that right?

20  A.   Yes.

21  Q.   And does that also show the time and the date when that

22  occurred?

23  A.   Yes.

24  Q.   And does it show 3:37 p.m.?

25  A.   Yes.

Flores - Cross-Examination

```
 1            MR. GARCIA:  I'll pass the witness, Your Honor.

 2            THE COURT:  Mr. Pool?

 3            MR. POOL:  No questions for Ms. Flores, Your Honor.

 4            THE COURT:  Mr. Stroder?

 5            MR. STRODER:  None from me, Your Honor.

 6            THE COURT:  Okay.

 7            Mr. Lewis, anything in redirect?

 8            MR. LEWIS:  No, Your Honor.

 9            THE COURT:  Okay.  May this witness be excused?

10            MR. LEWIS:  Yes, Your Honor.

11            THE COURT:  Mr. Leach?

12            MR. LEACH:  No objection.

13            THE COURT:  Mr. Garcia?

14            MR. GARCIA:  No objection, Your Honor.

15            THE COURT:  Mr. Pool?

16            MR. POOL:  No objection, Your Honor.

17            THE COURT:  Mr. Stroder?

18            MR. STRODER:  No objection.

19            THE COURT:  Turn the lights back on, please.

20            Ms. Flores, we appreciate you being here.  You're

21  excused.  I'd ask you not to discuss the case or your testimony

22  with anyone except the attorneys until the jury begins its

23  deliberations, okay?

24            THE WITNESS:  Okay.

25            THE COURT:  All right.
```

Flores - Cross-Examination

```
 1              THE WITNESS:  Thank you.

 2              THE COURT:  Why don't we take us a little recess

 3   here.  We've been in here for a while.  And ask the jury to

 4   leave its notepads here in the courtroom.  Don't discuss the

 5   case among yourselves.  And we'll take about a 15-minute

 6   recess.

 7              And we have called the GSA; however, they're having a

 8   convention in Las Vegas right now and ask them to turn the --

 9   no, turn the air conditioning down.  We have to call Lubbock to

10   get our air conditioning turned down so we've called up there

11   to get -- make it a little bit cooler.

12              Anyway, we'll see y'all back here in about 15.

13              Go ahead and let her go by.  Go ahead.

14              All right.  All rise for the jury please.

15              (At 9:51 a.m., jury leaves)

16              THE COURT:  We'll be in recess for about 15 minutes.

17              (Recess from 9:51 a.m. to 10:09 a.m.)

18              THE COURT:  Anything we need to take up before we

19   bring the jury in?  Silence means assent.  All right.

20              Bring the jury in.

21              (At 10:10 a.m., jury enters)

22              THE COURT:  All right.  Let's all be seated.  It's 10

23   minutes after 10:00.  We're back in the courtroom with the

24   jury.  And the attorneys are all presents.  The defendants are

25   all present.
```

Benson - Direct Examination

```
 1          Mr. Lewis, call your next witness, please.
 2          MR. LEWIS:  Your Honor, the government would call
 3  Vincent Benson.
 4          THE COURT:  All right.  Would you stand up, please,
 5  sir, and let the clerk give you the oath as a witness.  Other
 6  hand.  Other right hand.  There you go.
 7          (Witness sworn by the clerk)
 8          THE COURT:  You may proceed.
 9          MR. LEWIS:  Thank you, Your Honor.
10                         VINCENT BENSON,
11           GOVERNMENT'S WITNESS SWORN AT 10:10 a.m.
12                      DIRECT EXAMINATION
13  BY MR. LEWIS:
14  Q.   Mr. Benson, if you can kind of lean forward close to that
15  mic so everybody can hear your responses, please.
16  A.   Yes, sir.
17  Q.   Would you state your full name for the record, please.
18  A.   Vincent Robert Benson.
19  Q.   Sir, spell your last name for the record.
20  A.   B-E-N-S-O-N.
21  Q.   Mr. Benson, I know that you're appearing today in orange.
22  You're currently in custody?
23  A.   Yes, sir.
24  Q.   Okay.  And you're in custody for what?
25  A.   Possession of a firearm felon.
```

Benson - Direct Examination

1  Q.    Felon in possession of a firearm?

2  A.    Yes, sir.

3  Q.    Okay.  You were charged with that offense?

4  A.    Yes, sir.

5  Q.    And what is the status of that case presently?

6  A.    I'm waiting for sentencing.

7  Q.    Is it in connection with this case that you're here to

8  testify about?

9  A.    No, sir.

10  Q.    Take you back to May of last year, May 2014.  Where were

11  you living at the time?

12  A.    I was living on 48th.

13  Q.    In what city?

14  A.    Odessa, Texas.

15  Q.    Okay.  Had you lived there long?

16  A.    Since January 2014.

17  Q.    And at that time did you have -- were you working?

18  A.    Yes, sir.

19  Q.    Okay.  Do you recall where you were working?

20  A.    Yes, sir.  I was work at C & D Lawn Services landscaping.

21  Q.    How long had you had that job?

22  A.    Probably like three months.  I was only out six months, so

23  yeah.

24  Q.    And during that time did you have a car?

25  A.    Yes, sir.

Benson - Direct Examination

```
1   Q.    Can you describe that car that you had?

2   A.    2014 Kia Optima.

3   Q.    Do you recall what color it was?

4   A.    Brownish.

5   Q.    Okay.  Now, at some point did you relinquish or give up

6   possession of that vehicle?

7   A.    Yes, sir.

8   Q.    Okay.  About what time was that?

9   A.    At the beginning of May.

10  Q.    Okay.  And why was that?  Why did you relinquish

11  possession?

12  A.    Because I violated -- I was going back -- I violated my

13  probation.  I was going back to prison so I let a friend of

14  mine that was my friend get the car, take the payments because

15  Kelly Grimsley told me I had 90 days.  They wouldn't repossess

16  it so I just let my friend take the car.

17  Q.    Who is the friend that you let take your car?

18  A.    Anthony.

19  Q.    Anthony who?

20  A.    Gonzales.

21  Q.    Do you see that Anthony Gonzales in the courtroom?

22  A.    Yes, sir.

23  Q.    Can you point to where he's sitting or describe what he's

24  wearing, please?

25  A.    He's over there to the far left.
```

Benson - Direct Examination

1  Q.   Okay.  Can you make out what kind of shirt?  And if you

2  have to stand up to be able to see the shirt...

3  A.   Pink shirt and black.

4         MR. LEWIS:  Your Honor, let the record reflect the

5  witness has identified the defendant.

6         MR. KLASSEN:  Could we maybe lift his microphone just

7  a little bit?  I think he's struggling.  There we go.

8         THE COURT:  The record will so reflect.

9  Q.   (BY MR. LEWIS)  After that time, after Anthony took the

10 car, did you operate or use it at any time?

11 A.   No, sir.

12 Q.   Okay.  How long have you known Anthony?

13 A.   Since 2012.

14 Q.   Okay.  And did he come by your place frequently or did you

15 go over to his house frequently?

16 A.   No.  When I got out of prison, I got out of prison October

17 of '13 because I went down the whole year of '13, since

18 January, and I ran into him like around Christmastime, and I

19 hadn't seen him in so long I was kicking it with him before I

20 went to prison.

21 Q.   What's "kicking" it mean?

22 A.   Well, we were chilling.  I was -- I went on the run for a

23 little bit.  We were just chilling at the homie's house.  And

24 then, like I said, when I ran into him, I wanted to help him

25 out.  I didn't want him wasting his money on rental cars.  He

 1  told me he was living in Colorado.

 2  Q.   Now, at this time as well, do you know if he was in a

 3  relationship with anybody?

 4  A.   Yes.

 5  Q.   Who was that?

 6  A.   His wife.

 7  Q.   And who is that?

 8  A.   Stacey.

 9  Q.   Okay.  Do you see that Stacey in the courtroom today?

10  A.   Yes, sir.

11  Q.   And can you describe where she is sitting or what she is

12  wearing?

13  A.   She's wearing a black, I guess, blouse, whatever you want

14  to call it, shirt.

15          THE COURT:  Try not to hit the microphone.

16          THE WITNESS:  Oh, yes, sir.

17  A.   And then she has glasses on over there with her hair down.

18          MR. LEWIS:  Let the record reflect the witness has

19  identified Defendant Castillo, Your Honor.

20          THE COURT:  The record will so reflect.

21          MR. LEWIS:  Thank you.

22  Q.   (BY MR. LEWIS)  So when you turned over this car in May of

23  2014, did you have any additional contact -- or further contact

24  with either Anthony or Stacey after that day?

25  A.   Yes, I used to talk to them on the phone frequently

Benson - Direct Examination

1  because they did have my car and I was just waiting for my

2  warrant to come in so I could turn myself in.

3  Q.    Okay.  Do you recall the murder or the killing of Sean

4  Lamb?

5  A.    Yes, sir.

6  Q.    How did you learn of that?

7  A.    The next day, they had called me and asked me if I had

8  seen the news.

9  Q.    Now, who called you?

10  A.    Anthony.

11  Q.    Okay.  And what did he tell you?

12  A.    He had asked me if I had seen the news, and I told him,

13  "Why would I want to watch the news?  I barely woke up."  And I

14  don't watch the news, you know.  It is just not my -- I don't

15  wake up and do all that.  And then he was just telling me what

16  happened.  They were trying to come into town.  They were stuck

17  at --

18          MR. LEACH:  Your Honor, I'll object to the narrative.

19          THE COURT:  Sustained.

20          Just answer the question he gave you.  The question

21  he asked you is --

22          THE WITNESS:  Okay.

23  A.    Can you repeat the question, sir?

24          THE COURT:  Repeat your question.

25          MR. LEWIS:  I will, Your Honor.

Benson - Direct Examination

```
 1  Q.    (BY MR. LEWIS)  Now, when he called you --
 2  A.    Yes, sir.
 3  Q.    Okay -- after he asked you if you had watched the news,
 4  did he ask you about anything else or did he tell you anything
 5  else?
 6  A.    He asked told me he was coming to my apartment right then
 7  and there.
 8  Q.    Did he say why he was coming or what the purpose of his
 9  visit was going to be?
10  A.    To let me know what happened the day before.
11  Q.    Okay.  Now, this place that you were staying at, did you
12  live by yourself?
13  A.    No, I was living with my wife.
14  Q.    Okay.  Anybody else in the house besides you and your
15  wife?
16  A.    My son.
17  Q.    Did Anthony Gonzales show up at your apartment?
18  A.    Him and his wife showed up.
19  Q.    Okay.  Stacey Castillo as well.
20  A.    Yes, sir.
21  Q.    About how long did it take from his phone call to when he
22  showed up at your apartment?
23  A.    Roughly maybe an hour.
24  Q.    When he and Stacey got there, what vehicle were they in?
25  A.    My car.
```

Benson - Direct Examination

1  Q.   This meeting, did it take place the day after Sean Lamb's

2  murder?

3  A.   Yes, sir.

4  Q.   When they got to your apartment -- when Stacey and Anthony

5  got to your apartment, was your wife and son still there?

6  A.   No.

7  Q.   Was anybody else there with you?

8  A.   No, sir.

9  Q.   So when they got to your apartment, did they enter your

10 apartment?

11 A.   Yes, sir.

12 Q.   Okay.  Where did you go, what did you do at that point?

13 A.   We just sat in the living room.

14 Q.   Okay.  Was there a conversation?

15 A.   Yes, sir.

16 Q.   Okay.  Who talked?

17 A.   Both of them.

18 Q.   Okay.  And what did they talk to you about?

19 A.   About what happened.

20 Q.   What did Anthony -- what do you recall Anthony telling you

21 about what happened?

22         MR. GARCIA:  Excuse me, Your Honor.  I am going to

23 object to any testimony of what Anthony told him.  That is --

24 those are statements that are made after the conspiracy is

25 already done.  It's already over.

 1              THE COURT:  It is a statement against interest made

 2    by a party to the --

 3              MR. GARCIA:  And it would be hearsay and violate our

 4    right to confrontation as to Mr. Paredes.

 5              MR. LEACH:  And I would join that objection.

 6              MR. STRODER:  Join the objection, Your Honor.

 7              THE COURT:  Okay.

 8              What's your response?

 9              MR. LEWIS:  The response is it's a statement against

10    interest by a party defendant.

11              THE COURT:  Let me see the parties.

12              (Sidebar conference on the record)

13              THE COURT:  Of course, they can cross-examine this

14    witness.

15              MR. LEWIS:  Right.

16              THE COURT:  Yeah.

17              MR. LEWIS:  Right.  They can cross-examine this

18    witness.

19              THE COURT:  You can cross-examine this witness all

20    you want to.

21              MR. LEACH:  But we can't cross-examine --

22              THE COURT:  That's true, but that doesn't violate

23    anything.  So the objection is overruled.

24              (Sidebar conference on the record concluded)

25              THE COURT:  You have a running objection, too.

Benson - Direct Examination

1          MR. LEACH:  Thank you, Your Honor.

2          MR. GARCIA:  Thank you, Your Honor.

3          MR. POOL:  Thank you, Your Honor.

4          MR. LEWIS:  May I proceed, Your Honor?

5          THE COURT:  You may.

6          MR. LEWIS:  Thank you.

7  Q.   (BY MR. LEWIS)  Mr. Benson, what do you recall Anthony

8  telling you?

9  A.   That they were involved with the killing of Sean Lamb.

10  Q.   And what did Stacey tell you?

11  A.   They were trying to orchestrate and tell everybody what to

12  do here and there and then ole boy had acted out and shot him.

13  Q.   Okay.  Was -- how did they appear to you?  What kind of a

14  mood did you sense or get from them as they were telling you

15  this story?

16  A.   Panicking.

17          MR. STRODER:  I'm sorry, what did you say?

18  Q.   (BY MR. LEWIS)  What did you say they were?

19  A.   They were panicking.

20          MR. LEWIS:  Panicking.

21  Q.   (BY MR. LEWIS)  How long did this meeting take place?

22  A.   Maybe like 15 minutes.

23  Q.   And was that the only thing they came by to talk to you

24  about?

25  A.   No, they wanted me to help them sell them guns.

Benson - Direct Examination

1  Q.    What guns?

2  A.    The MAC-10, a brown gun; and a revolver.

3  Q.    Okay.  Did you see the guns?

4  A.    Yes, sir.

5  Q.    How did you see the guns?

6  A.    Well, we had went and picked up the MAC-10 from one of his

7  friend's house which I don't know, and then we had went to some

8  black dude that I know and selled [sic] it.

9  Q.    Okay.  Just wait a second.  When they get to your

10  apartment --

11  A.    Yes.

12  Q.    -- did they have the guns with them?

13  A.    Well, later on I had found out that they had a .38 in the

14  Kia.

15  Q.    But when they first got there, you did not see any guns?

16  A.    No.

17  Q.    Okay.  When did -- but during this first meeting in your

18  house --

19  A.    Okay.

20  Q.    -- did they -- was there conversation about getting rid of

21  some guns?

22  A.    Yes, sir.

23  Q.    Okay.  What did you -- what was the conversation at that

24  time between you, Anthony and Stacey about getting rid of the

25  guns?

Benson - Direct Examination

1  A.   They told me they were broke, and they were trying to get

2  out of town.

3  Q.   Did you agree to help them?

4  A.   Yes, sir.

5         MR. GARCIA:  Excuse me, Your Honor, just to clarify

6  the record.  I know the Court gave us a running objection to

7  anything that Anthony said, but can we also have the same

8  objection -- same running objection with regard to what Stacey

9  would say?

10        THE COURT:  Same thing, yes.

11        And if you would, please, Mr. Lewis ask the questions

12  so you don't say, "what did they say."  Let's -- specifically

13  who said what rather than "they said."

14        MR. LEWIS:  Yes, Your Honor, I'll clean that up.

15  Q.   (BY MR. LEWIS)  Did you agree to help Stacey and Anthony

16  in selling the guns?

17  A.   Yes, sir.

18  Q.   Did you have an idea on how selling the guns could be

19  accomplished?

20  A.   Yes, sir.

21  Q.   And did you make your thoughts known to Stacey and

22  Anthony?

23  A.   Yes, sir.

24  Q.   And what did you suggest or what did you offer to Stacey

25  and Anthony about disposing or getting rid of these guns?

1  A.    I told them if they would sell them for cheap, we can get

2  rid of them right then and there.

3  Q.    Okay.  So what decision was made at that time?

4  A.    To go to the -- it was right down the way, down Dixie to

5  go to the house and show them what we had, the merchandise.

6  Q.    Did you have to go get the guns now?

7  A.    Yes, sir.

8  Q.    Okay.  What did -- and did you go out to the Kia?

9  A.    No, we hopped in my Mustang.

10 Q.    Okay.  When you get out to your car -- you had another

11 car, a Mustang.

12 A.    Yes, sir.

13 Q.    Okay.  Who all got in the Mustang?

14 A.    Well, my wife had showed back up from taking my little boy

15 to school.  It was me, Anthony, in the front and Stacey and my

16 wife in the backseat.

17 Q.    Okay.  Did you see any guns at that point when you got in

18 the Mustang?

19 A.    No, sir, we had to go pick it up.

20 Q.    Okay.  Where did you go to pick up the guns?

21 A.    We went over there off of 18th.

22 Q.    Okay.  Do you know what -- was it a house, an apartment?

23 A.    It was a house.

24 Q.    Okay.  Do you know whose house?

25 A.    No, sir.

Benson - Direct Examination

1  Q.    When you pulled up to this house, what happened?

2  A.    Anthony had hopped out and went and grabbed it from his

3  friend.

4  Q.    Okay.  Did you see who that friend was?

5  A.    No, sir.

6  Q.    Describe the gun as best you remember that he got at the

7  house on 18th.

8  A.    It was in a black case and it was a brown with a black

9  suppressor.  And pretty much the body of the gun was brown and

10  the rest of it was all black, the clip, everything else was

11  black.

12  Q.    And what type of weapon did you say it was?

13  A.    A MAC-10.

14  Q.    A MAC-10?

15  A.    Yes, sir.

16  Q.    Are you familiar with that type of gun?

17  A.    No, sir.  It's either a MAC-10 or MAC-11, I'm not real --

18  with them guns, but it was --

19  Q.    Did Anthony describe what kind of a weapon it was to you?

20  A.    I mean, I had seen it right there with my eyes, so it

21  was --

22  Q.    You said it was in a case.

23  A.    Yes, sir.

24  Q.    At some point did you see what was in the case?

25  A.    Yes, sir.

Benson - Direct Examination

1    Q.    How did you see that?

2    A.    Whenever went to the black friend of mine house, he pulled

3    it out and showed it to him.

4    Q.    Who is "he"?

5    A.    Who?

6    Q.    Who pulled it out?

7    A.    Anthony.

8    Q.    Okay.  Is that when you saw the gun for the first time?

9    A.    No, sir.

10   Q.    When did you see the gun for the first time?

11   A.    I seen it way -- like a week before they did that dumb

12   shit.

13   Q.    Okay.  You had seen Anthony with this same gun prior to

14   the killing of Sean Lamb.

15   A.    Yes, sir.

16   Q.    Had you seen that gun in the possession of Anthony

17   Gonzales?

18   A.    Yes, sir.

19   Q.    Okay.  Now, what about the other -- was there a second gun

20   as well besides this MAC-10 that you've described?

21   A.    Whenever we were at my black friend's house after he

22   bought the gun, Anthony said that he had a revolver too, but he

23   had to go back to the Kia and get it.  And I told him that he

24   can come back over there and do that on his own.  And we went

25   back to my apartment.  And I dropped him off and he hopped in

Benson - Direct Examination

1  the Kia and went and sold the revolver.

2  Q.   So after you got the MAC-10, you went to the guy's

3  house -- this black friend you're describing.

4  A.   Yes, sir.

5  Q.   Okay.  Where did he live in relation to your apartment?

6  A.   About 31st and Dixie, so 17 blocks.

7  Q.   17 blocks from you.

8  A.   Yes, sir.

9  Q.   Okay.  So who drove?

10  A.   I drove my Mustang.

11  Q.   Who all is still in the Mustang with you?

12  A.   Us four:  me, Anthony, Stacey and my wife.

13  Q.   When you got to your black friend's house --

14  A.   Yes, sir.

15  Q.   -- did you go -- who went up to the front door?

16  A.   Me and Anthony got off.

17  Q.   Where did Stacey and your wife go?

18  A.   They stayed in the black seat.  They stayed in the car.

19  Q.   Okay.  Did you have a meeting with this black friend of

20  yours at this house?

21  A.   Yes, sir.

22  Q.   Do you know him by name or can you tell us who he was?

23  A.   Yes, sir.

24  Q.   Who is this person?

25  A.   Anthony Draper.

Benson - Direct Examination

1  Q.   And when you met with him, tell me, how does the

2  conversation go?  Who did most of the talking?

3  A.   Well, both of them because it was Anthony's gun so they

4  talked the price.

5  Q.   What was Anthony looking to get for the gun?

6  A.   500.

7  Q.   And was there a price agreed upon?

8  A.   Yes, sir, that was a guarantee price because guns like

9  that go for at least a thousand on the street.

10 Q.   Okay.  Was there any discussion about why the gun was

11 being sold for 500?

12 A.   No, sir, we didn't tell him.

13 Q.   Did you know why the gun was being sold for 500?

14 A.   Yes, sir.

15 Q.   Why is that?

16 A.   Because it was used in the Sean Lamb murder.

17 Q.   How did you know that?

18 A.   Because Anthony told me.

19 Q.   Now, after -- was there any discussion at that house about

20 the revolver?

21 A.   Yes, sir.  Anthony -- Anthony Draper started talking about

22 it.  And Anthony Draper's wife/girlfriend wanted the revolver

23 because he said it was pink, had a pink handle.  So I think

24 they were talking about buying it for 150 or 200.

25 Q.   Was there any photo of it or anything to show Anthony what

1  it looked like to see if he was interested?

2  A.   No, sir.  He had said he was going to go back down the

3  street to my house and come right back with it.

4  Q.   "He" being?

5  A.   Anthony Gonzales.

6  Q.   Okay.  Now, who got the money?

7  A.   Anthony.

8  Q.   Did Mr. Draper pay him?

9  A.   Yes, sir.

10  Q.   What happened at that time?

11  A.   I saw him pay him the 500 for the MAC.  And we went and

12  hopped in my car, drove to my house, and I dropped off Anthony

13  and Stacey to go do what they had to do with the revolver.

14  Q.   You didn't have anything to do with the revolver at that

15  point.

16  A.   No, sir.

17  Q.   Okay.  Did you ever see the revolver?

18  A.   Yes, sir.

19  Q.   And when do you recall seeing the revolver?

20  A.   Like a week before.

21  Q.   Oh, the week before?

22  A.   Yeah, I've seen them guns before they did that.

23  Q.   But on the day that they were going to take it down to

24  Mr. Draper, did you see it in the Kia that day?

25  A.   No.  No, sir.

Benson - Direct Examination

1   Q.   Okay.  Do you have any personal knowledge that they, in

2   fact, did go back down and sell the gun?

3   A.   Yes, sir.

4   Q.   And how do you know that?

5   A.   Because I went and talked to my black friend and made sure

6   everything went good, cool, because I don't want no problems.

7   I don't need no people like that buying guns.  So I just make

8   sure when I ran into him again.

