Case 7:14-cr-00227-DC   Document 252   Filed 10/05/15   Page 1 of 82

1

USA vs. Olgin, et al. - Jury Trial - Volume 4 - April 9, 2015

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                   MIDLAND-ODESSA DIVISION

 3
   UNITED STATES OF AMERICA,        )
 4                                  )
        Plaintiff,                  )
 5                                  ) Case No. 7:14-CR-0227 RAJ
        vs.                         )
 6                                  ) Midland, Texas
   RAYMOND HERNANDEZ OLGIN, JR.;    )
 7 RUDOLFO ROMERO PAREDES;          ) April 9, 2015
   STACEY LOUISE CASTILLO; and      )
 8 ANTHONY RYAN GONZALES;           )
                                    )
 9      Defendants.                 )
   _____) 8:30 a.m.
10

11
                TRANSCRIPT OF JURY TRIAL - VOLUME 4
12            BEFORE THE HONORABLE ROBERT A. JUNELL
                SENIOR UNITED STATES DISTRICT JUDGE
13

14
   APPEARANCES:
15

16 FOR THE GOVERNMENT:   WILLIAM FRANKLIN LEWIS, JR., AUSA
                         Office of the U.S. Attorney
17                       400 W. Illinois, Suite 1200
                         Midland, Texas  79701
18  - and -

19                       JOHN S. KLASSEN, AUSA
                         Office of the U.S. Attorney
20                       400 W. Illinois, Suite 1200
                         Midland, Texas  79701
21

22 FOR THE DEFENDANT, RAYMOND HERNANDEZ OLGIN, JR.:
                         E. JASON LEACH
23                       Law Office of E. Jason Leach, PLLC
                         The Grant Building
24                       307 N. Grant Avenue, Suite 300
                         Odessa, Texas  79761
25
```

USA vs. Olgin, et al. - Jury Trial - Volume 4 - April 9, 2015

```
 1                      APPEARANCES (CONTINUED)

 2


 3

    FOR THE DEFENDANT, RUDOLFO ROMERO PAREDES:
 4                          ROBERT V. GARCIA, JR.
                            Attorney at Law
 5                          413 N. Texas Avenue
                            Odessa, Texas  79761
 6


 7

    FOR THE DEFENDANT, STACEY LOUISE CASTILLO:
 8                          JOHN L. POOL
                            Law Office of John L. Pool
 9                          117 N. W. Avenue A
                            Andrews, Texas  78714
10


11

    FOR THE DEFENDANT, ANTHONY RYAN GONZALES:
12                          ALLEN R. STRODER
                            Attorney at Law
13                          6010 Highway 191, Suite 230
                            Odessa, Texas  79762
14


15


16

    COURT REPORTER:      Ann M. Record, RMR, CRR, CMRS, CRI
17                       200 East Wall Street, Suite 117
                         Midland, Texas  79701
18                       (432) 685-0361

19


20

            Proceedings reported by machine shorthand reporter.
21          Transcript produced by Computer-Aided Transcription.

22


23


24


25
```

USA vs. Olgin, et al. - Jury Trial - Volume 4 - April 9, 2015

1                          **I N D E X**

2

3  **WITNESSES FOR THE GOVERNMENT:**                      **PAGE**

4  JOHN SIKES
       Direct Examination Continued By Mr. Lewis          8
5      Cross-Examination By Mr. Garcia                    58
       Cross-Examination By Mr. Pool                      68
6

7  Government rests                                       70

8  Motion for Instructed Verdict by Mr. Leach            71

9  Motion for Instructed Verdict by Mr. Garcia           71

10 Motion for Instructed Verdict by Mr. Pool             72

11 Motion for Instructed Verdict by Mr. Stroder          72

12 Response by Mr. Lewis                                  72

13 Court's Ruling by The Court                            72

14 Defendant Olgin rests                                  78

15 Defendant Paredes rests                                78

16 Defendant Castillo rests                               79

17 Defendant Gonzales rests                               79

18

19

20

21

22

23

24

25

Case 7:14-cr-00227-DC   Document 252   Filed 10/05/15   Page 4 of 82

4

USA vs. Olgin, et al. - Jury Trial - Volume 4 - April 9, 2015

```
 1                    I N D E X  (CONTINUED)

 2

 3   EXHIBITS:                                            RCVD

 4   GX 169   Interview of Anthony Gonzales                11
              02:35-02:55
 5   GX 173   Interview of Anthony Gonzales 12:42 -        11
              13:29
 6   GX 175   Interview of Anthony Gonzales 15:18 -        11
              15:22
 7   GX 176   Interview of Anthony Gonzales 15:45 -        11
              15:50
 8   GX 177   Interview of Anthony Gonzales 15:51 -        11
              16:00
 9   GX 178   Interview of Anthony Gonzales 16:02 -        11
              16:32
10   GX 180   Interview of Anthony Gonzales 17:01 -        11
              17:50
11   GX 182   Interview of Anthony Gonzales 18:53 -        11
              19:24
12   GX 183   Interview of Anthony Gonzales 19:26 -        11
              20:54
13   GX 185   Interview of Anthony Gonzales 21:20 -        11
              21:29
14   GX 186   Interview of Anthony Gonzales 21:50 -        11
              22:44
15   GX 188   Interview of Anthony Gonzales 25:44 -        11
              27:00
16   GX 189   Interview of Anthony Gonzales 27:14 -        11
              27:50
17   GX 194   Interview of Anthony Gonzales 30:40 -        11
              31:05
18   GX 202   Interview of Rudy Paredes 15:30:20 -         36
              15:30:48
19   GX 203   Interview of Rudy Paredes 15:30:55 -         36
              15:33:02
20   GX 208   Recorded Interview of Ray Olgin - May        50
              17, 2014 - 18:24:02 - 18:25:43
21   GX 209   Recorded Interview of Ray Olgin - May        50
              17, 2014 - 18:25:58 - 18:26:46
22   GX 211   Recorded Interview of Ray Olgin - May        50
              17, 2014 - 18:37:20 - 18:44:45
23   GX 212   Recorded Interview of Ray Olgin - May        50
              17, 2014 - 18:46:20 - 18:55:51
24   GX 213   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 1 0-00-01 - 0-00-22
25
```

USA vs. Olgin, et al. - Jury Trial - Volume 4 - April 9, 2015

1                    **I N D E X (CONTINUED)**

2                                                        **PAGE**

3    GX 214   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 2 0-00-12 - 0-00-30
4    GX 215   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 3
5    GX 216   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 4
6    GX 217   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 5 0-00-38 - 0-02-01
7    GX 218   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 6
8    GX 219   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 7 0-001-10 - 0-01-40
9    GX 220   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 8 0-02-35 - 0-03-01
10   GX 221   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 9 0-00-01 - 0-02-37
11   GX 222   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 10
12   GX 223   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 11 0-00-01 - 0-00-21
13   GX 224   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 12 - 0-00-51 - 0-01-50
14   GX 225   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 13
15   GX 226   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 14
16   GX 227   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 15 - 0-00-45 - 0-01-50
17   GX 228   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 16 0-02-22 - end
18   GX 229   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 17 - 0-03-02 - 0-05-01
19   GX 230   Valero Gas Cameras - Presidio, Texas -       19
              May 14, 2014 - 18 0-00-09 - 0-00-35

20

21   **NOTE:**  Government's Exhibits 126, 127, 128, 129, 130, 132,
     133, 134, 135, 136, 137, 139, 140, 141, 143, 144, 145, 146,
22   147, 148, 151, 153, 154, 155, 156, 159, 161, 162 and 163
     that were offered and admitted on Wednesday, April 8, 2015,
23   were withdrawn

24   Court's Ruling by The Court                           72

25

USA vs. Olgin, et al. - Jury Trial - Volume 4 - April 9, 2015

1                    **P R O C E E D I N G S**

2              (At 8:30 a.m., proceedings commenced)

3              (Defendants present)

4          MR. LEACH:  I have one matter, Your Honor.

5          THE COURT:  All right.  Everybody be seated, please.

6  It's 8:30.  We're in the courtroom outside the presence of the

7  jury.  The attorneys are present, and all the defendants are

8  present.

9              And, Mr. Leach, what would you like to --

10          MR. LEACH:  Your Honor, after reviewing last night's

11 videos, I've spoken with Mr. Lewis, and I believe I've reached

12 an agreement with any objections I had to any videos, or

13 substantive objections.  However, throughout the videos with

14 each defendant, Your Honor, Detective Sikes references

15 "statements made by others," "word on the street," "various

16 people."  I think he's doing it in order to try and elicit

17 information from our clients; in other words, "people tell us

18 you had a gun," "people have told us you were there," "word is

19 that you are there."  I am not asking for anything but a

20 limiting instruction that says, "What Officer Sikes states is

21 not evidence against the defendant."

22          THE COURT:  Do you have any problem with that,

23 Mr. Lewis?

24          MR. LEWIS:  No, Your Honor, we do not.

25          THE COURT:  Okay.

USA vs. Olgin, et al. - Jury Trial - Volume 4 - April 9, 2015

1              Mr. Stroder?

2              MR. STRODER:  Your Honor, just a matter.  Apparently

3   the Odessa American had a pretty nasty article -- I didn't read

4   it, but I just heard about it.

5              THE COURT:  Nasty article?

6              MR. STRODER:  Nasty article about our defendants.

7              THE COURT:  About?

8              MR. STRODER:  This trial.

9              THE COURT:  Okay.  When did it run?

10             MR. STRODER:  I guess last night, right?

11             DEFENDANT CASTILLO:  Yesterday.

12             THE COURT:  You know, I don't get the Odessa

13  American, I'm sorry.

14             MR. POOL:  I didn't read it.

15             THE COURT:  But -- okay.  Anybody -- anything else?

16  Mr. Garcia, is that fine you with?

17             MR. GARCIA:  That's fine with me, Your Honor.

18             THE COURT:  Mr. Pool, is that fine with you?

19             MR. POOL:  Yes, Your Honor.

20             THE COURT:  Mr. Stroder, is that fine with you what

21  Mr. Leach said, the limiting instruction?

22             MR. STRODER:  Yes.

23             THE COURT:  If you'll just let me know, make sure I

24  know that we're going to play one of these videos and that sort

25  of things, okay?

Sikes - Direct Examination Continued

1              Let's bring the jury in.

2              (At 8:32 a.m., jury enters)

3              (Cry of the Court)

4              THE COURT:  All right.  Please be seated.  Good

5    morning and it is 8:32 and we're in the courtroom with the

6    jury.  The attorneys are all present, and the defendants are

7    present.  And Officer Sikes is still on the stand, so I think

8    cross-examination, is that where we were at this point in time?

9              MR. LEWIS:  No, Your Honor, still direct.

10             THE COURT:  Still direct.  All right.  You may

11   proceed.

12             MR. LEWIS:  Thank you, Your Honor.

13             **DIRECT  EXAMINATION CONTINUED**

14   BY MR. LEWIS:

15   Q.   Detective Sikes, yesterday afternoon before we broke, I

16   was talking about your interview with Anthony Gonzales.  Do you

17   remember that?

18   A.   Yes, sir.

19   Q.   Did you, in fact, interview Anthony Gonzales in Marfa,

20   Texas?

21   A.   I did.

22   Q.   And what day was that?

23   A.   It was 5/15 of 2014.

24   Q.   And prior to your interview, did you provide him with his

25   Miranda warnings?

Sikes - Direct Examination Continued