9   Q.   Okay.  You said you were charged with being a felon in

10  possession.

11  A.   Yes, sir.

12  Q.   Did you plead guilty to that charge?

13  A.   Yes, sir.

14  Q.   Was that pursuant to a plea agreement with the government?

15  A.   Yes, sir.

16  Q.   Okay.  You indicated you haven't been sentenced yet.

17  A.   Yes, sir.

18  Q.   Is that correct?

19  A.   Yes, sir.

20  Q.   As part of your plea agreement, did you have an agreement

21  with the government that you would cooperate with the

22  government; provide information when necessary; testify, if

23  necessary?

24  A.   Yes, sir.

25  Q.   Okay.  And in return for that, do you have some hope or

1  expectation?

2  A.    All I was told was as recommendation.

3  Q.    Okay.  And there might be a recommendation made based upon

4  your cooperation.

5  A.    Yes, sir.

6  Q.    And that recommendation might be made or would be made to

7  who?  Who would make the recommendation?

8  A.    The judge.

9  Q.    Okay.  The judge -- who determines your sentence?

10  A.    The judge.

11  Q.    Okay.  And you're hoping that the judge would know about

12  whatever cooperation you've provided to the government.

13  A.    Yes, sir.

14  Q.    Okay.  Do you know what your sentence is going to be at

15  this particular time?

16  A.    No, sir.

17            MR. LEWIS:  A moment, Your Honor.

18            (Sotto voce discussion between Messrs. Lewis and

19  Klassen)

20            MR. LEWIS:  Pass the witness subject to redirect.

21            THE COURT:  Mr. Leach.

22                        **CROSS-EXAMINATION**

23  BY MR. LEACH:

24  Q.    Sir, where do you spend the evenings now, Ector County

25  Correctional Center?

Benson - Cross-Examination

```
 1  A.    No, sir.

 2  Q.    Where are you now?

 3            MR. LEWIS:  Objection.  Relevancy.

 4            THE COURT:  Sustained.

 5  Q.    (BY MR. LEACH)  Are you incarcerated?

 6  A.    Yes, sir.

 7  Q.    On federal charges.

 8  A.    Yes, sir.

 9  Q.    When did you get those arrests?

10  A.    April 26.

11  Q.    Of?

12  A.    2014.

13  Q.    Okay.  And did you make bond on that?

14  A.    Yes, sir.

15  Q.    When were you put in on your case that you've pled guilty

16  on?

17  A.    Well, I got indicted June 1st of 2014.

18  Q.    Okay.  Is that how long you've been incarcerated then

19  continuously?

20  A.    No, I got incarcerated in May.  I turned myself in.

21  Q.    Okay.  Where did you turn yourself in?

22  A.    At the courthouse in Odessa.

23  Q.    And this would have been late May?

24  A.    Yes, May 22nd.

25  Q.    May 22nd.
```

Benson - Cross-Examination

1              And did you contact the government regarding the

2    information you had?

3    A.    About what, sir?

4    Q.    About what you're testifying here to.

5    A.    No, sir.

6    Q.    Okay.  When did you first talk with them?

7    A.    When my lawyer asked me some questions.

8    Q.    Okay.  You talked with them on October 30th, 2014, did you

9    not?

10   A.    Yes, sir.

11   Q.    Okay.  You agreed then to give information.

12   A.    Yes, sir.

13   Q.    And it is common knowledge among people incarcerated on a

14   federal case that the way you get a lesser sentence is to

15   cooperate, isn't it?

16   A.    I have no idea what you're talking about, sir.

17   Q.    You don't know that you can get a lesser sentence by

18   cooperating?

19   A.    You can get a recommendation.

20   Q.    Okay.  Who makes that recommendation?

21   A.    The prosecutor.  And then it is up to the judge.

22   Q.    Right.  These gentlemen make that recommendation, correct?

23   A.    But it goes with Judge Junell.

24   Q.    Let's try my question:  Who makes the recommendation?

25   A.    What is that relevant to?

Benson - Cross-Examination

```
 1            MR. LEACH:  Your Honor, I'd object as nonresponsive.
 2            THE COURT:  Okay.  I think he said the prosecutor
 3  earlier.
 4            MR. LEACH:  He said the prosecutor and the judge.
 5            THE COURT:  Well, okay.
 6  Q.  (BY MR. LEACH)  You don't think the judge makes the
 7  recommendation.
 8  A.   I'm not real familiar with recommendations because this is
 9  my first time doing this stuff like this, sir.
10  Q.   Well, you're charged with being a felon in possession,
11  correct?
12  A.   Yes, sir.
13  Q.   In trouble for possessing a firearm when you shouldn't,
14  correct?
15  A.   Yes.
16  Q.   When it is illegal for you to do so.
17  A.   Yeah.
18  Q.   So you do have some familiarity with the legal system.
19  A.   Somewhat.
20            MR. LEACH:  Pass the witness.
21            THE COURT:  Mr. Garcia.
22            MR. GARCIA:  I have no questions, Your Honor.
23            THE COURT:  Mr. Pool.
24
25
```

1                        **CROSS-EXAMINATION**

2    BY MR. POOL:

3    Q.   Good morning, Mr. Benson.

4    A.   Good morning.

5    Q.   You're here this morning testifying because you want to go

6    home, correct?

7    A.   No, sir.

8    Q.   Isn't that what you told the prosecutors and the

9    detectives in your recorded interview with them, that you

10   wanted to go home?

11   A.   Because I am not trying to get killed in prison.  You know

12   what happens --

13   Q.   Just answer the question yes or no.  Did you tell the

14   prosecutors as a matter of fact approximately 10 to 15 times

15   that you wanted to go home?

16   A.   Yes.

17   Q.   Okay.  And you asked them several times, "Can I go home?"

18   Is that correct?

19   A.   Well, I told them more than what you're saying.

20   Q.   Yes or no.

21   A.   No.

22   Q.   You didn't ask them if you could go home?

23   A.   No.

24   Q.   You're aware that that interview was recorded, correct?

25   A.   Yes, sir, but I had said more than just that after that.

Benson - Cross-Examination

1   Q.   But you said that also, correct?

2   A.   Yes, sir.

3   Q.   Okay.  And you told them that you would testify for them;

4   is that correct?

5   A.   Yes, sir.

6   Q.   Okay.  And, in fact, when the interview started, they lied

7   to you and told you that Mr. Gonzales implicated you in this

8   crime; is that correct?

9   A.   I don't remember that, sir.

10  Q.   You don't remember them telling you that you were

11  implicated in this?

12  A.   That they said that I was involved?

13  Q.   That you were -- yes.

14  A.   Yes, I remember that.

15  Q.   Okay.  And that made you mad, didn't it?

16  A.   Of course.

17  Q.   And you were also mad about the car; isn't that correct?

18  A.   Of course.

19  Q.   Okay.  So you were mad at Mr. Gonzales and Ms. Castillo

20  because the government lied to you and told you that they

21  implicated you in this and because you believe they didn't take

22  care of your car, correct?

23  A.   What do you mean take care of my car, sir?

24  Q.   I believe you told them that they left it stranded in

25  Pecos?

Benson - Cross-Examination

1  A.   No, they got arrested and it was in impound in Presidio.

2  Q.   I'm talking about your recorded interview, Mr. Benson, and

3  what you told law enforcement.  Do you recall telling them that

4  they didn't take care of your car and that made you mad?

5  A.   No.

6  Q.   You don't recall telling them that.

7  A.   No, sir.

8  Q.   Okay.  You don't recall being upset because of your

9  cosigner?  You were upset of what was happening to your

10  cosigner?  You don't remember telling them that?

11  A.   That they had to go pick it up.  I can't go to the Western

12  District of Texas to go pick up the car.

13  Q.   Okay.  Just -- listen to my question, please, Mr. Benson.

14  You told the officers that you were upset at Mr. Gonzales and

15  Ms. Castillo because they didn't take care of your car and that

16  put your cosigner in a bad position.  Do you recall that?

17  A.   No, sir.

18  Q.   Okay.  Once again, it was recorded, correct?

19  A.   You want to play it?

20  Q.   Was it recorded?

21  A.   Yes, sir.

22  Q.   Okay.

23  A.   Something -- of course the interview was recorded.

24  Q.   Mr. Benson, during your testimony today, you mentioned the

25  name Anthony Draper; is that correct?

Benson - Cross-Examination

```
 1  A.    Yes, sir.
 2  Q.    When did you learn that name?
 3  A.    I've been knowing that name, sir.
 4  Q.    Okay.  You didn't give anyone that name during your
 5  recorded interview.
 6  A.    During the recording, I knew his nickname, and then I had
 7  to sit back and think after the interview of what his real name
 8  was.  It's been a while since I've talked to him.  Like I said,
 9  I've been incarcerated.  I haven't been in the free world.
10  Q.    Okay.  Since the recorded interview back in October, has
11  anyone from the prosecutor's office or law enforcement come to
12  talk to you?
13  A.    Since October?
14  Q.    Yes.
15  A.    Yes.
16  Q.    When was that?
17  A.    I can't recall that, sir.  I'm not -- I don't have --
18  Q.    More than one occasion?
19  A.    Just one more time after that.
20  Q.    Okay.  How long ago?  Within the last couple of weeks?
21  A.    Yes, sir.
22  Q.    Okay.  Towards the end of your interview, you were asking
23  them, you know, "What can y'all do for me?"  Correct?
24  A.    Yes, sir.
25  Q.    You told them, "I am facing 65 months," correct?
```

1  A.   Yes, sir.

2  Q.   Okay.  You kept saying, you know, "I want to go home,"

3  correct?

4  A.   Yeah, because I've been sitting back in Odessa at the

5  courthouse seeing people leaving on ten to life in bigger cases

6  than me, of course I was wanting to ask to go home.  Anybody

7  would.

8  Q.   And they told you that you would have to talk to the

9  prosecutor about that, correct?

10 A.   Yes, sir.

11 Q.   And they said they'd talk to you about that later.  That

12 was not on the recorded interview, correct?

13 A.   No, sir.

14 Q.   Okay.

15         MR. POOL:  I'll pass the witness, Your Honor.

16         THE COURT:  Mr. Stroder.

17                    **CROSS-EXAMINATION**

18 BY MR. STRODER:

19 Q.   Mr. Benson, you said something to the effect this is your

20 first time to be involved in something like that.  You're not

21 telling the jury that you don't have a criminal record, are

22 you?

23 A.   I'm talking about testifying, sir.

24 Q.   Okay.  You do have a criminal record, do you not?

25 A.   Yes, sir.

1  Q.    Okay.  And you're charged -- you're in -- you're locked up

2  now and waiting sentencing for a firearm in possession of a

3  felon; is that right?

4  A.    Yes, sir.

5  Q.    What felony was that that you -- how did you become a

6  felon in the first place?

7  A.    When I was young.

8  Q.    What was the crime that you committed?

9  A.    I got caught with weed, sir.

10 Q.    Sorry?

11 A.    I got caught with marijuana.

12 Q.    Marijuana?

13 A.    Yes, sir.

14 Q.    How many other felonies do you have?

15 A.    As an adult, just that one, sir.

16 Q.    Okay.  As a juvenile, how many felonies did you commit?

17 A.    I'd rather --

18         MR. LEWIS:  Objection, Your Honor.

19         THE COURT:  Just a second.

20         What's your objection?

21         MR. LEWIS:  Objection to relevance.

22         THE COURT:  Sustained.

23 Q.    (BY MR. STRODER)  You're awaiting sentencing as we speak;

24 is that right?

25 A.    Yes, sir.

Benson - Cross-Examination

```
 1  Q.    When did you plead guilty?

 2  A.    Sometime in August.

 3  Q.    Last August?

 4  A.    Yes, sir.

 5  Q.    Your sentencing has been continued three times, has it

 6  not?

 7  A.    Because they said I was going to -- yes.

 8  Q.    Okay.  They wanted you to testify before you got the

 9  sentence; isn't that right?

10  A.    I have no idea, sir.

11  Q.    When was the last time you saw Anthony before today?

12  A.    The Super Bowl, February 1st.

13          THE COURT:  Of this year or year before?

14          THE WITNESS:  2015.  We were in the courthouse

15  together, the same tank.

16          THE COURT:  Okay.

17  Q.    (BY MR. STRODER)  Okay.  So you saw him while y'all were

18  at the courthouse?

19  A.    Yes, sir.

20  Q.    Okay.  And that was this year.

21  A.    Yes, sir.

22  Q.    Previous to that, when was the last time you saw him?

23  A.    In May of 2014.

24  Q.    Okay.  And you spoke of a meeting you had with him and you

25  talked about going to another guy's house.  After that -- and
```

Ann M. Record, RMR, CRR, CMRS, CRI ********** (432) 685-0361

Benson - Cross-Examination

1  that was the day after the killing of Sean; is that right?

2  A.   Yes, sir.

3  Q.   When was the next time you saw him after -- did you see

4  him any time after that?

5  A.   No, sir.  After they left my house, I never seen them

6  again.  They got locked up.

7  Q.   Okay.  Your black friend, as you put it, his name is

8  Anthony Draper; is that right?

9  A.   Yes, sir.

10  Q.   Who is Remy?

11  A.   Remy?

12  Q.   Remy.

13  A.   That's one of my homeboys.

14  Q.   Okay.

15  A.   His dad owns a tire shop.  That's how I met him.

16  Q.   Okay.  Now, this gun you described, you said it was all

17  black, with magazine and all?

18  A.   No, it was brown.

19  Q.   Brown?

20  A.   The body was brown and there was a black suppressor and

21  the clip and other little details.

22  Q.   The clip was -- the handle was black?

23  A.   The clip.

24  Q.   Was black?

25  A.   Yes.

Benson - Cross-Examination

```
 1  Q.    It stuck down?
 2  A.    The clip, sir, yes.
 3  Q.    It was mostly black.
 4  A.    Yes, sir.
 5  Q.    Now, you went over to 18th Street somewhere to your --
 6  A.    To one of Anthony's friends, sir.
 7  Q.    Okay.  Is that one of Anthony's friends?  You didn't know
 8  his name.
 9  A.    No, sir.
10  Q.    It was at 18th and what?
11  A.    I'm going to say it was in the neighborhood around Hancock
12  and Adams and all that over there.
13  Q.    Let me ask you this.  Before Anthony came over and told
14  you about his supposed involvement in Sean's death, you had
15  heard it on the TV; is that right?
16  A.    No, sir.
17  Q.    Oh, you hadn't heard it yet?
18  A.    No, sir.
19  Q.    So Anthony came over before you heard about it on the TV?
20  A.    Yes, sir, I barely woke up, and I don't have -- I don't
21  have regular TV to watch the news.
22  Q.    Okay.  Well, I thought you told us you talked -- you heard
23  about it on the TV first.
24  A.    No, they had asked me if I seen what happened on TV.
25  Q.    Okay.  All right.  So he came to your house.  You had no
```

Ann M. Record, RMR, CRR, CMRS, CRI ********** (432) 685-0361

1  idea that Anthony or Stacey or anybody had anything to do with

2  Sean or anybody else, for that matter, getting killed; is that

3  right?

4  A.    Repeat your question, sir.

5  Q.    You had no knowledge that Anthony, Stacey had anything to

6  do with any killing before they came over.

7  A.    No, sir.

8  Q.    Okay.  So it's your testimony is that -- and Anthony

9  didn't have the gun with him when he first came over there; is

10 that right?

11 A.    Well, of course they're not going to be driving around

12 with it.

13 Q.    Okay.  Answer my question.  Did Anthony have the gun with

14 him?

15 A.    No, sir.

16 Q.    Didn't have any gun with him.

17 A.    He told me he had the revolver in his car, in the Kia.

18 Q.    Did he have a gun with him, any guns?

19 A.    Not on him, sir.

20 Q.    So your testimony is that he's going to come over, doesn't

21 have any gun.  He's going to come over and confess to you about

22 his involvement in a murder; is that right?

23 A.    Yes.

24 Q.    And rather than -- he doesn't have a gun to get rid of,

25 does he, yet?

Benson - Cross-Examination

1   A.   He came over to talk because he told me he was broke so he

2   can --

3   Q.   Did he have a gun to get rid of --

4        THE COURT:  Hold your voice down.

5        MR. STRODER:  I'm sorry.

6        THE COURT:  Okay.  Just keep your voice down.

7   Everybody keep calm.  Keep calm.

8   Q.   (BY MR. STRODER)  Did he have a gun to get rid of when he

9   came over to see you?

10  A.   Not at the time.

11  Q.   Okay.  So it is your testimony that he went and got a gun

12  so he could get rid of; is that right?

13  A.   No.  The firearms were his that was involved in Sean

14  Lamb's murder so he wanted to get rid of them as soon as

15  possible so he could leave town.

16  Q.   But he didn't have the gun, did he, when he first came to

17  you?

18  A.   Not at the time, sir.

19  Q.   And so he just decided he would just confess to you.

20  A.   Yes, sir.

21  Q.   Okay.  You don't know a Liz Hernandez?

22  A.   No, sir.

23  Q.   Okay.  In your recorded testimony -- testimony -- in your

24  recorded statement, did you not tell the police that Liz and

25  Noe set this all up?

Benson - Cross-Examination

1  A.   From what Stacey and Anthony were telling me, yes.

2  Q.   Did you put that in your recorded statement about from

3  what Anthony and Stacey told you?

4  A.   Yes, sir.

5  Q.   Do you know Noe Galan?

6  A.   No, sir.

7  Q.   Now, would it surprise you that the police talked to

8  Mr. Draper?

9  A.   Sir?

10 Q.   Never mind.

11      Let's assume the police talked to Draper.  Would it

12 surprise you that Mr. Draper denies that he bought any gun from

13 Anthony or anybody else?

14      MR. LEWIS:  Objection.  Calls for the witness to

15 speculate.

16      THE COURT:  Sustained.

17 Q.   (BY MR. STRODER)  Did you know that Mr. Draper denied that

18 he bought the gun?

19      MR. LEWIS:  Objection, Your Honor.  Calls for --

20      MR. STRODER:  I'm asking him a question, Judge.

21      THE COURT:  Overruled.

22 Q.   (BY MR. STRODER)  Did you know that Mr. Draper denied

23 buying a gun from Anthony?

24 A.   No, sir.

25 Q.   Did you know that Mr. Draper said the only contact he had

Benson - Cross-Examination

1  with his -- with Gonzales was in March or April of 2014?

2  A.   No, sir.

3  Q.   Did you know that Mr. Draper told him that they came to

4  his house in a Honda?

5  A.   Repeat your question, sir.

6  Q.   Did you know that Mr. Draper told the police that Anthony

7  and Stacey came to his house in a Honda?

8  A.   No, sir.

9  Q.   Did you know that Mr. Draper didn't even mention you

10  coming with him?

11  A.   No, sir.

12  Q.   Have you sold guns to Mr. Draper yourself?

13  A.   No, sir.

14  Q.   Never?

15  A.   No, sir.

16  Q.   Have you -- being a felon, have you sold any other guns?

17  A.   No, sir.

18  Q.   Haven't helped anybody sell any other guns?

19  A.   I helped Anthony, sir.

20  Q.   And you're talking about the occasion you're alleging

21  today?

22  A.   Yes, sir.

23  Q.   Never went to Dallas to sell any guns?

24  A.   No, sir.

25          MR. STRODER:  Pass the witness.

Benson - Cross-Examination

```
 1              THE COURT:  Mr. Lewis, anything else?
 2              MR. LEWIS:  Nothing further of this witness, Your
 3  Honor.
 4              THE COURT:  Okay.
 5              Mr. Leach, anything else?
 6              MR. LEACH:  Nothing else, Your Honor.  Thank you.
 7              THE COURT:  Mr. Garcia?
 8              MR. GARCIA:  No, Your Honor.
 9              THE COURT:  Mr. Pool?
10              MR. POOL:  Nothing further, Your Honor.
11              THE COURT:  Okay.  Is this witness excused,
12  Mr. Lewis?
13              MR. LEWIS:  Yes, Your Honor.
14              THE COURT:  Any objection, Mr. Leach?
15              MR. LEACH:  No objection.
16              THE COURT:  Mr. Garcia?
17              MR. GARCIA:  None, Your Honor.
18              THE COURT:  Mr. Pool?
19              MR. POOL:  No, Your Honor.
20              THE COURT:  Mr. Stroder.
21              MR. STRODER:  No, Your Honor.
22              THE COURT:  Okay.  Mr. Benson, we appreciate you
23  being here.  You're excused.  I'm going to ask you not to
24  discuss the case or your testimony with anybody except your own
25  lawyer and the lawyers here representing these parties, okay?
```

Benson - Cross-Examination

```
 1              THE WITNESS:  Yes, sir.
 2              THE COURT:  Thank you.  You're excused.
 3              The -- let me see the attorneys for just a second
 4  here.
 5              (Sidebar conference on the record)
 6              THE COURT:  How long is your next witness going to
 7  take?
 8              MR. LEWIS:  It's going to be more than 15 minutes.
 9  We've got the medical examiner coming in and then a couple of
10  HSI agents to talk about the videos that they recovered.
11              MR. KLASSEN:  And one other thing, just so counsel
12  knows, Mr. Draper is here.  We're probably not going to call
13  him, but I want you to -- to know what he told us so we can
14  make an intelligent decision about what to do.
15              MR. STRODER:  Is it different than what was said
16  here?
17              MR. KLASSEN:  Yeah.  It is actually more helpful.
18              MR. LEACH:  I'm shocked.
19              THE COURT:  Okay.  Well, you have -- who has the CD?
20              MR. LEACH:  We've got about an hour-and-55-minute CD
21  we have to listen to.
22              THE COURT:  So why don't we recess now.  It is almost
23  eleven o'clock and let y'all listen -- is it video or is it --
24              MR. LEWIS:  Just audio.
25              MR. LEACH:  It is audio.
```

Benson - Cross-Examination

```
 1              THE COURT:  -- let y'all listen to that.  Do y'all
 2    have something that you --
 3              MR. LEWIS:  We'll make arrangements.
 4              THE COURT:  You can use the conference room around
 5    there and Jeff will help you if you have any problems.
 6              MR. LEWIS:  It shouldn't be a problem.
 7              THE COURT:  And then we'll come back at one o'clock
 8    then -- or 1:15.  Why don't we make it 1:15.  Then that gives
 9    y'all a chance to -- well, let's see, eleven to twelve, twelve
10    to one.  Then y'all can have a chance to -- we'll make it 1:30.
11              MR. LEACH:  1:30.
12              THE COURT:  Okay.  We'll make it 1:30.
13              MR. LEACH:  Thank you, Judge.
14              MR. POOL:  Thank you, Judge.
15              THE COURT:  Thank you.
16              (Sidebar conference on the record concluded)
17              THE COURT:  We're going to take our noon break right
18    now.  The lawyers need to do something during the lunch hour
19    involving the case and this came up this morning and so it
20    couldn't be done earlier.  So we're going to take a recess now,
21    and we're not going to come back until 1:30.
22              Now, you are welcome to come up and hang out in the
23    jury room.  And I have no objection and you can tell the CSOs
24    downstairs that you can bring -- are y'all bringing your cell
25    phones in?  Are y'all able to can bring your cell phones?  You
```

Benson - Cross-Examination

```
 1  can bring your cell phones in.  Just don't Tweet anything about
 2  the case.  Don't put anything on there about the case.  But if
 3  you need to get ahold of some people or do some things or you
 4  want to play Words With Friends on your iPhone, then feel free
 5  to do that, because you're going to have kind of a long recess.
 6  Again, I'd ask you not to do any research about the case or
 7  anything like that.
 8          And if you'll notify the CSOs downstairs that they
 9  can bring their iPhones back in when y'all come back up, if
10  you'd like to do that and then you can -- need to catch up with
11  any business or something like that.
12          Take your notepads.  Put them in the envelopes back
13  there and then we'll see you back here at 1:30 -- ready to go
14  at 1:30, okay?
15          Let's all rise for the jury, please.
16          (At 10:51 a.m., jury leaves)
17          THE COURT:  And, Marshals, I would ask you to hold
18  the crowd until the jury has a chance to clear out of the
19  courthouse.
20          Yes, sir, Mr. Klassen?
21          MR. KLASSEN:  Could we make a record of something
22  very briefly?
23          THE COURT:  Yes, sir, you may.
24          MR. KLASSEN:  I mentioned this --
25          THE COURT:  Y'all can be seated.  Everybody can be
```

Benson - Cross-Examination

```
 1   seated.
 2            MR. KLASSEN:  I mentioned it up at the bench.  There
 3   was reference just now to a man named Draper, an
 4   African-American man who Mr. Benson brought the guns to.
 5   Mr. Draper is here.
 6            THE COURT:  And I think that was -- I think she got
 7   the record on that.
 8            Is that correct, Ms. Record?
 9            THE REPORTER:  Yes, sir.
10            MR. KLASSEN:  He is here.  I think the government's
11   instinct right now is probably not to call him, but I wanted
12   the defense -- you obviously have a statement he gave to the
13   police before.  We met with Mr. Draper last week -- and
14   Mr. Lewis can correct me and Detective Sikes can correct me if
15   I'm wrong -- but the general tenor of what he told us last week
16   is he does remember Mr. Benson coming by to try to sell him a
17   couple of weapons, which are something with a pink handle and a
18   MAC-10, which I think he may remember as being camouflagey in
19   nature.
20            Mr. Benson, I believe, if he testifies consistent
21   with what he told us last week did not, in fact, buy those
22   weapons; but he remembers Mr. Benson trying to sell them to
23   him.  He believes he saw photographs of them on a cell phone or
24   something of that nature.  He does not -- he said --
25            THE COURT:  I'm going to stop you.  I'm going to stop
```

Benson - Cross-Examination

1    you.