```
1   A.    I did.
2   Q.    Did Mr. Gonzales agree to waive his rights and speak with
3   you?
4   A.    Yes, sir, he did.
5   Q.    And that interview that you conducted, was that interview
6   recorded?
7   A.    It was.
8   Q.    And if you recall, is -- what nature of recording was
9   made?
10  A.    It was a digital audio recorder.
11  Q.    Okay.  Approximately how long did that interview last?
12  A.    I believe it was around an hour, if I'm not mistaken.
13  Q.    And have you had an opportunity to review that entire
14  recording?
15  A.    I have.
16  Q.    And did your recording device record the interview
17  accurately?
18  A.    Yes, sir, it did.
19  Q.    Did you notice any problems or did your recording device
20  malfunction in any way during the course of that interview?
21  A.    It did not.
22  Q.    In preparation for coming today and testifying, have you
23  had an opportunity to review the recording you made?
24  A.    Yes, sir.
25  Q.    And in anticipation of those recordings, have excerpts of
```

1  the entire interview been prepared for presentation?

2  A.   Yes, sir.

3  Q.   Have you had an opportunity to compare those little

4  excerpts with the entire recording?

5  A.   Yes, sir.

6  Q.   Are those excerpts that have been prepared accurate and

7  exact duplicates taken from the original recording?

8  A.   They are.

9  Q.   You have before you what's marked for identification

10  purposes as Government's Exhibit 168 through 200.  Do you see

11  that?

12  A.   Yes, sir, I do.

13  Q.   Okay.  And what is reflected in Government's 168 through

14  200?

15  A.   It is the interview with Anthony Gonzalez.

16  Q.   Is it the excerpts from the interview that have been

17  prepared?

18  A.   Yes, sir, it is.

19  Q.   Okay.

20        MR. LEWIS:  Your Honor, at this time for purposes of

21  examination of this witness, the government would offer only at

22  this time Government's Exhibits 169, 173, 175, 176, 177, 178,

23  180, 182, 183, 185, 186, 188, 189 and 194.

24        THE COURT:  Just so that I have this correct, we're

25  talking about 169, 173, 175, 176, 177, 178, 180, 182, 183, 185,

Sikes - Direct Examination Continued

1   186, 188, 189 and 194.

2           MR. LEWIS:  That is correct, Your Honor.

3           THE COURT:  Okay.

4           Any objection -- I am going to give an instruction

5   here in a minute.

6           MR. LEACH:  No objection then, Your Honor.

7           THE COURT:  Okay.  Mr. Garcia, any objection?

8           MR. GARCIA:  Your Honor, I'd simply reiterate the

9   objection that I made at the bench yesterday concerning

10  Ms. Castillo's interviews, that they should -- that they're not

11  proper 801 evidence.  These are statements that are made

12  once -- you know, after the conspiracy is terminated and it is

13  not in furtherance of any conspiracy.  And so they're hearsay

14  to us and deny us the right to confrontation.  And we would ask

15  for -- that they not be admitted as to Mr. Paredes and short of

16  that ask the Court for an instruction to the jury in that

17  respect.

18          THE COURT:  Your objection is overruled.

19          Mr. Pool?

20          MR. POOL:  Your Honor, I would also join in the same

21  objection Mr. Garcia made and then we articulated to the Court

22  yesterday on behalf of Ms. Castillo and request the running

23  objection.

24          THE COURT:  Objection's overruled.

25          Mr. Stroder, anything?

1              MR. STRODER:  No, Your Honor.

2              THE COURT:  Okay.  I don't know if you remember this

3    when we did jury selection, but one of the things -- and it

4    will be in your instructions as well -- that the evidence that

5    a jury can consider is the sworn testimony of witnesses, any

6    exhibits that are admitted during the course of the trial,

7    anything that I instruct you to find or any stipulations by the

8    parties, agreements between the parties that this is evidence.

9              In listening to these recordings, the statements by

10   the officer is not evidence, okay?  Now the response would be,

11   but the statement by the officer is not evidence.  So if you'll

12   just kind of keep in mind as you listen to these exhibits as we

13   go through here.

14             All right.  You may proceed.

15             MR. GARCIA:  Excuse me, Your Honor.  May I have a

16   running objection to my --

17             THE COURT:  You may, yes.

18             You may proceed.

19             MR. LEWIS:  Thank you, Your Honor.

20   Q.   (BY MR. LEWIS)  When you spoke with Mr. Gonzales during

21   that interview, what was the nature of your conversation?  What

22   was the topic?  What were you talking about?

23   A.   It was in reference to the homicide of Sean Lamb.

24   Q.   Okay.  And how did that interview go to begin with?  What

25   kind of response did you get from Mr. Gonzales?

Sikes - Direct Examination Continued

1  A.   That he was not a part of it and that he was with another

2  party 24/7 and never left that party's side.

3          MR. LEWIS:  If I may play Government's Exhibit 169.

4          THE COURT:  Okay.

5          (Audio played)

6  Q.   (BY MR. LEWIS)  How long did this back and forth go

7  concerning his knowledge or lack of knowledge concerning the

8  incident that you were talking to him about?

9  A.   Not terribly long.

10 Q.   At some point were you able to elicit some information

11 from Mr. Gonzalez concerning the events surrounding the

12 abduction of Sean Lamb?

13 A.   I was.

14 Q.   Let me play for you Government's Exhibit 173.

15         (Audio played)

16 Q.   (BY MR. LEWIS)  How did Mr. Gonzales describe to you how

17 they got -- or how he got to the alley at 16th and Dixie?

18 A.   He said that him and other parties went in the Kia.

19 Q.   Let me play for you Government's Exhibit 175.

20         (Audio played)

21 Q.   (BY MR. LEWIS)  Now, let me play for you Government's

22 Exhibit 176.

23         (Audio played)

24 Q.   (BY MR. LEWIS)  Now, let me play for you Government's

25 Exhibit 177.

Sikes - Direct Examination Continued

1              (Audio played)

2  Q.   (BY MR. LEWIS)   Now, let me play for you Government's

3  Exhibit 178.

4              (Audio played)

5  Q.   (BY MR. LEWIS)   What is Mr. Gonzales describing to you at

6  this particular point in the interview?

7  A.   He's discussing what was occurring in the alley in the

8  1600 block of North Dixie.

9  Q.   What was he telling you he was doing, if anything?

10  A.   He stated that he stayed behind at the Kia during that --

11  the altercation that was occurring at the Expedition.

12  Q.   Okay.  And as he describes the altercation, as he

13  describes what happens, how did he describe it to you as far as

14  what went -- what occurred in that alley?

15  A.   He stated that Liz Hernandez was confronting Sean Lamb

16  about -- asking him, pardon my French, "where the shit was,"

17  and that "he" -- "he" being Sean Lamb -- "fucked up."

18  Q.   Okay.  Now, in street terms having been a police officer

19  for the years that you have been, having been a detective,

20  the -- using the term "where the shit was," does that have a

21  particular meaning to you?  Do you understand it to reference a

22  particular item?

23  A.   Yes, sir, narcotics.

24  Q.   Let me play for you now Government's Exhibit 180.

25              (Audio played)

1  Q.   (BY MR. LEWIS)  What is he describing at this particular

2  point in time in the interview?

3  A.   He described to me that there was more people present, but

4  he didn't know them, and he didn't witness anybody armed in the

5  alley or anything like that.

6  Q.   As you continued on with your investigation, did those

7  statements made by Mr. Gonzales corroborate or agree with other

8  information that you received or obtained during the course of

9  your investigation?

10  A.   No, they did not.

11          (Audio played)

12  Q.   (BY MR. LEWIS)  Let me stop this.  This is Government's

13  Exhibit 182.

14          (Audio played)

15  Q.   (BY MR. LEWIS)  And now let me play Government's

16  Exhibit 183.

17          (Audio played)

18  Q.   (BY MR. LEWIS)  What is Mr. Gonzales describing to you at

19  this particular point in time?

20  A.   He was talking about after they left the 1600 block of

21  North Dixie going to the Parkway Inn with the rest of the

22  parties involved.  He still says that he never saw any firearms

23  or anything like that.

24  Q.   Prior to this that we've played, had Mr. Gonzales made

25  statements that he had been to the Parkway Inn?

Sikes - Direct Examination Continued

1  A.    No, he didn't give an explanation to anything.  I asked

2  him, and I don't recall an explanation of them going.

3  Q.    But at least at this particular part of the interview, he

4  talked about going to the Parkway?

5  A.    Yes, sir.

6  Q.    Okay.  And what did he describe to you?  What was the

7  reason for him going to the Parkway?

8  A.    To help locate Steven Saenz -- well, I don't specifically

9  think he said Steven Saenz.  I don't recall if he did or not,

10 but to go look for other parties involved with Sean Lamb.

11 Q.    Okay.  Another thing that he says in this portion of his

12 recorded interview is what happens at the -- when they leave

13 the Parkway.  Did you hear that?

14 A.    Yes, sir.

15 Q.    Okay.  And what did Anthony Gonzales tell you about what

16 he did when he left the Parkway?

17 A.    He stated that the other parties involved went left when

18 they exited the Parkway Inn and that he went right out of the

19 Parkway Inn.

20 Q.    Now, when he left the Parkway, what vehicle would he have

21 been in?

22 A.    The Kia.

23 Q.    And based upon the videos that we saw yesterday, I believe

24 it is Government's Exhibit 35, what direction did the Kia

25 actually go?

Sikes - Direct Examination Continued

1  A.    Left.

2  Q.    Let me play for you now Government's Exhibit 186.

3           (Audio played)

4  Q.    (BY MR. LEWIS)   At this particular point in the interview,

5  what are you talking to Mr. Gonzales about?

6  A.    About the information received, that him and another party

7  took Ruben Hernandez to the Texas-Mexico border and

8  subsequently believed that Ruben Hernandez escaped to Mexico.

9  Q.    And as part of that investigation, were you able to obtain

10 any additional information concerning that, whether, in fact,

11 there was some substance to that trip?

12 A.    Yes, sir.  I received a video from HSI Will Werner from

13 the Valero gas station which showed Mr. Gonzalez and Ruben

14 Gonzales [sic] as well as other parties at the Valero gas

15 station.

16 Q.    And on what day were they at the Valero gas station?

17 A.    I believe it was the night of the 14th, if I'm not

18 mistaken, of May.

19 Q.    Now, from -- if you know, from Odessa to Presidio, how --

20 what's the distance or how long would it take somebody to drive

21 down?

22 A.    Depending on how fast you go.  Anywhere from 3 1/2 to 4

23 hours.

24 Q.    Have you had an opportunity to review that video that you

25 received from Will Werner?

Sikes - Direct Examination Continued

1  A.   Yes, sir.

2  Q.   And in preparation for this trial, have excerpts of that

3  entire video been made?

4  A.   Yes, sir.

5  Q.   Okay.  And have you had an opportunity to review those

6  excerpts, compare them against the original to ensure that they

7  are exact copies or duplicates?

8  A.   Yes, sir, I have.

9  Q.   Okay.  You have before you what's marked for

10  identification purposes as Government's Exhibits 213 through

11  230.  Do you see that?

12  A.   Yes, sir, I do.

13  Q.   What are Government's Exhibits 213 through 230?

14  A.   They're the excerpts from the Valero gas station in

15  Presidio, Texas.

16  Q.   And are they the excerpts that came from the original

17  video that you received from Will Werner --

18  A.   Yes, sir.

19  Q.   -- the HSI agent?

20  A.   Yes, sir.  I'm sorry.

21       MR. LEWIS:  The government would offer Government's

22  Exhibits 213 through 230 at this time.

23       MR. LEACH:  No objection to 213 through 230.

24       THE COURT:  Mr. Garcia?

25       MR. GARCIA:  No objection, Your Honor.

Sikes - Direct Examination Continued

1          THE COURT:  Mr. Pool?

2          MR. POOL:  No objection, Your Honor.

3          THE COURT:  Mr. Stroder?

4          MR. STRODER:  No objection.

5          THE COURT:  Government's Exhibits 213 through 230 are

6    admitted.

7          MR. LEWIS:  Thank you, Your Honor.  Permission to

8    publish some of those videos to the jury at this time?

9          THE COURT:  You may.

10   Q.  (BY MR. LEWIS)  This is Government's Exhibit 213.

11          (Video played)

12   Q.  (BY MR. LEWIS)  I'll stop it at this point.  Detective

13   Sikes, can you tell us about this vehicle right here that we

14   see on the screen (Indicating)?

15   A.  It is the Kia Optima that was used by Anthony Gonzales and

16   other parties.

17   Q.  Okay.

18          (Video played)

19   Q.  (BY MR. LEWIS)  Now, let me go to Government's

20   Exhibit 214.  What do you see in the middle of the screen

21   there?

22   A.  The same gray Kia Optima.

23   Q.  Where is it going at this point?

24   A.  The gas pumps.

25          (Video played)

1   Q.   (BY MR. LEWIS)  Let me stop it at this point.  I am

2   circling an individual.  Do you see that?

3   A.   Yes, sir.

4   Q.   Okay.  Who is that individual?

5   A.   It's believed to be Stacey Castillo.

6   Q.   And who is this individual?

7   A.   Believed to be Ruben Hernandez.

8   Q.   Describe what he's wearing for the jury, please, and for

9   the record.

10  A.   Blue shirt and blue jeans.

11  Q.   Oh, the third individual that appears in the photograph,

12  do you know who that person is?

13  A.   I don't.

14  Q.   During the course of your investigation, have you been

15  able to determine whether this person had any involvement or

16  participation in your investigation?

17  A.   It doesn't appear that she does, but I have no information

18  on that person.

19        MR. STRODER:  I'm sorry, which person were you

20  referring to?

21  Q.   (BY MR. LEWIS)  Let me circle it.  I am circling this

22  particular person.  Do you see that person, Detective Sikes?

23  A.   Yes, sir, I do.

24        THE COURT:  For the record, because these circles

25  will not last, it is the person on the far right that appears

Sikes - Direct Examination Continued