2              MR. KLASSEN:  Yes.

3              THE COURT:  Your statement was:  "Mr. Benson, I

4    believe, if he testifies consistent with what he told us last

5    week" --

6              MR. KLASSEN:  I'm sorry.  Mr. Draper.

7              THE COURT:  Mr. Draper.

8              MR. KLASSEN:  Mr. Draper remembers seeing Mr. Benson

9    and seeing photographs of some guns which he thought were

10   priced too cheaply.  It made him suspicious so he did not want

11   to buy the guns because he figured they were hot or something

12   of that nature.  He does not think that anybody was -- came to

13   the door with Mr. Benson.  Someone may have been in the

14   vehicle, but he says he does not know who that was.  So if any

15   of the defense attorneys think they might want to call him, I

16   will not cut him loose.

17             Anyway, so I -- it is different from what he told the

18   police before.  Maybe you-all think that's somewhat more

19   helpful to you, if you would like to call him.

20             MR. STRODER:  Please don't cut him loose.

21             THE COURT:  Okay.  All right.  So are the attorneys

22   going to use the conference room to listen right across here?

23             MR. LEACH:  I believe so, Your Honor.

24             MR. GARCIA:  Yes.

25             THE COURT:  Okay.  Use the conference room.  Then

Benson - Cross-Examination

```
 1  what do we have that they can listen to the tape with?
 2          MR. LEWIS:  We have this laptop.
 3          THE COURT:  Okay.  But you have to cross your hearts
 4  that you will not do an NSA on Mr. Lewis' laptop.
 5          MR. GARCIA:  We might erase all the exhibits
 6  accidentally.
 7          (Laughter)
 8          THE COURT:  Okay.  All right.  And if there is a
 9  problem, if you'll let Jeff know, let my clerk know.  Jeff is a
10  techy and he can help get the stuff -- and help get something
11  else if that doesn't work.
12          All right.  So we'll be in recess till 1:30, then.
13  Thank you very much.
14          (Luncheon recess from 10:54 a.m. to 1:37 p.m.)
15          (At 1:37 p.m., jury enters)
16          THE COURT:  All right.  Let's all be seated.  It's
17  1:37, and we're back in the courtroom with the jury.  And the
18  attorneys are all present.  The defendants are present.
19          And, Mr. Klassen, would the government call its next
20  witness, please.
21          MR. KLASSEN:  Yes, Your Honor.  The government would
22  call Mr. Anthony Draper who is right there by the witness
23  stand.
24          THE COURT:  Will the clerk swear Mr. Draper as a
25  witness, please.
```

Draper - Direct Examination

```
 1                (Witness sworn by the clerk)
 2              THE COURT:  All right.  You may proceeded.
 3              MR. KLASSEN:  Thank you, Your Honor.
 4                      ANTHONY DRAPER,
 5            GOVERNMENT'S WITNESS SWORN AT 1:39 p.m.
 6                    DIRECT EXAMINATION
 7  BY MR. KLASSEN:
 8  Q.   Mr. Draper, don't give me the street address, but what
 9  city do you live in, sir?
10  A.   Odessa, Texas.
11  Q.   What do you do for a living at the present time, sir?
12  A.   Bartender and a bouncer at a nightclub, and I work for
13  landscape.
14  Q.   All right.  Mr. Draper, let me ask you:  Do you know a man
15  by the name of Vincent Benson?
16  A.   Yes, sir.
17  Q.   How do you know Mr. Benson?
18  A.   Prior incarceration.
19  Q.   You were in prison together, correct?
20  A.   Well, no, not in prison, in Ector County Law Enforcement
21  Center, the jail.
22  Q.   Which jail?
23  A.   Ector County Law Enforcement Center.
24  Q.   How long were you incarcerated with him?
25  A.   Maybe a month and a half, two months tops.
```

Draper - Direct Examination

1  Q.    Is that the only time you actually got to know him was in

2  the jail?

3  A.    That's the only time I've been around him like that, yeah.

4  Yes, sir.

5  Q.    What year would that have been approximately?

6  A.    2010.

7  Q.    Okay.  If I could direct your attention to some events

8  that occurred last year in 2014 about the month of May.  Do you

9  have a recollection of an occasion that Mr. Benson perhaps came

10 to see you or met you somewhere with an idea of maybe having

11 you purchase a firearm or two?

12 A.    I sure do.

13 Q.    All right.  Tell the jury what you recall about that.  Did

14 he come to your place, or did you meet somewhere else?

15 A.    Well, initially, like at first, he came to my house.  It

16 was upon me, you know, getting out of being incarcerated.  And

17 he came by just, I guess, like a farewell plus a hello.  I was

18 getting out and he was supposedly going in.

19 Q.    Okay.

20 A.    And like maybe a couple of days later it was -- you know,

21 it was presented to me, you know, via phone would I like to

22 purchase some.

23 Q.    All right.  So you had -- he visited you once just to have

24 a conversation.

25 A.    Maybe like ten minutes, yeah.

1  Q.   And then he made a phone call to you a couple days later.

2  A.   Yes, sir.

3  Q.   And this is when he proposed the firearm transaction.

4  A.   Yes, sir.

5  Q.   What did he propose that you buy?

6  A.   One of them was like a little pistol; and then the other

7  one, it was just like a gun.  It was a black box.  It was like

8  a MAC or something, I don't know.  But it was -- whatever it

9  was, it was high powered, whatever it was.

10  Q.   Okay.  Did he quote a price to you?

11  A.   $325.

12  Q.   For both of them.

13  A.   For one.  And then the other, like, just give me a hundred

14  or whatever.  I got to buy out, you know, my wife is whatever

15  so...

16  Q.   Okay.  At any point in time did he come and actually show

17  you these weapons?

18  A.   No, I seen the weapons on the phone.

19  Q.   Tell me about that.  You saw them -- when you say -- like

20  a photograph on a phone?

21  A.   Yeah, photograph on a flat touch screen phone.

22  Q.   All right.  When did he -- did he show you that or did

23  somebody else?

24  A.   No, he showed them to me.

25  Q.   Okay.  Did he come by your house to do that?

Draper - Direct Examination

1  A.   No, he came by my house after that.  He called me and was,

2  like, let me show you the phone, let me show you whatever,

3  whatever, and then he came after that.

4  Q.   Okay.

5  A.   It wasn't around the -- you know, it wasn't right then.

6  It was, like, simultaneous.

7  Q.   I understand.  All right.  So what do you remember seeing

8  on the phone, the photographs on the phone?

9  A.   Well, like I said, one of them was like a black and pink

10  handgun, .38 or .32.

11  Q.   Black and pink you said?

12  A.   Black and pink.

13  Q.   Okay.

14  A.   .32 or something like that -- .38 or .32, somewhere around

15  that.  And then the other one I was told, you know --

16  Q.   You didn't actually see it.

17  A.   I didn't actually see -- I just seen -- like, you could

18  see the back end.  It was just camouflaged out the box, you

19  know.  So I was like, man, you know -- but --

20  Q.   So he actually had that weapon?  You saw a photograph

21  of --

22  A.   No, I don't know if he had it, but it was on the photo.

23  Q.   It was on the photo, but not the whole thing, just part of

24  it.

25  A.   No, just part of it.

1  Q.   All right.  And it was -- describe it again, the second

2  one, that you could just see part of it.

3  A.    It was just like a camouflage weapon.  It was in a little

4  briefcase looking box mini armor, whatever it is, I don't know.

5  Q.   Was anybody with Mr. Benson when he showed you these

6  firearms?

7  A.   The first time, no.  The second time he said he had his

8  friend with him.  You could see a silhouette of a body in the

9  car, but I couldn't see a face, you know what I mean, so...

10 Q.   Nobody you could identify.

11 A.   Nobody that I could identify.

12 Q.   This conversation that you had where he was -- you were

13 looking at these photographs, was that inside your house, out

14 on your doorway, out in your yard?  What do you remember?

15 A.   Upon presentation at first, it started outside and then I

16 went on into my house just really kind of letting him -- you

17 know, I kind of felt comfortable with him.  So I was letting

18 him, you know, meet my wife and my kids and stuff like that

19 because, like I say, we -- you know, we had a mutual -- I

20 wouldn't call it a friendship, but I would say, you know, a

21 mutual acquaintance.

22 Q.   I understand.  You invited him in the house for a few

23 minutes.

24 A.   Yeah.

25 Q.   All right.  Mr. Draper, did you actually purchase one or

Draper - Direct Examination

1  both of these firearms from him?

2  A.    I sure did not.

3  Q.    Why not?

4  A.    Because I'm not -- you know, I am -- just give you my

5  background and history, I am a convicted felon.  I don't have

6  any kind of dealings with guns.  I mean, that's -- it's not

7  going to balance out good for me in my favor, you know what I'm

8  saying, so...

9  Q.    All right.  Mr. Benson, I take it, left then after you

10  declined to purchase those weapons.

11  A.    Yes, I never heard from him again until the officer came

12  to my doorstep.

13  Q.    Okay.  And you don't know who that was that might have

14  been in the car while he came up to talk to you.

15  A.    No.

16  Q.    All right.  Can you even tell us whether it was a man or a

17  woman?

18  A.    It was a man.

19  Q.    Okay.  And, Mr. Draper, so the jury is entitled to know,

20  you mentioned being incarcerated before.  You have some felony

21  convictions, correct?

22  A.    Yes, sir.

23  Q.    You have five or six for narcotics?

24  A.    Yes, sir.

25  Q.    All right.  They all kind of ran together.  That's what

Draper - Cross-Examination

1  your memory is?

2  A.   That was an open-ended investigation.   So every time a

3  transaction was made, I was individually charged instead of

4  just one charge.

5  Q.   All right.   And you also have a burglary conviction.

6  A.   Yeah.

7  Q.   All right.   Any other felony convictions?

8  A.   No, sir.

9  Q.   All right.

10         MR. KLASSEN:   I'll pass the witness.

11         MR. LEACH:   I don't have any questions for

12  Mr. Draper, Your Honor.

13         THE COURT:   Mr. Garcia?

14         MR. GARCIA:   I don't have any questions of this

15  witness, Your Honor.

16         THE COURT:   Mr. Pool?

17         MR. POOL:   No questions, Your Honor.

18         THE COURT:   Mr. Stroder.

19                    **CROSS-EXAMINATION**

20  BY MR. STRODER:

21  Q.   Mr. Benson was the only one you talked to or dealt with

22  about these particular guns; is that right?

23  A.   Yes, sir.

24  Q.   Didn't talk to anybody else.

25  A.   I didn't talk to anybody else.

Draper - Cross-Examination

1  Q.   Nobody asked you to buy any other gun.

2  A.   Nobody else asked me to buy anything.

3  Q.   Nobody else walked up to your door and knocked on your

4  door and asked you about selling some guns.

5  A.   Nobody else walked up to my door.

6  Q.   And you certainly didn't purchase any gun.

7  A.   I certainly sure did not.

8  Q.   And you certainly didn't purchase a pink one for your

9  wife.

10  A.   No.  I tried.  It was told in a joking matter, "Your wife

11  might like it," but I don't have that type of wife that needs a

12  pistol, so...

13  Q.   That's a dangerous thing to have your wife with a pistol.

14  A.   It really is.

15        (Laughter)

16  Q.   (BY MR. STRODER)  Now, Mr. Klassen referred to some time

17  around May of 2014.  Are you -- what date do you remember this

18  happening?

19  A.   I really don't even remember, really, honestly.  I mean, I

20  had just got out of being incarcerated.  So, I mean, those type

21  events and stuff like that, I don't memorize them.  I mean, it

22  was just a day.  It was during the daytime on some day.

23  Probably in the mid part of the week.  I can't remember what

24  day, a month, none of that so...

25  Q.   So just some time that Benson offered to sell you some

Draper - Cross-Examination

1  guns.

2  A.    Just some time.

3  Q.    You don't know what it was connected to?

4  A.    I sure didn't.

5  Q.    You certainly didn't know it was connected to any shooting

6  or anything, right?

7  A.    Sure didn't.

8  Q.    Okay.

9            MR. STRODER:  Pass the witness.

10            THE COURT:  Mr. Klassen?

11            MR. KLASSEN:  Nothing further, Judge.

12            THE COURT:  May this witness be excused, Mr. Klassen?

13            MR. KLASSEN:  No objection.

14            THE COURT:  Mr. Leach?

15            MR. LEACH:  No objection.

16            THE COURT:  Mr. Garcia?

17            MR. GARCIA:  No objection, Your Honor.

18            THE COURT:  Mr. Pool?

19            MR. POOL:  No objection, Your Honor.

20            THE COURT:  Mr. Stroder?

21            MR. STRODER:  No objection.

22            THE COURT:  We appreciate you being here, Mr. Draper.

23  You're excused.  I'd ask you not to discuss the case or your

24  testimony with anyone except the attorneys until the jury

25  begins its deliberations, okay?

Greenberg - Direct Examination

```
 1              THE WITNESS:  Thank you so much.
 2              THE COURT:  Thank you, sir.
 3              Call your next witness, Mr. Klassen.
 4              MR. KLASSEN:  Your Honor, the government calls
 5   Dr. Tasha Greenberg.
 6              (Witness sworn by the clerk)
 7              THE CLERK:  Have a seat.
 8              THE COURT:  You may proceed.
 9                   TASHA GREENBERG, M.D.,
10          GOVERNMENT'S WITNESS SWORN AT 1:48 p.m.
11                   DIRECT EXAMINATION
12   BY MR. KLASSEN:
13   Q.   Ma'am, if we could begin this way.  If you'll state your
14   full name for the record.
15   A.   Tasha Greenberg.
16   Q.   And the first name is spelled how?
17   A.   T-A-S-H-A.
18   Q.   And, Dr. Greenberg, what do you do for a living?
19   A.   I am a deputy medical examiner for the Tarrant County
20   Medical Examiner's Office in Fort Worth.
21   Q.   Tell us a little bit about -- aside maybe from TV shows
22   and stuff that we may have seen, what does a medical examiner
23   actually do?
24   A.   Basically our job is to investigate sudden and unexpected
25   deaths, and we are charged with determining what we call the
```

1   cause and manner of death.  And so the cause of death is

2   basically how someone died, whether they had a heart attack or

3   suffered an injury.  And the manner of death is how that came

4   about.  So that could be natural, accident, suicide or

5   homicide.  And to do that, we take all kinds of information

6   from our own investigators, from police, hospital records and

7   then we perform an examination which may be just an external

8   examination or kind of a look-at or we may do a complete

9   autopsy with a bunch of ancillary testing and use all of that

10  information to make the decisions about cause and manner of

11  death.  And then we fill out a death certificate, create a

12  report, etc.

13  Q.   It is probably obvious or implicit, but when you say "do

14  an examination or an autopsy," you're talking about an

15  examination of a corpse, or a dead body, correct?

16  A.   Yes.

17  Q.   Dr. Greenberg, tell us about what kind of training and

18  experience that you've had that qualifies you to hold the

19  position that you do.

20  A.   Okay.  Well, I got a Bachelor of Science degree at UCLA in

21  Kinesiology.  Did a couple of years of graduate work at

22  Northwestern in Neuroscience before I went to medical school,

23  which is where I got my medical degree, at Baylor College of

24  Medicine in Houston.

25           And then I did a residency in pathology.  It was a

Greenberg - Direct Examination

1  five-year residency in anatomic and clinical pathology.  The

2  first year I spent at St. Joseph's Hospital in Phoenix,

3  Arizona; and then I returned to Baylor College of Medicine in

4  Houston for the last four years.

5          After that, I did a year of fellowship training in

6  forensic pathology at the Medical Examiner's Office for the

7  county of Cook in Chicago, Illinois.

8          And after that, I went to work in Maryland for the

9  State of Maryland as an assistant medical examiner working in

10 Baltimore.

11         Then I moved down here and spent a couple of years as

12 the director of the medical autopsy service at UT Southwestern.

13 We were located at Parkland Hospital in Dallas.

14         And then I came to work here in Fort Worth two and a

15 half years ago.

16 Q.   And Fort Worth is Tarrant County, correct?

17 A.   Tarrant County Medical Examiner, yes.

18 Q.   All right.  Is the correct -- another word for your field

19 forensic pathology?

20 A.   Yes.

21 Q.   All right.  How many years total would you say,

22 Dr. Greenberg, that you have worked in the field in some form

23 or fashion of in forensic pathology?

24 A.   Approximately ten.

25 Q.   All right.  Dr. Greenberg, the procedures that are

 1  followed in Tarrant County, at least since you've worked there

 2  the last couple of years, are they consistent with the

 3  procedures of forensic pathology that are pretty commonly used

 4  throughout the country in similar labs?

 5  A.   Yes.

 6  Q.   Dr. Greenberg, have you testified in courts before on the

 7  manner of death and the cause of death?

 8  A.   Yes, I have.

 9  Q.   How many times would you say?

10  A.   I haven't kept good track, but a few dozen.

11  Q.   All right.  Have you ever testified in federal court

12  before?

13  A.   I have, once in Baltimore.

14  Q.   All right.

15          MR. KLASSEN:  Your Honor, I would request that

16  Dr. Greenberg be recognized as an expert in the field of

17  forensic pathology.

18          THE COURT:  Any objection, Mr. Leach?

19          MR. LEACH:  No objection, Your Honor.

20          THE COURT:  Mr. Garcia?

21          MR. GARCIA:  None, Your Honor.

22          THE COURT:  Mr. Pool?

23          MR. POOL:  No objection, Your Honor.

24          THE COURT:  Mr. Stroder?

25          MR. STRODER:  None.

```
 1              THE COURT:  Ladies and gentlemen, if scientific,
 2   technically or other specialized knowledge might assist the
 3   jury in understanding the evidence or in determining a fact in
 4   issue, a witness qualified by knowledge, skill, experience,
 5   training or education may testify and state an opinion
 6   concerning such matters.  Merely because such a witness has --
 7   expresses an opinion does not mean, however, that you must
 8   accept this opinion.  You should judge the doctor's testimony
 9   like any other testimony.  You may accept it or reject it and
10   give it as much weight as you think it deserves considering her
11   education and experience, the soundness and the reasons given
12   for the opinion and all other evidence in the case.
13              You may proceed, Mr. Klassen.
14              MR. KLASSEN:  Thank you, Your Honor.
15   Q.  (BY MR. KLASSEN)  Dr. Greenberg, if I could direct your
16   attention to the month of May of last year, of 2014.  Did you
17   have occasion, either from your memory or perhaps because
18   someone asked you to check your records recently, of whether or
19   not you did an examination of a body of a young man from
20   Odessa, Texas, by the name of Sean Lamb?
21   A.  Yes.
22   Q.  All right.  And about when did you do that examination
23   according to the records or your memory?
24   A.  Excuse me, do you mind if I refer to my notes?
25   Q.  Would it help refresh your recollection?
```

1  A.    It would.

2  Q.    All right.   Please do.

3  A.    Thank you.

4           Okay.   The autopsy was performed on May 15th of 2014.

5  Q.    Okay.   Dr. Greenberg, perhaps as background, it might be

6  helpful for the jury to know.   Obviously Tarrant County is some

7  distance from Ector County.   Does Tarrant County sometimes

8  perform this type of autopsy or medical examination for smaller

9  counties throughout Texas?

10  A.    Yes, we do.   We -- our Tarrant County office covers four

11  counties generally under our jurisdiction:   Tarrant, Parker,

12  Denton and Johnson.   But then we contract with other counties

13  who don't have their own medical examiner or their own morgue

14  to perform the autopsies.   And so we do quite a few from many

15  outlying counties.

16  Q.    All right.   According to your memory or the notes that you

17  may have in front of you or have been able to refer to, what

18  was -- when you first started your examination of this young

19  man, what -- anything immediately apparent as you started the

20  external examination of the body?

21  A.    Well, the most significant findings were the evidence of

22  injuries.

23  Q.    All right.   Were there -- was there evidence, in fact, of

24  injuries that appeared to be gunshot wounds of some sort?

25  A.    Yes.

Greenberg - Direct Examination

1  Q.   Maybe if you could just detail the ones that you noted, at

2  least in general terms, for the ladies and gentlemen of the

3  jury.

4  A.   Okay.   There were multiple gunshot wounds and, in fact,

5  there were ten gunshot wounds that were identified.   And I'll

6  just go through them very briefly, and the order that I go

7  through them in does not imply the order in which they were

8  received.   I go basically from the top of the head down, okay?

9  Q.   In fact, from the work that you kind of -- that you do, is

10  it possible for you to make conclusions about the order of when

11  particular gunshot wounds were suffered?

12  A.   There are certain instances where that's possible based on

13  the degree of hemorrhage or a fracturing pattern, but a lot of

14  times it's very difficult to do that.

15  Q.   In this case would that have been something that you could

16  reach any conclusions?