```
 1  to be a woman with a red and white striped blouse on or shirt
 2  on.
 3          MR. LEWIS:  Right.
 4  Q.   (BY MR. LEWIS)  Is that correct, Detective?
 5  A.   Yes, sir.
 6  Q.   Is that the one that you're talking about that you don't
 7  know who that person is?
 8  A.   Correct.
 9  Q.   Okay.  I play for you now Government's Exhibit 215.
10          (Video played)
11  Q.   (BY MR. LEWIS)  Government's Exhibit 216.
12          (Video played)
13  Q.   (BY MR. LEWIS)  And in Government's Exhibit 216, what do
14  you see?
15  A.   The person Ruben Hernandez goes to the bathroom and Stacey
16  Castillo goes to the soft drink cooler.
17  Q.   Okay.  Now let me play Government's Exhibit 217.
18          (Video played)
19  Q.   (BY MR. LEWIS)  Do you see anybody of interest in
20  Government's 217?
21  A.   Yes, sir, Stacey Castillo is at the counter with the
22  clerk.
23  Q.   Okay.  Do you see anybody behind her?
24  A.   Yes, sir, Ruben Hernandez.
25          (Video played)
```

Sikes - Direct Examination Continued

```
 1  Q.   (BY MR. LEWIS)  What can you tell the jury that you see at
 2  this particular point in the video?
 3  A.    It appears that Ms. Castillo has made a purchase and that
 4  she has what appears to be a brief conversation between her and
 5  Ruben, and now Ruben is at the counter.  I'm sorry, Ruben
 6  Hernandez.
 7  Q.    Let me play for you now Government's Exhibit 218.
 8              (Video played)
 9  Q.   (BY MR. LEWIS)  What view is this, Government's
10  Exhibit 218?
11  A.    It is looking down at the cash register.
12              (Video played)
13  Q.   (BY MR. LEWIS)  And on the video appears to be -- there is
14  something scrolling through the video.  Do you see that?
15  A.    Correct.
16  Q.    Okay.  And what can you make out of what is scrolling
17  through the video?
18  A.    It is a running log of what is being purchased at the
19  time.  It's for loss prevention purposes from the Valero.  It's
20  pretty neat.
21  Q.    Does it provide a time?
22  A.    Yes, sir, it does.
23  Q.    What time is reflected?
24  A.    It shows 10:24 p.m.
25  Q.    Okay.
```

Sikes - Direct Examination Continued

1              (Video played)

2  Q.   (BY MR. LEWIS)   As it continues to scroll through, is the

3  date reflected now?

4  A.   Yes, sir, it is.

5  Q.   And what's the date?

6  A.   It's May 14th, 2014.

7              (Video played)

8  Q.   (BY MR. LEWIS)   At this particular point now with respects

9  to Government's Exhibit 218, who is at the counter?

10 A.   The clerk and Ruben Hernandez.

11 Q.   Okay.

12              (Video played)

13 Q.   (BY MR. LEWIS)   Is Mr. Hernandez making a -- does it

14 appear that he's making a purchase?

15 A.   No, sir.

16              (Video played)

17 Q.   (BY MR. LEWIS)   What do you see happening at this

18 particular point?

19 A.   The clerk appears to be writing something down from a

20 piece of paper on the register.

21              (Video played)

22 Q.   (BY MR. LEWIS)   What does she do with the piece of paper?

23 A.   She hands it to Ruben Hernandez.

24 Q.   I'll publish Government's Exhibit 219.

25              (Video played)

Sikes - Direct Examination Continued

1    Q.   (BY MR. LEWIS)  What do you see in this video initially?

2    A.   Ms. Castillo and the other female walking out of the

3    Valero.

4    Q.   Okay.  Where does Ms. Castillo appear to be going?

5    A.   Towards the gas pump where the Kia is.

6              (Video played)

7    Q.   (BY MR. LEWIS)  Do you see anybody else now in this video

8    of Government's Exhibit 219?

9    A.   Appears to be Ruben Hernandez walking out of the Valero.

10             (Video played)

11   Q.   (BY MR. LEWIS)  And where does Mr. Hernandez appear to be

12   going?

13   A.   To the Kia Optima.

14   Q.   I play for you now Government's Exhibit 220.

15             (Video played)

16   Q.   (BY MR. LEWIS)  What are we seeing the Kia do at this

17   particular point in time?

18   A.   It's up at the top.  It's driving around the parking lot.

19   Q.   And now let me go to Government's Exhibit 221.

20             (Video played)

21   Q.   (BY MR. LEWIS)  What do you see in Government's

22   Exhibit 221?

23   A.   It's driven around to the -- the Kia is driven around to

24   the side of the Valero and parked in a parking space.

25             (Video played)

Sikes - Direct Examination Continued

1   Q.   (BY MR. LEWIS)   Have people exited the Kia?

2   A.   Yes, sir.

3   Q.   Okay.   Are you able to identify who has exited the Kia?

4   A.   On the far side, I believe he got out and got back in was

5   Ruben Hernandez; and then the person walking in front of the

6   vehicle at this moment appears to be Anthony Gonzales.

7   Q.   Okay.   Now, this person -- has this person come closer

8   towards the video camera?

9   A.   Yes, sir.

10   Q.   I'm circling now in the lower left portion of the video

11   that person.   Do you recognize that individual?

12   A.   Yes, sir, Anthony Gonzales.

13   Q.   And for the record, if you can describe what that

14   individual is wearing.

15   A.   It appears to be a white shirt and blue jeans.

16   Q.   Now, is there something else about this individual that

17   leads you to believe that that is, in fact, Anthony Gonzales?

18   A.   Yes, sir.   Anthony Gonzales has a very distinctive walk

19   that it appears the same in both videos from the Parkway and

20   this video as well as information obtained from his statement

21   and other statements.

22             (Video played)

23   Q.   (BY MR. LEWIS)   Mr. Gonzales has moved out of the frame.

24   Do you know where he goes?

25   A.   Inside of the store.

Sikes - Direct Examination Continued

1              (Video played)

2  Q.   (BY MR. LEWIS)   Do you see Ruben Hernandez?

3  A.   I do.

4              (Video played)

5  Q.   (BY MR. LEWIS)   What does he appeared to be doing at the

6  time?

7  A.   Texting on the phone and picking his nose, sir.

8              (Video played)

9  Q.   (BY MR. LEWIS)   What does he appear to have in his right

10  hand?

11  A.   A cell phone.

12              (Video played)

13  Q.   (BY MR. LEWIS)   What is he doing at this particular point

14  in time, referring to Mr. Hernandez, Ruben Hernandez?

15  A.   It appears that he's talking on a cell phone.

16              (Video played)

17  Q.   (BY MR. LEWIS)   Now, what happens at this particular point

18  of the video?

19  A.   It looks like he's waving at a car that will come into the

20  screen.

21  Q.   So let me go to Government's Exhibit 227 now.

22              (Video played)

23  Q.   (BY MR. LEWIS)   And as Government's Exhibit 227 plays,

24  what do you see out at the gas pumps?

25  A.   It is a white Suburban or Suburban-looking vehicle.

Sikes - Direct Examination Continued

```
 1   Q.   And now what do you see in the video of Exhibit 227?
 2   A.   Ruben Hernandez approaching that vehicle.
 3           (Video played)
 4   Q.   (BY MR. LEWIS)  Can you make out the plates on that
 5   vehicle?
 6   A.   I cannot.
 7           (Video played)
 8   Q.   (BY MR. LEWIS)  What is Ruben Hernandez doing at this
 9   point in the video?
10   A.   Walking back towards the Kia on the side of the business.
11           (Video played)
12   Q.   (BY MR. LEWIS)  Let me pause it right here.  Do you see
13   this individual between the two cars (Indicating)?
14   A.   I do.
15   Q.   Describe for the record and for the jury this individual.
16   A.   It appears that he's wearing a white shirt and blue jeans.
17   Q.   Okay.  And where did he come from?
18   A.   From that white Suburban-looking vehicle.
19   Q.   Do you know who this individual is?
20   A.   I do not.
21   Q.   Have you been able to make any headway in identifying who
22   this individual is?
23   A.   I have not.
24   Q.   Let me move to Government's Exhibit 229.
25           (Video played)
```

Sikes - Direct Examination Continued

1   Q.   (BY MR. LEWIS)  Let me pause it at this time.  What do we

2   see in Government's Exhibit 229?

3   A.   Can you replay it just a little bit?

4   Q.   Okay.  I'll back it up.

5            (Video played)

6   A.   Anthony Gonzales has come back into the screen from the

7   inside of the Valero back to the side towards the Kia Optima

8   and Ruben Hernandez is approaching him.

9   Q.   (BY MR. LEWIS)  During this part of the video, what do

10  Anthony Gonzales and Ruben Hernandez appear to be doing?

11  A.   They appear to be talking.

12           (Video played)

13           MR. STRODER:  Your Honor, he -- I think this pretty

14  much speaks for itself.  Do we have to have his interpretation

15  of every picture?  I'm objecting to that.

16           THE COURT:  Overruled.

17           (Video played)

18  Q.   (BY MR. LEWIS)  At this point in the video of Government's

19  Exhibit 229, it looks like about a minute and 26 seconds into

20  it, what comes into the screen?

21  A.   The white Suburban-looking vehicle from the gas pumps.

22  Q.   Okay.  What else do we see now?

23  A.   Ruben Hernandez approaching the vehicle.

24           (Video played)

25  Q.   (BY MR. LEWIS)  Can you tell from this video, explain to

Sikes - Direct Examination Continued