17  A.   No.

18  Q.   All right.   Start at the top of the body and then proceed,

19  please.

20  A.   Okay.   So the first one that I'll describe is a gunshot

21  wound to the head.   And there is an entrance wound that is on

22  the right side of the head and the bullet passes through the

23  skull and all the way through the brain and exits on the left

24  side of the head.   And this was one is traveling, in general,

25  obviously from right to left, a little front to back and

1  slightly downward.

2          The second one that I am going to describe is on the
3  right side of the neck.  The entrance is on the right side of
4  the neck.  It enters, goes through the muscle, hits the right
5  side of the fourth cervical vertebrae, so one of the bones of
6  the spine.  And in that region there's an artery that supplies
7  blood up to the brain called the vertebral artery.  So that can
8  be injured in that region.  It also injured the esophagus where
9  you swallow your food, the larynx which is where you breathe
10  and where you create sound for your voice.  It went through the
11  thyroid gland just an endocrine gland that sits in the front of
12  your neck.  And exited on the left side of the neck.  So that
13  one went from right to left.

14          The third one that I will describe is on the back of
15  the right arm.  So we have an entrance on the back of the arm
16  that goes through the muscle of the arm, and there is an exit
17  on the inside or medial right arm.  That bullet then reentered
18  the chest and went through the muscle on the right side of the
19  chest but then exited on the front of the chest.  So that one
20  was traveling from back to front, right to left and maybe a
21  little bit in the downward direction.

22          And when I am describing these as far as directions,
23  you have to picture an upright body standing with their arms
24  out to the side and the palms facing front.  So this is not
25  necessarily a realistic description of this incident, how the

Greenberg - Direct Examination

1  bullets traveled, that that's our anatomic diagram that we use

2  to describe the directions.

3          Okay.  The fourth -- okay.  The next group of wounds

4  I am going to describe four of them together, okay?  They are

5  on the right upper back and back of the shoulder.  So there's

6  four wounds there.  And because they're so tightly grouped,

7  they're very difficult to separate each individual wound path

8  so I kind of describe them together.

9          One of them passes through the axilla, which is the

10 armpit.  They all kind of commingle or travel together through

11 the right scapula, the right --

12 Q.   The scapula is what?

13 A.   Oh, sorry.  The shoulder blade.

14 Q.   Okay.

15 A.   The back of the first and second ribs on the right, the

16 right upper lobe of the lung.  And the lung has this area that

17 we call the hilum, and that is basically the part where the

18 lung attaches to its blood vessels and to the airways.  And the

19 bullet -- or the bullets passed through that area as well.

20 Q.   You said there were four, correct?

21 A.   That's correct, there were four of them.

22         One of them then exited on the right front of the

23 chest.  The other three continued to travel more towards the

24 left passing through the heart and then exiting on the front of

25 the left chest.  So kind of complicated crossing paths, one

Greenberg - Direct Examination

 1  coming out on the right and three kind of going and coming out

 2  on the left chest.

 3  Q.    But all of those did exit the body.

 4  A.    All of those did exit, all four of those.  Two of those

 5  wounds on the back were interesting because they had some

 6  features on the skin that are a little bit different than some

 7  of the others.

 8  Q.    What was that feature?

 9  A.    They had what we call gunpowder tattooing or stippling.

10  So that is just basically abrasions of the skin where gunpowder

11  that comes out of the barrel of the gun, injuries the skin.

12  One of them also had the presence of soot which is the fine

13  particles that also come out of the barrel of a gun.  And those

14  indicate to us a general range of fire.  So where the gun is

15  held in a distance from the skin.  And when we have this

16  pattern tattooing or stippling, that puts it in what we call an

17  intermediate range.

18  Q.    Meaning which would be roughly what?

19  A.    And it depends -- this is highly qualified.  It depends

20  very much on the type of weapon, the caliber of weapon, the

21  type of ammunition, the type of powder that is inside that

22  bullet, how clean it is, etc.  And every individual gun is

23  going to be different.  But in general, you will have visible

24  stippling up to 2 to 3 feet, but a tight grouping of stippling

25  with some soot deposition is going to put you probably in the

Greenberg - Direct Examination

1   6-inch range.  And, again, it is incredibly variable.  And the

2   other thing that can affect this is if there is an intermediate

3   target or something that the bullet is near or passes through.

4   Q.   In what sense could that affect?

5   A.   That can be a person who is wearing clothing.  That can be

6   considered an intermediate target that the bullet has to pass

7   through, and so it will filter out this soot and gunpowder

8   particles.

9           In a case like this, it could be -- we know that some

10  of these passed through the back of the car seat.  And so the

11  particles that are coming from the gun are going to get stopped

12  by that seat.  It is going to affect the patterns that we see

13  on the skin.

14  Q.   All right.  So we covered those four tight ones.

15  A.   Right.

16  Q.   Any other gunshot wounds?

17  A.   Yes, there were three that were present on the right

18  middle back grouped together, and I am going to describe them

19  kind of together too because their paths are a little bit

20  commingled as well.

21          So they're on the right middle back.  They go through

22  the right back of the chest wall through what we call the

23  intercostal space, which is the space between two ribs -- so

24  the tenth intercostal space -- injuring the tenth vertebrae in

25  the thoracic region; the liver; the pancreas; the splenic

1  artery, which is the large artery that passes right by the
2  pancreas; and the stomach.  None of these wounds exited and we
3  have a bullet and a jacket fragment that are recovered from the
4  muscle on right side of the abdomen or the flank.  We have a
5  bullet and two jacket fragments from the right middle abdominal
6  wall so the front of the belly.  There was a bullet in the
7  tenth thoracic vertebra, and then there was a copper jacket.
8  So the outer portion of the bullet on the front of the stomach.
9  So one of the bullets had separated and we had a jacket
10  fragment.
11  Q.   Did we get all ten?
12  A.   That should be it.  One, two, three, four, five, six,
13  seven, eight, nine, ten.  Yes, got all ten.
14  Q.   All right.  And I think you already said, but from the
15  kind of work you do in your experience and training, you're
16  able to determine what an -- whether a particular type of
17  gunshot wound is entry or exit; is that correct?
18  A.   Yes.
19  Q.   In this particular case, the entry wounds were on what
20  part of this young man's body?
21  A.   Well, considering we covered quite a few from, you know,
22  head down, but they were all on the right side of the body and
23  those -- well, so right side of the head would be the entrance.
24  Right side of the neck was an entrance.  The right upper back
25  and shoulder were the entrances, and the right midback were the

1   entrances.  And the exits were all on the opposite side.

2   Q.   Dr. Greenberg, did you, in fact, conclude that gunshot

3   wounds were, in fact, the cause of this young man's death?

4   A.   Yes.

5   Q.   All right.  This may be a question that you can't answer,

6   but given the number of wounds here, are you able to form an

7   opinion about whether any of these gunshot wounds individually

8   would have been fatal to Mr. Lamb or is that a question that's

9   not really answerable?

10  A.   No, I can answer that.

11  Q.   Go ahead.

12  A.   Okay.  Sorry.

13  Q.   Which wounds -- at least in the terms of likelihood, which

14  ones would have -- even if it was just that one particular

15  gunshot wound would have had a pretty decent likelihood of

16  being fatal.

17  A.   Well, the one that involves the brain, so the one of the

18  head.  That one would have been fatal.  The wound to the neck

19  had the potential to be fatal.  If it's injuring the vertebral

20  artery on the side of the neck, that can certainly lead to

21  bleeding as well as injury of the larynx, or the upper part of

22  the airway that I mentioned.  You can certainly get bleeding

23  from other areas that gets down into the lungs that way.

24           The ones that traveled through the chest injuring the

25  lung and injuring the hilum of the lung, those can lead to

1  significant bleeding.  When they injure the lung, they can also

2  lead to difficulty breathing as well as the bleeding.

3       Some of those going through the heart, that can be a

4  devastating injury.  The heart can no longer pump.  So those

5  can be fatal.  And then all of the ones in the abdomen, injury

6  to the liver will bleed, injury to the pancreas and to the

7  splenic artery, those will all bleed.  So you can have blood

8  loss and potential death from that as well.

9  Q.   All right.  Perhaps there were one or two that would not

10 have been fatal, correct?

11 A.   Correct.

12 Q.   And most likely.

13 A.   Right.  I mean, the one that goes into the right arm, that

14 just injures muscle, didn't hit a major artery, and it goes

15 into the chest but doesn't go inside the chest itself to injure

16 an organ, just through the muscle.  So that's what we consider

17 more of a superficial wound and really not potentially fatal.

18 And then there was one that -- the one of the upper back that

19 went through and exited on the right front of the chest.  That

20 one didn't really hit too much of importance, if you will,

21 compared to the other ones.  It certainly could have bled more

22 over time but probably was the least lethal of those.

23 Q.   All right.  As part of the process of examining this young

24 man's body, did you actually take -- you or somebody at your

25 direction take some x-ray type of photographs of the body?

Greenberg - Direct Examination

1  A.    Yes.

2  Q.    All right.  I am going to display to you what's already

3  been admitted as Government's Exhibit 111.  You should be able

4  to look at it on your screen closely or up above on the big

5  screen, whatever is most convenient for you.

6          What are we looking at there being illustrated in

7  Government's 111?

8  A.    So this is an x-ray of the -- what we would call the

9  torso.  So it is the lower chest and the upper abdomen.  So

10 from the top of the picture there's kind of a blob in the

11 center and that's the heart.

12 Q.    You know what?  You can take your finger there on the

13 screen and go ahead and -- there you go.

14 A.    Oh, look at that.  Okay.  So right above -- right here is

15 the heart (Indicating).  This area here is going to be the

16 diaphragm, and then there are these --

17 Q.    Okay.  The diaphragm is?

18 A.    The diaphragm is the large muscle that separates the chest

19 from the abdomen, and it helps with breathing, separates the

20 chest and abdominal cavity.

21          So down below we see sort of these white bright dots.

22 Q.    Maybe put an X on a couple of them.

23 A.    Yeah, there is one here, one here, here --

24 Q.    That's fine.

25 A.    -- here (Indicating).  Those are the things that we're

Greenberg - Direct Examination

1  talking -- those are intact bullets or portions of a bullet or

2  jacket.  And, I mean, you can see that there's extra little

3  small fragments.  We found, you know, fragments of jacket along

4  with core or bullet itself throughout the abdomen.

5          THE COURT:  What is a jacket?

6          THE WITNESS:  The jacket is the metal covering that

7  surrounds the core or the central part of the bullet.  And so

8  when they come in -- if they go through an intermediate target,

9  which can be a foreign object, or like a part of the car or

10 even bone in the body, that jacket can separate from the bullet

11 core.  And so that's why you don't always get one nice pretty

12 bullet.  You will get pieces throughout the body.  So we're

13 getting multiple pieces of bullet and pieces of the jacket or

14 the covering.

15 Q.   (BY MR. KLASSEN)  All right.  And then let's put up

16 Government's Exhibit 112.  This may basically illustrate the

17 same thing.  And if it does, just tell me.  And I'll clear the

18 annotations.  Is that basically --

19 A.   Yes.

20 Q.   -- a similar view?

21 A.   Yes.

22 Q.   All right.  It looks like -- well, all right.  Let's look

23 at 113.  This is something a little different.  What are we

24 looking at in Government's Exhibit 113?

25 A.   So this is an x-ray of the head and neck.  And so up here

1   in the head you can start to see these kind of black lines

2   traveling through the skull.

3   Q.    What are those?

4   A.    Those are fractures, and that's related to the gunshot

5   wound as it travels through.   You'll get an entrance defect on

6   the right side, which is over here, exit on the left.   And then

7   as that bullet passes through the skull, the pressure causes

8   fractures to extend from that entrance and same from the exit.

9   So the head -- the skull itself does not look exactly

10  symmetric.   Like right here (Indicating), instead of being

11  round, it is a little bit depressed and that's from the

12  fractures.

13  Q.    All right.

14  A.    And you can also see a little bit down here in the neck.

15  There's a little bit of those kind of black color inside that

16  soft tissue, and that's just illustrating part of the wound

17  track that's traveling through the neck.

18  Q.    All right.   Those various fragments and pieces that we saw

19  on the earlier exhibit as part of the autopsy or examination

20  process, are they removed from -- did you remove them from the

21  body?

22  A.    Yes.

23  Q.    And those are -- what happened to those in this case?

24  A.    They get packaged into evidence envelopes and documented

25  for where they were recovered from.

Greenberg - Direct Examination

1   Q.   And the police department takes those back, correct?

2   A.   That's correct.

3   Q.   All right.  And Exhibit 119, is that's what's being

4   illustrated here?

5   A.   Yes, that's as -- as I am taking them out and keeping

6   track of where they are from, that's one photograph of it.  And

7   then one is individually packaged into its own envelope.

8   Q.   All right.  Dr. Greenberg, in addition to noting the

9   gunshot wounds that you've already described for the jury, was

10  there an examination of the exterior of his body for things --

11          MR. KLASSEN:  Yes, I'm finished, Dorothy.  Thank you.

12  Q.   (BY MR. KLASSEN)  -- examination of his body for things

13  like contusions or bruises?

14  A.   Yes.

15  Q.   Did you note any as part of your examination of Mr. Lamb's

16  body?

17  A.   Yes.

18  Q.   Perhaps -- not necessarily every single one, but ones that

19  were notable to you or certainly that appeared fresh, for lack

20  of a better word, is that a distinction that you can make, that

21  a particular bruise appears to have occurred recently as

22  opposed to one that may be older and healing?

23  A.   In a lot of cases, we can.  In some cases, we can't.  It

24  used to be believed that color was definitive for telling you

25  the time frame of a bruise, but I think everyone has experience

Greenberg - Direct Examination

1   with their own bruises, that depending on the body party, some

2   of them heal different and have different colors so it is not

3   absolute.  But when I am looking at one particular person and I

4   see a bruise that looks green or brown, it looks a lot older

5   than one that looks fresh and blue and purple that has fresh

6   hemorrhage in it --

7   Q.    Hemorrhage is what?

8   A.    Hemorrhage is bleeding.

9   Q.    Okay.

10   A.    So I can tell basically if some are fresher than the

11   others in most cases.

12   Q.    All right.  So perhaps -- if you noted any, perhaps tell

13   the jury about maybe the more significant recent appearing

14   abrasions or contusions on Mr. Lamb's body.

15   A.    Okay.  First, I am just going to give you a brief

16   definition, but in the autopsy report, they are described as

17   blunt force injuries.

18   Q.    Blunt force injuries?

19   A.    Right.

20   Q.    Okay.

21   A.    And blunt force injuries is kind of our forensic

22   terminology for anything that's caused by a blunt or hard

23   object hitting the body or the body hitting a blunt object.  So

24   that can be what we call contusions, which are bruises.

25   Q.    Okay.

Greenberg - Direct Examination

1  A.   That can be abrasions, which are scrapes; and that can be

2  lacerations, which are splits or tears in the skin.  They're

3  all the same basic mechanism of blunt object hitting body or

4  body hitting blunt object.  It is just depends on how much

5  force and which part of the body which injury we get.

6  Q.   Would a fist, at least in some cases, be considered a

7  blunt forced object?

8  A.   Yes.

9  Q.   Okay.  Go ahead.

10 A.   So just very briefly, there were contusions or bruises

11 that looked more recent on the right forehead, the left side of

12 the nose, the left upper ear, the -- and the -- a large one on

13 the left arm.  There was a laceration, which is that skin

14 splitting or tearing, on the -- basically near the bridge of

15 the nose.  And then there were abrasions or the superficial

16 scrapes of the surface of the skin.  Those were on -- there's

17 some on the forehead, the nose, the cheek, the right upper

18 chest, right forearm, right elbow and the back of the right

19 ankle.

20 Q.   Okay.  And that at least covers the more significant ones.

21 A.   Yes.

22 Q.   All right.  Dr. Greenberg, you've already testified as to

23 the cause of death.  In this case given all the facts that were

24 presented to you in your own examination, do you have an

25 opinion as to the manner of this young man's death?

Greenberg - Direct Examination

1  A.    Yes.

2  Q.    What is that?

3  A.    The matter of death is homicide.

4  Q.    All right.  And finally, Dr. Greenberg, the federal

5  government is compensating you for your time today, correct?

6  A.    Yes.

7  Q.    All right.  And what is your basic fee for coming out here

8  today to testify in this matter or other court matters like it?

9  A.    Well, we get paid for these outside cases that we are

10  contracted for from outside counties that don't fall within our

11  routine jurisdiction, and we have a variable fee rate depending

12  on what it is that we're doing.  So for sitting on the stand, I

13  get paid one rate.  Do you really want --

14  Q.    Yes.

15  A.    Okay.  For time on the stand, it is at $550 an hour.  For

16  preparation time to review the chart and have meetings with

17  attorneys -- oh, God, this is terrible 295, I believe; and then

18  for travel or standby time, I believe it is $125, $135 an hour.

19  Q.    All right.  Thank you very much, Dr. Greenberg.

20             MR. KLASSEN:  Pass the witness.

21             THE COURT:  Mr. Leach?

22             MR. LEACH:  I have no questions for Dr. Greenberg.

23             THE COURT:  Mr. Garcia?

24             MR. GARCIA:  No questions, Your Honor.

25             THE COURT:  Mr. Pool?

1          MR. POOL:  No.

2          THE COURT:  Mr. Stroder?

3          MR. STRODER:  None.

4          MR. GARCIA:  I'm sorry, Your Honor.  Can I get a

5   question?  I forgot.  I'm sorry.

6          THE COURT:  I don't know.  We passed.  All right.

7          MR. GARCIA:  I am just so used to just saying "no

8   questions."

9                    **CROSS-EXAMINATION**

10  BY MR. GARCIA:

11  Q.   Good afternoon, Dr. Greenberg.

12  A.   Good afternoon.

13  Q.   Dr. Greenberg, you asked for a toxicology test on the

14  body?

15  A.   Yes.

16  Q.   And do you have the results of that, ma'am?

17  A.   I do.  Somewhere.

18  Q.   Okay.  Thank you.  Can you tell the -- first of all, tell

19  the jury what a toxicology report is?

20  A.   The toxicology report is detailing the results of an

21  examination on body fluids where our toxicology lab is looking

22  for the presence of alcohol or drugs.

23  Q.   Okay.  What is the purpose of getting a toxicology report

24  test?

25  A.   It depends on the type of case.  In some cases, we are

1   looking at those medications to see if they are being

2   appropriately taken, and others we're looking to see if those

3   drugs represent a cause of death.  And it is routine -- in our

4   office, it is part of our protocol that we get them on all

5   homicides.

6   Q.   Okay.  These are done under your supervision and

7   direction?

8   A.   It is ordered under my direction; however, the toxicology

9   lab is not my area.

10  Q.   But it is a report that you use to rely on reaching your

11  opinions, correct?

12  A.   Yes.

13  Q.   Okay.  And in this particular case, what drugs, if any,

14  were found in Mr. Lamb?

15  A.   In -- we tested -- or, excuse me, the laboratory tested

16  subclavian blood.  So that is blood that we draw from the

17  subclavian artery which sits right up here by your clavicle, or

18  your collarbone.  And in that blood there was methamphetamine,

19  amphetamine and alprazolam.

20  Q.   Do you know what that is?

21  A.   Alprazolam is Xanax.  So it is a mild anxiolytic

22  medication.  Kind of -- if you get anxious, you take it and it

23  kind of calms you down.

24  Q.   Okay.  Was there any other testing done on any other

25  fluids?

Greenberg - Cross-Examination

 1  A.   Yes.   Initially, what happens is we do testing on --

 2  excuse me -- the laboratory does testing on urine.   They do a

 3  screen.   And what that does is it picks up medications or drugs

 4  that might be in the system, and then they go and they confirm

 5  it in a blood sample.   In the blood sample, they can, A,

 6  confirm it; and then, B, quantify it, meaning that they can

 7  give us a number for how much is in there, which is very useful

 8  with -- like medications that are prescribed or taken over the

 9  counter.   So urine was initially screened.

10  Q.   What were the results of that?

11  A.   So the urine screening was positive for both amphetamine

12  and methamphetamine, which makes sense considering that we had

13  them in the blood.   So the urine was positive for THC, which is

14  the marker for marijuana.   Positive for benzodiazepine, which

15  then is what the alprazolam represented on the blood screen.

16  And that -- let's see.   Oh, and also the urine was positive for

17  ephedrine or pseudoephedrine.   That's tested as just a class of

18  drugs.

19  Q.   Okay.

20          MR. GARCIA:  That's all I have.   Thank you, Your

21  Honor.

22          THE COURT:  Mr. Pool, anything?

23          MR. POOL:  No questions, Your Honor.

24          THE COURT:  Mr. Stroder?

25          MR. STRODER:  None, Your Honor.

Greenberg - Cross-Examination

```
 1              THE COURT:  Mr. Klassen?
 2              MR. KLASSEN:  Nothing else, Your Honor.
 3              THE COURT:  Mr. Leach, anything else?
 4              MR. LEACH:  Nothing, Your Honor.
 5              THE COURT:  May this witness be excused, Mr. Klassen?
 6              MR. KLASSEN:  No objection.  She would like to get
 7  back to Fort Worth.
 8              THE COURT:  Mr. Leach?
 9              MR. LEACH:  No objection.
10              MR. GARCIA:  No objection, Your Honor.
11              MR. POOL:  No objection, Your Honor.
12              MR. STRODER:  None.
13              THE COURT:  Doctor, we appreciate you being here.
14  You're excused.  We'd ask you not to discuss the case or your
15  testimony with anyone except the attorneys until the jury
16  begins its deliberations, all right?
17              THE WITNESS:  Okay.
18              THE COURT:  Thank you, ma'am.
19              THE WITNESS:  Thank you.
20              THE COURT:  Will the government call its next
21  witness, please.
22              MR. LEWIS:  Recall Liz Henderson.
23              THE COURT:  All right.  For cross-examination, all
24  right.
25              Ladies and gentlemen, if you recall, Ms. Hernandez
```

Liz Hernandez - Cross-Examination

```
 1  was our last witness, I think, yesterday afternoon; and the
 2  government did its direct.  And the government -- I mean, the
 3  defendants' counsel are now going to do their cross-examination
 4  of her.
 5          Ms. Hernandez, would you state your name again for
 6  me, please.
 7          THE WITNESS:  Liz Hernandez.
 8          THE COURT:  Okay.  And you were sworn as a witness
 9  and testified yesterday?
10          THE WITNESS:  Yes, sir.
11          THE COURT:  You understand you're still under oath.
12          THE WITNESS:  Yes, sir.
13          THE COURT:  Okay.
14          You may proceed, Mr. Leach.
15          MR. LEACH:  Thank you.
16                        CROSS-EXAMINATION
17  BY MR. LEACH:
18  Q.  Ma'am, you entered into a plea agreement on March the 10th
19  with the United States government, didn't you?
20  A.  Yes.  Yes, sir.
21  Q.  Are you familiar with the terms of your plea agreement?
22  A.  Not really.
23          MR. LEACH:  Your Honor, may I approach the witness?
24          THE COURT:  You may.
25  Q.  (BY MR. LEACH)  Ms. Hernandez, I've handed you your plea
```

Liz Hernandez - Cross-Examination

1  agreement; is that correct?