```
 1  the jury, what do you see Ruben to be doing?
 2  A.    It appears that he's getting inside of the vehicle.
 3  Q.    Does he appear to have anything in his arms or hands?
 4  A.    Yes, sir, it does.
 5  Q.    Which arm?
 6  A.    In his right arm.
 7  Q.    Can you make out what that is?
 8  A.    I cannot.
 9              (Video played)
10  Q.    (BY MR. LEWIS)  And now let me play Government's
11  Exhibit 230.
12              (Video played)
13  Q.    (BY MR. LEWIS)  What do we see in Government's 230?
14  A.    The Kia is leaving the parking lot and turning left, I
15  believe.
16  Q.    And based upon your review of the video, as this Kia
17  leaves, is Ruben Hernandez inside the vehicle?
18  A.    No, sir.
19              (Video played)
20  Q.    (BY MR. LEWIS)  As your interview with Mr. Gonzales
21  continued, did you continue to discuss the events at the
22  Parkway Inn with him?
23  A.    Yes, sir.
24  Q.    Let me play now Government's Exhibit 188.
25              (Audio played)
```

Sikes - Direct Examination Continued

1  Q.   (BY MR. LEWIS)   And now let me play for you Government's

2  Exhibit 189.

3             (Audio played)

4  Q.   (BY MR. LEWIS)   What is he describing to you at this

5  particular point in the investigation?

6  A.   He was actually -- oh, I'm sorry.

7  Q.   Go ahead.

8  A.   He was actually describing this section to Corporal

9  Hudgens.   I stepped out to make a call.

10 Q.   But what is he describing?   What is Mr. Gonzales

11 describing?

12 A.   That he had no further involvement after the Parkway Inn.

13 Q.   Was his statements -- were his statements still that they

14 went in another direction from the direction the Expedition

15 went?

16 A.   I'm sorry?

17 Q.   Were his statements indicating that they went a different

18 direction from the direction the Expedition went?

19 A.   Yes, sir.

20 Q.   Then let me play for you Government's Exhibit 194.

21            (Audio played)

22 Q.   (BY MR. LEWIS)   I'm sorry.   Government's Exhibit 194.

23            (Audio played)

24 Q.   (BY MR. LEWIS)   You heard Mr. Gonzales' statement.

25 A.   Yes, sir.

Sikes - Direct Examination Continued

1  Q.   When compared against the video of Parkway, how does that

2  statement by Mr. Gonzales compare to what you see in the video?

3            MR. STRODER:  Your Honor, that's speculation.  That's

4  his opinion.  That's -- the jury has the evidence.

5            THE COURT:  Sustained.  Sustained.

6  Q.   (BY MR. LEWIS)  Let me show you what has previously been

7  introduced as Government's Exhibit 34.  Play it for you.

8            (Video played)

9  Q.   (BY MR. LEWIS)  Do you recognize Government's Exhibit 34?

10 A.   Yes, sir, I do.

11 Q.   What is Government's Exhibit 34?

12 A.   It is the upstairs view from the surveillance system at

13 the Parkway Inn.

14           (Video played)

15 Q.   (BY MR. LEWIS)  Do you see an individual that's gotten out

16 of the car, and I'll circle it right here in the center of the

17 video?

18 A.   Yes, sir, I do.

19 Q.   Who is that individual?

20 A.   Anthony Gonzales.

21 Q.   And what is one way you were able to identify that

22 individual as Anthony Gonzales?

23 A.   His distinctive walk as compared to the other video.

24           (Video played)

25 Q.   (BY MR. LEWIS)  Who is the person that is just now

Sikes - Direct Examination Continued

 1  climbing the stairs in this video, the person that I am

 2  circling here (Indicating)?

 3  A.    That's Anthony Gonzales.

 4              (Video played)

 5  Q.   (BY MR. LEWIS)   What do you see Mr. Gonzales doing?

 6  A.    Knocking on a hotel room door.

 7              (Video played)

 8  Q.   (BY MR. LEWIS)   What is Mr. Gonzalez doing at this point?

 9  A.    Appears that he's looking in the window of the hotel room.

10              (Video played)

11  Q.   (BY MR. LEWIS)   Now what do you see Mr. Gonzalez doing?

12  A.    He's walking in a quick pace down the stairs.

13  Q.    And where does he go in the video?

14  A.    To the Expedition.

15  Q.    Which side?

16  A.    Passenger.

17  Q.    And who is sitting in the passenger's side?

18  A.    Sean Lamb.

19              (Video played)

20  Q.   (BY MR. LEWIS)   Is there anybody else around Mr. Gonzales?

21  A.    Yes, sir.

22  Q.    And who are they?

23  A.    Stacey Castillo, Ruben Hernandez, Rudy Paredes.

24              (Video played)

25  Q.   (BY MR. LEWIS)   Does the Parkway video, Government's

1   Exhibit 34, support Mr. Gonzales' statements made during the

2   interview?

3   A.    No, sir.

4           MR. STRODER:  Your Honor, I object again.  It is

5   speculation.  It is a matter of opinion.  The jury has seen the

6   evidence.

7           THE COURT:  Sustained.

8   Q.   (BY MR. LEWIS)  As part of this investigation, did you

9   conduct any other interviews?

10  A.    I did.

11  Q.    Did you have an opportunity to interview Rudy Paredes?

12  A.    I did.

13  Q.    Do you recall when you interview Mr. Paredes?

14  A.    May the 17th, 2014.

15  Q.    Where did that interview take place?

16  A.    Odessa Police Department.

17  Q.    And during the course of that interview, do you know or

18  recall whether or not it was recorded?

19  A.    It was.

20  Q.    And how was that recording made?

21  A.    On video digital recording in our interview room.

22  Q.    And during that time and prior to the interview, did you

23  advise Mr. Paredes of his Miranda rights?

24  A.    I did.

25  Q.    Did Mr. Paredes agree to speak with you and answer your

Sikes - Direct Examination Continued

1   questions?

2   A.   Yes, sir, he did.

3   Q.   As part of the recording, have you had an opportunity to

4   review and listen to and observe the recording that was made --

5   A.   Yes, sir.

6   Q.   -- of Mr. Paredes' interview?

7   A.   I'm sorry.  Yes, sir.

8   Q.   Did the equipment at the Odessa Police Department appear

9   to operate corrected -- correctly without any malfunctions?

10  A.   Yes, sir, it did.

11  Q.   Did the recording that you viewed of Mr. Paredes'

12  interview, did it accurately depict and take into consideration

13  everything that happened during that interview?

14  A.   Yes, sir.

15  Q.   In preparation for this trial, have there been excerpts

16  made from that interview?

17  A.   Yes, sir.

18  Q.   And have you had an opportunity to review those excerpts

19  from Mr. Paredes' interview against the original?

20  A.   I have.

21  Q.   And do those excerpts appear to accurately depict portions

22  of Mr. Paredes' interview?

23  A.   Yes, sir.

24        MR. LEWIS:  Your Honor, at this time the government

25  would offer for purposes of this examination Government's 202

Sikes - Direct Examination Continued

1   and 203.

2          THE COURT:  Any objection to Government's

3   Exhibits 202 and 203?

4          MR. LEACH:  Yes, Your Honor, I'd reurge the objection

5   under 801, the statements should not be admissible as to

6   Mr. Olgin.  I'd also ask the Court to instruct the jury that

7   the Paredes statements can only be considered as evidence

8   against Mr. Paredes and not as to any other defendant.

9          THE COURT:  Mr. Garcia, any objections?

10         MR. GARCIA:  Your Honor, we have no objections to

11  this video.

12         THE COURT:  Mr. Pool?

13         MR. POOL:  No objection, Your Honor.

14         THE COURT:  Mr. Stroder?

15         MR. STRODER:  Your Honor, I would assert the same

16  objections as Mr. Leach for Mr. Gonzales.  I would also

17  reiterate that it is hearsay and --

18         THE COURT:  Can you speak up a little bit?  We're

19  having a hard time hearing you.

20         MR. STRODER:  I'm sorry.  Also reiterate that it is

21  hearsay and it violates our right to confront the witness

22  against and request an instruction that any statement should be

23  admissible only against Mr. Paredes and not my client, and we

24  would ask for an instruction -- wait a minute -- the

25  instruction to be a continuing running -- our objection be a

Sikes - Direct Examination Continued

1  running objection, if the Court will do that.

2           THE COURT:  All objections are overruled, and the

3  objections made will continue to be a running objection.

4           And same instruction I gave you earlier.  Again, the

5  questions are not evidence.  So just the statements made by the

6  defendants are evidence in these videos.

7           So Government's Exhibits 202 and 203 are admitted.

8  Q.   (BY MR. LEWIS)  What were you interviewing Mr. Paredes

9  about on May 17th?

10 A.   The homicide of Sean Lamb.

11 Q.   What, if anything, did Mr. Paredes tell you about

12 knowledge he had concerning that incident?

13 A.   He ultimately admitted to being there for the abduction as

14 well as at the Parkway Inn and at -- close to the alley of

15 30 Neta Place.

16 Q.   Let me play Government's Exhibit 202.

17          (Video played)

18 Q.   (BY MR. LEWIS)  And now let me play for you Government's

19 Exhibit 203.

20          (Video played)

21 Q.   (BY MR. LEWIS)  What is Mr. Paredes telling you during

22 this interview?

23 A.   In a roundabout way that he was at the Parkway Inn.  He

24 did say that he was there and that -- he just stayed real vague

25 about whether he believed Sean Lamb was actually at the Parkway

Sikes - Direct Examination Continued

1  Inn or not.  He also described carrying the diaper bag up to

2  the room and he claimed that there were drugs in that diaper

3  bag.

4  Q.   Let's go to Government's Exhibit 33.

5           (Video played)

6  Q.   (BY MR. LEWIS)  Looking at Government's 33, can you tell

7  the jury what view we're look at in the Parkway Inn?

8  A.   It's the downstairs view looking out towards the parking

9  lot.

10  Q.   Okay.

11  A.   It is going to be directly below the previous upstairs

12  view.

13  Q.   As the video continues to play --

14           (Video played)

15  Q.   (BY MR. LEWIS)   -- the blue Expedition has come into view;

16  is that correct?

17  A.   Yes, sir.

18           (Video played)

19  Q.   (BY MR. LEWIS)  Another vehicle, do you see that vehicle

20  pull up?

21  A.   Yes, sir.

22  Q.   Okay.  Can you describe it for the jury, please?

23  A.   It is a brown or tan GMC pickup.

24           (Video played)

25  Q.   (BY MR. LEWIS)  Who has gotten out of that pick up?

Sikes - Direct Examination Continued

1   A.    Ruben Hernandez.

2              (Video played)

3   Q.   (BY MR. LEWIS)   Who is this person now walking between the

4   Expedition and Ruben Hernandez's truck?   And I am circling it

5   right here.

6   A.    That's Rudy Paredes.

7   Q.    Okay.   And can you, for the record and for the jury,

8   describe what he's wearing at this time?

9   A.    A red shirt and blue jeans.

10  Q.    Is there anything else that you notice in this video at

11  this particular time?

12  A.    Yes, sir, Mr. Paredes is carrying a bag around his

13  shoulder.

14  Q.    And do you see that bag more clearly now?

15  A.    Yes, sir.

16  Q.    Okay.   I am holding up and displaying for you what has

17  previously been introduced as Government's Exhibit 124.   Are

18  you familiar with Government's Exhibit 124?

19  A.    Yes, sir.

20  Q.    What is Government's Exhibit 124?

21  A.    It is a gray diaper bag that I recovered from Anabell

22  Flores.

23              MR. LEWIS:   May I approach the witness with this,

24  Your Honor?

25              THE COURT:   You may.

Sikes - Direct Examination Continued

1          MR. LEWIS:  Thank you.

2          THE COURT:  Do you want the lights turned on?

3          MR. LEWIS:  No, because I was still going to...

4  Q.  (BY MR. LEWIS)  Is Government's Exhibit 124 the same bag

5  that we see Mr. Paredes in the video with?

6  A.   Yes, sir.

7  Q.   What observations did you make as you viewed this video

8  with regards to the bag being possessed by Mr. Paredes?

9  A.   It appeared to have some weight to it, more than --

10         MR. GARCIA:  Your Honor, I'm going to object.

11         MR. LEACH:  Objection.  Speculation.

12         MR. STRODER:  Objection.

13         THE COURT:  What basis?  Is he taking this just from

14  the video?

15  Q.  (BY MR. LEWIS)  Your observations from the video.

16  A.   Yes, sir.

17         THE COURT:  Objection is sustained.

18  Q.  (BY MR. LEWIS)  What is he doing with the bag as he goes

19  up the steps?

20  A.   He's carrying it around his shoulder and holding it with

21  his right hand.

22         (Video played)

23  Q.  (BY MR. LEWIS)  And then if we go to Government's

24  Exhibit 34 -- well, let me -- let's finish with Government's

25  Exhibit 33.

Sikes - Direct Examination Continued

1              (Video played)

2    Q.   (BY MR. LEWIS)  Do you see Mr. Paredes coming back down

3    the stairs at this particular point in the video at 1 minute

4    and 14 seconds?

5    A.   Yes, sir.

6    Q.   Okay.  Does he still have the bag with him?

7    A.   He does.  It is on the opposite side of him now.

8              (Video played)

9    Q.   (BY MR. LEWIS)  Where does he go to?

10   A.   The Expedition with Sean Lamb.

11             (Video played)

12   Q.   (BY MR. LEWIS)  At this particular point in the video,

13   1 minute and 26 seconds of Government's Exhibit 33, where is

14   Mr. Paredes?

15   A.   He's in the center of the parking lot.

16   Q.   Is he near anybody?

17   A.   Yes, sir.

18   Q.   And who is he near?

19   A.   Anthony Gonzales and Stacey Castillo.

20             (Video played)

21   Q.   (BY MR. LEWIS)  Now what do you see Mr. Paredes doing?

22   A.   He's running on the opposite side of the Expedition from

23   Sean Lamb.

24             (Video played)

25   Q.   (BY MR. LEWIS)  And what do you see in this frame?

Ann M. Record, RMR, CRR, CMRS, CRI ********** (432) 685-0361

1  A.    He's on the driver's side of the Expedition.

2  Q.    "He" being Mr. Paredes?

3  A.    Yes, sir.  I'm sorry.

4  Q.    And you probably can't tell from this so let's go to

5  Government's Exhibit 33 now -- I'm sorry, Government's

6  Exhibit 34, and we'll speed it ahead a little bit.

7            (Video played)

8  Q.    (BY MR. LEWIS)  Where has Mr. Paredes gone at 1 minute,

9  34 seconds on Government's Exhibit 34?

10  A.    The driver's side of the blue Ford Expedition.

11            (Video played)

12  Q.    (BY MR. LEWIS)  And at this time, what do you see

13  Mr. Paredes doing?

14  A.    Opening the back left door.

15  Q.    Does he get into the vehicle?

16  A.    Yes, sir.

17            (Video played)

18  Q.    (BY MR. LEWIS)  Now, we go to Government's Exhibit 35.  Do

19  you remember the multi-camera view?

20  A.    Yes, sir.

21  Q.    Is there something as you viewed this portion of the

22  videos that caught your attention as it related to Mr. Paredes?

23  A.    Yes, sir.  At one point in time in the video, we'll see

24  the silver or silver blue Expedition belonging to Anabell

25  Flores come into the frame.  And then in one of the other

Sikes - Direct Examination Continued

 1  camera views, we'll see Mr. Paredes leaving that vehicle and

 2  going over towards the rest of the parties.

 3  Q.   And which particular camera view is it we should focus on

 4  or pay particular attention to?

 5  A.   This one is where we'll see the (Indicating) vehicle come

 6  in, and then I believe -- I don't have this part -- I believe

 7  it is this one where we'll see (Indicating) the Expedition

 8  park, if I'm not mistaken.

 9          THE COURT:  Describe what is "this one for us."

10  Q.   (BY MR. LEWIS)  How many camera views do you have if you

11  count all the different camera views?

12  A.   14.

13  Q.   And counting from the top left, the first mark that you've

14  made would be camera number what or what number?

15  A.   The first mark I made was Camera 13 down in the bottom

16  center of the fourth row.

17  Q.   Okay.  And then the one above that?

18  A.   Yes, sir, that is on the second row, third from the left.

19  Q.   Okay.  Now, when the vehicles leave, do you have a camera

20  view -- can you see the vehicles when they depart?

21  A.   Yes, sir, it is the same one that I marked in the

22  beginning, bottom row, second from the left.

23  Q.   As you describe Mr. Paredes getting rid of this bag, is it

24  in -- the one down there in the bottom in the middle or is

25  there another camera view?

Sikes - Direct Examination Continued

1  A.   It is another camera view, sir.

2  Q.   Which camera view is that?

3  A.   I believe it is going to be the second row, third from the

4  left.

5  Q.   Okay.

6  A.   I'll be able to pick it up when that part comes.

7  Q.   Okay.  And let's get to that part.

8           (Video played)

9  A.   Okay.  I'm sorry.  I believe the portion that we're

10  talking about is going to show in the bottom row, all the way

11  to the right camera, if I'm not mistaken.

12  Q.   (BY MR. LEWIS)  If you could circle that, please.

13  A.   (Indicating).

14  Q.   So the very last camera angle, bottom row to the right.

15  A.   Yes, sir, I believe that's correct.

16  Q.   Okay.  And whose vehicle is in the middle of that camera

17  frame?

18  A.   This one right there (Indicating) is the gray or silver

19  blue Expedition.

20  Q.   Who is driving that vehicle?

21  A.   Anabell Flores.

22  Q.   What vehicle has now come into display in that camera

23  view?

24  A.   It is still the blue Expedition containing Sean Lamb.

25           (Video played)

Sikes - Direct Examination Continued

1   Q.   (BY MR. LEWIS)  What do we see now in this view?

2   A.   Rudy Paredes running back to the silver Expedition.

3   Q.   What do you see him do?

4   A.   He places the diaper back into window of the -- the

5   passenger window of the Expedition.

6   Q.   Do you notice or observe anything significant about the

7   diaper bag when he places inside the Expedition?

8            MR. GARCIA:  Objection, Your Honor.  The question

9   calls for speculation.

10           THE COURT:  Overruled.

11           MR. STRODER:  Join the objection, Your Honor.

12           THE COURT:  Overruled.

13  A.   It appears to be very light.

14           MR. GARCIA:  Once again, Your Honor, I object to the

15  question and the answer because it is something that the

16  officer is giving his opinion and it is based solely on

17  speculation.

18           THE COURT:  Sustained.

19           MR. GARCIA:  And I ask that the jury be instructed to

20  disregard it.

21           THE COURT:  The jury is instructed to disregard the

22  witness' answer.

23  Q.   (BY MR. LEWIS)  After he placed the bag in the Expedition,

24  where do you see Mr. Paredes go?

25  A.   Back to the blue Expedition.

Sikes - Direct Examination Continued

1            (Video played)

2  Q.   (BY MR. LEWIS)  And in the camera angle to the left of the

3  one we've been concentrating on, what does that show us again?

4  A.   The vehicles exiting the parking lot.

5  Q.   As you continued your interview --

6            MR. LEWIS:  Turn the lights back.

7  Q.   (BY MR. LEWIS)  As you continued your interview with

8  Mr. Paredes, what information did he provide to you -- what

9  statements did he provide to you concerning the incident in the

10 alley at 30 Neta Place?

11 A.   He claimed that he had only heard that Noe Galan shot Sean

12 Lamb.

13 Q.   Did he indicate whether he had actually gone to the alley

14 or been in that area?

15 A.   He told me that they made several stops in several alleys

16 and that at one point he got out of the vehicle.

17 Q.   Did he claim or did he indicate to you where he went?

18 A.   I don't believe so.  I believe he stated that he went

19 home.

20 Q.   Did he say how he got home?  Did he go walking, in a car,

21 or anything like that?

22 A.   Well, initially he said that he drove his Expedition home.

23 Q.   And then did his story remain the same about not being in

24 the vehicle when the shooting took place or did that change?

25 A.   It did remain the same.

Sikes - Direct Examination Continued

1  Q.   Was he aware of or did he describe -- first, let me ask

2  you this.  Was he aware of any guns being present in the

3  Expedition?

4  A.   Yes, sir.

5  Q.   Did he describe to you a gun that was present in the

6  Expedition?

7  A.   He did.

8  Q.   And how did he describe that gun?

9  A.   He said it looked like a TEC-9 firearm and believed that

10 it had a suppressor on the end of it, and he told me that it

11 was black or dark gray in color.

12 Q.   And when he was in the Expedition, where did he indicate

13 he was sitting?

14 A.   He said that he was sitting behind the driver's seat.

15 Q.   Who did he say had the gun?

16 A.   Noe Galan.

17 Q.   And did he indicate when he saw Noe Galan in possession of

18 this weapon?

19 A.   After the Parkway Inn.

20 Q.   Did he claim or did he indicate to you where or how Noe

21 Galan was holding this gun?

22 A.   To the back of the seat.

23 Q.   To the back of what seat?

24 A.   I'm sorry.  The front passenger's seat.

25 Q.   Where Sean Lamb was sitting.

Sikes - Direct Examination Continued

1  A.   Yes, sir.

2  Q.   Now, after Mr. Paredes' interview, did you conduct any

3  other interviews?

4  A.   Yes, sir, I did.

5  Q.   Who else did you interview?

6  A.   Raymond Olgin.

7  Q.   And where did that interview take place?

8  A.   The Odessa Police Department.

9  Q.   And when did that interview take place?

10  A.   The same day as Rudy Paredes.  It was the 17th.

11  Q.   Of May?

12  A.   Yes, sir, I'm sorry.

13  Q.   Okay.  And as part of that interview, do you recall, was

14  that recorded?

15  A.   It was.

16  Q.   And how was it recorded?

17  A.   By video and audio.

18  Q.   Prior to interviewing Mr. Olgin, did you advise him of his

19  Miranda rights?

20  A.   I did.

21  Q.   Did Mr. Olgin indicate he was willing to answer your

22  questions to be interviewed?

23  A.   Yes, sir, he did.

24  Q.   Approximately how long did that interview take place?

25  A.   I believe it was a couple of hours, maybe shorter than

Sikes - Direct Examination Continued

1  that.

2  Q.   Have you had an opportunity to review that video --

3  videotaped interview that was made of Mr. Olgin?

4  A.   Yes, sir.

5  Q.   Did that video appear to have been recorded accurately?

6  A.   Yes, sir, it did.

7  Q.   Did the equipment at the Odessa Police Department appear

8  to have operated properly that day in making that recording?

9  A.   Yes, sir.

10  Q.   As part of trial preparation, have you had an opportunity

11  to make some excerpts of that interview of Ray Olgin?

12  A.   Yes, sir.

13  Q.   And during those -- and when you made those excerpts, did

14  you have an opportunity to compare those excerpts against the

15  original interview that was made on May 17th?

16  A.   Yes, sir.

17  Q.   Did the excerpts appear to accurately reflect the

18  interview, the original interview as it took place and was

19  recorded on May 17th?

20  A.   Yes, sir.

21       MR. LEWIS:  Your Honor, at this time for purposes of

22  this examination, the government would offer Government's 208,

23  209, 211 and 212.

24       THE COURT:  Any objections Mr. Leach?

25       MR. LEACH:  No objection.

Sikes - Direct Examination Continued