2  A.    Yes, sir.

3  Q.    Okay.  Would you thumb through that for just a moment to

4  make sure it is all there, if possible.

5  A.    (Witness complies.)  Yes, sir, it's all here.

6  Q.    Okay.  And you were represented by an attorney in this

7  matter, correct?

8  A.    Yes, sir.

9  Q.    And you wanted that attorney to negotiate the best

10 possible deal for you; is that correct?

11 A.    Yes, sir.

12 Q.    You want to get home as soon as you possibly can, correct?

13 A.    Yes.

14 Q.    Okay.  How old are you?

15 A.    35.

16 Q.    And yesterday I believe you testified that you pled guilty

17 to all three charges; is that correct?

18 A.    Yes, sir.

19 Q.    That's not, in fact, true, is it, Ms. Hernandez?

20 A.    Yes.

21 Q.    Ms. Hernandez, I'd ask that you just look at the first

22 page of your plea agreement right under the language "Defendant

23 Liz Sanchez Hernandez" and read that.

24 A.    Okay.  Accounts to plead guilty to Count Three of the

25 pending superseding indictment.

Liz Hernandez - Cross-Examination

1  Q.   I am not asking you to read it.  I just want you to take a
2  look at stuff when I reference it, okay?
3  A.   Okay.
4  Q.   So you, in fact, only pled guilty to Count Three; isn't
5  that true?
6  A.   Yes, sir.
7  Q.   So you're incorrect in your ability to remember what
8  exactly you pled to; is that correct?
9  A.   Yes, sir.
10 Q.   And, in fact, as terms of your agreement, two charges are
11 going to be dismissed; is that correct?
12 A.   I guess.
13 Q.   Well, you were at your plea, correct?
14 A.   Yes.
15 Q.   The magistrate judge went through everything on your plea
16 agreement with you, didn't he?
17 A.   Yes, sir.
18 Q.   Your attorney explained your plea agreement to you.
19 A.   Yes, sir.
20 Q.   You were given an opportunity to ask any questions about
21 your plea agreement.
22 A.   Yes, sir.
23 Q.   Nobody forced you to plead guilty?
24 A.   No.
25 Q.   Threatened you?

Liz Hernandez - Cross-Examination

1  A.    No.

2  Q.    Coerced you?

3  A.    No.

4  Q.    It is something you did after reading that plea agreement

5  and agreeing to its terms, correct?

6  A.    Yes, sir.

7  Q.    And, in fact, Ms. Hernandez, your attorney got you a

8  sweetheart deal, didn't he?

9  A.    (Witness nodding head.)

10 Q.    Is that a "yes"?

11 A.    Yes.

12 Q.    In fact, you were looking at what term of imprisonment for

13 the charge you pled guilty to before this plea agreement?

14 A.    Life.

15 Q.    Life.  The rest of your life, correct?

16 A.    Yes, sir.

17 Q.    And you got what kind of deal?

18 A.    I believe it is 20 to 30.

19 Q.    So you could serve as little as 20 years for the offense

20 of murder; is that correct?

21 A.    Yes, sir.

22 Q.    And you could serve at the most instead of life, 30 years,

23 correct?

24 A.    Yes, sir.

25 Q.    And you know what a bargain is, right?

Liz Hernandez - Cross-Examination

1  A.    Yes.

2  Q.    It's a trade, an exchange.

3  A.    Yes, sir.

4  Q.    And in exchange for your bargain, what do you have to do?

5  A.    Testify.

6  Q.    Okay.  And you need to get a recommendation, don't you?

7  A.    Yes, sir.

8  Q.    And you want that recommendation, don't you?

9  A.    If possible, yes.

10 Q.    Okay.  And it is these gentlemen here that would make that

11 recommendation, isn't it?

12 A.    Yes, sir.

13 Q.    And you agreed to terms in your plea agreement that left

14 the sole discretion on whether they make that recommendation up

15 to them, didn't you?

16 A.    Yes, sir.

17 Q.    So if they're not pleased with your testimony, you don't

18 get the recommendation.  Is that your understanding?

19 A.    Yes.

20 Q.    You had to agree to cooperate, correct?

21 A.    Yes, sir.

22 Q.    And your cooperation is critical to you getting the least

23 amount of time possible.

24 A.    Yes.

25 Q.    And as part of that cooperation, you agreed to testify,

Liz Hernandez - Cross-Examination

1  didn't you?

2  A.    Yes, sir.

3  Q.    So you're going to testify, Ms. Hernandez, in a manner

4  that gives you the best chance at getting that recommendation,

5  aren't you?

6  A.    Yes, sir.

7  Q.    Okay.  Let's talk about your drug use.  You testified some

8  about it yesterday; is that correct?

9  A.    Yes, sir.

10  Q.    How long have you been using drugs?

11  A.    Since I was like 17, 16.

12  Q.    Okay.  And let's go to the time of May 2014.  You were

13  using marijuana at times?

14  A.    Yes, sir.

15  Q.    Okay.  You were a heavy methamphetamine user.

16  A.    Yes, sir.

17  Q.    Okay.  You said as much as 150 in one instance -- $150 a

18  day.

19  A.    Yes, sir.

20  Q.    Sometimes even $200 a day.

21  A.    Yes, sir.

22  Q.    Okay.  You used Xanax.

23  A.    Yes, sir.

24  Q.    Was that prescribed to you?

25  A.    No.

Liz Hernandez - Cross-Examination

```
 1   Q.    You were buying those?

 2   A.    Yes, sir.

 3   Q.    Or trading them?

 4   A.    Buying them.

 5   Q.    Okay.  And what did the marijuana do for you?

 6   A.    It just relaxed me.

 7   Q.    Okay.  What does the methamphetamine do to you?  It would

 8   be the opposite of marijuana, wouldn't it, ma'am?

 9   A.    Yes, sir.

10   Q.    Keep you up all night.

11   A.    Yes, sir.

12   Q.    Make you tired?

13   A.    Not really.

14   Q.    Okay.  You were up, I think you said, sometimes days at a

15   time?

16   A.    Yes, sir.

17   Q.    A month at a time, you think?  Sometimes you would barely

18   sleep in a month.

19   A.    Yes, sir.

20   Q.    Okay.  It makes you paranoid?

21   A.    Yeah, sometimes.

22   Q.    Okay.  Affects your ability to recall things?

23   A.    Yes, sir.

24   Q.    Okay.  Affects your ability to perceive events as they're

25   happening, doesn't it?
```

Liz Hernandez - Cross-Examination

1  A.    Yes, sir.

2  Q.    Okay.  Tell me about the Xanax.  Same effect, correct?

3  A.    Yes.

4  Q.    Knocks you out?  Sometimes you can't remember?

5  A.    Yes, sir.

6  Q.    Don't know what's going on?

7  A.    Yes, sir.

8  Q.    And, in fact, you said you drank some tea and you don't

9  remember anything after that at all, do you?

10  A.    Yes, sir.

11  Q.    You don't have a good memory of the time of these events,

12  do you?

13  A.    Not completely.

14  Q.    You were high?

15  A.    Yes, sir.

16  Q.    Stoned?

17  A.    Yes, sir.

18  Q.    Not sleeping?

19  A.    Yes, sir.

20        MR. LEACH:  I'll pass the witness.

21        THE COURT:  Mr. Garcia.

22                    **CROSS-EXAMINATION**

23  BY MR. GARCIA:

24  Q.    Ms. Hernandez, you were shown the video of the vehicles as

25  they're getting into the hotel, is that correct, the motel?

Liz Hernandez - Cross-Examination

1  A.   Yes, sir.

2  Q.   And I believe you had testified that before that time in

3  the alleyway at Dixie and 16th or 17th, you mentioned that Rudy

4  Paredes got into Sean Lamb's vehicle, the one that he was in?

5  A.   Yes, sir.

6  Q.   But do you remember seeing the video as Sean Lamb's car

7  pulls into the parking lot?

8  A.   Yes, sir.

9  Q.   And do you recall that Rudy did not get out of that

10 vehicle?

11 A.   Yes, sir.

12 Q.   So you were wrong about that, correct?

13 A.   Yes, sir.

14 Q.   Okay.

15      MR. GARCIA:  That's all I have, Your Honor.

16      THE COURT:  Mr. Pool.

17                    **CROSS-EXAMINATION**

18 BY MR. POOL:

19 Q.   Good afternoon, Liz.

20 A.   Hello.

21 Q.   Liz, was Brian on any drugs during this time that you're

22 aware of?

23 A.   Marijuana.

24 Q.   Okay.  And you -- as you've already been questioned about

25 and testified to, you were using drugs daily, correct?

Liz Hernandez - Cross-Examination

1   A.    Yes, sir.

2   Q.    Would it be fair to say or would you agree with me that

3   Brian's memory of the events around this time would be sharper

4   than yours?

5   A.    Yes, sir.

6   Q.    Liz, you testified yesterday that you called Shaunte to

7   get ahold of Stacey Castillo so that she could help locate Sean

8   to recover the drugs, correct?

9   A.    Yes, sir.

10  Q.    Okay.  When you gave a recorded statement to the police,

11  do you remember doing that?

12  A.    Yes, sir.

13  Q.    It was back in October.  You were with your attorney and

14  some of the people at this table.  Do you recall that?

15  A.    Yes, sir.

16  Q.    During that recorded interview, do you remember saying --

17  do you remember telling the police, "I called Shaunte to get

18  ahold of Stacey so that I can find my car.  They stole my car.

19  I need help finding my car"?  Do you recall something to that

20  effect?

21  A.    I don't really remember that.

22  Q.    Okay.  A little bit further in the interview, do you

23  recall telling them, "I told Shaunte I needed help finding my

24  car"?  Do you recall making a statement to that effect?

25  A.    No, sir, I don't remember.

Liz Hernandez - Cross-Examination

1  Q.   Okay.  A little bit further during the interview, one of

2  the officers made a statement to you, and I want to see if this

3  refreshes your recollection.  One of the officers said, "I'm

4  making a few assumptions here, and I'm going to read between

5  the lines."  And he's talking to you, okay?  He says, "What

6  you're essentially saying is you called Shaunte to get Stacey

7  to recover the drugs.  Stacey and Ruben made an agreement so

8  that Stacey could get the drugs after she paid Ruben."  Do you

9  recall something like that?  And then the officer said, "That's

10 what you're saying without saying it.  You're just not

11 completely saying it."  Do you remember -- and you just went --

12 you went "uh-huh."  Do you remember anything like that?

13 A.   No, sir.

14 Q.   During that interview you also stated -- you know, you're

15 having trouble with your memory.

16 A.   Uh-huh.

17 Q.   And you told them, you know, you had been high and you

18 hadn't slept for a month.  Is that accurate?

19 A.   Yes, sir.

20        MR. POOL:  I'll pass the witness, Your Honor.

21        THE COURT:  Mr. Stroder.

22                    **CROSS-EXAMINATION**

23 BY MR. STRODER:

24 Q.   Ms. Hernandez, you were interviewed by Detective Sikes

25 back in October of last year; is that right?

1  A.    Yes, sir.

2  Q.    Okay.  And, of course, he wanted to know -- he wanted you

3  to talk to him and he was trying to get you to open up to him;

4  is that right?

5  A.    Yes, sir.

6  Q.    Okay.  Do you remember him asking you a question -- well,

7  this wasn't really a question, "Just being there did not make

8  you a party."  Did he make that statement to you approximately

9  18 -- 8 minutes and 30 seconds into the interview?

10  A.    I don't remember.

11  Q.    Okay.  About 28 minutes and 40 seconds into the interview

12  while he's talking to you, "Not your choices.  You're not

13  responsible.  You're just there."  Did you remember him saying

14  that?

15  A.    I think so.

16  Q.    Then later on at 29:45 seconds, he asked you:  "Did you

17  shoot Sean?"

18           "No."

19           "Then you're not responsible."

20           Do you remember that?

21  A.    No, I don't.

22  Q.    Ms. Hernandez, you say you were looking for the meth that

23  was missing.  Did you ever get any meth back?

24  A.    No, sir.

25  Q.    And Sean was dead?

Liz Hernandez - Cross-Examination

1   A.   Yes, sir.

2   Q.   It's not in your plea agreement, but were you concerned

3   about Brian's fate in this whole matter?

4   A.   Yes, I was.

5   Q.   Is that also part of the reason you're pleading guilty?

6   A.   No.

7   Q.   Is that also not part of the reason you're testifying

8   today?

9   A.   No.

10  Q.   Do you know how much time that Brian has agreed to accept

11  and -- as a bargain for his plea and testimony?

12  A.   No.

13  Q.   And the officers never told you?

14  A.   I'm sorry?

15  Q.   The officers, anybody with the government never told you?

16  A.   I don't remember.

17  Q.   You don't remember?

18  A.   No.

19  Q.   Have you got some state court charges against you?

20  A.   Not that I believe of.

21  Q.   Well, you had charges of a capital murder over in Ector

22  County, did you not?

23  A.   Yes, sir.

24  Q.   Is there an agreement that those are going to disappear?

25  A.   No.

Liz Hernandez - Cross-Examination

1  Q.   Did the government tell you that those charges wouldn't be

2  processed?

3  A.   No, sir.

4  Q.   So I guess the State can take your testimony that you've

5  given to us in court and use it to prosecute you for capital

6  murder.  Is that your understanding?

7  A.   Yes, sir.

8  Q.   Same goes for Brian?

9  A.   Yes, sir.

10          MR. STRODER:  I'll pass the witness.

11          THE COURT:  Mr. Lewis?

12          MR. LEWIS:  No questions of the witness, Your Honor.

13          THE COURT:  Okay.  May this witness be excused,

14 Mr. Lewis?

15          MR. LEWIS:  Yes, Your Honor.

16          THE COURT:  Mr. Leach?

17          MR. LEACH:  Yes, Your Honor.

18          THE COURT:  Mr. Garcia?

19          MR. GARCIA:  Yes, Your Honor.

20          THE COURT:  Mr. Pool?

21          MR. POOL:  Yes, Your Honor.

22          THE COURT:  Mr. Stroder?

23          MR. STRODER:  Yes.

24          THE COURT:  Okay.

25          You're excused.  We'd ask you not to discuss the case

```
 1   or your testimony with anyone except your own attorney and the

 2   attorneys involved in this case, all right?

 3              THE WITNESS:  Yes, sir.

 4              THE COURT:  Thank you very much.

 5              THE WITNESS:  Do I keep this paper?

 6              THE COURT:  That's -- I think it was an exhibit.

 7              MR. LEACH:  I'll get it, Your Honor, if you want me

 8   to.

 9              THE COURT:  Yes.

10              Mr. Lewis, will the government call its next witness,

11   please.

12              MR. LEWIS:  The government will call Will Werner.

13              (Witness sworn by the clerk)

14              THE COURT:  All right.  You may proceed.

15              MR. LEWIS:  Thank you, Your Honor.

16                        WILL WERNER,

17            GOVERNMENT'S WITNESS SWORN AT 2:39 p.m.

18                     DIRECT EXAMINATION

19   BY MR. LEWIS:

20   Q.   Sir, would you state your full name for the record,

21   please.

22   A.   Yes, sir.  My name is Will Werner.

23   Q.   Spell your last name.

24   A.   W-E-R-N-E-R.

25   Q.   How are you employed, sir?
```

Werner - Direct Examination

1  A.   I am a special agent with Homeland Security

2  Investigations.

3  Q.   How long have you been a special agent with Homeland

4  Security?

5  A.   Approximately five years.

6  Q.   And where is your current duty assignment?

7  A.   Presidio, Texas.

8  Q.   How long have you been in Presidio?

9  A.   The entire time.

10 Q.   Does this five years with Homeland Security constitute

11 your entire law enforcement career?

12 A.   Yes, sir.

13 Q.   With Homeland Security being assigned in Presidio, what's

14 the nature of the investigations or offenses that you typically

15 investigate on a day-to-day basis?

16 A.   We investigate anything that happens on or around the

17 border, to include drug trafficking, human trafficking, the

18 smuggle of weapons, and currency into Mexico.  Anything that we

19 can tie an international nexus to.

20 Q.   In May of last year, May of 2014, did you have an

21 opportunity to provide some assistance to detectives with the

22 Odessa Police Department?

23 A.   Yes, sir, I did.

24 Q.   Do you recall the nature of or what that assistance was?

25 A.   Yes, sir, I do.

Werner - Direct Examination

1  Q.    And what was that assistance?

2  A.    On the 16th of May, I traveled to the Valero gas station

3  in Presidio to retrieve some electronic media.

4  Q.    And why did you do that?  What reason did you have to go

5  to the Valero gas station in Presidio?

6  A.    I sat down with Detective John Spivey -- or Sikes, excuse

7  me, and he and I sat through an interview.  And from that

8  interview, we obtained some information that there was possibly

9  some video surveillance at the Valero gas station that could be

10 useful in his investigation.

11 Q.    So did you follow up on that?

12 A.    Yes, sir, I did.

13 Q.    What were you able to -- well, first off, did you know

14 which Valero gas station to go to in Presidio?

15 A.    Yes, sir.  There is only one.

16 Q.    Oh.  That kind of limited it -- narrowed it down a little

17 bit.

18 A.    Correct, sir.

19 Q.    So you went to the Valero gas station on the 16th of May.

20 Who did you meet with?

21 A.    I met with Sergio Madrid.  He is the general manager there

22 at the gas station in town.

23 Q.    What did you mention to Mr. Madrid you were there for?

24 A.    I introduced myself formally.  Told him the reason we were

25 there.  We would like to review his video surveillance system

1    at his -- at his job place.  He fully consented to that, and we

2    went to the back room and reviewed the tapes.

3    Q.    And did you personally review those tapes?

4    A.    Yes, sir, I did.

5    Q.    And based upon your review, what, if anything, did you

6    note or see that you thought might be of interest to Detective

7    Sikes?

8    A.    There were several persons of interest that Detective

9    Sikes and I were looking for in that video.  During the review

10   of the video, we believed that we found the people that we were

11   looking for on the video, and I requested the general manager

12   to burn us a copy of the tapes.

13   Q.    And did he do that?

14   A.    He did.

15   Q.    And were you able to obtain those tapes?

16   A.    I was.

17   Q.    Okay.  After you obtained those tapes, did you have a

18   chance to review the tapes to make sure that they accurately

19   depicted what you had seen earlier prior to making these

20   copies?

21   A.    Yes, sir.

22   Q.    And did the tapes accurately depict what you had seen

23   earlier when you made the request of the general manager to

24   make those copies for you?

25   A.    Yes, sir.

Werner - Direct Examination

1  Q.   What did you do with that -- was it all on one CD or DVD?

2  A.   It was on one DVD, yes, sir.

3  Q.   What did you do with that DVD after you received it from

4  the Valero gas station manager?

5  A.   I held on to it for a couple of days until I was able to

6  travel to Odessa to turn that tape recording over to him.

7  Q.   To who?

8  A.   Detective Sikes.

9  Q.   Okay.  And then that was it.  You did -- you had nothing

10  else to do with those recordings.

11  A.   That is correct.

12  Q.   Okay.  Did you provide any other assistance in securing

13  any other evidence for Detective Sikes?

14  A.   That was it.

15        MR. LEWIS:  Pass the witness, Your Honor, at this

16  time subject to redirect.

17        THE COURT:  Mr. Leach?

18        MR. LEACH:  I have no questions for Agent Werner.

19        THE COURT:  Mr. Garcia?

20        MR. GARCIA:  No questions, Your Honor.

21        THE COURT:  Mr. Pool?

22        MR. POOL:  No questions, Your Honor.

23        THE COURT:  Mr. Stroder?

24        MR. STRODER:  I don't have any, Your Honor.

25        THE COURT:  May this witness be excused?

```
 1              MR. LEWIS:  Yes, Your Honor.

 2              THE COURT:  Any objection?

 3              MR. LEACH:  No objection.

 4              THE COURT:  Any objection?

 5              MR. GARCIA:  No objection, Your Honor.

 6              MR. POOL:  No objection, Your Honor.

 7              MR. STRODER:  None.

 8              THE COURT:  We appreciate you being here, Agent, and

 9  you're excused.  We'd ask you not to discuss the case with

10  anyone except the attorneys in this case until the jury begins

11  its deliberations, okay?

12              THE WITNESS:  Thank you.

13              THE COURT:  Call your next witness, please.

14              MR. LEWIS:  Your Honor, the government would call

15  Heath Hardwick.

16              (Witness sworn by the clerk)

17              THE COURT:  You may proceed.

18              MR. LEWIS:  Thank you, Your Honor.

19                       HEATH HARDWICK,

20          GOVERNMENT'S WITNESS SWORN AT 2:44 p.m.

21                     DIRECT EXAMINATION

22  BY MR. LEWIS:

23  Q.   Sir, would you state your full name for the record,

24  please.

25  A.   My name is William Heath Hardwick.
```

Hardwick - Direct Examination

1  Q.   Sir, how are you employed?

2  A.   I am a special agent with the Department of Homeland

3  Security Investigations currently assigned to the Corpus

4  Christi office.

5  Q.   How long have you been in the Corpus Christi office?

6  A.   Since February.

7  Q.   Prior to -- and when you say "February," is this February

8  of this year?

9  A.   Yes, sir, that's correct.  February of this year.

10 Q.   Prior to being assigned in the Corpus Christi office in

11 February of this year, what was your duty assignment?

12 A.   I was assigned to the Midland office here doing computer

13 forensics work, cell phone analysis work.

14 Q.   And how long had you been in the Midland office?

15 A.   For about seven years.

16 Q.   How long have you been with Homeland Security?

17 A.   Since 2003.

18 Q.   And during that time with Homeland Security, you said you

19 do forensics, computer forensics and forensics on cell phones?

20 A.   Yes, sir, that's correct.  I started that in 2008.

21 Q.   Okay.  And what kind of training did you have to go

22 through or schooling or education to be able to do this type of

23 forensic analysis or forensic examination of those types of

24 media?

25 A.   I first started off at the Federal Law Enforcement

Hardwick - Direct Examination

1   Training Center.  It's called FLETC in Georgia.  I was there

2   for about a month and a half going through basic computer

3   forensics training, also doing -- become A plus certified,

4   meaning able to work on computers and stuff like that.  Shortly

5   after that, about less than a year, I went to cell phone

6   computer -- or cell phone forensics training.  And for two

7   weeks, I was in Washington, D.C., learning Cellebrite and other

8   forensic tools that are used to analyze cell phones.

9   Q.   Well, let me ask you:  You mentioned the term

10  "Cellebrite."  Let's talk a little bit about that.  What is

11  Cellebrite?

12  A.   Cellebrite is the company that manufactures a device that

13  is called a UFED, and the UFED is what we use to analyze cell

14  phones with.  It's pretty much a self-automated system.  You

15  open up the back of the cell phone or you find out what the

16  device model is, you find the device model name and the device

17  itself, press enter and the system itself goes through and

18  reads the file systems of the cell phone and pulls out

19  photographs, text messages, anything in the phone that you may

20  need for your report.

21       Once it has all that information, then it produces

22  all that information into a separate report.  And it is

23  self-automated.  It's pretty much a touch and off it goes by

24  itself.

25  Q.   But you received the training on how to utilize, use this

1  type of system and then analyze, review, read the reports and

2  digest the information that is provided to you through the use

3  of this software; is that correct?