```
 1            THE COURT:  Mr. Garcia?
 2            MR. GARCIA:  Your Honor, I would reurge the objection
 3  that I've been making to all of these statement.  That they're
 4  not proper 801 evidence.  They're not made in furtherance of --
 5  certainly not made in furtherance of any alleged conspiracy.
 6  It denies our right to confrontation.  They're hearsay.  And
 7  short of that, I would ask the Court to issue an instruction to
 8  the jury, that they're to be considered only against the person
 9  making the statements, in this case Mr. Olgin, and not against
10  Mr. Paredes.  And that's -- that would be my objection to
11  those.
12            THE COURT:  Objection's overruled.
13            MR. GARCIA:  I would ask for a running objection.
14            THE COURT:  You may have a running objection.
15            MR. POOL:  Your Honor, I would join in Mr. Garcia's
16  objection on behalf of Ms. Castillo.  And should the Court
17  overrule it, I would also request a running objection.
18            THE COURT:  Your objection is overruled, and you may
19  have a running objection.
20            Mr. Stroder?
21            MR. STRODER:  Yes, Your Honor, I would join in the
22  previous two objections as to -- on behalf of Mr. Gonzales, and
23  I also request a running -- continual running objection.
24            THE COURT:  Your objection is overruled, but you may
25  have a running objection.
```

Sikes - Direct Examination Continued

1          MR. STRODER:  Your Honor, I also would like the

2  instruction just in case -- the instruction that these

3  statements by Ray Olgin cannot be considered in any way against

4  my client, Mr. Gonzales.

5          THE COURT:  Your objection is overruled.

6          And the same instruction I gave you, ladies and

7  gentlemen, earlier.  The statements by the person asking the

8  questions are not evidence of the offense.

9          So you may proceed.

10          MR. LEWIS:  Thank you, Your Honor.

11  Q.   (BY MR. LEWIS)  Detective Sikes, going back to Ray Olgin's

12  interview.  How --

13          THE COURT:  And let me finish that.  208, 209, 211

14  and 212 are admitted.

15          MR. LEWIS:  Thank you, Your Honor.

16  Q.   (BY MR. LEWIS)  How did the interview proceed?

17  A.   I told him what I was there to investigate, and Mr. Olgin

18  stated that he had heard about it.

19  Q.   Did he claim to have any knowledge of it?

20  A.   Not really.  He stated that he heard a large argument in

21  his alley.

22  Q.   Where does Mr. Olgin live?

23  A.   He lives at the corner of 17th and Dixie.

24  Q.   Where his -- and his house is where in connection to where

25  the abduction of Sean Lamb took place?

Sikes - Direct Examination Continued

1  A.   The abduction took place in the east alley right behind

2  his house.

3  Q.   As he described for you -- or initially during this

4  interview, what is he telling you he's seeing or observing?

5  A.   He stated that he observed a large group of people in his

6  back alley.  He looked out to see what was going on.  He said

7  that he did see guns, but he did not go into the alley.  He

8  just went up to the fence.  And then he made the statement that

9  he put two and two together of what happened.

10 Q.   Okay.  Let me play Government's Exhibit 208.

11            (Video played)

12 Q.   (BY MR. LEWIS)  What is Mr. Olgin describing to you and

13 explaining to you at this portion of the interview?

14 A.   He's giving the accounts that -- his alibi story of where

15 he was during the time that all of this in the alley was

16 occurring.

17 Q.   And where is he saying he went?

18 A.   He's saying that he went to a Kent Kwik store on Andrews

19 Highway, and then he said he proceeded to a game room, the

20 digital -- the video slot game room where he played a couple of

21 games.  He stated that he went to another Texaco at the corner

22 of 42nd and Andrews Highway and following that he walked across

23 the street to a salt water fish place, a guy owns a salt water

24 fish where he sells aquarium equipment, I guess.

25 Q.   Okay.  Let me play now Government's Exhibit 209.

Sikes - Direct Examination Continued

1              (Video played)

2  Q.   (BY MR. LEWIS)   As this interview progresses, what is

3  Mr. Olgin continuing to do?

4  A.   He's asserting that he wasn't with this group of people.

5  Q.   Now, one thing that you ask him about and we see,

6  according to his alibi, where was he supposed to have been at

7  the time of around four o'clock?

8  A.   On Andrews Highway in the area of 31st, 36th and Andrews

9  Highway all the way down past 42nd.

10  Q.   And as he also tells you, does he reference the commotion

11  in his alley?

12  A.   Correct.  Yes, sir.

13  Q.   And when you ask him about that, what time do you tell him

14  that commotion took place?

15  A.   At four o'clock, or 1600 hours.

16  Q.   As you hear his alibi and what you know, is there a

17  conflict between the two statements?

18  A.   Yes, sir.  Yes, sir, there is.

19  Q.   And do you confront him about that?

20  A.   I did.

21  Q.   And is that what we just saw?

22  A.   Yes, sir.

23  Q.   What did Mr. Olgin continue to assert?

24  A.   That he's all messed up on times.  He doesn't understand

25  times and that he was at the places he was telling me.  He told

Sikes - Direct Examination Continued

1  me that there should video surveillance of him at those times.

2  Q.    Let me now play Government's Exhibit 211.

3             (Video played)

4  Q.   (BY MR. LEWIS)   What happens at this point in the

5  interview?

6  A.    After confronting him with the evidence, he reached his

7  hand out to me and said he didn't want to get into this shit.

8  Q.    What is he describing to you, though, during the course of

9  this -- this part of this interview about his participation or

10  knowledge of the abduction of Sean Lamb?

11  A.    He stated that he drove the vehicle.  He did state that he

12  tried to stop them and that others were assaulting Sean Lamb.

13  And then he described all the way up to the alley in Neta Place

14  where Sean Lamb was found deceased.  He described getting out

15  of the truck -- or the Expedition, I'm sorry, and getting into

16  a maroon truck and calling his girlfriend to come get him.

17  Q.    Did he mention guns at that particular point in time at

18  this interview?

19  A.    He made mention that -- his quote -- "that son of bitch

20  tried to shoot me," as in Ray.

21  Q.    Okay.  Let me play Government's Exhibit 212.

22             (Video played)

23  Q.   (BY MR. LEWIS)   What is Mr. Olgin describing for you

24  there?  Let's start with the alley.  Does he start at the alley

25  again at 16th and Dixie?

Sikes - Direct Examination Continued

1   A.   He does, yes, sir.

2   Q.   What does he describe for you?  What does he tell you

3   about what happens in the alley as it pertains to Mr. Olgin?

4   A.   He stated that he got in the driver's seat.  He claimed

5   that he was going to try to make an escape with Sean or he

6   thought about it.  And at some point somebody jumped into the

7   window of the vehicle and began choking Sean Lamb with the seat

8   belt and that he told him to drive.  And he described turning

9   and it was a sharp turn out of the alley onto 16th -- I'm

10  sorry -- onto Dixie.

11  Q.   And where did he -- as the interview progressed, did he

12  describe where he then drove the vehicle to?

13  A.   Yes, sir.  Can I look at my notes right quick so I can --

14  Q.   Sure.

15  A.   Thank you.

16        Okay.  Yes, sir.  He described going to the Parkway

17  Inn on Highway 80.  He said that the subject was still in the

18  vehicle with him, the other party.  And at some point he

19  witnessed another party get in, first tossing a bag into

20  another car and then getting into the backseat with them.

21  Q.   Okay.  And as they left the Parkway Inn, what does

22  Mr. Olgin tell you during his interview?

23  A.   That he witnessed a firearm in the back passenger person's

24  hands.

25  Q.   Did he indicate whether or not he had seen a gun before

Sikes - Direct Examination Continued

1  then?

2  A.   No, sir.

3  Q.   Was that the first time he had seen a gun inside the

4  vehicle?

5  A.   Yes, sir.

6  Q.   At that point what did Mr. Olgin say that he continued to

7  do?

8  A.   He said that they drove out of the Parkway and started

9  taking streets at the direction of the other party.

10  Q.   Did he follow those directions?

11  A.   Yes, sir.

12  Q.   And at some point what does he eventually tell you during

13  this part of the interview we just played?

14  A.   He stated that he gets to an alley, presumably 30 Neta

15  Place, where more vehicles were arriving.  He claimed that one

16  of the vehicles blocked them in.  And he heard what he thought

17  was a shot and he perceived that he was being shot at.  He got

18  out of the vehicle and got into another.

19  Q.   And that vehicle was driven by who?

20  A.   I don't know.  A lady.

21  Q.   Okay.

22        THE COURT:  Can we turn the lights back on, please?

23        (Sotto voce discussion between Messrs. Lewis and

24  Klassen)

25  Q.   (BY MR. LEWIS)  When you spoke with Ray and during the

Sikes - Direct Examination Continued

1  course of the interview with Ray Olgin, what did he describe to
2  you the purpose of this entire venture was?
3  A.   He stated that he came about knowledge that Sean Lamb owed
4  money for drugs or something of that sort.
5  Q.   Okay.  And with regards to the vehicle, the Expedition
6  that was found at 30 Neta Place, when you arrived, was -- what
7  was the condition of the vehicle?
8  A.   The vehicle was running.  The lights were on.  There were
9  three doors open.  And if you're looking at the rear of the
10  vehicle in your mind, the front right door, the front left door
11  and the back left door were standing open when I got there.
12  Q.   Was the vehicle in gear?
13  A.   It was not.
14  Q.   Did -- during the course of this interview that you
15  conducted with Mr. Olgin, did he describe how he left that
16  vehicle that day when he got out of it?
17  A.   I believe he stated that he just got out and ran back.
18  Q.   Earlier during the -- when you got to -- let me ask it
19  this way.  When you got to 30 Neta Place and observed the
20  Expedition, did you observe or see any clothes inside?
21  A.   Yes, sir, I did.
22  Q.   Specifically, did you see any clothes in the console area,
23  the front part of the vehicle?
24  A.   Yes, sir, I did.
25  Q.   And what -- or what were you able to determine, what were

Sikes - Direct Examination Continued

 1  you able to make of those clothes that you saw?

 2  A.   When we removed them, there was a white T-shirt as well as

 3  a black and white checkered pants.  They were really baggy

 4  pants, checkered pants.

 5  Q.   And whose clothes did those belong to?

 6  A.   Sean Lamb.

 7  Q.   Now, with regards to Anthony Gonzales, do you know whether

 8  or not Anthony Gonzales -- oh, I'm sorry.

 9            (Sotto voce discussion between Messrs. Lewis and

10  Klassen)

11  Q.   (BY MR. LEWIS)  Let me correct that.  With regards to

12  Ruben Hernandez, does Ruben Hernandez have an active warrant?

13  A.   Yes, sir, he does.

14  Q.   Okay.  And that warrant is for what?

15  A.   Capital murder.

16  Q.   And with regards to Noe Galan, is there an active warrant,

17  if you know, for him?

18  A.   Yes, sir, there is.

19  Q.   What is that warrant for?

20  A.   Capital murder.

21  Q.   And how do those warrants relate to or pertain to this

22  case that you're here testifying about?

23  A.   It's for the murder of Sean Lamb.

24  Q.   Okay.

25            MR. LEWIS:  Pass the witness at this time, Your

Honor, subject to redirect.

Sikes - Cross-Examination

1  the first time he saw a firearm was at Parkway?

2  A.   Yes, sir, I believe that's correct.

3  Q.   And you prepared a report in connection with this case?

4  A.   Yes, sir, I did.

5  Q.   And do you have a copy of that report in front of you?

6  A.   Yes, sir, I do -- well, my narrative of it, yes, sir.

7  Q.   I direct you to Page 67 of your report.

8  A.   (Witness complies.)

9  Q.   Do you have it, sir?

10 A.   Yes, sir.

11 Q.   And is that pretty much -- I guess the third page of your

12 narrative that has to do with the interview of Mr. Olgin?

13 A.   The one that we witnessed that was admitted into evidence

14 is actually in the -- Page 45.

15 Q.   But you also interviewed him and prepared a narrative that

16 starts at Page 65; is that right?

17 A.   Yes, sir.  This is a separate interview.  Yes, sir.

18 Q.   Okay.  And in that interview, Mr. Olgin tells you that

19 he -- as he was driving out of the alley on 16th and Dixie --

20         MR. LEACH:  Your Honor, may we approach?

21         THE COURT:  You may.

22         (Sidebar conference on the record)

23         MR. LEWIS:  Before we get off into a line of

24 questioning, I just wanted to be sure and clear.  Mr. Olgin sat

25 down for a proffer from October -- September or October of last

Sikes - Cross-Examination