4  A.    Yes, sir, that is correct.

5  Q.    Okay.  And for this type of training, is that the only

6  training you've ever received?

7  A.    For cell phones, yes, sir.

8  Q.    Okay.  And with regards to forensic analysis and forensic

9  training, is there routine updating or additional training that

10 you have to get -- to keep and maintain whatever certificates

11 that you have?

12 A.    For the cell phones, no, sir, there's not.

13 Q.    Okay.  What about for computers and that type?

14 A.    For computers, that are certain softwares that we use that

15 you would go back and get your training in or make sure you're

16 up to date.

17 Q.    Now, you've been using this Cellebrite system for how

18 long?

19 A.    Since 2008.

20 Q.    And during that time, there's been no changes, no updates,

21 no upgrades to the system or to the software that has required

22 you to go back and get any type of additional training?

23 A.    Additional training is not required; however, updates come

24 out as new cell phones are produced and put out by different

25 cell phone companies.  We have to update our software as those

 1   devices come out and get added to the system.

 2   Q.   And as that happens, do you have to keep -- you have to

 3   keep up to date with the industry and the changes and the

 4   technology; is that correct?

 5   A.   That is correct, sir.

 6   Q.   And as part of your training, in order to use this type of

 7   technology, do you have to keep up and maintain the changes

 8   with the updates and the phones and that type of stuff?

 9   A.   Yes, sir, Cellebrite itself sends out an e-mail saying

10   there's a new update.  You get that new update, add it to your

11   software, and then you're back up to speed with the latest

12   software.

13   Q.   During that time since 2008, have you ever experienced any

14   problems or difficulties in being able to operate or utilize

15   the Cellebrite system in the day-to-day -- in your day-to-day

16   duties performing cell phone -- or cellular phone analysis?

17   A.   No, sir.  It's pretty much an easy plug in.  You press the

18   model number and it will process the phone.

19   Q.   Okay.  Now, in connection with your duties and while you

20   were here and operating in Midland office, did you have an

21   occasion in May of last year to provide some assistance on a

22   cell phone examination to the Odessa Police Department?

23   A.   Yes, sir, I did.

24   Q.   Was it in connection with the investigation they were

25   conducting into Sean Lamb?

Hardwick - Direct Examination

1    A.    Yes, sir.

2              MR. LEWIS:  May I approach the witness, Your Honor?

3              THE COURT:  You may.

4              MR. LEWIS:  Thank you.

5    Q.   (BY MR. LEWIS)  Agent Hardwick, I've handed you first

6    what's been marked for identification purposes as Government's

7    Exhibit 125.  Do you see that?

8    A.    Yes, sir, I do.

9    Q.    Okay.  What is Government's Exhibit 125?

10   A.    This is a Nokia cell phone that was given to me by Odessa

11   Police Department to conduct an analysis on it.  I think it was

12   May 30th.

13   Q.    May 30th of when?

14   A.    Of 2014, I'm sorry.

15   Q.    And were you provided any instructions or directions or

16   what examination was necessary on that phone?

17   A.    No, sir.  They just asked me if I could perform an

18   analysis and generate a report for it.

19   Q.    And did you perform such an analysis?

20   A.    Yes, sir, I did.

21   Q.    And if you can, briefly tell us what type of analysis that

22   you performed.

23   A.    As I stated earlier, the Cellebrite that I use is a very

24   simple device.  You find out the model number of the cell

25   phone.  You find the model number and the software that we use.

1  Go to that location, hit enter, and the device itself will be

2  analyzed through the software.  And when it is completed, you

3  open up another piece of software and it produces that same

4  information you obtained from the phone into an Adobe Acrobat

5  document.

6  Q.   Okay.  Now, the phone that you were analyzing, did you

7  know whose phone it was?

8  A.    I was told this phone belonged to Stacey Castillo.

9  Q.   And when you connected it to your Cellebrite system, did

10  the system operate as it is supposed to?

11  A.   Yes, sir.

12  Q.   Did the system provide you with information extracted from

13  that phone into a report that you could then review and

14  analyze?

15  A.   Yes, sir.

16  Q.   Okay.

17        MR. LEWIS:  Your Honor, at this time the government

18  would offer Government's Exhibit 125.

19        THE COURT:  Any objections Mr. Leach?

20        What is 125?

21        MR. LEWIS:  The cell phone.

22        MR. LEACH:  No, no objection to 125, Your Honor.

23        THE COURT:  Mr. Garcia?

24        MR. GARCIA:  No objection, Your Honor.

25        THE COURT:  Mr. Pool?

1          MR. POOL:  Which one was 125?

2          MR. LEWIS:  The cell phone.

3          MR. POOL:  Could I ask Agent Hardwick a couple of

4    quick questions, Your Honor?

5          THE COURT:  You may.

6                    **VOIR DIRE EXAMINATION**

7    BY MR. POOL:

8    Q.    Good afternoon, Agent Hardwick.

9    A.    Yes, sir.  Good afternoon.

10   Q.    You testified that you were told the phone belongs to

11   Stacey Castillo?

12   A.    Yes, sir.

13   Q.    Did you take any steps to independently verify that?

14   A.    No, sir, I did not.

15   Q.    Did you attempt to see if the phone was registered to any

16   individual?

17   A.    No, sir.

18   Q.    Was there any independent proof that the phone belonged to

19   a Stacey Castillo?

20   A.    No, sir, I was told who the phone belonged to, and then I

21   did the analysis.

22          MR. POOL:  Your Honor, I'd object as to an

23   insufficient foundation.

24          THE COURT:  Mr. Lewis.

25          MR. LEWIS:  He said he obtained the phone from

Hardwick - Voir Dire Examination

1  Detective Sikes as part of the Sean Lamb investigation, was

2  asked to conduct it.  He received that information concerning

3  the phone.  It goes to weight, not to admissibly.

4          THE COURT:  Well, but -- Mr. Sikes ever tell how he

5  got the phone -- how he got the phone?

6          MR. LEWIS:  Mr. Sikes will be testifying, Your Honor.

7          THE COURT:  Okay.  And when is he supposed to

8  testify?

9          MR. LEWIS:  Will be next.

10          THE COURT:  Okay.  Well --

11          MR. STRODER:  Your Honor, I would like to add a

12  relevance objection just to follow-up to what Mr. Pool said.

13          THE COURT:  Well, I don't think there is any -- I

14  think Mr. Pool has got a good point about how do we know this

15  is that phone other than he was told that.  But there's no

16  chain of custody.  And I know chain of custody doesn't have to

17  be quite as precise in federal court as it does in state court,

18  but there's no proof of whose phone that is.  And I guess --

19  unless there was something in the phone when he analyzed the

20  phone that -- was there any --

21          Was there anything in the phone that would indicate

22  it was Ms. Castillo's phone?

23          THE WITNESS:  I did not analyze it in depth, Your

24  Honor, to determine that.

25          MR. LEWIS:  I'll deal with that -- I'll cover that

Hardwick - Direct Examination Continued

 1  with Mr. Sikes.

 2          THE COURT:  Okay.  So you'll recall him after --

 3          MR. LEWIS:  If necessary, Your Honor.

 4          THE COURT:  Okay.

 5          MR. LEWIS:  I would like to at least go into at least

 6  some of the items that he did find or locate on the phone so I

 7  don't have to recall him and then subsequently offer those

 8  after Detective Sikes has testified.

 9          THE COURT:  Well, that would be offering testimony

10  here before the jury on those matters, would it not?

11          MR. LEWIS:  I am just going to ask him about

12  particular items that he found without discussing or describing

13  those items.  I am not going to offer --

14          THE COURT:  Let's go ahead -- let's prove it up first

15  and then recall him to prove it up.

16          MR. LEWIS:  Okay.

17          THE COURT:  All right.  So is that all you have with

18  him now at this time?

19          MR. LEWIS:  Let me just -- just a couple of more

20  questions then, Your Honor.

21                  **DIRECT  EXAMINATION CONTINUED**

22  BY MR. LEWIS:

23  Q.   Agent Hardwick, once you completed your analysis, did the

24  Cellebrite system generate a report?

25  A.   Yes, it did, sir.

Hardwick - Direct Examination Continued

1  Q.   Okay.  And what -- did you have an opportunity to review

2  that report?

3  A.   Yes, sir, I did.

4  Q.   And generally speaking, the report that you received

5  contained what?

6  A.   Photographs that were obtained from the phone.

7         MR. POOL:  Your Honor, I am going to object to any

8  more testimony about this until the proper foundation has been

9  laid.

10        THE COURT:  Overruled.

11 Q.   (BY MR. LEWIS)  Other than photographs, did you receive --

12 or did the report generate anything else?

13 A.   No, sir, that was the majority of the information.

14 Q.   Okay.

15        MR. LEWIS:  I'll pass the witness at this time, Your

16 Honor, subject to recall.

17        THE COURT:  Okay.

18        Mr. Leach, anything?

19        MR. LEACH:  Nothing, Your Honor.

20        THE COURT:  Mr. Garcia?

21        MR. GARCIA:  No, Your Honor.

22        THE COURT:  Mr. Pool?

23        MR. POOL:  Nothing at this time, Your Honor.

24        THE COURT:  Mr. Stroder?

25        MR. STRODER:  No, Your Honor.

Sikes - Direct Examination

```
 1              THE COURT:  Okay.

 2              And so he's -- you're not excused so if you -- don't

 3    discuss your testimony with any of the other witnesses or

 4    anybody else and be available to be recalled, okay?

 5              THE WITNESS:  Yes, sir, Your Honor.

 6              THE COURT:  Thank you.

 7              Mr. Lewis, call your next witness, please.

 8              MR. LEWIS:  Detective John Sikes.

 9              THE COURT:  Would you state your name for us, please.

10              THE WITNESS:  John Sikes.

11              THE COURT:  And you were previously sworn as a

12    witness like on Monday; is that correct?

13              THE WITNESS:  Yes, sir, I was.

14              THE COURT:  You understand you're still under oath.

15              THE WITNESS:  Yes, sir, I do.

16              THE COURT:  You may proceed.

17              MR. LEWIS:  Thank you, Your Honor.

18                        JOHN SIKES,

19     GOVERNMENT'S WITNESS SWORN AT 8:55 a.m. on April 6, 2015

20                     DIRECT EXAMINATION

21    BY MR. LEWIS:

22    Q.   Detective Sikes, would you state your full name for the

23    record, please, and spell your last name.

24    A.   John Sikes, S-I-K-E-S.

25    Q.   How are you employed, sir?
```

Sikes - Direct Examination

1   A.    I am a sergeant with the Odessa Police Department.

2   Q.    And how long have you been a sergeant with the Odessa

3   Police Department?

4   A.    Since November.

5   Q.    Of?

6   A.    2014.

7   Q.    Now, is that your entire law enforcement career with the

8   Odessa Police Department?

9   A.    No, sir, it is not.

10  Q.    And what is -- how long have you been with the Odessa

11  Police Department?

12  A.    Approximately eight years.

13  Q.    And during that time, have you held any other positions in

14  the Odessa Police Department?

15  A.    Yes, sir.  Immediately prior to promoting to sergeant, I

16  was a member of the Robbery/Homicide Unit.

17  Q.    Okay.  And how long were you in the Robbery/Homicide Unit?

18  A.    Approximately three years.

19  Q.    During that time that you were in robbery/homicide, did

20  you happen to investigate a homicide that occurred on May 13th

21  of 2014?

22  A.    Yes, sir, I did.

23  Q.    And specifically with regards to that homicide, who was

24  the victim in that case?

25  A.    His name was Sean Lamb.

Sikes - Direct Examination

1  Q.    Where did the shooting take place?

2  A.    It took place in the alley, the -- I believe it would be

3  the north alley of Neta Place right behind No. 30.

4  Q.    Is that in Odessa?

5  A.    Yes, sir, it is.

6  Q.    Were you one of the responding officers to the scene?

7  A.    I responded immediately after patrol did.

8  Q.    Were you there at the scene most of the evening?

9  A.    Yes, sir.

10 Q.    At that time, what information did you have concerning the

11 death of Sean Lamb?

12 A.    I was sitting at my desk getting ready to go home and

13 Corporal Chadwick who is also part of my unit came up and he

14 told me that there was a shooting victim up in the Country

15 Club.  So I turned on my radio to listen.  And knowing that's

16 what we investigate, so I went ahead and took off out to the

17 car.  And as I was driving out there, I talked to Corporal

18 Ray -- Roy Ramos on the radio, and he advised me that Sean Lamb

19 was deceased in the vehicle up there.

20 Q.    Now, as you're standing there, what information -- how

21 does somebody work a homicide case from the scene?  What are

22 you looking for?

23 A.    Well, a scene like this, when I was the first investigator

24 to show up on the scene, and what I always like to do before

25 anything else is talk to the first responding officer, find out

Sikes - Direct Examination

1   who he talked to, what he saw, if anybody was around, of course
2   where the victim is and things like that and then what steps
3   he's taken up until that point.  And that gets me started.

4          With a scene like this, there wasn't much except for
5   the vehicle and the person inside of the vehicle whom we had
6   identified.  So first things first, find out whose vehicle and
7   get -- it is kind of a silly term, but what we call
8   victimology, and that's -- it is not an official term.  It is
9   just something that we use.  And it is basically finding out
10  everything we can about the victim, who his friends, family,
11  haunts, habits, all that kind of stuff so we can start from
12  there and progress out.
13  Q.   So what did you do with regards to this particular
14  investigation?  How did you employ that type of training that
15  you had received?
16  A.   The first thing I did was -- of course, I talked to Roy
17  and got what he had already done with the case.  But I believe
18  I even used his computer and I ran the vehicle, the license
19  plate number on the vehicle and found who that came back to.  I
20  found it did not come back to Sean Lamb.  So I called another
21  investigator to go ahead and write a search warrant for the
22  vehicle, where it sat.  And then I called other investigators,
23  "Let's get started on everything we know about the victim, find
24  their family, find their friends," things like that, and try to
25  get last moments of the person before they died.

Sikes - Direct Examination

1  Q.    Were you able to do that?

2  A.    Yes, sir, I was.

3  Q.    Okay.  So as this investigation now starts, where did this

4  investigation lead to as far as trying to figure out what led

5  to Sean Lamb being found dead in that alley?

6  A.    One of the investigators got into contact with Jacqueline

7  Pineda, and she advised that she loaned her vehicle to Sean

8  that afternoon and that he was dropped off with a couple of

9  individuals that she didn't know.  So we were kind of left on

10  an island there on that deal.

11         So we progressed that evening with -- I dispatched

12  detectives out to speak to the two subjects that ended up

13  calling into the police department, I believe, that they were

14  in the vehicle with Sean and reported an abduction of Sean at

15  16th and Dixie.

16         And, of course, at that time I had become aware that

17  several officers had gone over to the area of -- or the alley

18  behind the 1600 block of North Dixie, the east alley.  So I

19  told them, "Go ahead and stay where you're at.  Do some canvas

20  and take some photographs and collect any evidence that we

21  can."

22         And then I sent other detectives to talk to the two

23  witnesses.  I stayed with the scene.

24  Q.    So as this is unfolding, as this investigation is now

25  beginning, do you have at that particular point in time a clear

Sikes - Direct Examination

1    sense, a clear direction of where this is going to go, who

2    you're going to be talking to, who is going to be involved?

3    A.   Not initially, no.  It wasn't until the next day after we

4    had talked to the witnesses that we had.  We had talked to

5    Sean's family.  There wasn't too much.  So we started the

6    process of figuring out who is going to be searching the

7    vehicle, processing all that, contacting the right people.  It

8    wasn't until the next morning after a short night of sleep that

9    we got several Crime Stoppers tips in regarding this incident.

10   Q.   And there was some anonymous tips that were received.

11   A.   We got quite a few.

12   Q.   Where did those tips lead you to or at what -- how did the

13   investigation go based upon these tips?

14   A.   Well, we received several tips from the family directing

15   us towards the people --

16        MR. LEACH:  Your Honor, I'd object to that.  It is

17   hearsay.

18        THE COURT:  Sustained.

19   A.   The tips that we received sent us to -- I was talking

20   about the Crime Stoppers --

21        MR. LEACH:  Your Honor, I renew my objection.

22        THE COURT:  Sustained.

23   Q.   (BY MR. LEWIS)  Don't tell me what the tips were.

24   A.   Yes, sir.

25   Q.   But based on tips, where did it take your investigation?

Sikes - Direct Examination

1          MR. STRODER:  Your Honor, I'm going to object to

2  that.  That's indirect hearsay.  It means the same thing.

3          THE COURT:  Overruled.

4  A.    We came about information of Liz and Brian Hernandez at

5  1101 Fitch, Apartment 404.

6  Q.    (BY MR. LEWIS)  And were detectives within your department

7  dispatched, sent over to that location?

8  A.    Yes, sir, I sent Corporal Chadwick and at the time

9  Corporal Pete Gonzales.

10  Q.    Okay.  Did they -- do you know whether or not they met

11  with, spoke with Liz and/or Brian Hernandez at that location?

12  A.    They did.  I'm sorry.

13  Q.    My apology.

14          Did you receive updates, reports based upon those

15  interviews?

16  A.    I did.

17  Q.    And based upon those interviews, what, if anything -- what

18  actions were taken?

19  A.    Initially, they weren't forthcoming.  I told them to stick

20  with it.  And on my end, I would work and see, put a probable

21  cause on PAYER.  See if we had probable cause for a judge for a

22  search warrant.  And during that process, I found that

23  Ms. Hernandez did have a local warrant for arrested ticket.  So

24  I told them if she is seen again, we're going to execute a

25  search warrant on the residence.  It was signed by the judge at

Sikes - Direct Examination

1   that time.

2   Q.   This is all happening on the 14th of May; is that correct?

3   A.   Yes, sir.

4   Q.   And also on the 14th of May, are you receiving any other

5   information at this time?  Do you have any other detectives out

6   there conducting investigations, providing you with updates

7   that are helping you determine who is responsible -- who may be

8   responsible for the death of Sean Lamb?

9   A.   I'd like to look in my report.

10  Q.   Sure.

11  A.   I know I noted these people.

12          (Sotto voce discussion between Messrs. Lewis and

13  Klassen)

14  A.   At this time that this was going on, our focus pretty much

15  shifted to 1101 Fitch based on some of the statements that were

16  made to Chadwick and also the potential for evidence inside.

17  Q.   (BY MR. LEWIS)  Okay.  Did you go to that location that

18  day?

19  A.   I did not.

20  Q.   Okay.  At some point, though, were Liz Hernandez and Brian

21  Hernandez brought to the police department?

22  A.   Yes, sir, they were.

23  Q.   Okay.  Do you recall whether or not they were interviewed?

24  A.   They were.

25  Q.   Okay.  Did you participate in any of those interviews?

Sikes - Direct Examination

1  A.    I interviewed Brian Hernandez.

2  Q.    Were there other detectives interviewing Liz Hernandez?

3  A.    Yes, sir.

4  Q.    Based upon information you obtained during the course of

5  your interview with Brian Hernandez as well as the interview

6  with Liz Hernandez, did you develop any additional information,

7  any additional leads?

8  A.    Yes, sir, I did.   Through the interviews, I came to the

9  information about Johnny San Miguel as well as --

10         MR. STRODER:  Your Honor, again, I'm sorry, I'm going

11  to object.   This is hearsay.   It's indirect hearsay.

12         THE COURT:  Overruled.

13  A.    Brian told me about --

14         THE COURT:  Just a second.   Who is Brian?

15         THE WITNESS:  Brian Hernandez.

16         THE COURT:  Okay.  Go ahead.

17  A.    -- about Johnny San Miguel and Steven Saenz as being

18  friends and staying with them.   At that point we shifted

19  focus -- well, not at that exact moment, but we moved to go

20  find those two.   It was likely they were with Sean prior to his

21  death.   And we also came about the names of Noe Galan, Ruben

22  Hernandez and Stacey Castillo during that initial.

23  Q.    (BY MR. LEWIS)   Okay.  Did you attempt to locate or find

24  these individuals?

25  A.    We did.

1  Q.   What was the purpose for wanting to find and locate Ruben

2  Hernandez, Noe Galan and Stacey Castillo at that time?

3  A.   At -- well, Noe Galan and Ruben Hernandez, after that

4  portion of the interview, I had warrants -- I applied for

5  warrants for their arrest so finding them was hopeful.  Stacey

6  Castillo was a person of interest in the case due to the

7  statements that were made.

8  Q.   Okay.  And she became a person of interest why?  What were

9  you wanting to find Stacey Castillo for?

10 A.   It was believed at the time that she was a party to being

11 with several people that ultimately caused Sean's death on the

12 13th.

13 Q.   By May 14th, what information did you have -- or did you

14 have information as to any connection between Stacey Castillo

15 and Liz Hernandez?

16 A.   The only information I had is that they were friends at

17 that time.

18 Q.   But based upon that, you wanted to find her, see what

19 information she might have.

20 A.   Correct.  Yes, sir.

21 Q.   Were you able to locate Stacey Castillo?

22 A.   Yes, sir.  Well, not that day.

23 Q.   Okay.  As the investigation progressed, do you recall what

24 day you were able to locate her?

25 A.   It was the 15th of -- I'm sorry, 15th of May in 2014.

Sikes - Direct Examination

1  Q.    Okay.  And where were you able to locate her?

2  A.    In Marfa, Texas.

3  Q.    And did you travel to Marfa, Texas?

4  A.    I did.

5  Q.    Did you travel by yourself?

6  A.    No, sir.

7  Q.    Okay.  Who went with you?

8  A.    Corporal Keith Hudgens.

9  Q.    And when you got to Marfa, was Stacey Castillo there?

10  A.    Yes, sir, she was.

11  Q.    And when we talk about Stacey Castillo, the Stacey

12  Castillo that you met with in Marfa, do you see her in the

13  courtroom today?

14  A.    Yes, sir.

15  Q.    And if you could, point to where she is sitting, describe

16  what she is wearing for the Court and the jury, please.

17  A.    She is the female with her hair down, glasses on sitting

18  next to Mr. Pool.

19  Q.    Okay.  Did you have an opportunity to interview Stacey

20  Castillo?

21  A.    I did.

22  Q.    Okay.  Prior to your interview, did you advise her of her

23  rights?

24  A.    I did.

25  Q.    Did she agree to waive those rights and answer any

Sikes - Direct Examination

1  questions that you had?

2  A.    She did.

3  Q.    What was it that you wanted to talk to Stacey Castillo

4  about?

5  A.    The homicide of Sean Lamb.

6  Q.    Okay.  Did you know what information, if any, she might

7  have at that time?

8  A.    I did not.  It was vague, at best.

9  Q.    Okay.

10        MR. LEWIS:  May I approach the witness, Your Honor?

11        THE COURT:  You may.

12 Q.    (BY MR. LEWIS)  I show you what's been marked for

13 identification purposes as Government's Exhibit 31,

14 Government's Exhibit 32.  Do you see those?

15 A.    Yes, sir.

16 Q.    Are you familiar with Government's 31 and 32?

17 A.    I am.

18 Q.    What are 31 and 32?

19 A.    They're photographs that I took in Marfa, Texas, of a gray

20 Kia Optima.

21 Q.    And who did that gray Kia Optima belong to?

22 A.    Stacey Castillo.

23        MR. LEWIS:  Your Honor, the government would offer

24 Government's Exhibits 31 and 32.

25        THE COURT:  Any objection, Mr. Leach?

Sikes - Direct Examination

1              MR. LEACH:  No objection to 31 and 32.

2              THE COURT:  Mr. Garcia?

3              MR. GARCIA:  No objection, Your Honor.

4              THE COURT:  Mr. Pool?

5              MR. POOL:  No objection, Your Honor.

6              THE COURT:  Mr. Stroder?

7              MR. STRODER:  None, Your Honor.

8              THE COURT:  Government's Exhibits 31 and 32 are

9    admitted.