```
 1   year.
 2            MR. LEACH:  September 9th.
 3            MR. LEWIS:  And my concern is that the line of
 4   questioning Mr. Garcia is going to go into deals with that
 5   proffer and in case there that is an issue --
 6            MR. LEACH:  Well, that does concern me is because --
 7   because if -- Detective Sikes will know what he put in his
 8   narrative.  And if it came from proffer, then it can't be used
 9   against Mr. Olgin.  It would be an inconsistent statement that
10   Mr. Olgin would be giving that would not be used against him
11   unless he were to testified and testified differently by the
12   terms of his proffer.  And that's what Mr. Garcia is going
13   into.
14            MR. GARCIA:  And, essentially, Your Honor, what I am
15   trying to get into is that during that interview Mr. Olgin
16   testified that at the alley on Dixie and 16th, Mr. -- when
17   Mr. Galan got into the vehicle, he had a couple of -- he had
18   two firearms in his possession, one of which was an Uzi looking
19   firearm.
20            And then another -- there's another portion down here
21   where he says that he never saw Mr. Paredes possess a firearm.
22            MR. LEACH:  I can't represent to the Court whether or
23   not that information is solely from the proffer or not.
24            MR. LEWIS:  No, I believe it is.  The initial
25   interview that we just played --
```

Sikes - Cross-Examination

1          MR. LEACH:  Was the first only.

2          MR. LEWIS:  -- was the first one when he was in

3    custody at the police department, the video.  And there he

4    talks about the first time he sees a gun is when they leave the

5    Parkway.  These statements about additional guns were seen

6    prior to the Parkway come from that proffer that we have with

7    Mr. Olgin.

8          So my concern is if Mr. Garcia is going to be asking

9    the witness questions about what Mr. Olgin said that are

10   inconsistent and derived from a proffer, that that creates an

11   issue for Mr. Olgin, and that's what I wanted to raise to this

12   Court before we got too much further down the line.

13         THE COURT:  Well, if he's just using it to impeach

14   his testimony, I mean, I think, can't you use a proffer if he

15   becomes -- there's one statement that says one thing and he

16   gives another statement that says something else.

17         MR. LEACH:  But he's trying to impeach Mr. Olgin's

18   statement, and Mr. Olgin isn't on the stand.  He's trying to

19   impeach -- he's trying to get a different version of the facts

20   out and -- when I signed -- or when we make our proffer, Judge,

21   the understanding is that cannot be used against Mr. Olgin

22   unless Mr. Olgin testifies.

23         MR. LEWIS:  Or does something inconsistent.

24         MR. LEACH:  Or makes an inconsistent statement with

25   the proffer.

Sikes - Cross-Examination