10             MR. LEWIS:  Thank you, Your Honor.

11   Q.   (BY MR. LEWIS)  During the course of the interview with

12   Ms. Castillo, tell me how the interview started, how it went,

13   what information she provided to you.

14   A.   Immediately upon her coming in, she told me that she knew

15   who I was and why I was there.  And she told me that we didn't

16   understand what we were doing and people were going to get hurt

17   because of us, being the police.  And I explained to her that I

18   was there to investigate a homicide that occurred in Odessa.

19   Q.   Okay.  During the course of that interview, was that

20   interview recorded?

21   A.   It was.

22   Q.   Okay.

23             (Sotto voce discussion between Messrs. Lewis and

24   Klassen)

25   Q.   (BY MR. LEWIS)  How long did that interview take?

Sikes - Direct Examination

1   A.    Several hours.  I don't recall the exact...

2   Q.    But have you had an opportunity to listen to that

3   interview since May 15th of 2014?

4   A.    Yes, sir, I have.

5   Q.    Did the recording that you made of the interview with

6   Stacey Castillo, was it an accurate and true recording

7   containing everything that you and Stacey talked about that day

8   in Marfa, Texas?

9   A.    Yes, sir, it was.

10  Q.    Okay.  From that interview, have you caused to be made or

11  have short clips of statements she made during that interview

12  been made for purposes of this trial today?

13  A.    Yes, they have.

14  Q.    Okay.

15          MR. LEWIS:  May I approach the witness, Your Honor?

16          THE COURT:  You may.

17  Q.    (BY MR. LEWIS)  And, Detective Sikes, I show you what's

18  been marked for identification purposes as Government's

19  Exhibit 126 through 167, I believe it is.  Yes.  Do those --

20  does that disk contain those excerpts from Stacey Castillo's

21  interview?

22  A.    Yes, sir, I believe it does.

23  Q.    Okay.  And in looking at -- or in listening to those

24  excerpts, do those excerpts accurately depict the interview

25  that you conducted with Stacey Castillo on that day, on

1  May 15th?

2  A.   Yes, sir.

3  Q.   Are they taken from the original four-hour -- or a

4  couple-hour interview that you did with Stacey Castillo that

5  day?

6  A.   Yes, sir.

7  Q.   Okay.

8          MR. LEWIS:  Government at this time would offer

9  Government's Exhibits 126 through 167.

10         THE COURT:  All right.  Mr. Leach?

11         MR. LEACH:  Your Honor, may we approach?

12         THE COURT:  You may.

13         (Sidebar conference on the record)

14         MR. GARCIA:  Your Honor, my concern is that these are

15  going to be statements against Stacey Castillo, and I

16  understand that they're admissible against her, but we would

17  object as to the admissibly against Mr. Paredes because it is

18  obviously statements made after the conspiracy is over and so

19  it would be hearsay as to us.  So we would object to the

20  introduction of those statements and at the very least ask the

21  Court for instruction to the jury that they cannot consider

22  these statements against --

23         MR. LEACH:  Anyone other than --

24         MR. GARCIA:  Yeah, anyone other than Ms. Castillo.

25         THE COURT:  Okay.  Anybody else?

Sikes - Direct Examination

```
1             MR. LEACH:  And I join in that.

2             MR. POOL:  Your Honor --

3             MR. STRODER:  As do I.

4             MR. POOL:  -- I've got an objection to Exhibit

5  No. 135.

6             THE COURT:  Let's just take up this oral objection

7  first.

8             MR. POOL:  Okay.  I'm sorry.

9             THE COURT:  Mr. Stroder, do you have the same

10 objection?

11            MR. STRODER:  I have the same objection.

12            THE COURT:  Okay.

13            Mr. Lewis, what is your response?

14            MR. LEWIS:  Well, the response -- she's talking --

15 the interview and the discussions, it is not whether the

16 conspiracy is still ongoing.  The conspiracy was ongoing

17 because she was down there taking Ruben Hernandez to Mexico at

18 that time.

19            THE COURT:  But the statement is not among

20 conspirators.  It's not -- I mean, her statement to the

21 officer.

22            MR. LEWIS:  Correct.  But the statements that she's

23 making are of actions made by conspirators -- or at least her

24 while she was a member of the conspiracy describing the

25 conspiracy.
```

Sikes - Direct Examination

1          THE COURT:  Well, that doesn't make the
2  co-conspirator but --
3          MR. KLASSEN:  Bruton's been taken care of.
4          MR. LEWIS:  But the other thing -- and I know there
5  is a lot of issue regarding Bruton, but we've taken and
6  condensed these so that the statements only pertain to things
7  that she has done or things that she is talking about.  She is
8  not talking about anybody else.
9          THE COURT:  So you've taken care of the Bruton issues
10  and the statements?
11          MR. LEWIS:  Yes, by doing the clips.  That's what the
12  purpose of the clips are.
13          MR. KLASSEN:  And there may be times when she refers
14  to "we" generically --
15          MR. LEWIS:  Or "they."
16          MR. KLASSEN:  -- but there's no specific reference
17  to --
18          THE COURT:  No specific reference to a name.
19          MR. GARCIA:  But I still think that the Court should
20  at least instruct the jury that these statements are admitted
21  against -- in the case against Ms. Castillo, not against the
22  other defendants.
23          THE COURT:  Okay.  I decline to do that.  The
24  statements are admissible as statements of a party and against
25  her interest.  I assume she was Mirandized before she gave the

Sikes - Direct Examination

1    statements so that's not a question.

2            All right.  Mr. Pool, what's your --

3            MR. LEACH:  May we have a running objection?

4            THE COURT:  You may, yes.

5            MR. LEACH:  Okay.

6            THE COURT:  Mr. Pool.

7            MR. POOL:  Your Honor, I have an objection to Exhibit

8    No. 135, 155 --

9            MR. LEWIS:  Can I get my cheat sheet?

10           MR. POOL:  Yes.

11           MR. LEWIS:  Okay.  Thank you.

12           (Sidebar conference on the record concluded)

13           THE COURT:  While we're discussing the basketball

14   game the other night between Wisconsin and Duke, why don't we

15   take a break right quick.  So leave your notepads here.  Don't

16   discuss the case among yourselves, and we'll take a short

17   recess.

18           Let's all rise for the jury, please.

19           (At 3:20 p.m., jury leaves)

20           THE COURT:  Okay.  Please be seated.  Okay.  We're

21   outside the presence of the jury.  And the attorneys are here.

22   The defendants are here.  And I think Mr. Pool had an

23   objection.  What were the numbers that you objected to,

24   Mr. Pool?

25           MR. POOL:  Yes, Your Honor.  I would object to

Sikes - Direct Examination

1    Exhibit No. 135 --

2            MR. KLASSEN:  135?

3            MR. POOL:  Yes.

4            MR. KLASSEN:  Okay.

5            MR. POOL:  -- 155 and 167 on the grounds that they

6    contain 404(b) evidence that was requested and not provided.

7            MR. LEWIS:  Okay.  The portion -- I guess I am not

8    understanding.  With regards to 155, I'm not -- I don't

9    understand the 404(b) notification issue.

10           MR. POOL:  That discusses carrying a firearm

11   previously, and that would fall under 404(b), Crimes, Other

12   Wrongs.

13           THE COURT:  But she's not charged -- she wasn't

14   charged with carrying a firearm, was she?

15           MR. POOL:  No, sir.

16           THE COURT:  Okay.  Overruled on 155.  What about 135?

17           MR. LEWIS:  135, that's another one I am not

18   understanding what the 404.

19           (Sotto voce discussion between Messrs. Lewis and

20   Pool)

21           MR. POOL:  Your Honor, just to -- I know Your Honor

22   already overruled me, but just for the record, for 155, my

23   position is 404(b) doesn't have to be charged activity.

24           THE COURT:  Okay.  But this is a crime in which

25   someone was killed and she's being accused of that crime and it

Sikes - Direct Examination

1    was -- they were killed by firearms.

2            MR. POOL:  But they're talking about previously in

3    the past carrying a firearm.  That would -- my argument is that

4    would fall under 404(b) notice that they would be required to

5    notify me of their intent to use.

6            THE COURT:  Okay.  And your objection is overruled.

7    Now, what is 135 about?

8            MR. POOL:  135 contains what the officer classifies

9    as a threat to a witness.  And, once again, that would be

10   classified as either a criminal activity or uncharged crime or

11   bad act which would fall under 404(b).

12           THE COURT:  Okay.  Overruled.  What else do you have,

13   167?

14           MR. POOL:  167 is, once again, referring to

15   possessing a firearm.

16           THE COURT:  Okay.  Overruled.  And, again, none of

17   these are charged offenses, correct?

18           MR. POOL:  That's correct, Your Honor.

19           THE COURT:  Okay.  All overruled.

20           All right.  So we'll take a break and then we'll come

21   back in here.  Any others -- besides those, Mr. Pool, are those

22   the only ones you had objection to?

23           MR. POOL:  Yes, Your Honor.

24           THE COURT:  Okay.  And, Mr. Stroder, do you have any

25   objections at all to the --

Sikes - Direct Examination

 1            MR. STRODER:  Not presently, Your Honor, but I was

 2  hoping -- we discussed it with them, if something comes up

 3  during the middle of these, we have a finger on a button.  We

 4  can hear our objection.

 5            THE COURT:  Have you listened to these?

 6            MR. STRODER:  Not all of them, no.  We just got these

 7  a couple of days ago.

 8            MR. LEWIS:  I've provided them -- they've had all the

 9  recordings --

10            MR. STRODER:  We've had the entire recordings, yeah,

11  but the excerpts we are talking about.

12            MR. LEWIS:  But I gave them the excerpts Monday

13  morning so that they could listen to them.

14            THE COURT:  Okay.  All right.  So Exhibits 126

15  through 167 are admitted; and the objections to 135, 155 and

16  167 are noted and overruled.

17            All right.  Let's take a recess and we'll come back

18  in here and finish up.

19            (Recess from 3:25 p.m. to 3:42 p.m.)

20            (At 3:42 p.m., jury enters)

21            THE COURT:  All right.  Let's all be seated.  It's

22  about 3:43, and we're in the courtroom with the jury.  And the

23  attorneys are present.  The defendants are present.  The jury

24  is present.  And Mr. Sikes is still on the stand.

25            And I've admitted, ladies and gentlemen, Exhibits 126

Sikes - Direct Examination

1  through 167 as well.

2          So, Mr. Lewis, you may proceed.

3          MR. LEWIS:  Thank you, Your Honor.

4  Q.  (BY MR. LEWIS)  One other thing, Mr. Sikes, when you did

5  this interview with Ms. Castillo and you recorded the

6  interview, was it audio only or was it audio and video?

7  A.  Yes, sir, the Marfa Sheriff's Office didn't have video

8  capability so I had to use a little digital recorder.

9  Q.  So it is just audio.

10 A.  Yes, sir.

11 Q.  Okay.  Now, typically as part of this investigation or

12 maybe the way you conduct all your interviews, tell me how this

13 interview progressed that you conducted with Ms. Castillo.

14 A.  Typically what I like to do is I am not a very

15 confrontational person when it comes to interviews.  I like to

16 tell them why I am there, tell the person what I am doing there

17 and what it is for and then ask them to tell me their side of

18 it.  And then if I do have evidence at the time of it, I

19 typically -- if I find inconsistencies of what the evidence

20 shows as compared to what they're saying, I present those to

21 them as they come out and ask them if they can explain for that

22 and then we progress on from there.

23 Q.  Okay.  So let me play a portion of that interview for you?

24          MR. LEWIS:  For the Court and the record, it is

25 Government's Exhibit 131.

Sikes - Direct Examination

```
 1              (Audio played)
 2  Q.   (BY MR. LEWIS)  What is Stacey Castillo describing to you
 3  at this particular part of the interview?
 4  A.   She's telling me that she was not in the alley in the 1600
 5  block of North Dixie in that east alley with Liz and the
 6  others.
 7  Q.   Where Brian was -- I'm sorry -- where Sean was abducted?
 8  A.   Correct.  Yes, sir.
 9  Q.   Then as the interview went on, at some point did her story
10  change?
11  A.   Yes, it did.
12  Q.   And what did she tell you, if you remember?
13  A.   She told me that they did go to the alley, but it was only
14  to get Sean's attention due to a transaction that had taken
15  place between Ruben and Liz and others involved.
16  Q.   Let me play for the jury now Government's Exhibit 138.
17              (Audio played)
18  Q.   (BY MR. LEWIS)  At this particular point in the interview,
19  when Stacey was referring to "they came up on us and ambushed
20  us," what was she describing to you?
21  A.   She was describing --
22          MR. STRODER:  Your Honor, I am going to object to him
23  giving an annotation of her confession.  It says what it says.
24          THE COURT:  Restate your question, please.
25  Q.   (BY MR. LEWIS)  When Ms. Castillo referenced or made
```

Sikes - Direct Examination

 1  reference as we heard to "they ambushed us," what was she

 2  referring to?  What was -- what was she telling you during the

 3  interview?

 4          MR. LEACH:  Your Honor, and I would object, too.

 5  That's --

 6          THE COURT:  Sustained.

 7  Q.   (BY MR. LEWIS)  Who ambushed -- according to Ms. Castillo,

 8  who ambushed them in the alley?

 9  A.   She told me that Liz's -- or Ruben's people -- and she

10  made several references to cartel members, specifically La

11  Linea cartel.

12  Q.   How did she describe this group ambushing them for you?

13  A.   She continuously called them "the Mexicans."  They were --

14  they didn't -- they dressed -- these are her terms, they

15  dressed like "Mexicans" and wearing plaid shirts and jeans and

16  boots.

17  Q.   How many people did she describe was part of this group?

18  A.   I don't recall her giving me a specific number but she

19  said there was a whole bunch of them, a large group of people

20  she didn't know.

21  Q.   Had she ever met these people before?

22  A.   No.

23  Q.   Based upon your investigation as of that particular moment

24  when you were interviewing Ms. Castillo, did that -- did those

25  statements of some other people ambushing her seem plausible?

1  A.   They did for the fact that we already had information

2  there was a large group of people involved in this, and we had

3  a whole bunch that were outstanding and didn't have names on

4  them at that time.

5  Q.   As your investigation continued, though, did her

6  statements of another group ambushing them in the alley, did

7  that hold any water?

8  A.   No, sir.

9  Q.   She described somebody named Noe.  Did you know who that

10 person was at the time?

11 A.   Yes, sir.

12 Q.   Who did you understand Noe to be at that time when you

13 were interviewing Stacey Castillo?

14 A.   Noe Galan.

15 Q.   Yes.  What did you know, if anything, about Noe Galan as

16 part of this investigation?

17 A.   At that time I knew that he was -- by the statements of

18 others he was -- he was involved in it and very probably the

19 person who shot Sean Lamb.

20 Q.   Let me play for you now Government's Exhibit 140.

21          (Audio played)

22 Q.   (BY MR. LEWIS)  And then let me play for you Government's

23 Exhibit 141.

24          (Audio played)

25          MR. LEACH:  Your Honor, I am going to object to that

Sikes - Direct Examination

```
 1  as hearsay, "somebody."
 2          MR. STRODER:  It is Bruton.
 3          MR. LEACH:  May I finish?
 4          MR. STRODER:  I'm sorry.  Go ahead.
 5          MR. LEACH:  It's a confrontation problem, it's
 6  hearsay, and I'd ask that it be struck and the jury so
 7  instructed.
 8          THE COURT:  Mr. Stroder, what's your objection?
 9          MR. STRODER:  My objection is I think she's talking
10  about somebody else.  It's a Bruton problem.
11          THE COURT:  Mr. Lewis?
12          MR. LEWIS:  We can -- may we approach, Your Honor?
13          THE COURT:  You may.
14          (Sidebar conference on the record )
15          THE COURT:  I thought you represented that all
16  references to what other people said were out of there.
17          MR. LEWIS:  To what other people said, correct.
18  She's describing her thing, "I've thought about it.  I've
19  thought about what Anthony and I have could done differently,"
20  but she's not talking about what somebody else said.
21          MR. LEACH:  But he is.
22          THE COURT:  Are you pointing at me?
23          MR. LEACH:  No, I'm not.
24          THE COURT:  Okay.
25          MR. LEACH:  I am pointing at the witness.  The
```

 1   witness says, "Somebody" -- he then says, "Somebody told me

 2   that Ray..."  Well, who is this somebody?  And either it is

 3   hearsay -- it's either not a co-conspirator and it's hearsay or

 4   if it is a co-conspirator, it is a Bruton problem.

 5             MR. STRODER:  I thought it was all cleaned -- all

 6   this --

 7             MR. LEWIS:  And that's why --

 8             THE COURT:  Don't point your finger.  Keep your

 9   finger down.  Keep your hand down.

10             MR. STRODER:  I was talking to him.  But I was

11   talking about I thought, you know, even the Anthony thing she

12   mentioned is verging on Bruton.

13             MR. LEWIS:  And that's why I provided these cuts to

14   you-all to see if you had any other issues with any of --

15             MR. LEACH:  You told me they didn't mention my guy's

16   name.

17             MR. LEWIS:  In the context of Bruton -- look, I'm

18   not -- okay.  But that's why I gave them to you and asked you

19   to review them in case there were any issues so that we could

20   take those up.

21             THE COURT:  Okay.  I am going to exclude that the

22   last one and give an instruction --

23             MR. LEWIS:  Okay.

24             THE COURT:  -- that they're not to consider that.

25   And that number is what?

Sikes - Direct Examination

1        MR. LEWIS:  141.

2        (Sidebar conference on the record concluded)

3        THE COURT:  Ladies and gentlemen, the jury is

4   instructed to disregard the very last clip that we heard, and

5   it is Clip No. 141.  You'll disregard it and not consider it as

6   evidence in this case.

7   Q.   (BY MR. LEWIS)  During the course of the interview with

8   Ms. Castillo, did you discuss with her anything else about the

9   alley and 16th and Dixie?

10  A.   Yes, sir.  I asked her if she witnessed any firearms in

11  that alley.  She said that she did, but it was only again the

12  Mexicans that had them.

13        And I asked her if -- while in that alley, if what

14  they were -- what the purpose of them being there.  And she

15  told me again that she was going to give them -- or give Sean

16  his clothes.

17        And I asked her if Sean was assaulted in the alley,

18  and she said that he was leaned on a little bit.  That was her

19  term for it.  She never claimed to assaulting him herself.  She

20  stated that other parties did that.

21  Q.   Let me play for you now -- well, before we get to that.

22  Was there any discussion during the course of the interview

23  with Ms. Castillo concerning the Parkway Inn?

24  A.   Yes, sir, there was.

25  Q.   Okay.  And specifically what did -- what did you ask her,

Sikes - Direct Examination

```
 1  what was said about what knowledge she had about going to the
 2  Parkway Inn?
 3  A.   I did, and she initially denied going there, but then she
 4  recalled that she did go.  However, she was not with the party
 5  that went -- the group of Mexicans that went with Sean.
 6  Q.   Let me play now Government's Exhibit 142.
 7            (Audio played)
 8  Q.   (BY MR. LEWIS)  As she describes to you, as she just said,
 9  what was the importance of finding Steven, according to
10  Ms. Castillo?
11  A.   She believed that Steven Saenz had stolen narcotics from
12  Liz and Ruben Hernandez.
13  Q.   Was that the purpose for finding Sean?
14  A.   Yes.
15  Q.   And the purpose for finding -- as she explained to you,
16  the purpose for finding Sean was to do what?
17  A.   To get to Steven.
18  Q.   And when they were able to find Steven, then what would
19  happen?
20  A.   Can I look at my report?
21  Q.   Sure.
22  A.   Okay.  Thank you.  I want to get it.
23            It was to recover the narcotics from Steven wherever
24  he was.
25            MR. STRODER:  Your Honor, if he's characterizing what
```

Sikes - Direct Examination

1   she had previously said -- I don't know what he's reading

2   from -- characterized what she previously said, because she

3   didn't say that.  It was to get clothes in the car, I thought.

4   I don't know what he's talking -- is he read from his own notes

5   or from what we just listened to?

6           THE COURT:  I don't know.

7           THE WITNESS:  It is from my narrative, sir.  From the

8   narrative in the report.

9   Q.   (BY MR. LEWIS)  You made notes of your interview with

10  Stacey Castillo as well, correct?

11  A.   Yes, sir, I did.

12  Q.   Okay.  In addition to listening to the interview that you

13  had with her, you made notes; is that correct?

14  A.   Correct.  Yes, sir.

15  Q.   And when you're saying you're referring to your narrative,

16  you're referring to the notes that you made during the course

17  of the interview that you conducted with Stacey to refresh your

18  memory as to different things that she said.

19  A.   Yes, sir.

20  Q.   Okay.  Now, let me move over to Government's 34, just 34.

21          MR. LEWIS:  If we could just dim the lights, please.

22          (Sotto voce discussion between Messrs. Lewis and

23  Klassen)

24  Q.   (BY MR. LEWIS)  Detective Sikes, you're familiar with this

25  video, are you not?

1  A.    Yes, sir, I am.

2  Q.    Okay.  This video, was it part of your investigation, part

3  of material that you've reviewed in order to determine who was

4  behind the murder of Sean Lamb?

5  A.    Yes, sir, it was.

6  Q.    Okay.  Did you believe that this information had some --

7  would help explain or provide some information as to who the

8  parties might be involved?

9  A.    Yes, sir.

10 Q.    Okay.  When you spoke with Stacey Castillo on May 15th,

11 were you aware of the contents of this video at that time?

12 A.    I was not.

13 Q.    Okay.  Subsequent to having interviewed her, you were made

14 aware of the contents and reviewed these videos; is that

15 correct?

16 A.    Yes, sir, I believe we recovered the video the next day.

17 Q.    What did Ms. Castillo tell you about her trip to Parkway

18 to find Steven?

19 A.    That it was just her and Liz and that she had parked on

20 the opposite side of the people who had Sean Lamb.

21 Q.    First, let me draw your attention to this vehicle here

22 (Indicating).  Do you see the vehicle I've circled?