```
 1              THE COURT:  Okay.  Mr. Garcia, what's your thought
 2  about that?
 3              MR. GARCIA:  Your Honor, we're not -- in my view,
 4  we're not using it against Mr. Olgin so much as we're showing
 5  that there's at least a different version that was given to
 6  those particular facts, that the government is attempting to
 7  imply that Mr. -- I guess Mr. Paredes was -- brought in the gun
 8  into the whole picture.
 9              THE COURT:  Okay.  The objection's overruled -- I
10  mean, the objection is sustained.  You can't go into the
11  statement he gave as a proffer.
12              MR. LEACH:  And I'd ask for an instruction to
13  disregard any testimony so far about that.
14              THE COURT:  I can't remember anything he said other
15  than --
16              MR. LEACH:  He asked his question and he started to
17  say it was a different time and statement.  Just anything in
18  reference to another interview, I'd ask that the jury be
19  instructed to disregard that, Your Honor.  He went into the
20  fact that what the source of this statement was.
21              THE COURT:  Well, how does that -- he didn't go into
22  the substance of the statement.
23              MR. LEACH:  But Mr. Garcia already has.
24              THE COURT:  Mr. Garcia didn't go into the substance
25  of the statement, did he?
```

 1          MR. LEACH:  I thought he asked a specific question
 2  just about that -- that exact statement, Your Honor.
 3          THE COURT:  Okay.  He asked a question, but did he
 4  answer it?
 5          MR. LEACH:  He began to tell him he took that from a
 6  different statement.
 7          THE COURT:  Okay.  We're not going to instruct.
 8          MR. GARCIA:  So, Your Honor, for the purposes of the
 9  record, you know, that's what I would show as far as my
10  examination of this witness that would have to do with those --
11  if I may borrow -- if I make it clear for the record, that my
12  question would be:  Did Mr. Olgin tell you at a different
13  interview that when they left the alley at 16th and Dixie, that
14  Mr. Galan entered the vehicle holding two firearms, one of
15  which he described as a small automatic pistol and an Uzi style
16  firearm?
17          And I would anticipate that Mr. Sikes would answer,
18  yes, that's what he put in his report.  That's what Mr. Olgin
19  told him in the interview.  And also that during that same
20  interview, Mr. Olgin said he never saw Mr. Paredes in
21  possession of a firearm and, again, asserted that Mr. Galan was
22  the person that was wielding two firearms, and this was on the
23  way to the alley at Neta Place.
24          THE COURT:  Okay.
25          MR. GARCIA:  And that would be what I would ask him,

Sikes - Cross-Examination

 1  and I would anticipate the answers to my questions to be, yes,

 2  that's what Mr. Olgin told him.

 3          THE COURT:  Because it was given in a proffer

 4  statement and could be used against Mr. -- your client.

 5          MR. LEACH:  Olgin.

 6          THE COURT:  -- Olgin.

 7          MR. GARCIA:  And it would be -- in my opinion, that

 8  would be exculpatory evidence that I would be entitled to show

 9  the jury because it does --

10          THE COURT:  Well, why don't we just declare a

11  mistrial and we'll start all over again.

12          MR. LEWIS:  I would rather not, Your Honor.

13          THE COURT:  Well, I understand that, but, Mr. Lewis,

14  I didn't create all these things and these issues here.  You

15  know, I'm -- that's what happens when you try four of them

16  together.  I mean, that was the government's choice, to try

17  four of them together.

18          MR. LEWIS:  That is correct.

19          THE COURT:  And I see some unfairness to Mr. Garcia's

20  client by not being able to go into those things.  Here is a

21  guy that said another thing at another time, and how can -- and

22  I am going to tell you, I don't think just saying, well, you

23  can't use these statements against that, I'm not sure that

24  instruction necessarily can't be used against Mr. Olgin.  And

25  you're the one that asked the question to set this up -- I mean

Sikes - Cross-Examination

1   the government asked the question to set this up.

2           MR. LEWIS:  During the first interview.  Now, he can

3   certainly ask -- I think he can certainly ask the witness:

4   "Did Mr. Olgin ever tell you that he saw Paredes in possession

5   of a weapon?"  I think he can ask that question.

6           THE COURT:  Okay.  Mr. Leach?  As long as he doesn't

7   refer to the interview and he doesn't --

8           MR. LEWIS:  As long as he doesn't refer to the

9   interview.

10           MR. LEACH:  I'm thinking, Your Honor.  I'm not trying

11   to slow things down.

12           THE COURT:  No, I understand.

13           MR. LEACH:  I think that would be permissible because

14   I think that's the -- consistent with his second interview that

15   was some portions were played, that statement would be

16   consistent.

17           THE COURT:  Okay.  But you can't go into this

18   specific interview or anything like that.

19           MR. LEWIS:  Right.

20           MR. GARCIA:  I just can't reference the date of the

21   interview, but I can ask him the questions?

22           THE COURT:  Well, I think -- no.

23           MR. LEACH:  No, you can ask him -- I am not the

24   judge, but I'm conceding that you could ask the questions:

25   "Did Mr. Olgin ever say that he saw Mr. Paredes with a weapon?"

Sikes - Cross-Examination

1   I'm not going to object to that question.

2           THE COURT:  Okay.

3           MR. GARCIA:  Well, but the government's theory, Your

4   Honor, is that in that bag that Mr. Paredes was carrying was

5   apparently the weapon, and he's the one that introduced it into

6   the vehicle there at Parkway.  That's his whole theory.

7           THE COURT:  Well, we kept out whether it is light or

8   whether it is heavy.  We just know that the bag has been going

9   back and forth.

10          MR. LEWIS:  Exactly.

11          MR. GARCIA:  And -- well, but when you add on to the

12  fact that "when was the first time you saw this gun?," was

13  it --

14          THE COURT:  Okay.  You can't go into it at all.

15  We've given you a chance and you've decided not to take it and

16  so we're going to -- we offered you a chance to ask that

17  question so the objection is that rule stands.

18          MR. GARCIA:  And, Your Honor, what I would also ask,

19  I would ask for a severance because our inability to bring in

20  this evidence.  It's prejudicial.

21          THE COURT:  Why didn't you ask that before we started

22  trial?

23          MR. GARCIA:  Because I didn't realize this was going

24  to be an issue.

25          THE COURT:  I mean, you knew that there were these

Sikes - Cross-Examination

```
 1  statements.
 2           MR. GARCIA:  I didn't realize that there was any
 3  contention --
 4           THE COURT:  Okay.  Overruled.  Denied.
 5           MR. GARCIA:  -- that the government was doing.
 6           THE COURT:  Denied.
 7           (Sidebar conference on the record concluded)
 8           THE COURT:  The jury will disregard the witness' last
 9  answer to the question that was given before I met with the
10  lawyers up here.
11           Mr. Garcia, next question, please.
12  Q.  (BY MR. GARCIA)  Officer Sikes, did Mr. Olgin ever tell
13  you that he never saw Mr. Paredes in possession of a firearm?
14  A.   I am going to refer to my notes right quick.
15           THE COURT:  No, sir.  Do you remember that or not?
16  A.   I -- I believe he told me that.  Yes, sir, I think he did
17  say that.
18           THE COURT:  Okay.  Next question.
19  Q.  (BY MR. GARCIA)  Very quickly, Officer Sikes.  The -- you
20  saw the tattoo that Mr. Lamb had on his forehead?
21  A.   Yes, sir.  He had two separate ones, yes, sir.
22  Q.   You saw the one that was marked as 5150?
23  A.   Yes, sir, I did.
24  Q.   Are you familiar with what that means?
25  A.   I've researched, and I found that it is the California
```

```
 1  Penal Code site for criminally insane.
 2          MR. GARCIA:  That's all I have, Your Honor.
 3          THE COURT:  Okay.
 4          Mr. Pool.
 5                      CROSS-EXAMINATION
 6  BY MR. POOL:
 7  Q.    Good morning, Detective Sikes.
 8  A.    Good morning.
 9  Q.    First of all, I want to start off, I owe you an apologize.
10  Remember yesterday during the questioning with Liz Hernandez?
11  Do you recall that?
12  A.    Yes.
13          THE COURT:  Let's move on and ask questions.  Come
14  on, let's move on.  We're not going to -- this is not the place
15  for -- you can tell him you're sorry some time other, but let's
16  ask questions and move along.
17  Q.    (BY MR. POOL)  I attributed a statement to you in regards
18  to the interview with Liz Hernandez; is that correct?
19  A.    Yes, sir.
20          THE COURT:  Just a second.
21          What does that have to do with this questioning right
22  now, the cross-examination now?
23          MR. POOL:  It's in reference to his investigation,
24  Your Honor.
25          THE COURT:  No.  What does it have to do with the
```

Sikes - Cross-Examination

```
 1  cross-examination of this witness from the government's direct
 2  examination?
 3              MR. POOL:  I'll move on.
 4              THE COURT:  Okay.
 5  Q.  (BY MR. POOL)  When you interviewed Stacey Castillo, the
 6  interview lasted approximately 4 hours and 13 minutes, correct?
 7  A.   Yes, sir.
 8              MR. POOL:  That's all I have, Your Honor.
 9              THE COURT:  Okay.
10              Mr. Stroder?
11              MR. STRODER:  I don't have any questions, Your Honor.
12              THE COURT:  All right.
13              Mr. Lewis, anything else?
14              MR. LEWIS:  Nothing further of this witness, Your
15  Honor.
16              THE COURT:  Okay.  We're not going to excuse him.
17              MR. LEWIS:  Right.
18              THE COURT:  You can step down.  Thank you.
19              THE WITNESS:  Thank you.
20              THE COURT:  Call your next witness.
21              MR. LEWIS:  Your Honor, just as a matter of
22  housekeeping and in keeping with the way the exhibits have been
23  entered today concerning the various interviews of Defendants
24  Gonzales, Paredes and Olgin, yesterday the government had
25  offered all of the interview excerpts for Stacey Castillo even
```

Sikes - Cross-Examination

```
 1  though we only played a portion of them.  What the government
 2  would like to do at this time is withdraw those exhibits that
 3  were not played and offer only those exhibits that were played
 4  and that would be Government's Exhibit 131, 138, 141, 142, 149,
 5  150, 152, 157, 158, 160, 164, 165, 166, 167.
 6            THE COURT:  Okay.  Any objection?
 7            MR. LEACH:  One moment.
 8            (Sotto voce discussion between Messrs. Lewis and
 9  Leach)
10            MR. LEWIS:  We will draw 141 as well, Your Honor.
11            THE COURT:  Why don't we do this.  Why don't we do
12  this during a break.
13            MR. LEWIS:  Okay.
14            THE COURT:  If that's agreeable, that we'll do this
15  all during a break and then we don't take up jury time --
16            MR. LEWIS:  That's fair.
17            THE COURT:  -- and we'll figure that out and if we
18  need to do anything else.  Okay.
19            MR. LEWIS:  Very good, Your Honor.  We'll do that.
20  At this time the government rests, Your Honor.
21            THE COURT:  All right.
22            Ladies and gentlemen, let's go ahead and take our
23  lunch hour now, and we've got some things we need to do here in
24  the courtroom.  And we'll -- let's be back at 12:30, how does
25  that sound, 12:30?  That gives you an hour and a half to get
```

Sikes - Cross-Examination

 1   lunch and get back over here.

 2            So take your notepads, put them in the envelopes back

 3   there in the courtroom.  Don't discuss the case among

 4   yourselves.  Don't let anybody discuss it with you.  And we

 5   will be back here ready to go at 12:30 then.  Thank you.

 6            Let's all rise for the jury, please.

 7            (At 10:59 p.m., jury leaves)

 8            THE COURT:  All right.  Let's be seated please.  And,

 9   Mr. Leach, subject to this cleaning up the exhibit numbers and

10   everything that we'll do, does the defendant Mr. Olgin have a

11   motion for an instructed verdict?

12            MR. LEACH:  I do, Your Honor.  Pursuant to Federal

13   Rule of Criminal Procedure 29, Ray Olgin moves for a judgment

14   of acquittal as to Counts One, Two and Three on the grounds

15   that the evidence, even viewed in a light most favorable to the

16   government, could not prove beyond -- could not rationally

17   prove beyond a reasonable doubt that Mr. Olgin is guilty of

18   Counts One, Two or Three and we would move for a judgment of

19   acquittal on that basis.

20            THE COURT:  And, Mr. Garcia?

21            MR. GARCIA:  Your Honor, on behalf of Mr. Paredes, we

22   would also move under Rule 29 for a judgment of acquittal on

23   the basis that the evidence is insufficient for a jury to

24   return a verdict of guilty on Counts One, Two and Three.

25            THE COURT:  Okay.

Sikes - Cross-Examination

1          Mr. Pool?

2          MR. POOL:  Yes, Your Honor.  Pursuant to Rule 29 on

3  behalf of Stacey Castillo, I'd move for an acquittal as to

4  Count One, Two and Three on the basis that the evidence entered

5  by the government is insufficient to sustain a guilty verdict.

6          THE COURT:  Mr. Stroder?

7          MR. STRODER:  Yes, Your Honor.  Pursuant to Rule 29

8  on behalf of Mr. Gonzales, I move for a judgment and acquittal

9  on Counts One, Two and Three on the basis that the evidence is

10 insufficient to sustain the government's burden.

11         THE COURT:  Mr. Lewis, do you and Mr. Klassen want to

12 respond?

13         MR. LEWIS:  Your Honor, the government believes that

14 the evidence that has been presented over the last three and a

15 half days more than satisfies the requirements.  And as it is

16 set forth and dictated by Rule 29, we ask that their motions be

17 denied.

18         THE COURT:  In reviewing the evidence in a light most

19 favorable to the government and resolving all issues of

20 credibility in favor of the government, taking all inferences

21 in favor of the government which is the standard of review of a

22 Rule 29 motion, the Court finds that a rational and reasonable

23 juror could find each of the defendants guilty beyond a

24 reasonable doubt on each of the charges and each of the

25 elements contained within each charge as contained in the three

Sikes - Cross-Examination

 1   counts of the indictment and respectfully overrules the

 2   defendants' motions.

 3            Let's -- here's what I'd like to do is give y'all a

 4   chance during this noon hour to get the exhibit issue that

 5   everybody is on key with that and make sure that the clerk has

 6   all that so we know which exhibits are in.

 7            The other thing I would like to do and, Mr. Olgin,

 8   Mr. Paredes, Ms. Castillo and Mr. Gonzales, would y'all all

 9   stand for just a second, please, just if y'all would stand.

10            (Defendants comply)

11            THE COURT:  Thank you.  You have -- each of you have

12   the right to testify or not testify.  The decision to testify

13   is left up to you and you alone.  You can ask your attorney for

14   their advice, but the decision whether or not to testify is

15   left up to you.

16            In the jury instructions, if do you testify,

17   obviously you'll be cross-examined by the government's attorney

18   and you can be asked questions by the other defense counsel as

19   well.  If you don't -- and if you do testify, I will instruct

20   the jury that -- to the effect that if the defendant has the

21   right not to testify, but if a defendant does testify, their

22   testimony should be weighed and his or her credibility

23   evaluated the same way as that of any other witness.

24            If you don't testify, then the instruction would

25   be -- that instruction would not be there, but an instruction

Sikes - Cross-Examination