23 A.    Yes, sir, I do.

24 Q.    And whose vehicle is that?

25 A.    Stacey Castillo's.

Sikes - Direct Examination

```
 1   Q.   Okay.  And then I'll draw a circle around the second
 2   vehicle.  Do you see that?
 3   A.   Yes, sir.
 4   Q.   What vehicle is that?
 5   A.   That's Jacqueline Pineda's vehicle with Sean Lamb.
 6   Q.   So when you were able to take a look at this, did her
 7   statements, as far as her description of where she went at
 8   Parkway Inn, was that truthful to you?
 9   A.   No, sir.
10   Q.   Now, what else did she describe to you about the purpose
11   for going to the Parkway Inn?
12   A.   To locate Steven Saenz.
13   Q.   Okay.  And who else did she say -- or who did she say went
14   there to locate Steven Saenz?
15   A.   Her and Liz.
16   Q.   Okay.  What about the Mexicans that --
17   A.   Oh, yes, sir.  She stated all of the people she did not
18   know were there.
19            (Video played)
20   Q.   (BY MR. LEWIS)  Now, as I pause it right here, do you see
21   this person (Indicating) that I've just circled?
22   A.   Yes, sir, I do.
23   Q.   Who is that person?
24   A.   I believe that's Anthony Gonzales.
25   Q.   Okay.
```

Sikes - Direct Examination

1              (Video played)

2  Q.   (BY MR. LEWIS)   The person that I've circled here, do you

3  see that person?

4  A.   Yes, sir, I do.

5  Q.   And do you recognize that person?

6  A.   Through the investigation I recognize that as Ruben

7  Hernandez.

8  Q.   Okay.

9              (Video played)

10  Q.   (BY MR. LEWIS)   And then this person coming up the steps

11  that I am now circling, do you recognize that person?

12  A.   Yes, sir.

13  Q.   And who is that?

14  A.   Rudy Paredes.

15              (Video played)

16  Q.   (BY MR. LEWIS)   This person standing here (Indicating),

17  are you able to identify that person for us?

18  A.   Yes, sir.

19  Q.   And who would that be?

20  A.   Stacey Castillo.

21              (Video played)

22  Q.   (BY MR. LEWIS)   Now, down here at the bottom (Indicating),

23  can you -- who is that standing next to the vehicle?

24  A.   That's Stacey Castillo.

25  Q.   Okay.  Can you make out what she's doing?

Sikes - Direct Examination

1  A.   It looks like she's talking to the person inside of the

2  vehicle.

3  Q.   And the vehicle we're talking about is what?

4  A.   It's the vehicle that Sean Lamb was inside of.

5  Q.   And when she's talking, on what side is she talking?

6  A.   The passenger's side.

7  Q.   Is that closest or furthest away from Sean Lamb?

8  A.   Closest.

9           (Video played)

10 Q.   (BY MR. LEWIS)  Do you see this person I've circled?

11 A.   Yes, sir, I do.

12 Q.   Who is that person?

13 A.   I don't know his identity.

14 Q.   Do you have a name?

15 A.   I do.  I have a tentative name of Bruno.

16 Q.   Do you have any other information?

17 A.   No, sir -- well, I have information that he is a West

18 Texas gang member but nothing else.

19          (Video played)

20 Q.   (BY MR. LEWIS)  And then who is this (Indicating)?

21 A.   That's Liz Hernandez.

22          (Video played)

23 Q.   (BY MR. LEWIS)  And then who is this (Indicating)?

24 A.   That's Brian Hernandez.

25          (Video played)

Sikes - Direct Examination

```
 1   Q.   (BY MR. LEWIS)  Now, as you watch this video, were you
 2   able to compare this video to the statements made by
 3   Ms. Castillo --
 4              MR. LEWIS:  You can go ahead and bring the lights up.
 5   Q.   (BY MR. LEWIS)  -- concerning other people having snatched
 6   up Sean and taking him away to another location?
 7   A.   Yes, sir, I did.
 8   Q.   Okay.  And as you compared, what conclusions did you
 9   arrive at or what conclusions did you reach?
10   A.   As a result of everything, there were no large amounts of
11   other people outside of this group that were there.
12   Q.   Okay.  That were there where?
13   A.   At the Parkway Inn and at 16th and Dixie.
14   Q.   Your investigation did not bear that out.
15   A.   No, sir.  No.
16   Q.   Okay.  In fact, as the -- what does the video depict with
17   regards to where Ms. Castillo parked in relation to where they
18   were going to find Steven?
19   A.   The same side that the room was on.
20   Q.   From this video as you watched it, what role or what
21   conclusions did you make concerning Stacey Castillo's role or
22   participation at this time?
23              MR. STRODER:  I am going to object, Your Honor.
24   That's opinion.  That's for the jury.
25              THE COURT:  Sustained.
```

Sikes - Direct Examination

1  Q.   (BY MR. LEWIS)  During your interview with Stacey

2  Castillo, did she talk to you about the drugs that were

3  involved?

4  A.   Yes, sir.

5  Q.   Okay.  And how did she describe the drugs to you?

6  A.   She stated that it was ice or methamphetamine, and it

7  belonged to Ruben Hernandez.  And as far as she was aware, it

8  was 6 1/2 pounds of ice.

9  Q.   Let me play for you Government's Exhibit 144.

10           (Audio played)

11  Q.   (BY MR. LEWIS)  So based upon Ms. Castillo, how many --

12  who were the people that had stolen the drugs from Liz and

13  Ruben?

14  A.   Steven Saenz, Johnny San Miguel and Sean Lamb.

15  Q.   And according to Stacey Castillo, how much of the drugs

16  was stolen?

17  A.   6 1/2 pounds.

18           MR. STRODER:  Your Honor, I'll object to that.  That

19  was according to Liz.  That's a mischaracterization of the

20  evidence.

21           THE COURT:  Overruled.

22  A.   6 1/2 pounds.

23  Q.   (BY MR. LEWIS)  As you continued to talk to her, did her

24  story change with regards to her participation or her

25  involvement in this abduction of Sean Lamb?

Sikes - Direct Examination

1  A.   Somewhat.  She began to talk as she was there to assist

2  Liz into finding him -- into finding these three, and she said

3  that that's what -- who she called her people.  That's what

4  they did, was find people.

5  Q.   Okay.  Let me play for you Government's Exhibit 149.

6           (Audio played)

7  Q.   (BY MR. LEWIS)  When she's describe -- when Stacey

8  Castillo is describing to you the -- how everybody left at

9  Parkway Inn, what was she telling you?  It sounds like she was

10 showing you by directions or through some other method.  How

11 was she describing to you how she left the Parkway Inn that

12 day?

13 A.   Well, she described them as going -- the other people

14 going in a separate direction than she did.  And mind you, we

15 didn't have the video at the time to say the way, but she

16 described two different directions.  There's two different

17 entries to the Parkway, one on the east side of the complex and

18 one on the west side.  And she described leaving and going west

19 out of the parking lot and the rest of the group going east.

20 Q.   Have you had a chance to review the Parkway Inn video

21 concerning the departure of these vehicles from that location?

22 A.   Yes, sir, I have.

23 Q.   Let me show you what's been marked and introduced into

24 evidence as Government's 35.

25           MR. LEWIS:  Can you dim the lights, please?

Sikes - Direct Examination

1          (Video played)

2  Q.  (BY MR. LEWIS)  And let me stop this right here and let me

3  just ask you, Detective, what are we looking at Government's

4  Exhibit 35?

5  A.   This is the multi-cam view.  It shows all of the active

6  cameras at this time at Parkway Inn.

7  Q.   And is there one in particular that you concentrated on in

8  making a determination as far as the departure of vehicles from

9  this location?

10 A.   Yes, sir.  Can I go ahead and mark here?

11 Q.   Sure.

12 A.   I'm sorry.  I'm terrible at this.  This camera right here

13 (Indicating) is the camera.  That shows the eastern entrance to

14 the Parkway Inn.  Just for reference, we -- this camera, if

15 we're looking from it, we're right above the office and the

16 office faces south.  And so that entrance over to our left

17 where these hedges are right there (Indicating), that's the

18 entrance on the eastern side of it.

19 Q.   Okay.  Let me clear this.  Let me circle.  Is it this

20 camera angle here that you were looking at (Indicating)?

21 A.   Yes, sir, I believe that's it.

22 Q.   Okay.  Let me play Government's Exhibit 35, and I'll speed

23 this up towards...

24          (Video played)

25 Q.   (BY MR. LEWIS)  Okay.  Now concentrating on that camera

Sikes - Direct Examination

```
 1  angle, what can you tell us that you see in this camera that
 2  you've -- angle that you've identified?
 3  A.    The blue Expedition containing Sean Lamb is heading south
 4  and he is at that eastern entrance point.
 5           (Video played)
 6  Q.   (BY MR. LEWIS)  Which direction does it turn?
 7  A.    East.
 8           (Video played)
 9  Q.   (BY MR. LEWIS)  What was the next vehicle?
10  A.    That was the brown GMC pickup believed to be occupied by
11  Ruben Hernandez.
12  Q.    And which direction did it go?
13  A.    East.
14           (Video played)
15  Q.   (BY MR. LEWIS)  What's the next vehicle?
16  A.    The gray Kia Optima.
17  Q.    And who was believed to be in that vehicle?
18  A.    Stacey Castillo, Liz Hernandez and Anthony Gonzales.
19           (Video played)
20  Q.   (BY MR. LEWIS)  Which direction does it go?
21  A.    East.
22           (Video played)
23  Q.   (BY MR. LEWIS)  And then the next vehicle?
24  A.    It is a silver or -- I'm partially color blind.  It looks
25  kind of blue to me, but the silver blue Ford Expedition.
```

Sikes - Direct Examination

1  Q.    Who was occupying or driving that?

2  A.    Anabell Flores.

3  Q.    Okay.  And which direction does it go?

4  A.    East.

5          (Video played)

6  Q.    (BY MR. LEWIS)  And then this last vehicle?

7  A.    It's a dark colored Dodge pickup.

8  Q.    And do you know who was occupying that vehicle?

9  A.    Believed to be occupied, the male that I only have

10 identified as Bruno as well as Brian Hernandez.

11 Q.    And which direction does it go when it leaves?

12 A.    East.

13 Q.    Were there any other vehicles that you were able to

14 identify as part of this investigation that were at this

15 location?

16 A.    No, sir.

17 Q.    Okay.  Did any of the vehicles appeared to go right as

18 claimed by Ms. Castillo during the interview with you?

19 A.    No, sir.

20 Q.    Let me play for you Government's Exhibit 150.

21          (Audio played)

22 Q.    (BY MR. LEWIS)  Now, as the interview went on, what did

23 you become concerned of as the interview wore on?

24 A.    Well, I was concerned that we needed to find Johnny San

25 Miguel and Steven Saenz, get them somewhere, get them away

1  because I was afraid they were going to be found because now

2  I'm being told about all the cartel people that are possibly

3  there and involved.  And, again, I hadn't seen this video.  And

4  so -- and I needed to find possibly Ruben and Noe, get

5  something out about them so that we could, you know, hopefully

6  stop more things from happening.

7  Q.   And as you know, as you continue to conduct your interview

8  and had a chance to then go back and listen to and replay this

9  interview, did any of those statements made by Ms. Castillo

10 concerning Mexicans or cartels or anything like that appear to

11 have been involved in the abduction of the Sean Lamb and the

12 murder?

13 A.   No, sir, not directly involved in what's this

14 investigation.  No, sir, I have no information of that.

15 Q.   Anybody else other than the people that you've identified

16 in the video earlier that we looked at at the Parkway Inn?

17 A.   Yes, sir.

18 Q.   Anybody else besides that?

19 A.   No, sir.

20 Q.   Now, you became concerned about a gun.

21 A.   Yes, sir.

22 Q.   Did you ask Ms. Castillo about a gun?

23 A.   Yes, sir, I did.

24 Q.   And do you recall what she said about that?

25 A.   I believe I asked her if there -- if I need to worry about

Sikes - Direct Examination

1  a gun laying around to where kids could come across it, and she

2  said the Mexicans were the only ones that had any weapons, and

3  she described them as large, like, machine guns.

4  Q.   Okay.  Let me play Government's Exhibit 152.

5       (Audio play)

6  Q.   (BY MR. LEWIS)  The truck, who -- the truck that she

7  describes belonged to who?

8  A.   I believe Ruben Hernandez.

9  Q.   The white vehicle, was there a white vehicle involved?

10 A.   Not that I can find, no, sir.

11 Q.   Now, as she continued to answer your questions during this

12 interview, did she provide some background information on

13 herself and who she is and what she does for people in the

14 Odessa community?

15 A.   Yeah, she kind of told me about herself and how she -- she

16 helps others find people they're looking for.  She kind of at

17 one point described herself kind of like a western figure or

18 the Regulators from Billy the Kid.  She was pretty high on

19 herself for quite a bit of this portion.  She described that

20 she was in a relationship with another party as well.

21 Q.   Now, let me play for you Government's Exhibit 157.

22      (Audio played)

23 Q.   (BY MR. LEWIS)  And now let me play for you Government's

24 Exhibit 158.

25      (Audio played)

Sikes - Direct Examination

1  Q.   (BY MR. LEWIS)  Detective Sikes, what did your

2  investigation indicate or suggest to you concerning how many

3  people were involved with Stacey Castillo in the abduction and

4  murder of Sean Lamb?

5  A.   A total of eight or nine, including the two that I don't

6  know who they are.

7  Q.   Okay.  Let me play for you Government's Exhibit 12 -- I'm

8  sorry -- Government's Exhibit 160.  I apologize.

9           (Audio played)

10 Q.   (BY MR. LEWIS)  In this particular part of the interview,

11 the conversation that you're having with Ms. Castillo, where --

12 as she tells you this story, where is she sitting at that time

13 that she tells the story?

14 A.   I believe it was at Liz Hernandez's apartment.

15 Q.   The day of or the day before?

16 A.   She interchanged the two.  She talked about the day prior

17 and then she would talk about the day of Sean's murder.

18 Q.   Okay.  And what did she -- she indicated Brian told her

19 something; is that correct?

20 A.   Yes, sir.

21 Q.   And what was it that Brian had told her?  What did she

22 relay to you?

23 A.   That he, Brian, had gotten in touch with Sean Lamb.

24 Q.   And Brian is a reference to who?

25 A.   Brian Hernandez.

Sikes - Direct Examination

1  Q.   And what did Stacey suggest to Brian Hernandez?

2  A.   "Tell him to come get his clothes."  "Tell Brian to

3  come" -- I mean, I'm sorry -- "Sean to come get his clothes."

4  Q.   And that was for what purpose?

5  A.   So that they could snatch him up or -- so that they could

6  find the dope.

7  Q.   And that's what she makes a reference to, correct?

8  A.   Yes, sir.

9  Q.   So that they could get the dope or something with it?

10  A.   Yes, sir.

11  Q.   Now, I think you made reference to this earlier, but let

12  me ask in case I didn't.  Did she kind of explain to you what

13  her role was or what she does in Odessa, Texas?

14  A.   Yes, sir, she was kind of the -- she considered herself

15  her own form of law -- of law enforcement.  She found people.

16  And she also asserted herself as kind of the leader of her

17  pack.  You know, if she needed people, they were loyal, they

18  would come to her.

19  Q.   Okay.  Let me play for you Government's Exhibit 164.

20        (Audio played)

21  Q.   (BY MR. LEWIS)  And as she described this to you, what did

22  you see as far as emotions or did you get a read off of Stacey

23  Castillo when she was telling you this information?

24        MR. LEACH:  Your Honor, I am going to object as to

25  vague, "get a read."

Ann M. Record, RMR, CRR, CMRS, CRI ********** (432) 685-0361

Sikes - Direct Examination

1          THE COURT:  Sustained.  Let's ask a more simple
2   question.
3   Q.   (BY MR. LEWIS)  In your mind, what conclusions did you
4   reach as to how Stacey Castillo described herself?
5   A.   She had -- when she would talk about herself, it was --
6   she had a lot of bravado.  She was really out there with it.
7   She -- like I said, she was kind of high on herself throughout
8   that part.
9   Q.   Okay.  And then let me play for you Government's
10  Exhibit 165.
11          (Audio played)
12  Q.   (BY MR. LEWIS)  And now let me play for you Government's
13  Exhibit 166.
14          (Audio played)
15  Q.   (BY MR. LEWIS)  Who was she referring to when she refers
16  to Steven?
17  A.   Steven Saenz.
18  Q.   Okay.  And did she have any emotion at that time as she
19  said that?
20  A.   No, sir.
21  Q.   And when she said "giving a ride to Liz to the alley," has
22  she at this time during the course of your interview admitted
23  to having been in the alley with Liz Hernandez and Sean Lamb?
24  A.   Yes, sir.
25  Q.   Now, let me play for you Government's 167.

Sikes - Direct Examination

1          MR. POOL:  Your Honor, I am going to renew the

2  objection I placed earlier.

3          THE COURT:  Okay.  And your objection is overruled.

4          (Audio played)

5  Q.   (BY MR. LEWIS)  After you finished the interview with

6  Stacey Castillo, what did you do?

7  A.   I conducted an interview with Anthony Gonzales.

8  Q.   And where was that at?

9  A.   It was in Marfa.

10 Q.   He was also there?

11 A.   Yes, sir.

12 Q.   And at the time that you conducted your interview with

13 Mr. Gonzales, did you provide him with his Miranda rights?

14 A.   I did.

15 Q.   Did he agree to waive those rights?

16 A.   He did.

17 Q.   Did he agree to speak with you?

18 A.   Yes, sir.

19 Q.   Okay.  What was it that you wanted to talk to Mr. Gonzales

20 about?

21 A.   His involvement, if any, in the death of Sean Lamb.

22 Q.   Okay.  Did you know what involvement, what information or

23 knowledge he might have at that time?

24 A.   No, sir.

25 Q.   Okay.  Had you looked at the video --

Sikes - Direct Examination

1  A.    No, sir.

2  Q.    -- the Parkway Inn video?

3  A.    No, sir.

4  Q.    So did you talk to him about this?

5  A.    Yes, sir, I did.

6  Q.    Okay.  And tell me, has -- as the interview went on,

7  initially, what information, if any, did you obtain from

8  Anthony Gonzales about any knowledge he had of the abduction

9  and murder of Sean Lamb?

10  A.    Mr. Gonzales seemed real down during the interview the

11  entire time.  About the only thing is that him and one of the

12  other parties is involved in a relationship and they're

13  together 24/7.  He provided that him and this other party also

14  commonly drive a Kia vehicle and I asked him -- this was kind

15  of a cold interview.  I didn't have much with Mr. Gonzales, but

16  I asked him if he had met Hernandez and -- or Liz Hernandez and

17  Ruben Hernandez on 5/13/2014, and he stated he couldn't

18  remember.  He couldn't remember.  It was -- everything was kind

19  of vague to him.

20  Q.    And did that kind of set you off a little bit?

21  A.    A little, yes, sir.

22  Q.    And why was that?

23  A.    Just the way he was acting in the interview.  He acted

24  extremely down and he never made eye contact with me.  He

25  never -- he would never bring himself up.  In fact, I think

Sikes - Direct Examination

 1  there's several times, "Hey, man, can you talk to me?"  And he

 2  just -- there was just something that he just seemed real down.

 3  Q.   Now, this interview took place on what day?

 4  A.   I believe it was the 15th.

 5  Q.   So you're asking him about events that happened two days

 6  before.

 7  A.   Yes, sir.

 8  Q.   Okay.  And what is he telling you about his memory or

 9  knowledge or any indication like that?

10  A.   Well, during this part he -- right after I initially

11  started talking to him, I remember he asked if he could have a

12  cigarette and I said sure.  And we went outside and smoked a

13  cigarette and then we came back in.  And it was at this point

14  that he told me that Sean and his friends, his terminology,

15  "had fucked up."

16          MR. GARCIA:  Excuse me, Your Honor.  I am going to

17  object once again to the same objection that we lodged on the

18  statements made by Stacey Castillo for the same reasons.

19  It's -- these are statements against -- these are not

20  statements against interest from us, from Mr. Paredes.  These

21  are statements that are being made after this conspiracy is

22  already terminated and so it would be hearsay to us and it

23  deprives us our right to confrontation to the person that is

24  speaking, which would be Mr. Anthony Gonzales.

25          MR. LEACH:  And I join that objection, Your Honor.

Sikes - Direct Examination

```
 1            MR. POOL:  And I would join on behalf of
 2  Ms. Castillo, Your Honor.
 3            THE COURT:  Mr. Lewis, what's your response?
 4            MR. LEWIS:  The same comments and statements made
 5  earlier.  He is describing an interview that he's had with
 6  Mr. Gonzales who is a party defendant to this.  These are
 7  statements against interest.  These are conspiratorial
 8  statements and he's describing --
 9            THE COURT:  Well, it's not a conspiratorial statement
10  because it is not a statement made between conspirators.  It is
11  a statement made to a law enforcement officer.
12            MR. LEWIS:  Correct, Your Honor.  I apologize.  But
13  they are, as far as Anthony Gonzales, potential statements
14  against interest, and he's describing the nature of the
15  interview and the information that he's getting from
16  Mr. Gonzales concerning this investigation.
17            THE COURT:  Do you have a Bruton problem?
18            MR. LEWIS:  No.  No.
19            MR. GARCIA:  Not yet.
20            THE COURT:  Objection's overruled.
21            MR. GARCIA:  Your Honor, we would ask also for an
22  instruction to the jury that any statements made by
23  Mr. Gonzales be considered by the jury only as it affects
24  Mr. Gonzales and not as it affects Mr. Paredes.
25            MR. LEACH:  And I join on that on behalf of
```

USA vs. Olgin, et al. - Jury Trial - Volume 3 - April 8, 2015

1  Mr. Olgin.

2          MR. POOL:  I'll join on behalf of Ms. Castillo, Your

3  Honor.

4          THE COURT:  Request is denied.

5          You may proceed.

6          MR. LEWIS:  Thank you, Your Honor.

7  Q.   (BY MR. LEWIS)  During the course of this interview, did

8  you record this interview?

9  A.   I did.

10 Q.   Was it with the same recorder that you had used earlier

11 with Stacey Castillo?

12 A.   It was.

13         MR. GARCIA:  Excuse me, Your Honor.  Just for the

14 record also, can we have a running objection to this testimony?

15         THE COURT:  You may.  All counsel have a running

16 objection.

17         How long is this going to be?

18         MR. LEWIS:  We're getting into another long portion,

19 Your Honor.

20         THE COURT:  So how long is it going to be?

21         MR. LEWIS:  It could be the entire direct, Your

22 Honor.  It could be an hour and a half.

23         THE COURT:  Okay.  We're going to break for the

24 evening, then.  So we'll ask the jury to take their notepads,

25 put them in the envelopes back in the jury room.  Don't discuss

USA vs. Olgin, et al. - Jury Trial - Volume 3 - April 8, 2015

1  the case among yourselves or with anyone else.  Don't do any

2  research about the case and we'll see y'all here in the morning

3  ready to go at 8:30 a.m., okay?

4          Let's all rise for the jury, please.

5          (At 4:58 p.m., jury leaves)

6          THE COURT:  All right.  We'll be recessed until

7  tomorrow morning at 8:30.

8          (At 4:58 p.m., proceedings adjourned)

9                    *  *  *  *  *  *

10

11              C E R T I F I C A T E

12

13       I, ANN M. RECORD, RMR, CRR, CMRS, CRI, Federal

14  Official Court Reporter, certify that the foregoing is a

15  correct transcript from the proceedings in the

16  above-entitled matter.

17

18

19

20              _____
                      /s/Ann M. Record
21  Date: 10/05/2015   Ann M. Record, RMR, CRR, CMRS, CRI
                        United States Court Reporter
22                      200 East Wall Street, Suite 117
                        Midland, Texas  79701
23                      Telephone:  (432) 685-0361

24

25