```
 1  to the jury would be:  And no inference whatever may be drawn
 2  from the election of any defendant not to testify.  So that's
 3  just to let you know.  And I'm sure your attorneys -- your
 4  attorneys have copies of this, and they will be glad to visit
 5  with you about that, I'm sure.
 6          But during the lunch hour, y'all need to discuss with
 7  your lawyers and decide what you want to do so when we come
 8  back we'll have an idea at that time, okay?  All right.  Thank
 9  you.  You may be seated.
10          (Defendants comply)
11          THE COURT:  So we'll come back and see where we are
12  at 12:30.  And then if y'all would go ahead and work on the
13  exhibits here for just a few minutes and then the -- the
14  defendants can go on downstairs and get their lunch and
15  everything.  And then be back here ready to go at 12:30 and
16  we'll see where we are at that time.
17          And can I just see -- this doesn't need to be on the
18  record -- if I could just see the defendants here for just a
19  second.
20          MR. LEACH:  The lawyers?
21          THE COURT:  I mean, counsel, defendants' counsel and
22  government's counsel as well.
23          So with that, we'll stand in recess until 12:30.
24          (Luncheon recess from 11:05 a.m. to 12:30 p.m.)
25          THE COURT:  It's 12:30.  We're outside the presence
```

Ann M. Record, RMR, CRR, CMRS, CRI ********** (432) 685-0361

Sikes - Cross-Examination

```
 1   of the jury.  The attorneys are present.  The defendants are
 2   present.
 3            Mr. Leach, what's your intention?
 4            MR. LEACH:  My intention, Your Honor, is to confirm
 5   that Mr. Olgin does not wish to testify and then rest.
 6            THE COURT:  Okay.  Do you want to do that on the
 7   record right now?
 8            MR. LEACH:  Yes, sir, we can.  For the record, Your
 9   Honor, I spoke with Mr. Olgin numerous times throughout my
10   appointment as his lawyer.  We have spoken numerous times about
11   his right to testify and not testify.  We've spoke about it
12   throughout this trial.  Again, immediately before we recessed
13   for lunch, I told him again it was ultimately his decision.  He
14   has considered the same and remains that -- his position
15   remains that he is not going to testify.  And he'll confirm
16   that, Your Honor.
17            THE COURT:  Is that correct, Mr. Olgin?
18            DEFENDANT OLGIN:  Yes, sir.
19            THE COURT:  Okay.  Thank you.
20            Mr. Garcia, what's your position?
21            MR. GARCIA:  Your Honor, we don't have any evidence
22   to present.  And I guess I would just like to confirm with
23   Mr. Paredes that that's his decision also to not testify.
24            THE COURT:  Okay.
25            Mr. Paredes, is it your decision not to testify?
```

Sikes - Cross-Examination

```
 1              DEFENDANT PAREDES:  Yes, Your Honor.

 2              THE COURT:  Okay.  Thank you.

 3              Mr. Pool?

 4              MR. POOL:  Your Honor, after discussing the issues

 5   with Ms. Castillo, it is Ms. Castillo's decision not to testify

 6   as well.

 7              THE COURT:  Okay.  And are you going to rest in the

 8   case?

 9              MR. POOL:  Yes, Your Honor.

10              THE COURT:  And, Ms. Castillo, could you stand up for

11   just a second?

12              (Defendant complies)

13              THE COURT:  Is it your decision not to testify?

14              DEFENDANT CASTILLO:  Yes, sir.

15              THE COURT:  Okay.

16              And, Mr. Stroder?

17              MR. STRODER:  Mr. Gonzales does not wish to testify,

18   and so we're going to rest.

19              THE COURT:  Okay.

20              Mr. Gonzales, is it your decision not to testify?

21              DEFENDANT GONZALES:  Yes, sir.

22              THE COURT:  All right.  Thank you.

23              And what we'll do -- what our procedure will be is --

24   did the government rest in front of the jury?  I guess you did.

25              MR. LEWIS:  Yes, Your Honor, we did.
```

```
1               THE COURT:  Okay.  And then what I'll do is just ask
2    each of you to rest.  I'll say a little thing in there, you
3    know, the government has rested its case.  The defendants have
4    the right, if they want to, to put on any evidence.  Remember
5    that the burden of proof is upon the government beyond a
6    reasonable doubt.  Each of the defendants are presumed to be
7    innocent and no inference may be made by a defendant not
8    testifying.  And then I'll just go Mr. Leach --
9               MR. LEACH:  Proceed and I'll just rest.
10              THE COURT:  You rest.  And then Mr. Garcia and then
11   Mr. Pool and then Mr. Stroder.  Is that all right with y'all?
12              MR. LEACH:  Very good.
13              THE COURT:  Okay.  And then we'll dismiss the jury
14   for the day and then we'll work on the jury charge and come
15   back in the morning to argue the case.
16              MR. LEACH:  Yes, Your Honor.
17              THE COURT:  Okay.  All right.
18              Can I get you to tell the CSO to bring the jury in?
19              U.S. MARSHAL:  Yes, Your Honor.
20              THE COURT:  Thank you.
21              You got all the exhibit deal worked out and
22   everything?
23              THE CLERK:  Yes, sir.
24              MR. LEWIS:  We did, Your Honor.
25              THE COURT:  Okay.  Let's all rise.
```

Sikes - Cross-Examination

```
 1              (At 12:35 p.m., jury enters)

 2         THE COURT:  All right.  Let's be seated.  It's 12:35

 3   and we're back in the courtroom with the jury.  The attorneys

 4   are present.  The defendants are present.

 5              Ladies and gentlemen, the government has rested its

 6   case and what that means is in its case-in-chief, the

 7   government has put on all the evidence that it desires to put

 8   on.  The defendants may put on evidence.

 9              As you recall, the burden of proof to prove the case

10   is upon the government, and they must do so beyond a reasonable

11   doubt.  The defendants have no obligation to put on any

12   witnesses.  The defendants themselves do not have to testify

13   and no inference whatever may be drawn from the election of any

14   defendant not to testify.

15              And I don't know if I said this, but there is a

16   presumption of innocence that each of the defendants are

17   presumed to be innocent.  That the defendants may, if they

18   desire, to put on evidence.

19              Mr. Leach, does your client, Mr. Olgin, desire to put

20   on any evidence?

21         MR. LEACH:  Your Honor, we would rest.

22         THE COURT:  Okay.

23              And, Mr. Garcia, does your client, Mr. Paredes,

24   desire to put on any evidence?

25         MR. GARCIA:  Your Honor, on behalf of Mr. Paredes, we
```

Sikes - Cross-Examination

```
 1  would rest.

 2           THE COURT:  Okay.

 3           Mr. Pool, does your client, Ms. Castillo, desire to

 4  put on any evidence?  You can do it from right there, if you

 5  want to.

 6           MR. POOL:  Your Honor, on behalf of Ms. Castillo, we

 7  rest.

 8           THE COURT:  Okay.

 9           Mr. Stroder, does your client, Mr. Gonzales, desire

10  to put on any evidence?

11           MR. STRODER:  Mr. Gonzales rests.

12           THE COURT:  Okay.

13           So, ladies and gentlemen, we've heard all the

14  evidence in this case.  I've been working up here on the

15  Court's Instructions.  And, of course, by the time we let all

16  attorneys have their arguments that they're entitled to make,

17  and we have their clients, and we would be moving pretty late

18  this evening.  So what we're going to do, we're going to

19  adjourn for the rest of the afternoon.  And I'd like you back

20  here in the morning at nine o'clock.  And what we'll do is hear

21  the closing arguments in the case, and then you'll be able to

22  go out and begin your deliberations at that time on a verdict.

23           So I'd ask you, again, to follow all of those

24  instructions about don't talk to anybody about the case, don't

25  let anybody talk to you about the case, don't read anything
```

Sikes - Cross-Examination

```
 1   about the case, don't do any research or anything like that.
 2   And we'll see you back here in the morning ready to go at
 3   9 a.m., okay?
 4           Let's all rise for the jury, please.
 5           And if you'll put your notebooks back in your
 6   envelopes in there.  Thank you very much.
 7           (At 12:39 p.m., jury leaves for the day)
 8           THE COURT:  Okay.  Please be seated.  What I would
 9   like to do is a couple of things this afternoon.  One, we'll go
10   back and work on the jury charge; but, two, also let's -- if
11   the attorneys, before we come back to do that, if we could come
12   up here with the court's clerk and let's just make sure all of
13   the exhibits that were admitted, that we have a -- we're all in
14   agreements which exhibits were admitted and that we have them
15   all up here where they're going to be.
16           Also, once the jury leaves -- and I'm going to ask
17   Jeff, my clerk, to go back there -- and y'all are invited to
18   come back as well -- and see if the DVDs work on the machine we
19   have back there.  Otherwise, we'll have to find the court's
20   16-year-old that operates all of the IT equipment around here.
21   But we'll check to make sure that that works.
22           And I think the government is going to have to do
23   some modifying a little bit on some of the disks perhaps; is
24   that right?
25           MR. LEWIS:  Well, removing the exhibits that weren't
```

Sikes - Cross-Examination

1  offered.

2          THE COURT:  That were not offered.  Those portions

3  that were not offered.

4          MR. LEWIS:  Correct.

5          THE COURT:  And so that we're all in agreement with

6  that.

7          Mr. Klassen, Mr. Lewis, anything else from the

8  government before we adjourn for the evening?

9          MR. LEWIS:  No, Your Honor.

10          THE COURT:  Okay.

11          Mr. Leach, anything else that we need to take up on

12  the record?

13          MR. LEACH:  No.

14          THE COURT:  Okay.

15          Mr. Garcia, anything else?

16          MR. GARCIA:  I can't think of anything, Your Honor.

17          THE COURT:  Okay.

18          Mr. Pool?

19          MR. POOL:  No, Your Honor.

20          THE COURT:  Mr. Stroder?

21          MR. STRODER:  I can't think of anything, Your Honor.

22  I just -- I don't think we need to renew our Rule 29 since

23  there's no new evidence.

24          THE COURT:  There was no evidence.  So what I'd like

25  for you to do is let's look at the exhibits quick right here

Sikes - Cross-Examination

1  while -- all of y'all come up here with the clerk and go

2  through the exhibits and then come on back and we'll work on

3  the Court's Instructions and see how we're going to divide up

4  the time for tomorrow.

5          So, Marshals, I will need the defendants up here at

6  8:30 in the morning so we can take objections to the charge at

7  that time, and then we'll start the arguments right around

8  nine o'clock, okay?

9          U.S. MARSHAL:  Yes, sir.

10          THE COURT:  All right.  With that, this court is

11  adjourned until tomorrow morning at 8:30.  Thank you.

12          (Government's Exhibits 126, 127, 128, 129, 130, 132,

13  133, 134, 135, 136, 137, 139, 140, 141, 143, 144, 145, 146,

14  147, 148, 151, 153, 154, 155, 156, 159, 161, 162 and 163 were

15  withdrawn)

16          (At 12:42 p.m., proceedings adjourned)

17                    *  *  *  *  *  *

18              C E R T I F I C A T E

19          I, ANN M. RECORD, RMR, CRR, CMRS, CRI, Federal
   Official Court Reporter, certify that the foregoing is a
20  correct transcript from the proceedings in the
   above-entitled matter.

21

22

                              /s/Ann M. Record
23      Date: 10/05/2015    Ann M. Record, RMR, CRR, CMRS, CRI
                            United States Court Reporter
24                          200 East Wall Street, Suite 117
                            Midland, Texas  79701
25                          Telephone:  (432) 685-0361


Ann M. Record, RMR, CRR, CMRS, CRI ********** (432) 685-0361